**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

| | |
|---|---|
| **In re:  Santa Fe Natural Tobacco Company Marketing, Sales Practices, and Products Liability Litigation** | No. 1:16-md-2695-JB-LF<br><br>*This Submission Relates To All Actions, And Is Brought By All Defendants.* |

**DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS
THE CONSOLIDATED AMENDED COMPLAINT**

# TABLE OF CONTENTS

Page

Introduction............................................................................................................................1

Argument ..............................................................................................................................2

I.   The FTC's Consent Order Specifically Regulating And Approving Santa Fe's Speech
     Preempts Plaintiffs' Claims Premised On The "Safer Cigarette" Theory. ....................2

     A.   Plaintiffs Cannot Avoid The Fact That The FTC Specifically Approved The Exact
          Terms At Issue Here When Made By Santa Fe. ...............................................................3

     B.   The Preemptive Effect Of The Consent Order Extends To NAS Packaging, Which
          Uses The Exact Same Terms Accompanied By The Exact Same Disclosure.........................10

II.  Dismissal On First Amendment Grounds Is Warranted Because Plaintiffs Have Not
     Plausibly Alleged Facts Capable Of Overcoming The *Central Hudson* Standard. ............10

III. Plaintiffs' Statutory Claims Fail On Their Own Terms....................................................14

     A.   Plaintiffs' Attacks On The Safe Harbors Fail. ..............................................................14

     B.   Plaintiffs Have Not Adequately Alleged That Santa Fe Made Any Statement Capable
          Of Misleading A Reasonable Consumer............................................................................20

     C.   Four Of Plaintiffs' Claims Fail Because The Applicable Statute Does Not Authorize
          Relief Under These Circumstances..................................................................................24

IV.  Plaintiffs' Unjust-Enrichment Claims Fail On Their Own Terms. .....................................26

     A.   Because Plaintiffs Have Failed To Plausibly Allege That Any Injustice Occurred,
          Their Unjust-Enrichment Claims Fail...............................................................................26

     B.   The Availability Of An Adequate Remedy At Law Forecloses Almost All Of
          Plaintiffs' Unjust-Enrichment Claims. .............................................................................27

     C.   Plaintiffs Cannot Negate The Direct-Benefit Requirement That Applies Under
          Michigan, New Jersey, North Carolina, and Ohio Law.....................................................31

     D.   Plaintiffs' New Jersey And New York Unjust-Enrichment Claims Fail For Still
          Other Reasons. .............................................................................................................32

V.   Plaintiffs Cannot Show A Breach Of Any Express Warranty............................................33

     A.   Any Warranty On NAS Menthol Cigarettes Necessarily Did Not Guarantee An
          Absence Of Menthol. .....................................................................................................33

     B.   Plaintiffs Cannot Eliminate Six States' Pre-Litigation Notice Requirements...........................34

     C.   Plaintiffs Do Not Satisfy Exceptions To The Privity Requirement. ....................................36

VI.  Plaintiffs' Requests For Injunctive Relief Are Moot.......................................................37

VII. The Court Lacks Personal Jurisdiction Over RAI With Respect To The Claims Of The
     Five Plaintiffs That Were Not Parties To A Suit Originally Filed In North Carolina. ..................38

Conclusion ...........................................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*A & M Supply Co. v. Microsoft Corp.,*
No. 274164, 2008 WL 540883 (Mich. Ct. App. Feb. 28, 2008) ........................................................32

*Ackerman v. Coca-Cola Co.,*
No. 09-0395, 2010 WL 2925955 (E.D.N.Y. July 21, 2010) ............................................................21

*Adamson v. Ortho-McNeil Pharm., Inc.,*
463 F. Supp. 2d 496 (D.N.J. 2006) ........................................................30

*Aliano v. Fifth Generation, Inc.,*
No. 14-cv-10086, 2015 WL 5675423 (N.D. Ill. Sept. 24, 2015) ....................................................17

*Aliano v. Louisville Distilling Co., LLC,*
115 F. Supp. 3d 921 (N.D. Ill. 2015) ........................................................24

*Altria Group, Inc. v. Good,*
555 U.S. 70 (2008) ..........................................................1, 3, 4, 5, 6, 19

*Am. Honda Motor Co. v. Motorcycle Info. Network, Inc.,*
390 F. Supp. 2d 1170 (M.D. Fla. 2005) ........................................................29

*Astiana v. Hain Celestial Group, Inc.,*
783 F.3d 753 (9th Cir. 2015) ........................................................24

*Baker Constr. Co. v. City of Burlington,*
200 N.C. App. 435 (2009) ........................................................32

*Bietsch v. Sergeant's Pet Care Prod., Inc.,*
No. 15-cv-5432, 2016 WL 1011512 (N.D. Ill. Mar. 15, 2016) ........................................................36

*Brown v. Buhman,*
822 F.3d 1151 (9th Cir. 2016) ........................................................38

*Brown v. Hain Celestial Grp., Inc.,*
No. 11-cv-3082, 2012 WL 3138013 (N.D. Cal. Aug. 1, 2012) ........................................................9

*Bruton v. Gerber Prod. Co.,*
961 F. Supp. 2d 1062 (N.D. Cal. 2013) ........................................................11

*Camasta v. Jos. A. Bank Clothiers, Inc.,*
761 F.3d 732 (7th Cir. 2014) ........................................................24

*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.,*
973 P.2d 527 (Cal. 1999) ........................................................14

*Champion Pro Consulting Grp., Inc. v. Impact Sports Football, LLC,*
845 F.3d 104 (4th Cir. 2016) ........................................................19

## TABLE OF AUTHORITIES

**Page(s)**

*Comm. for First Amendment v. Campbell,*
 962 F.2d 1517 (10th Cir. 1992) ..........................................................................38

*Commw. v. Fremont Inv. & Loan,*
 897 N.E.2d 548 (Mass. 2008) .............................................................................17

*Connick v. Suzuki Motor Co.,*
 675 N.E.2d 584 (Ill. 1996) ..................................................................................35

*Corcoran v. CVS Health Corp.,*
 169 F. Supp. 3d 970 (N.D. Cal. 2016)................................................................25

*Corsello v. Verizon N.Y., Inc.,*
 967 N.E.2d 1177 (N.Y. 2012) .............................................................................33

*Curry v. High Springs Family Practice Clinic & Diagnosis Ctr. Inc.,*
 No. 1:08-cv-8, 2008 WL 5157683 (N.D. Fla. Dec. 9, 2008) .............................25

*Discount Tobacco City & Lottery, Inc. v. U.S.,*
 674 F.3d 509 (6th Cir. 2012)...............................................................................13

*Dudnikov v. Chalk & Vermillion Fine Arts, Inc.,*
 514 F.3d 1063 (10th Cir. 2008) ..........................................................................39

*Duffie v. Michigan Grp., Inc.,*
 No. 14-cv-14148, 2016 WL 28987 (E.D. Mich. Jan. 4, 2016) ..........................30

*Dymits v. Am. Brands, Inc.,*
 No. 96-cv-1897, 1996 WL 751111 (N.D. Cal. Dec. 31, 1996) ..........................40

*Ebin v. Kangadis Food Inc.,*
 No. 13-cv-2311, 2013 WL 6504547 (S.D.N.Y. Dec. 11, 2013) .........................37

*Ebner v. Fresh, Inc.,*
 838 F.3d 958 (9th Cir. 2016)...............................................................................15

*Embree Constr. Grp., Inc. v. Rafcor, Inc.,*
 411 S.E.2d 916 (N.C. 1992).................................................................................31

*Feikema v. Texaco, Inc.,*
 16 F.3d 1408 (4th Cir. 1994)..................................................................................3

*Fink v. Time Warner Cable,*
 714 F.3d 739 (2d Cir. 2013) (per curiam) ..........................................................20

*Fishman v. Gen. Elec. Co.,*
 No. 2:12-cv-585, 2013 WL 1845615 (D.N.J. Apr. 30, 2013).............................32

## TABLE OF AUTHORITIES

**Page(s)**

*Flanagan v. Altria Grp., Inc.,*
   No. 05-cv-71697, 2005 WL 2769010 (E.D. Mich. Oct. 25, 2005)...................................................18

*Garcia v. Kashi Co.,*
   43 F. Supp. 3d 1359 (S.D. Fla. 2014) ...............................................................................................24

*Gen. Motors Corp. v. Abrams,*
   897 F.2d 34 (2d Cir. 1990) ..................................................................................................................3

*Gilles v. Ford Motor Co.,*
   24 F. Supp. 3d 1039 (D. Colo. 2014) ...........................................................................................8, 16

*Good v. Altria Grp., Inc.,*
   501 F.3d 29 (1st Cir. 2007) ......................................................................................................5, 7, 10

*Herazo v. Whole Foods Mkt., Inc.,*
   No. 14-cv-61909, 2015 WL 4514510 (S.D. Fla. July 24, 2015) ......................................................29

*Hill v. Hoover,*
   899 F. Supp. 2d 1259 (N.D. Fla. 2012) .............................................................................................37

*Hoffman v. Fifth Generation, Inc.,*
   No. 14-cv-2569, 2015 WL 5440330 (N.D. Cal. Mar. 18, 2015) ......................................................15

*Hoffman v. Fifth Generation, Inc.,*
   No. 14-cv-2569, 2015 WL 7430801 (N.D. Cal. Nov. 20, 2015)......................................................16

*Ibarrola v. Kind, LLC,*
   83 F. Supp. 3d 751 (N.D. Ill. 2015).................................................................................................23

*IIG Capital LLC v. Archipelago, L.L.C.,*
   36 A.D.3d 401 (N.Y. App. Div. 2007) .............................................................................................31

*In re 5-Hour ENERGY Mktg. & Sales Practices Litig.,*
   2015 WL 12734796 (C.D. Cal. Jan. 22, 2015) .................................................................................36

*In re Checking Account Overdraft Litig.,*
   694 F. Supp. 2d 1302 (S.D. Fla. 2010) .............................................................................................27

*In re Cmty. Health Sys., Inc.,*
   No. 15-cv-222, 2016 WL 4732630 (N.D. Ala. Sept. 12, 2016).........................................................38

*In re Dial Complete Mktg. & Sales Practices Litig.,*
   No. 11-md-2263, 2013 WL 1222310 (D.N.H. Mar. 26, 2013) .........................................................27

*In re Ford Tailgate Litig.,*
   No. 11-cv-2953, 2014 WL 1007066 (N.D. Cal. Mar. 12, 2014) ......................................................28

# TABLE OF AUTHORITIES

**Page(s)**

*In re Frito-Lay N. Am., Inc. All Nat. Litig.*,
No. 12-md-2413, 2013 WL 4647512 (E.D.N.Y. Aug. 29, 2013) ....................................24

*In re Korean Air Lines Co.*,
642 F.3d 685 (9th Cir. 2011)..................................................................................................38

*In re Light Cigarettes Mktg. Sales Practices Litig.*,
751 F. Supp. 2d 183 (D. Me. 2010) ....................................................................................28

*In re Mentor Corp. ObTape Transobturator Sling Products Liability Litigation*,
No. 4:08-md-2004, 2015 WL 5468791 (M.D. Ga. Sept. 16, 2015) ................................36

*In re Orthopedic Bone Screw Prod. Liab. Litig.*,
193 F.3d 781 (3d Cir. 1999) ..................................................................................................13

*In re Porsche Cars N. Am., Inc.*,
880 F. Supp. 2d 801 (S.D. Ohio 2012)................................................................................25

*In re R.M.J.*,
455 U.S. 191 (1982)................................................................................................................13

*In re Rust-Oleum Restore Mktg., Sales Practices & Prod. Liab. Litig.*,
155 F. Supp. 3d 772 (N.D. Ill. 2016)..................................................................................35

*Jays Foods, Inc. v. Frito-Lay, Inc.*,
664 F. Supp. 364 (N.D. Ill. 1987) ......................................................................................25

*Jemez Agency, Inc. v. CIGNA Corp.*,
866 F. Supp. 1340 (D.N.M. 1994) ......................................................................................39

*Johnson v. Microsoft Corp.*,
834 N.E.2d 791 (Ohio 2005)................................................................................................32

*Jones v. ConAgra Foods, Inc.*,
912 F. Supp. 2d 889 (N.D. Cal. 2012)..................................................................................9

*Jou v. Kimberly-Clark Corp.*,
No. 13-3075, 2013 WL 6491158 (N.D. Cal. Dec. 10, 2013).................................... 22, 24

*Kacsuta v. Lenovo (U.S.) Inc.*,
No. 13-cv-316, 2013 WL 12126775 (C.D. Cal. July 16, 2013) ........................................35

*Keith v. Ferring Pharmaceuticals, Inc.*,
No. 15-cv-10381, 2016 WL 5391224 (N.D. Ill. Sept. 27, 2016)....................................37

*Koenig v. Boulder Brands, Inc.*,
995 F. Supp. 2d 274 (S.D.N.Y. 2014)........................................................................ 33, 37

## TABLE OF AUTHORITIES

**Page(s)**

*L-3 Comm'ns Corp. v. Jaxon Eng'g & Maint., Inc.,*
125 F. Supp. 3d 1155 (D. Colo. 2015) ...............................................29

*Lam v. Gen. Mills, Inc.,*
859 F. Supp. 2d 1097 (N.D. Cal. 2012).........................................21, 22

*Lass v. Bank of Am., N.A.,*
695 F.3d 129 (1st Cir. 2012) ...................................................27, 30

*Leiner v. Johnson & Johnson Consumer Cos.,*
215 F. Supp. 3d 670 (N.D. Ill. 2016)..............................................24

*Lemelledo v. Beneficial Mgmt. Corp. of Am.,*
696 A.2d 546 (N.J. 1997) ....................................................14, 18

*Licul v. Volkswagen Grp. of Am., Inc.,*
No. 13-cv-61686, 2013 WL 6328734 (S.D. Fla. Dec. 5, 2013).......................28

*Lorillard Tobacco Co. v. Reilly,*
533 U.S. 525 (2001)...........................................................13

*Loughrin v. United States,*
134 S. Ct. 2384 (2014) .........................................................7

*Marrone v. Philip Morris USA, Inc.,*
850 N.E.2d 31 (Ohio 2006) .....................................................19

*Mattson v. Aetna Life Ins. Co.,*
124 F. Supp. 3d 381 (D.N.J. 2015) ..............................................25

*Maybank v. S. S. Kresge Co.,*
273 S.E.2d 681 (N.C. 1981) ....................................................36

*Mobil Oil Corp. v. Dade Cty.,*
982 F. Supp. 873 (S.D. Fla. 1991)..............................................29

*Nat'l Amusements, Inc. v. N.J. Turnpike Auth.,*
619 A.2d 262 (N.J. Super. Ct. Law Div. 1992) ..................................30

*Nelson v. MillerCoors, LLC,*
No. 15-cv-7082, 2017 WL 1403343 (E.D.N.Y. Mar. 31, 2017) ....................34

*Pacheco v. Boar's Head Provisions Co.,*
No. 1:09-cv-298, 2010 WL 1323785 (W.D. Mich. Mar. 30, 2010)..................30

*Paikai v. Gen. Motors Corp.,*
No. 07-cv-892, 2009 WL 275761 (E.D. Cal. Feb. 5, 2009)......................27, 31

## TABLE OF AUTHORITIES

Page(s)

*PLIVA, Inc. v. Mensing,*
  564 U.S. 604 (2011)....................................................................................................2

*Price v. Philip Morris, Inc.,*
  43 N.E.3d 53 (Ill. 2015)............................................................................................17

*Price v. Philip Morris, Inc.,*
  848 N.E.2d 1 (Ill. 2005)............................................................................................14

*Probias v. Pfizer, Inc.,*
  490 F. Supp. 2d 1228 (S.D. Fla. 2007) ....................................................................17

*Pueblo of Pojoaque v. New Mexico,*
  214 F. Supp. 3d 1028 (D.N.M. 2016)......................................................................7, 8

*Real v. Radir Wheels, Inc.,*
  969 A.2d 1069 (N.J. 2009) .......................................................................................18

*Reed v. Zipcar, Inc.,*
  883 F. Supp. 2d 329 (D. Mass. 2012) ......................................................................29

*Reid v. Johnson & Johnson,*
  780 F.3d 952 (9th Cir. 2015)....................................................................................16

*Revo v. Disciplinary Bd. of the N.M. S. Ct.,*
  106 F.3d 929 (10th Cir. 1997) ..................................................................................12

*Reynolds v. Lifewatch, Inc.,*
  136 F. Supp. 3d 503 (S.D.N.Y. 2015)......................................................................33

*Robbins v. Oklahoma,*
  519 F.3d 1242 (10th Cir. 2008) ................................................................................11

*Robinson v. Toyota Motor Credit Corp.,*
  735 N.E.2d 724 (Ill. App. Ct. 2000) ........................................................................24

*Samiento v. World Yacht Inc.,*
  883 N.E.2d 990 (N.Y. 2008)....................................................................................30

*Segedie v. Hain Celestial Grp., Inc.,*
  No. 14-cv-5029, 2015 WL 2168374 (S.D.N.Y. May 7, 2015) ..................................9

*Small v. Lorillard Tobacco Co.,*
  672 N.Y.S.2d 601 (N.Y. Sup. Ct. 1997) ..................................................................19

*Smith v. Globe Life Ins. Co.,*
  597 N.W.2d 28 (Mich. 1999) ...................................................................................17

## TABLE OF AUTHORITIES

**Page(s)**

*Stewart v. Beam Global Spirits & Wine, Inc.,*
877 F. Supp. 2d 192 (D.N.J.2012) ....................................................................32

*Taft v. Nabisco,*
No. 15-cv-2685, 2015 WL 12819144 (C.D. Cal. June 4, 2015) .........................40

*Terlesky v. Fifth Dimension, Inc.,*
No. 1:15-cv-374, 2015 WL 7254189 (S.D. Ohio Nov. 17, 2015) .....................26

*Thomas v. Costco Wholesale Corp.,*
No. 12-cv-2908, 2014 WL 5872808 (N.D. Cal. Nov. 12, 2014)........................23

*ThunderWave, Inc. v. Carnival Corp.,*
954 F. Supp. 1562 (S.D. Fla. 1997)..................................................................29

*TOT Payments, LLC v. First Data Corp.,*
9 N.Y.S. 3d 44 (N.Y. App. Div. 2015) ..............................................................27

*Truong v. Allstate Ins. Co.,*
227 P.3d 73 (N.M. 2010)...................................................................................18

*U.S. ex rel. Bergman v. Abbot Labs.,*
995 F. Supp. 2d 357 (E.D. Pa. 2014)................................................................11

*U.S. ex rel. Cestra v. Cephalon, Inc.,*
No. 14-cv-1842, 2015 WL 3498761 (E.D. Pa. June 3, 2015)...........................11

*United States v. Philip Morris USA, Inc.,*
449 F. Supp. 2d 1 (D.D.C. 2006) .......................................................................5

*Utah Licensed Beverage Ass'n v. Leavitt,*
256 F.3d 1061 (10th Cir. 2001) .......................................................................11

*Virgin Enters. v. Am. Longevity,*
No. 99-cv-9854, 2001 WL 34142402 (S.D.N.Y. Mar. 1, 2001) ........................11

*VRG Corp. v. GKN Realty Corp.,*
641 A.2d 519 (N.J. 1994) .................................................................................33

*Walker v. THI of N.M. at Hobbs Ctr.,*
801 F. Supp. 2d 1128 (D.N.M. 2011).................................................................39

*Williams v. Bear Stearns & Co.,*
725 So. 2d 397 (Fla. Dist. Ct. App. 1998).........................................................29

*Williams v. Gerber Products,*
552 F.3d 934 (9th Cir. 2008)...................................................................... 21, 22

## TABLE OF AUTHORITIES

**Page(s)**

*Willis v. Gov't Emps. Ins. Co.,*
   No. 13-cv-280, 2016 WL 3946782 (D.N.M. Feb. 1, 2016) ................................................. 39

*Wilson v. Frito-Lay N. Am., Inc.,*
   No. 12-cv-1586, 2013 WL 1320468 (N.D. Cal. Apr. 1, 2013) .......................................... 22

*Wyeth v. Levine,*
   555 U.S. 555 (2009) ............................................................................................................. 2

**STATUTES**

15 U.S.C. § 45 ............................................................................................................................. 6

15 U.S.C. § 57b ....................................................................................................................... 6, 7

**REGULATORY MATERIALS**

*In re Am. Brands, Inc.,*
   79 F.T.C. 255 (1971) ........................................................................................................... 4

# INTRODUCTION

Nothing in Plaintiffs' opposition brief overcomes the two core facts that necessitate dismissal of the Consolidated Amended Complaint in its entirety.

*First*, the FTC Consent Order *authorizes* Santa Fe to make the very representations at issue here. Plaintiffs' primary response is that consent orders cannot authorize specific conduct. But this flawed argument relies on a fundamental misreading of *Altria Group, Inc. v. Good*, 555 U.S. 70 (2008), and in any event fails to account for the Consent Order's express statement that it "shall not prohibit" Santa Fe from employing the terms challenged here. Thus, the Consent Order preempts all of Plaintiffs' claims insofar as they are premised on the theory that Santa Fe misleads consumers into believing that NAS cigarettes are safer than alternatives. It also triggers safe harbors shielding Defendants from liability under the "safer cigarette" theory for purposes of *every* state statute Plaintiffs invoke.

*Second*, in alleging that Santa Fe's marketing terms are false or misleading, Plaintiffs rely on fundamentally unreasonable theories of deception. Plaintiffs insist that this is a factual issue incapable of resolution at this juncture, but that would be true only if their theories of deception were plausible. They are not. Instead, each theory relies on the notion of an unreasonable consumer who either willfully ignores the disclosure included on every NAS advertisement and package or interprets the challenged terms in a manner that disregards facts set forth in Plaintiffs' own CAC—which must, of course, be taken as true at this juncture (including that menthol placed in cigarettes filters inevitably migrates into the tobacco, and that all cigarette tobacco must be "processed"). Plaintiffs' unreasonable—and, more to the point, implausible—theories of deception cannot overcome the First Amendment protection that Santa Fe's commercial speech receives. These unreasonable positions also doom all of Plaintiffs' claims that require a showing that a *reasonable* consumer would be deceived.

These two points are not the only defects in Plaintiffs' claims.  Defendants' Opening Brief set forth a host of other flaws in those claims, and Plaintiffs' Opposition fails to explain away these flaws.

Other problems remain for Plaintiffs, too.  They cannot deny that changes Santa Fe is making to its advertisements and packages (under an agreement with the FDA) moot their claims for injunctive relief that seek the same changes.  Nor have Plaintiffs offered any basis on which RAI could be subject to personal jurisdiction with respect to claims brought by individuals who were parties to actions transferred from outside North Carolina, where RAI is incorporated and headquartered.

Dismissal of the entire Consolidated Amended Complaint is warranted.

## ARGUMENT

### I.  The FTC's Consent Order Specifically Regulating And Approving Santa Fe's Speech Preempts Plaintiffs' Claims Premised On The "Safer Cigarette" Theory.

Plaintiffs cannot deny that the FTC preempted their core theory—that Santa Fe misleads consumers into believing NAS cigarettes are safer than alternatives—when it entered a Consent Order authorizing Santa Fe to make precisely the representations at issue here.  Plaintiffs argue that the preemption analysis turns on "the purposes underlying federal regulations," and that Defendants cannot demonstrate purpose-based preemption.  Opp. 7 (quoting *Pueblo of Pojoaque v. New Mexico*, 214 F. Supp. 3d 1028, 1072 (D.N.M. 2016)); *see also id.* at 5 ("[T]he purpose of Congress is the ultimate touchstone in every pre-emption case." (quoting *Wyeth v. Levine*, 555 U.S. 555, 565 (2009))).  But determining the FTC's regulatory purpose is easy here, as the plain text of the Consent Order authorizes the *exact* representations at issue here by *this* exact manufacturer.  *See Wyeth*, 555 U.S. at 588 (Thomas, J., concurring) ("'[E]vidence of pre-emptive purpose must be sought in the text and structure of the provision at issue' ...." (citation omitted));  *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 618–19 (2011) (finding state law impliedly preempted based on text of federal regulations).  It is the Consent Order's text that Plaintiffs ignore and that dooms their position.

**A.  *Plaintiffs Cannot Avoid The Fact That The FTC Specifically Approved The Exact Terms At Issue Here When Made By Santa Fe.***

Plaintiffs argue that *Altria v. Good* categorically held that consent orders do not preempt state law; that a statutory provision regarding the non-exhaustive nature of certain remedies set forth in that statute applies to *different* remedies set forth in a *different* statute; and that Plaintiffs are free to use state law to impose obligations beyond those set by federal law.  These arguments fail.

**1.**  Plaintiffs' main argument hinges on a footnote in *Altria*, in which the Supreme Court gave two fact-specific reasons for finding that a decades-old consent order between the FTC and a different cigarette manufacturer did not have preemptive effect.  Plaintiffs argue that this footnote established a categorical rule that "FTC consent orders … should not be construed as authorizing any specific conduct."  Opp. 23.  Plaintiffs are wrong.  It has long been recognized that consent orders carry the full force of federal law and thus can have preemptive effect.  *See, e.g.*, *Feikema v. Texaco, Inc.*, 16 F.3d 1408, 1416 (4th Cir. 1994) ("[W]hen the EPA … enters into a consent order, that order will also preempt conflicting state regulation, including a federal court order based on state common law." ); *Gen. Motors Corp. v. Abrams*, 897 F.2d 34, 39 (2d Cir. 1990) ("[W]e hold that a consent order reflecting a reasonable policy choice of a federal agency and issued pursuant to a congressional grant of authority may preempt state legislation.").  The Court in *Altria* did not take issue with that principle, but instead concluded only that the consent order in *that* case did not have preemptive force, for reasons inapplicable to *this* case.  The Consent Order here carries the authorizing force that the *Altria* Court, based on the facts in that case, found lacking.

The question in *Altria* was whether federal law preempted state-law claims challenging certain cigarette manufacturers' use of terms like "light" or "low-tar."  555 U.S. at 72–74.  The manufacturer defendants argued that such claims were preempted by a 1971 FTC consent order prohibiting a *different* manufacturer from using terms like "low in tar" in advertisements unless it also included the

cigarettes' tar and nicotine content "as measured by the Cambridge Filter Method" (the only FTC-approved methodology).  *Id.* at 89 n.13 (citing *In re Am. Brands, Inc.*, 79 F.T.C. 255 (1971)).  In a footnote, the Supreme Court rejected this argument for two reasons:  (1) the 1971 consent order "only enjoined conduct," rather than authorizing conduct; and (2) "a consent order is in any event only binding on the parties to the agreement."  *Id.*  Neither reason applies here.

Most obviously, the Consent Order here binds Santa Fe and not some other party.  That alone suffices to distinguish this case from *Altria*.

Moreover, the Consent Order does not enjoin conduct; rather, it specifically authorizes Santa Fe to use the terms at issue here.  Indeed, Plaintiffs do not dispute that the FTC "blessed the language of Defendants' disclaimer" (Opp. 46), and in so doing it necessarily also blessed Santa Fe's use of the terms that the disclaimer accompanies.  This is demonstrated by the differences both in the text of the respective consent orders and in the FTC's enforcement conduct after entering each order.

*First*, the text of the consent order in *Altria* was purely prohibitive, requiring the respondent to "cease and desist from" making low-tar representations unless it included the specified test results. *Am. Brands*, 79 F.T.C. at 258.  Here, by contrast, the Consent Order affirmatively permits Santa Fe to continue using terms like "additive-free," by specifically stating that it "shall not prohibit respondent from truthfully representing, through the use of such phrases as 'no additives,' 'no chemicals,' 'additive-free,' … or substantially similar terms, that a tobacco product has no additives or chemicals, where such representation is accompanied by the disclosure mandated by this provision."  Consent Order at § I.  The consent order considered in *Altria* did not contain any such authorizing language.

*Second*, the *Altria* Court recounted decades of post-consent-order enforcement activity to support its conclusion that the FTC had not blessed "low-tar" representations going forward.  After issuing the 1971 consent order, the FTC continued to take enforcement action against other manufacturers

that advertised the test results required by that consent order, based on the FTC's conclusion that those manufacturers' presentation of the test results was nonetheless misleading.  555 U.S. at 88–89 (citing *Comm'n Determination Re Barclay Cigs.*, 48 Fed. Reg. 15953, 15954 (1983); *In re Am. Tobacco Co.*, 119 F.T.C. 3 (1995)).  Not only that, but in *Altria* the "Government itself disavow[ed] any policy authorizing the use of 'light' and 'low tar' descriptors" (*id.* at 87), submitting an amicus brief explaining that the FTC had never "affirmatively *authorized* the use of [the relevant] descriptors" (Brief for U.S. at 15, *Altria*, 555 U.S. 70 (No. 07-562), https://goo.gl/6VvJzA).  In the Court's view, "[t]his history show[ed] that … the FTC ha[d] no longstanding policy authorizing collateral representations based on Cambridge Filter Method test results."  *Altria*, 555 U.S. at 89.  (And even if the FTC *had* provided such authorization, it would not have extended to the conduct challenged in *Altria:* as the First Circuit explained in the decision under review, "Philip Morris uses the terms 'light' and 'Lowered Tar and Nicotine' … *without* mentioning" the required test results.  *Good v. Altria Grp., Inc.*, 501 F.3d 29, 57 (1st Cir. 2007) (emphasis added).)

There is no such history here.  Plaintiffs do not dispute that, since entering the Consent Order, the FTC has never suggested Santa Fe could be held liable for marketing NAS cigarettes as "natural" and "additive-free" despite including the disclosure.[1]  This confirms that the Consent Order meant what it said:  the disclosure suffices to eliminate any possibility of consumers concluding that NAS cigarettes are safer than alternatives, and so Santa Fe is authorized to use "additive-free" and "substantially similar terms" so long as it accompanies those terms with the disclosure.

---

[1] The Department of Justice's lawsuit in *United States v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 1 (D.D.C. 2006), is not to the contrary.  In describing this decision as "enjoining [Defendants] from using the term 'natural'" (Opp. 27), Plaintiffs omit that *Santa Fe* was not a defendant and that NAS cigarettes thus were not at issue.  Unlike Santa Fe, the defendants in *Philip Morris* had used "natural" "*without* informing consumers that 'natural' cigarettes are no safer than any others."  449 F. Supp. 2d at 924 (emphasis added).  That litigation thus in no way suggests that the FTC has come to view Santa Fe's representations—which are always accompanied by the disclosure—as unauthorized.

In short, both conditions the Court found lacking in its fact-bound *Altria* decision are present here. Because the FTC specifically authorized the exact representations at issue, when used by Santa Fe itself in precisely the manner that Plaintiffs challenge, the Consent Order carries preemptive force—consistent with courts' longstanding recognition that consent orders can preempt state law.[2] The Consent Order thus defeats Plaintiffs' claims insofar as they rely on the "safer cigarette" theory.

**2.** Plaintiffs similarly cannot avoid preemption by invoking 15 U.S.C. § 57b(e), which states that the "[r]emedies provided *in this section* are in addition to, and not in lieu of, any other remedy or right of action provided by State or Federal law" (emphasis added). This is because consent orders resolving unfair-practice charges are not among the remedies "in this section"—i.e., section 57b. The only remedies provided for in that section are orders—by "a United States district court or [] any court of competent jurisdiction of a State"—that "redress injury to consumers or other[s]" arising from violations of either an FTC rule or an FTC cease-and-desist order. § 57b(a), (b).

There is no such court order here. The FTC exercised its authority under a *different* section (15 U.S.C. § 45(b)) in alleging that Santa Fe was engaged in an unfair trade practice and in resolving that claim via the Consent Order. *See* § 45(b) (authorizing FTC to "issue … a complaint" charging an entity with "using any unfair method of competition or unfair or deceptive act or practice"); FTC Compl. ¶ 8 (alleging "unfair or deceptive acts or practices in or affecting commerce in violation of Section 5(a) of the Federal Trade Commission Act," codified at § 45(a)). Unlike section 57b, section 45 *does not* contain a provision stating that its remedies do not displace other federal and state remedies. Plaintiffs' position thus fails in light of the plain text of the very statute they rely upon.

---

[2] Indeed, in its *Altria* brief, the Government noted that "an FTC consent order does constitute federal law that … would preempt conflicting state law," and argued only that the 1971 consent order lacked preemptive force for the two reasons the Supreme Court ultimately adopted. Brief for U.S. at 25. The Court specifically cited the Government's brief in reaching those conclusions, without questioning its premise that consent orders can have preemptive effect. 555 U.S. at 89 n.13.

Plaintiffs fail to acknowledge any of this.  Instead, they place all their weight on the First Circuit's decision in *Good*, where the most the court could say was that "[w]e do not think it a stretch … to say that when the FTC merely issues an order" under section 45, that order somehow becomes a remedy subject to 57b(e)—even if the FTC does not enforce the order in court through either of the means provided in section 57b.  501 F.3d at 52.  The court made no attempt to reconcile its conclusion with section 57b(e)'s explicit limitation to "this section," or with the bedrock canon of statutory interpretation that, "when 'Congress includes particular language in one section of a statute but omits it in another' … this Court 'presumes' that Congress intended a difference in meaning." *Loughrin v. United States*, 134 S. Ct. 2384, 2390 (2014).  It is thus unsurprising that no other court— before or after *Good*—has adopted this rewrite of section 57b.  (Indeed, in reviewing the First Circuit's decision, the Supreme Court did not even cite that section.)  Plaintiffs similarly do not even try to explain how the First Circuit's position can be reconciled with basic rules of statutory interpretation.  It cannot.  Section 57b(e) has no relevance here.

**3.**  Finally, Plaintiffs argue that the Consent Order merely operates as "a minimum floor of acceptable conduct," and "is not 'an obstacle to suits premised on overlapping state statutes or on common law.'"  Opp. 24 (citation omitted).[3]  In Plaintiffs' telling, even though their state law claims go beyond federal law, those claims do not threaten any federal interest because they "align with federal law." *Id.* at 8.  But that is not how preemption works.  As this Court has explained, "[t]o avoid conflict preemption, 'it is not enough to say that the ultimate goal of both federal and state law is the same'"; a "state law also is pre-empted if it interferes with the methods by which the federal statute was designed to reach this goal." *Pueblo of Pojoaque*, 214 F. Supp. 3d at 1075 (citation omitted).  And

---

[3] Plaintiffs include aspects of this argument in their discussion of statutory safe harbors, which overlaps substantially with their treatment of preemption.

that is precisely the situation here:  crediting Plaintiffs' claims "would interfere with" decisions made

as a matter of federal law and produce a "conflict with [] federal law" (*id.* (citing *Colo. Dep't of Pub.*

*Health & Env't v. United States*, 693 F.3d 1214, 1224 (10th Cir. 2012))), by allowing Plaintiffs to use

state law to override the FTC's careful determination that the very speech at issue here will not give

rise to the exact claimed deception on which Plaintiffs premise their "safer cigarette" theory.  The

Supremacy Clause forecloses this attempt at disturbing the balance the FTC has struck between

Santa Fe's interest in truthfully marketing its products and consumers' interest in not being misled.

The decision in *Gilles v. Ford Motor Co.* highlights the invalidity of Plaintiffs' effort to go beyond

federal law.  24 F. Supp. 3d 1039 (D. Colo. 2014).  Plaintiffs accuse Defendants of "completely

misrepresent[ing] the thrust of" this decision (Opp. 25), but they disregard the portion of the

decision that they do not like.  There were two claims at issue in *Gilles:*  a claim that Ford had

engaged in "behavior that is inconsistent with FTC regulations" by failing to disclose that its

advertised fuel-economy standards were based on EPA data, and a claim that Ford should have

gone *further* than the FTC required by disclosing that "actual results may vary."  24 F. Supp. 3d at

1047.  Plaintiffs focus on the first claim, but ignore the second—and with it, the court's holding that

the second claim "*is* preempted by the regulations" because it "would impose a different labeling

requirement than the one required by the FTC."  *Id.* at 1047–48 (emphasis added).  In other words,

preemption barred the plaintiff from holding Ford to a standard *greater* than that imposed by the

FTC.  And that is exactly what Plaintiffs seek to do here, by attempting to hold Defendants liable for

conduct that the FTC has expressly authorized.  Just as in *Gilles*, this effort is preempted.

The same principles doom Plaintiffs' attempt at belatedly asserting a claim based on Santa Fe's

use of the term "organic."  Opp. 15–16.  *First*, Plaintiffs did not plead any "organic"-based claim;

none of their causes of action are tied to that term.  Opening Br. 12 n.3.[4]  *Second*, even if that term

were at issue, Plaintiffs' challenge would arise under the same flawed "safer cigarette" theory—the

idea apparently being that marketing certain NAS cigarettes as organic suggests they are safer than

alternatives.  But any such argument would again seek to impose standards beyond what federal law

requires.  Through the Organic Foods Production Act ("OFPA"), Congress has "establish[ed]

national standards governing the marketing of certain agricultural products as organically produced

products," to, among other things, "assure consumers that organically produced products meet a

consistent standard."  *Segedie v. Hain Celestial Grp., Inc.*, No. 14-cv-5029, 2015 WL 2168374, at *3

(S.D.N.Y. May 7, 2015) (quoting 7 U.S.C. § 6501(2)).  That statute authorizes manufacturers to

market their products as "organic," so long as the products comply with OFPA's "complex, detailed,

and specific" implementing regulations.  *Id.* (citation omitted).  Plaintiffs do not claim NAS cigarettes

fail to comply with *any* of those regulations; instead, they seek to bar Santa Fe from using "organic"

*despite* complying with the governing regulations.  None of the decisions that Plaintiffs invoke

support this effort to impose requirements beyond the OFPA, because the claims in those cases

were *consistent with* the OFPA regulations.[5]  Indeed, the court in *Segedie* noted that the preemption

analysis could come out differently "[i]f Plaintiffs were seeking to enforce a definition of 'organic'

based on something other than federal regulatory compliance."  2015 WL 2168374, at *6.  Because

---

[4] Similarly, although Plaintiffs reference "Native American or environmental imagery and statements"
   (Opp. 4–5 n.2), neither the CAC nor their brief connects such statements to any cause of action.

[5] *See id.* at *6 ("[T]he Organic Claims are not premised on a 'reasonable consumer' theory that
   diverges from the national organic standards.  Rather, the suit seeks to enforce those national
   standards."); *Jones v. ConAgra Foods, Inc.*, 912 F. Supp. 2d 889, 895 (N.D. Cal. 2012) (holding that
   "Plaintiffs' organic claims are not preempted" because they did not seek to "impose any relevant
   additional requirements than those under the OFPA"); *Brown v. Hain Celestial Grp., Inc.*, No. 11-cv-
   3082, 2012 WL 3138013, at *9 (N.D. Cal. Aug. 1, 2012) (finding no "obvious substantive conflict
   between the state and federal definitions of the term 'organic' as it is at issue in this case").

that is precisely what Plaintiffs are attempting to do here—stack new requirements atop what
Congress and federal regulatory authorities have deemed sufficient—their attempt at challenging
Santa Fe's use of the term "organic" would be preempted even if it had been properly pleaded.

**B.  *The Preemptive Effect Of The Consent Order Extends To NAS Packaging, Which
Uses The Exact Same Terms Accompanied By The Exact Same Disclosure.***

Plaintiffs argue that any preemptive effect does not extend to NAS packaging because the
Consent Order addressed only advertising.  Plaintiffs miss the point.  The NAS packaging uses the
very terms that the FTC authorized, accompanied by the exact disclosure in the Consent Order.
The FTC could have imposed restrictions on NAS packaging, but chose not to—evidencing a
conclusion that the packaging did not present cause for concern.  By nonetheless voluntarily
including the disclosure on packaging, Santa Fe has gone *further* than the FTC deemed sufficient to
dispel the very confusion on which Plaintiffs premise their "safer cigarette" theory.  *Contra Good*, 501
F.3d at 57 (holding that preemptive effect of consent order addressing advertising did not extend to
packaging, where defendants *did not* include terms required by consent order on their packaging).
Nor is there anything to Plaintiffs' "darned if you do, darned if you don't" argument that the NAS
packaging disclosures fail to comply with aspects of the Consent Order's font requirements.  Opp.
28.  Santa Fe's decision to include the FTC disclosure does not change the fact that packaging
inherently presents greater space constraints than print advertisements, requiring Santa Fe to make
certain adjustments.  In still finding a way to include the FTC's disclosure, Santa Fe ensured that its
packaging comes under the Consent Order's preemptive effect.

**II.  Dismissal On First Amendment Grounds Is Warranted Because Plaintiffs Have Not
Plausibly Alleged Facts Capable Of Overcoming The *Central Hudson* Standard.**

Plaintiffs concede the First Amendment protection of commercial speech like that here, but
argue that such protection is "[n]ot an [a]ppropriate [b]asis for [d]ismissal," and that they have

adequately alleged facts capable of overcoming this protection under the *Central Hudson* standard. Opp. 16, 18–22.  Plaintiffs are wrong on both counts.

**A.**  It is not enough for Plaintiffs to launch conclusory allegations that Santa Fe's speech is false or misleading.  Plausibility is the touchstone.  *See, e.g.*, *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) ("The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.").  To overcome First Amendment protection, Plaintiffs must *plausibly* allege facts capable of overcoming *Central Hudson*.  None of the decisions they cite are to the contrary.  In each, the court found the plaintiff had alleged adequately that speech was false or misleading, thus negating *Central Hudson*'s threshold requirement for constitutional protection.[6]

**B.**  Here, unlike in the cases on which Plaintiffs rely, Plaintiffs have failed plausibly to allege facts that would enable them to overcome the *Central Hudson* standard.[7]

First, and as Plaintiffs recognize, they must plausibly allege that the challenged terms are false or misleading.  Opp. 16; *Utah Licensed Beverage Ass'n v. Leavitt*, 256 F.3d 1061, 1066 (10th Cir. 2001). They have not done so.  Their allegations of literal falsity relate only to their "menthol-free menthol cigarette" and "un-processed cigarette" theories.  But (as further explained *infra* at § III.B), the use of

---

[6] *See U.S. ex rel. Cestra v. Cephalon, Inc.*, No. 14-cv-1842, 2015 WL 3498761, at *4 (E.D. Pa. June 3, 2015) (finding that plaintiff adequately "pled with particularity the details of a scheme to submit false claims to the government for reimbursement," including that the defendant made "knowing misrepresentation[s]"); *U.S. ex rel. Bergman v. Abbot Labs.*, 995 F. Supp. 2d 357, 373 (E.D. Pa. 2014) (same); *Bruton v. Gerber Prod. Co.*, 961 F. Supp. 2d 1062, 1093 (N.D. Cal. 2013) (same), *rev'd in part on other grounds,* No. 15-15174, 2017 WL 1396221 (9th Cir. Apr. 19, 2017); *Virgin Enters. v. Am. Longevity*, No. 99-cv-9854, 2001 WL 34142402, at *4–*5 (S.D.N.Y. Mar. 1, 2001) (same).

[7] Relying on a single unpublished decision, Plaintiffs argue that *Central Hudson* has no bearing on "causes of action based on a defendant's allegedly false or misleading advertising."  Opp. 18 (quoting *FTC v. Wellness Support Network, Inc.*, No. 10-cv-04879, 2014 WL 644749, at *10 (N.D. Cal. Feb. 19, 2014)).  Defendants have not found a single other decision adopting this reasoning.  And neither Plaintiffs nor the *Wellness Support* court explain how it could be that the First Amendment protects commercial speech from limitations imposed via government regulation, but leaves the very same speech exposed to lawsuits aiming to impose similar restrictions or to extract damages.

menthol cannot possibly render false Santa Fe's description of the relevant cigarettes' tobacco as "additive-free," given that Santa Fe expressly markets these cigarettes as containing menthol.[8]  Nor can Santa Fe's use of "chemical processes" render false its description of NAS cigarettes as "natural," given Plaintiffs' own recognition that those processes are essential to manufacturing commercial cigarettes.  Plaintiffs' few allegations of falsity thus fall far short of the plausibility bar.

Plaintiffs similarly have failed to plausibly allege that Santa Fe's speech—under any of their theories of deception—is inherently misleading.  Plaintiffs do not dispute that this is a high bar, one that is cleared only where speech is "incapable of being presented in a way that is not deceptive." *Revo v. Disciplinary Bd. of the N.M. S. Ct.*, 106 F.3d 929, 933 (10th Cir. 1997).  Instead, they try to avoid this standard altogether, claiming (without support) that the "inherently misleading" inquiry is irrelevant in as-applied challenges to commercial speech.  Opp. 20.  In so doing, however, Plaintiffs ignore the reasons demonstrating that the pertinent statements, in the very applications that they challenge, are incapable of being misleading.  As Defendants' Opening Brief explained, Santa Fe refutes the "safer cigarette" and "menthol-free menthol cigarette" theories by always making clear that its cigarettes are *not* safer than alternatives (via the FTC-mandated disclosure) and that its menthol cigarettes in fact contain menthol—which, Plaintiffs acknowledge, inevitably means menthol in the tobacco.  Opening Br. § II.A.1, 2; CAC ¶ 68.  Similarly, given that the term "natural" lacks any discernible standard, Plaintiffs cannot plausibly claim that Santa Fe's use of certain manufacturing processes—which, Plaintiffs recognize, are "essential"—renders the term "natural" misleading.  Opening Br. § II.A.3.  In these circumstances, the particular applications of commercial speech that Plaintiffs challenge are not misleading at all, let alone inherently misleading.

---

[8] Indeed, NAS advertisements and packaging expressly list tobacco *and* menthol as ingredients.  *See* CAC at 18 (advertisement); Exs. 9 and 13 to Defs.' Mot. for Judicial Notice (ECF 71-1) (packages).

Nor have Plaintiffs plausibly set forth allegations capable of overcoming any of the other *Central Hudson* factors.  Indeed, they address only one factor (the need for a substantial interest), thus conceding that they have not plausibly alleged that their requested relief would advance a substantial interest "to a material degree" (*Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001)) or would be "narrowly tailored" to that interest (*In re R.M.J.*, 455 U.S. 191, 203 (1982)).  And even on the substantial-interest requirement, Plaintiffs' argument falls short.  As Defendants predicted (Opening Br. 27–28), the only interest Plaintiffs can identify is preventing deception.  Opp. 21–22.  But they cannot show that this interest overrides the constitutional presumption favoring disclosure over concealment.  Although Plaintiffs downplay their interest in "silenc[ing] Santa Fe's speech," they resist the conclusion that those claims are moot, confirming their intention of pursuing speech-suppressing injunctions.  Opp. § VI.  Similarly, Plaintiffs' claim for damages would impose just as substantial an infringement on Defendants' First Amendment rights.  "[T]he award of money damages[] is treated no less stringently than direct regulation on speech: 'The fear of damage awards may be markedly more inhibiting than the fear of prosecution under a criminal statute.'"  *In re Orthopedic Bone Screw Prod. Liab. Litig.*, 193 F.3d 781, 792 (3d Cir. 1999) (quoting *N.Y. Times Co. v. Sullivan,* 376 U.S. 254, 279–280 (1964)).  Plaintiffs' allegations are thus insufficient to overcome the "substantial interest" requirement.

In sum, because Plaintiffs have not plausibly alleged facts capable of overcoming the protection that Santa Fe's commercial speech receives, dismissal is warranted now.[9]

---

[9] Plaintiffs submitted a Notice of Supplemental Authority citing the (five-year-old) decision in *Discount Tobacco City & Lottery, Inc. v. U.S.*, 674 F.3d 509 (6th Cir. 2012), a First Amendment case in which the Sixth Circuit opined that "common sense" supports the "presum[ption]" that consumers who buy additive-free products must "prefer such products precisely because they believe" those products "confer health advantages over conventional products." *Id.* at 536; Dkt. No. 104.  This Court is not bound by a Sixth Circuit panel's theorizing regarding certain consumer's beliefs and

## III. Plaintiffs' Statutory Claims Fail On Their Own Terms.

Plaintiffs fail to explain away the many flaws in their nineteen statutory claims: all fail in light of statutory safe harbors; fourteen also fail because Plaintiffs cannot satisfy the reasonable-consumer standard that they agree applies; and four fail for still other state-specific reasons.

### A. *Plaintiffs' Attacks On The Safe Harbors Fail.*

Plaintiffs cannot deny that all of their statutory claims fail in light of safe harbors for conduct permitted by federal law.

*First*, Plaintiffs contend that compliance with federal law does not ensure compliance with state law, and that "States are free to enact their own overlapping or complementary laws with heightened standards." Opp. 24-25. But that is the point: the States in question exercised their discretion and placed prudential limits on the reach of their own laws by enacting safe harbors that signal a "legislative policy of deference" to the authority of federal regulatory agencies. *Price v. Philip Morris, Inc.*, 848 N.E.2d 1, 38 (Ill. 2005). Indeed, precisely because consumer-protection statutes are often broadly worded and "provide too little guidance to courts and businesses" (*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 973 P.2d 527, 543 (Cal. 1999)), States may choose to allow businesses "to rely on the directions received from [regulatory] agencies without risk that such reliance may expose them to tort liability" (*Price*, 848 N.E.2d at 38). Otherwise, businesses might find themselves "subject … to multiple regulations that, as applied, will work at cross-purposes." *Lemelledo v. Beneficial Mgmt. Corp. of Am.*, 696 A.2d 546, 554 (N.J. 1997). Thus, where, as here, a State has enacted a safe harbor, courts must honor this "legislative policy" (*Price*, 848 N.E.2d at 38), rather than, as Plaintiffs urge, "impose their own notions of the day as to what is fair or unfair" (*Cel-Tech*, 973 P.2d at 541).

---

purchasing decisions. That is particularly true given that here, unlike in *Discount Tobacco*, Santa Fe always includes a disclosure expressly disclaiming the view that the Sixth Circuit ascribed to consumers. *Discount Tobacco* does not help Plaintiffs.

*Second*, Plaintiffs argue that no safe harbor can shield Santa Fe's use of the terms "natural" and "organic" because, Plaintiffs insist, those terms are not covered by the Consent Order.  As explained *supra* at § I.A.3, Plaintiffs have not pled a claim premised on the term "organic."  Moreover, their argument regarding the term "natural" rests on a disingenuous alteration of the Consent Order's list of covered terms, using a bracketed "and" and a misplaced, bracketed period to eliminate the coda to that list: "*or substantially similar terms*."  Consent Order at § I.  Plaintiffs then treat the abridged list as exhaustive and argue on this basis that "natural" is not covered.  In reality, the Consent Order also covers "substantially similar terms," and a letter from the FTC's investigation of Santa Fe confirms that the FTC considers "natural" substantially similar to "additive free."  Opening Br. 8.  Thus, Santa Fe's use of the term "natural" falls within all of the relevant safe harbors.

*Finally*, Plaintiffs argue that each safe harbor is inapplicable for various state-specific reasons, relying in large part on the same misreading of *Altria* that infects their position on preemption.  That position is doomed for the reasons set forth *supra* at § I.A.1, and their other arguments fare no better.

**California.**  Plaintiffs' only additional argument under California law is that "all of the authority" supposedly establishes that the California safe-harbor doctrine does not apply to "informal agency action like the Consent Order."  Opp. 30.  But in the decision Plaintiffs rely upon, the court emphasized that there were no "facts [] properly before the court" showing that a federal agency had "specifically investigated and approved" of the marketing terms at issue in that case. *Hoffman v. Fifth Generation, Inc.*, No. 14-cv-2569, 2015 WL 5440330, at *7 (N.D. Cal. Mar. 18, 2015)).[10]  Here, by contrast, there is no doubt that the FTC did precisely that with respect to the challenged terms.  More broadly, courts interpreting the California safe harbor have concluded that

---

[10] The other decision that Plaintiffs cite, *Ebner v. Fresh, Inc.*, said nothing about "informal agency action," and in fact held that the safe harbor protected conduct that—like the conduct at issue here—complied with federal regulations.  838 F.3d 958, 963–64 (9th Cir. 2016).

federal agency action protects conduct "under the same circumstances required for preemption" (*Hoffman v. Fifth Generation, Inc.*, No. 14-cv-2569, 2015 WL 7430801, at *6 (N.D. Cal. Nov. 20, 2015)), relying on a Ninth Circuit decision recognizing that "agency actions short of notice-and-comment rulemaking may have the force of law" for purposes of preemption (*Reid v. Johnson & Johnson*, 780 F.3d 952, 964 (9th Cir. 2015)).  Plaintiffs, moreover, do not challenge the authorities holding that consent orders can carry preemptive force.  Opening Br. 11 (citing *Feikema*, 16 F.3d at 1416; *Gen. Motors*, 897 F.2d 34 at 39); *supra* at I.A.1.

**Colorado.**  In arguing that the Colorado Consumer Protection Act's ("CCPA's") safe harbor "does not … grant a wholesale exemption to any industry … that is subject to regulation" (Opp. 31), Plaintiffs assail a straw man.  Defendants do not claim a "wholesale exemption" for the tobacco industry, but instead have shown that Santa Fe's use of the terms at issue, accompanied by the mandated disclosure, is shielded from liability.  Nor can the Court simply "assume[]" that the safe harbor does not apply because the CCPA has a "remedial purpose[]" (*id.*), as this would nullify the statutory safe harbor.  Finally, Plaintiffs' confusion about *Gilles* (*supra* at § I.A.3) extends to that decision's treatment of the CCPA's safe harbor.  *Gilles* held that the safe harbor did not apply insofar as the defendant "went further" than federal law allowed by *failing* to include the FTC-mandated disclosure about its gas-mileage statistics.  24 F. Supp. 3d at 1050.  Because Plaintiffs challenge statements that *do* comply with the Consent Order, this aspect of *Gilles* is inapposite.

**Florida.**  Plaintiffs' only argument under Florida law goes back to their baseless insistence that the terms at issue "were never approved" by a federal agency.  *See supra* at § I.A.1.  Moreover, one of their own cited decisions makes clear that express authorization is not the standard.  In *Prohias v. Pfizer, Inc.*, the court held that statements "*implicitly* authorized by the FDA … [fell] within the safe harbor," even though those statements "did not comport precisely with" the FDA-approved label.

490 F. Supp. 2d 1228, 1234–35 (S.D. Fla. 2007) (emphasis added).  Given that Plaintiffs challenge the *exact* terms that the FTC approved, it is even clearer that the safe harbor applies.

**Illinois.**  Plaintiffs contend that the Court should not rely on *Price v. Philip Morris* because that decision applied the safe harbor to conduct that the Supreme Court later held in *Altria* was not preempted by the FTC consent order in question.  Opp. 33.  But this disagreement as to the import of the particular consent order does not mean the Illinois safe harbors offer no protection to conduct that *is* approved by an FTC consent order, as Santa Fe's conduct has been.[11]  Indeed, other decisions recognize that the Illinois safe harbors apply in precisely these circumstances.  *See, e.g., Aliano v. Fifth Generation, Inc.*, No. 14-cv-10086, 2015 WL 5675423, at *4 (N.D. Ill. Sept. 24, 2015) (holding that Illinois Consumer Fraud Act's safe harbor protected the use of a marketing term that had been "specifically authorized by … a regulatory body").

**Massachusetts.**  Plaintiffs cite a decision in which the Massachusetts Supreme Judicial Court relied on *Altria* in declining to apply the State's safe harbor to virtually identical "light" and "low-tar" representations.  Opp. 34 (citing *Aspinall v. Philip Morris, Inc.*, 902 N.E.2d 421, 423–24 (Mass. 2009)).  Again, the fact that the consent order in *Altria* lacked preemptive force has no bearing here, where the FTC *did* authorize the relevant conduct.  Indeed, Plaintiffs do not deny that the Massachusetts safe harbor applies when a regulatory "scheme affirmatively permits the practice … alleged to be unfair or deceptive."  *Commw. v. Fremont Inv. & Loan*, 897 N.E.2d 548, 561 (Mass. 2008).

**Michigan.**  Plaintiffs do not dispute that Michigan's safe harbor applies where the "general transaction is specifically authorized by law, regardless of whether the specific misconduct alleged is prohibited."  *Smith v. Globe Life Ins. Co.*, 597 N.W.2d 28, 38 (Mich. 1999).  Instead, they argue only

---

[11] There is nothing to Plaintiffs' suggestion that *Price* is not good law.  Opp. 33 n.12.  As they note, the Illinois Supreme Court has *declined* to vacate *Price*.  *Price v. Philip Morris, Inc.*, 43 N.E.3d 53 (Ill. 2015).

that "[t]he logic" of a decision applying the safe harbor to "light" and "low tar" representations (*Flanagan v. Altria Grp., Inc.*, No. 05-cv-71697, 2005 WL 2769010 (E.D. Mich. Oct. 25, 2005)) was "expressly rejected" in the First Circuit's *Good* decision. Opp. 35. Again, the treatment of the consent orders at issue in *Altria Group v. Good* has no bearing on the Consent Order here, which—because it *did* authorize the challenged conduct—triggers the Michigan safe harbor's broad terms.

**New Jersey.** Plaintiffs agree that New Jersey's safe harbor applies where a federal regulator has "deal[t] specifically, concretely, and pervasively" with the challenged activity, such that there is a "direct and unavoidable conflict" between the regulatory scheme and New Jersey's Consumer Fraud Act. Opp. 35; *Lemelledo*, 696 A.2d at 554. Plaintiffs' flatly state that "[t]hat is clearly not the case here." Opp. 35. But there could not be a more direct conflict than a tort claim that would impose liability for statements the FTC has specifically, concretely authorized. This case is thus the opposite of *Real v. Radir Wheels, Inc.*, where there was "no statutory or regulatory regime … purport[ing] to govern" the relevant conduct. 969 A.2d 1069, 1079 (N.J. 2009) (quoted at Opp. 35–36).

**New Mexico.** Apart from again erroneously advocating a sweeping *Altria*-based rule that FTC consent orders can *never* "constitute a safe harbor," Plaintiffs' only argument is that the New Mexico safe harbor is "very narrow" and "require[s] express permission of the actual activity at issue." Opp. 36 (citing *Truong v. Allstate Ins. Co.*, 227 P.3d 73 (N.M. 2010)). But that is exactly the case here. Indeed, *Truong* held that, if a defendant "rel[ies] on [pre-conduct] communication" from a regulatory body as a basis for engaging in conduct, this "would be entitled to substantial weight in applying the" safe harbor. 227 P.3d at 84–85. And that is what Santa Fe did, by relying on the Consent Order.

**New York.** Although Plaintiffs note the truism that "compliance with regulations does not immunize misconduct outside the regulatory scope" for purposes of New York's safe harbors (Opp. 36–37 (citation omitted)), even they do not deny that the challenged terms are within the FTC's

"regulatory scope" (as the Consent Order confirms).  It is similarly beside the point that the safe

harbors do not protect "untruthful utterances" (*id.* at 37 (quoting *Small v. Lorillard Tobacco Co.*, 672

N.Y.S.2d 601, 609 (N.Y. Sup. Ct. 1997))), given that Plaintiffs have not plausibly alleged that Santa

Fe uses the challenged terms untruthfully and that the Consent Order establishes, as a matter of

federal law, that Santa Fe's use of the terms is *not* misleading.  This is quite different from *Small*,

where the statement at issue was that "nicotine is not addictive."  672 N.Y.S.2d at 609.[12]

**North Carolina.**  Plaintiffs acknowledge that North Carolina's safe harbor applies to "matters

already under pervasive and intricate regulation by other statutory schemes."  *Champion Pro Consulting*

*Grp., Inc. v. Impact Sports Football, LLC*, 845 F.3d 104, 110 (4th Cir. 2016); Opp. 37–38.  Ignoring the

reality of pervasive tobacco regulation, Plaintiffs claim *Altria* establishes that "cigarette advertising

and packaging cannot be said to be 'pervasively' regulated."  Opp. 37–38.  But the *Altria* Court was

not considering the pervasiveness of tobacco regulation; rather, the issue was only whether a

"handful of industry guidances and consent orders," combined with "the FTC's inaction with regard

to 'light' descriptors," carried preemptive force.  555 U.S. at 90.  Beyond this, Plaintiffs simply cite

decisions affirming the proposition that North Carolina law recognizes duty-to-disclose claims.  Opp.

37 (citations omitted).  Neither decision even involved the safe harbor.

**Ohio.**  Under the Ohio Consumer Sales Practices Act's ("OCSPA's") safe harbor, "deference is

particularly appropriate" in cases involving cigarette advertising.  *Marrone v. Philip Morris USA, Inc.*,

850 N.E.2d 31, 37 (Ohio 2006).  Plaintiffs' only response is that this is not a blanket exemption of

"activities by tobacco companies" (Opp. 38), but Defendants seek no such rule.  Rather, it is enough

---

[12] In addressing New York law, Plaintiffs claim that the FDA has "deemed" Santa Fe's packaging to
be in "violation of" the Tobacco Control Act and thus the FTC Act.  Opp. 37.  This is doubly
wrong:  the FDA's Warning Letter merely set forth allegations, and the FDA has since settled its
claims against Santa Fe *without* any finding of wrongdoing.  Opening Br. § I.C, VI; *infra* at § VI.

that the OCSPA's safe harbor applies to conduct "specifically permitted by [FTC] orders" (Ohio Rev. Code Ann. § 1345.11(B); Opp. 38)—including the terms at issue here.

**Washington.**  With respect to Washington's safe harbor, Plaintiffs simply invoke *Altria* and repackage their argument that the Consent Order "does not 'permit' the conduct challenged here." Opp. 38-39.  This argument fails for the reasons set forth above.

### B. *Plaintiffs Have Not Adequately Alleged That Santa Fe Made Any Statement Capable Of Misleading A Reasonable Consumer.*

Plaintiffs agree that fourteen of their statutory claims are subject to the reasonable-consumer standard.  Opp. 39; Opening Br. 40–41 (identifying the claims).  This concession is fatal to those claims, as each of Plaintiffs' three theories of deception relies on the existence of a fundamentally unreasonable consumer who either ignores or ascribes unsustainable interpretations to the statements on NAS advertisements and packages.

Plaintiffs try to avoid this reality by insisting that whether a statement is likely to deceive the reasonable consumer "is a question of fact not appropriate for determination on a motion to dismiss." Opp. 39.  But as the Second Circuit explained in affirming a dismissal for failure to satisfy the reasonable-consumer standard, "[i]t is well settled that a court may determine as a matter of law that an allegedly deceptive advertisement would not have misled a reasonable consumer." *Fink v. Time Warner Cable*, 714 F.3d 739, 741 (2d Cir. 2013) (per curiam) (collecting cases).  Indeed, Defendants' Opening Brief addressed a number of cases in which courts dismissed on this basis.  Opening Br. 43–49.  Nothing bars the Court from resolving this issue now.  Because none of Plaintiffs' theories of deception would mislead a reasonable consumer, the statutory claims in question must be dismissed.

**"Safer Cigarette" Theory.**  Plaintiffs' "safer cigarette" theory assumes that consumers *ignore* the disclosure, on every NAS advertisement and package, that "No additives in our tobacco does **NOT** mean a safer cigarette."  This theory cannot overcome the reasonable-consumer standard.

In responding, Plaintiffs abandon any claim that a reasonable consumer could be misled by NAS advertisements.  Instead, their response is limited to NAS *packaging*, and specifically the notion that Santa Fe has "hid[den] the disclaimer" on a side panel of the packaging.  Opp. 43–44.  Although they closely scrutinize the size and placement of the disclosure on NAS packaging (*id.* at 43–44, 51), Plaintiffs acknowledge Santa Fe's compliance with the Consent Order in advertisements (*id.* at 28).  Similarly, nearly every case Plaintiffs cite deals predominantly or exclusively with product-*labeling*.[13]  Having narrowed their "safer cigarette" theory in this considerable manner, Plaintiffs effectively concede that dismissal is warranted insofar as that theory challenges NAS advertisements.

In any event, Plaintiffs' objections to the size and placement of the disclosure on NAS packaging are unavailing.  Given the FTC's conclusion that the disclosure's inclusion in advertisements would be sufficient to inform NAS consumers, the size of the disclosure on packaging is a red herring.  Plaintiffs would still lose if there were *no* disclosure on the packaging; the fact that Santa Fe voluntarily includes the disclosure on packaging only makes Plaintiffs' losing position even weaker.  The decisions that Plaintiffs invoke, moreover, are inapposite.  In those decisions, courts held that defendants could not rely on disclosures that directly contradicted misrepresentations placed more prominently elsewhere on the packaging.  In *Ackerman v. Coca-Cola.*, for instance, the statement on the front of the package (that vitamin water was composed of only "vitamin + water" and was "all you need") was contradicted by the nutrition panel, which included the "actual sugar content" of the product and otherwise clarified that the product has "little or no nutritional value."  2010 WL

---

[13] *See, e.g., Williams v. Gerber Products*, 552 F.3d 934, 936 (9th Cir. 2008) ("Appellants challenged five features of the packaging used … to sell [] Fruit Juice Snacks."); *Ackerman v. Coca-Cola Co.*, No. 09-0395, 2010 WL 2925955, at *5 (E.D.N.Y. July 21, 2010) ("Plaintiffs' state law claims are premised on twelve allegedly misleading statements made in connection with the labeling of vitaminwater[.]"); *Lam v. Gen. Mills, Inc.*, 859 F. Supp. 2d 1097, 1100, 1104-05 (N.D. Cal. 2012) ("[Plaintiff's] claims are predicated on allegedly false and misleading statements that appear on the packaging of the Fruit Snacks ….").

2925955, at *15–*16.  And in *Williams v. Gerber Products*, the claim on the front of the package ("Fruit Juice," alongside images of several kinds of fruit) directly conflicted with a statement on the nutrition label that the product was actually "white grape juice from concentrate."  552 F.3d at 936.  The same is true of the other decisions Plaintiffs cite.[14]

Here, by contrast, Santa Fe's disclosure does not contradict the "Natural" and "Additive-Free" statements; instead, it provides additional, "more detailed information" (*Williams*, 552 F.3d at 939–40) to *confirm* what those terms mean and do not mean.  Unlike the use of "vitamin + water" to describe a product that also contains sugar, or the use of images of fruit to market a product made from concentrate, Santa Fe's use of the terms "natural" and "additive-free" does not inherently misrepresent the relative safety of NAS cigarettes; any conclusion as to the products' safety would require the consumer to make an inferential leap.  To prevent such a leap, the disclosure provides "more detailed confirmation of the representations on the front" of NAS packaging (Opp. 46), by verifying that those representations are truthful and foreclosing any misinterpretation that NAS cigarettes are safer than alternatives.  Accordingly, this case does not fit into Plaintiffs' line of decisions involving disclaimers that contradict overt misrepresentations.  And Plaintiffs do not identify any other basis for concluding that the terms at issue are capable of misleading a reasonable consumer into believing that NAS cigarettes are safer than others.  Accordingly, Plaintiffs' "safer cigarette" theory fails with respect to both NAS packaging and advertisements.

---

[14] *See Lam*, 859 F. Supp. 2d at 1100 (front label:  product "made with real fruit" and "strawberry"; nutrition label:  product made with "pears from concentrate"); *Wilson v. Frito-Lay N. Am., Inc.*, No. 12-cv-1586, 2013 WL 1320468, at *12–*13 (N.D. Cal. Apr. 1, 2013) (label stated that product was made with "ALL NATURAL Ingredients," which was "contrary to the reality described in the nutrition box"); *Jou v. Kimberly-Clark Corp.*, No. 13-3075, 2013 WL 6491158, at *6 (N.D. Cal. Dec. 10, 2013) (label stated that diapers were "pure & natural" when they "actually contain[ed] polypropylene and sodium polyacrylate").

**"Menthol-Free Menthol Cigarette" Theory.**  Plaintiffs' "menthol-free menthol cigarette"
theory is similarly unsalvageable.  Recognizing the absurdity of claiming to be deceived as to the use
of menthol in menthol cigarettes, Plaintiffs instead say they were misled into believing there would
be no menthol specifically in the tobacco.  Opp. 52.  This revised theory fares no better.  Plaintiffs
correctly allege that Santa Fe places menthol only "in the cigarette filters" and not in the tobacco itself
(CAC ¶ 68), thus acknowledging that Santa Fe manufactures the cigarettes with additive-free
tobacco.  Nor does any post-production, in-pack migration of menthol into the tobacco render the
term "additive-free" misleading, given Plaintiffs' express claim that migration is *inevitable*.  CAC
¶¶ 68–69; Opp. 52.  Plaintiffs thus *know* specifically that the tobacco in menthol cigarettes will
contain menthol.  And Plaintiffs cannot claim to be misled by what they know is unavoidable.  *See,
e.g.*, *Thomas v. Costco Wholesale Corp.*, No. 12-cv-2908, 2014 WL 5872808, at *5 (N.D. Cal. Nov. 12,
2014) ("[T]he Court simply finds it implausible that a reasonable consumer could purchase a *chocolate*
milk product and believe that it only contained naturally occurring sugars.").

**"Un-processed Cigarette" Theory.**  Plaintiffs' "un-processed cigarette" theory likewise
depends on the existence of an *un*reasonable consumer.  Plaintiffs recognize that "cigarettes do not
spring from the ground fully formed," but claim they were nonetheless misled by Santa Fe's curing
of the tobacco, which "chemical[ly] alter[ed]" it.  Opp. 53.  This clarification does not place Plaintiffs'
claim on any more solid footing.  In the CAC, Plaintiffs emphasize that this "chemical alteration" is
*necessary*.  CAC ¶ 72.  And they make no effort to explain how a reasonable consumer could believe
Santa Fe forgoes an essential process.  Courts have dismissed similar claims.  *See, e.g.*, *Ibarrola v. Kind,
LLC*, 83 F. Supp. 3d 751, 758 (N.D. Ill. 2015) (dismissing claim challenging use of phrase "no
refined sugars," and explaining that "[r]easonable consumers do not believe that they are eating
straight sugar cane … because sugar cane in its natural, unprocessed state is indigestible").

Plaintiffs' cited decisions (Opp. 53–54) are not to the contrary, as the plaintiffs in those cases never acknowledged the necessity of the very processes that allegedly rendered the term "natural" misleading. Instead, each case presented a live question whether that term misled consumers as to the inclusion of certain ingredients—none of which were concededly *essential* to the relevant product.[15]

### C. Four Of Plaintiffs' Claims Fail Because The Applicable Statute Does Not Authorize Relief Under These Circumstances.

Plaintiffs similarly cannot refute the other reasons that four of their statutory claims fail.

**Illinois Count II.** The Illinois Deceptive Trade Practices Act ("ILDTPA") authorizes injunctive relief only where a plaintiff is "likely to be harmed … in the future." *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 740–41 (7th Cir. 2014). There is no such likelihood here, because Plaintiffs are aware of the allegedly deceptive practices and, "armed with that knowledge," can avoid future harm (*Robinson v. Toyota Motor Credit Corp.*, 735 N.E.2d 724, 735 (Ill. App. Ct. 2000)). Plaintiffs insist that injunctive relief would protect *other* consumers "who may not even be aware of Defendants' deceptive trade practices." Opp. 55–56. But the ILDTPA does not authorize injunctive relief "when the plaintiff itself will not be deceived or confused in the future." *Aliano v. Louisville Distilling Co., LLC*, 115 F. Supp. 3d 921, 929 (N.D. Ill. 2015). Indeed, the *Aliano* court could not "identif[y] *any* [] authority" allowing injunctive relief under ILDTPA based on the possibility of "a different consumer's confusion." *Id.* (emphasis added). The sole decision Plaintiffs cite, *Leiner v. Johnson &*

---

[15] *See Garcia v. Kashi Co.*, 43 F. Supp. 3d 1359, 1368 (S.D. Fla. 2014) ("all natural" granola bar contained "Alpha-Tocopherol"); *Jou*, 2013 WL 6491158, at *6 ("pure & natural" diapers "actually contain[ed] polypropylene and sodium polyacrylate"); *In re Frito-Lay N. Am., Inc. All Nat. Litig.*, No. 12-md-2413, 2013 WL 4647512, at *15–*16 (E.D.N.Y. Aug. 29, 2013) ("all natural" tortilla chips included GMOs). Plaintiffs also quote the statement in *Astiana v. Hain Celestial Group, Inc.*, 783 F.3d 753, 756 (9th Cir. 2015), that, "[a]lthough the underlying question of what constitutes a 'natural' cosmetic poses a fascinating question, it is not one we answer." Opp. 53–54. But the *reason* the court did not answer this question had nothing to do with the case's 12(b)(6) posture or the reasonable-consumer standard. Instead, the court *could not* resolve this question because the only issues before it were "whether federal preemption or the primary jurisdiction doctrine prevents the district court from deciding when a 'natural' label … is false or misleading." 783 F.3d at 756. *Astiana* has no bearing here.

*Johnson Consumer Cos.*, 215 F. Supp. 3d 670 (N.D. Ill. 2016), arose under a "considerably broader" statute. *Jays Foods, Inc. v. Frito-Lay, Inc.*, 664 F. Supp. 364, 367 (N.D. Ill. 1987).

**New Jersey Count II.** Plaintiffs agree that the New Jersey Truth-In-Consumer Contract, Warranty, and Notice Act ("TCCWNA") "does not establish consumer rights" on its own, but instead merely "bolsters rights … established by other laws." Opp. 57–58; *Mattson v. Aetna Life Ins. Co.*, 124 F. Supp. 3d 381, 392–93 (D.N.J. 2015). Their only response is that they have alleged a predicate violation of the New Jersey Consumer Fraud Act. Opp. 56–57. But because that claim fails for the reasons set forth *supra* at § III.B, the TCCWNA claim necessarily fails, too.

**Ohio Count I.** Plaintiffs do not deny that, under the Ohio Consumer Sales Practices Act ("OCSPA"), Defendants must have been put on notice of their allegedly unlawful conduct. And the OCSPA provides that this notice can come only through a rule adopted by the Attorney General or a judicial finding. *In re Porsche Cars N. Am., Inc.*, 880 F. Supp. 2d 801, 867–68 (S.D. Ohio 2012) (citing Ohio. Rev. Code § 1345.09(B)). Nevertheless, Plaintiffs insist that this requirement does not apply in federal court under the *Erie* doctrine, because it is "purely procedural." Opp. 59–60. Plaintiffs are wrong: "[f]ederal courts typically consider pre-suit notice requirements to be substantive laws, rather than procedural laws, for *Erie* analysis." *Curry v. High Springs Family Practice Clinic & Diagnosis Ctr. Inc.*, No. 1:08-cv-8, 2008 WL 5157683, at *9 (N.D. Fla. Dec. 9, 2008). Indeed, Plaintiffs simply ignore the decisions of federal courts that dismiss class claims for failure to provide the required notice. *E.g.*, *Porsche*, 880 F. Supp. 2d at 868; *Corcoran v. CVS Health Corp.*, 169 F. Supp. 3d 970, 992 (N.D. Cal. 2016). Plaintiffs' only remaining argument is that the court should write off Ohio's notice requirement as "merely formalistic and ceremonial," and treat the CAC as providing the requisite notice. Opp. 60. This dismissive view finds no support in the OCSPA, which lays out two specific forms of valid notice—neither of which is satisfied by the filing of a complaint.

**Ohio Count II.**  Plaintiffs' claim under the Ohio Deceptive Trade Practices Act fails because "[t]he majority of courts" in Ohio have concluded that this statute "protects the interests of a purely commercial class that does not include individual consumers."  *Terlesky v. Fifth Dimension, Inc.*, No. 1:15-cv-374, 2015 WL 7254189, at *2 (S.D. Ohio Nov. 17, 2015) (quoting *Porsche*, 880 F. Supp. 2d at 874, and collecting other cases).  Plaintiffs urge the Court (Opp. 61) to ignore this majority rule and follow "[a]n alternative, and minority, school of thought" (*Terlesky*, 2015 WL 7254189, at *3).  The Court should adhere to the prevailing interpretation of Ohio law.

## IV. Plaintiffs' Unjust-Enrichment Claims Fail On Their Own Terms.

Plaintiffs have done nothing to show that their unjust-enrichment claims can stand apart from the unavailing theories that underlie their statutory causes of action.  These claims also fail on the merits.  Plaintiffs cannot get around the fact that most of the relevant States foreclose unjust-enrichment claims where, as here, an adequate remedy at law exists.  They cannot satisfy four States' requirement that the defendant have received a *direct* benefit with allegations that Santa Fe *indirectly* benefited from Plaintiffs' transactions with independent retailers.  And they cannot refute the additional defects in their claims under New Jersey and New York law.[16]

### A.  *Because Plaintiffs Have Failed To Plausibly Allege That Any Injustice Occurred, Their Unjust-Enrichment Claims Fail.*

Plaintiffs do not deny that they must allege some injustice for their unjust-enrichment claims to survive.  And they confirm that the only injustice alleged here is premised on the same supposed falsehoods that underlie their statutory claims.  Opp. 62.  Plaintiffs insist that this is enough to sustain their unjust-enrichment claims because the Court must accept their allegations as true.  *Id.* at 62–63.  But because they have not *plausibly* alleged any misrepresentations capable of misleading a reasonable consumer (*supra* at § III.B), their unjust-enrichment claims fall with their statutory claims.

---

[16] Plaintiffs agree that their claims are governed by the law of the state of purchase.  Opp. 62.

**B.** ***The Availability Of An Adequate Remedy At Law Forecloses Almost All Of Plaintiffs'*** ***Unjust-Enrichment Claims.***

Most of Plaintiffs' unjust-enrichment claims fail for the additional reason that the relevant States already provide adequate legal remedies, via the statutes Plaintiffs invoke.  Indeed, Plaintiffs do not deny that these statutes offer adequate legal remedies.  Instead, Plaintiffs primarily insist that it would be "premature" to dismiss the claims on this basis, and also offer a few other state-specific reasons that certain claims should survive.  These efforts fail, requiring the dismissal of nine of Plaintiffs' claims.  *See* Opening Br. 55 n.16 (identifying the claims).[17]

Plaintiffs first attempt to avoid the adequate-remedy issue altogether, arguing that it is "premature" at this stage because the Federal Rules allow plaintiffs to plead claims in the alternative. Opp. 63.  This argument misses the mark for two reasons.  *First*, Plaintiffs largely rely on cases where the allegedly adequate legal remedy was enforcement of an express contract, but there was some question as to whether a contract actually existed or actually applied to the dispute.[18]  When a plaintiff pleads an express-contract claim in the alternative, it is the *existence* of the legal remedy that is at issue; if there is no applicable contract, there is no legal remedy and so an equitable action is appropriate.  Here, however, the *existence* of statutory remedies is undisputed; the only question is whether Plaintiffs are entitled to those remedies.  Cases involving express contracts are inapposite.

---

[17] Defendants no longer seek the dismissal of Plaintiffs' unjust-enrichment claim under New Mexico law on this particular basis.

[18] *See, e.g., In re Dial Complete Mktg. & Sales Practices Litig.*, No. 11-md-2263, 2013 WL 1222310, at *8 (D.N.H. Mar. 26, 2013) ("Dial moves to dismiss plaintiffs' unjust enrichment claims, noting that 'the doctrine does not apply where a contract allegedly governs the parties' relationship.'"); *In re Checking Account Overdraft Litig.*, 694 F. Supp. 2d 1302, 1321 (S.D. Fla. 2010) ("The first argument is that there can be no claim for unjust enrichment when an express contract exists."); *Lass v. Bank of Am., N.A.*, 695 F.3d 129, 140–41 (1st Cir. 2012); *TOT Payments, LLC v. First Data Corp.*, 9 N.Y.S. 3d 44, 45 (N.Y. App. Div. 2015); *Paikai v. Gen. Motors Corp.*, No. 07-cv-892, 2009 WL 275761, at *4 (E.D. Cal. Feb. 5, 2009).

*Second*, courts in similar circumstances have specifically rejected Plaintiffs' attempt at simply pleading unjust-enrichment claims in the alternative.  In *In re Ford Tailgate Litigation*, for instance, the court held that, although "[p]laintiffs are, of course, entitled to plead alternative claims," that is not the end of the inquiry:  "where the unjust enrichment claim relies upon the same factual predicates as a plaintiff's legal causes of action, it is not a true alternative theory of relief but rather is duplicative of those legal causes of action."  No. 11-cv-2953, 2014 WL 1007066, at *5 (N.D. Cal. Mar. 12, 2014) (quoting *Licul v. Volkswagen Grp. of Am., Inc.*, No. 13-cv-61686, 2013 WL 6328734, at *7 (S.D. Fla. Dec. 5, 2013)).  Thus, where "plaintiffs do not distinguish the alleged deception underlying their unjust enrichment claims from that underlying their" legal claims, dismissal is required.  *Id.*  For this reason, the court in *Ford Tailgate* dismissed 19 unjust-enrichment claims on a 12(b)(6) motion, including claims under the laws of Florida, Illinois, Massachusetts, New York, North Carolina, and Ohio.  *Id.* at *5; Compl. ¶¶ 16, 21, 34, 45, 48, 50, *In re Ford Tailgate Litig.*, No. 11-cv-2953, 2014 WL 1007066 (ECF 148) (identifying relevant state laws).  Similarly, the *Licul* court dismissed an unjust-enrichment claim where the plaintiffs "ma[d]e no effort to distinguish the 'misconduct' and 'unfair and deceptive conduct' supporting their unjust enrichment claim from the alleged wrongdoing underlying their" statutory claim.  2013 WL 6328734, at *7.  The same result is warranted here, as the CAC makes clear that the same alleged misconduct underlies Plaintiffs' statutory and unjust-enrichment claims.[19]

Plaintiffs fare no better when they turn to the merits of the adequate-remedy issue.

**Colorado.**  The sole case that Plaintiffs rely upon recognizes that, under Colorado law, "unjust enrichment is an equitable remedy that is not available when a remedy at law lies to address the same

---

[19] Plaintiffs are similarly off-base in invoking a "presumption" that state statutory claims do not "displace state common law causes of action."  Opp. 63.  Their only support is a decision that relied on Maine law.  *In re Light Cigarettes Mktg. Sales Practices Litig.*, 751 F. Supp. 2d 183, 193 (D. Me. 2010) (citing *Maietta Constr., Inc. v. Wainwright*, 847 A.2d 1169, 1174 (Me. 2004)).  Plaintiffs fail to show that any of the relevant States employ the broad presumption they propose.

conduct." *L-3 Comm'ns Corp. v. Jaxon Eng'g & Maint., Inc.*, 125 F. Supp. 3d 1155, 1175 (D. Colo. 2015). Although an unjust-enrichment claim can "piggyback" on a legal claim if the former seeks distinct relief that is unavailable under the latter (*id.*), Plaintiffs have not identified any way in which the equitable remedy they seek ("restitution of Defendants' ill-gotten gains," CAC at 105) differs from the legal remedy they seek (damages). This case thus does not fall within the "piggybacking" exception.

**Florida.** Plaintiffs argue that, under Florida law, "an unjust enrichment claim fails only upon a showing that an express contract exists." Opp. 64 (citing *Williams v. Bear Stearns & Co.*, 725 So. 2d 397, 400 (Fla. Dist. Ct. App. 1998)). But they make no attempt to account for the more recent decisions, cited in Defendants' Opening Brief, holding that "[i]t is well settled in Florida that unjust enrichment is an equitable remedy and is, therefore, not available where there is an adequate legal remedy"—without limiting this rule to situations where an express contract exists. *Am. Honda Motor Co. v. Motorcycle Info. Network, Inc.*, 390 F. Supp. 2d 1170, 1178 (M.D. Fla. 2005); *see also Herazo v. Whole Foods Mkt., Inc.*, No. 14-cv-61909, 2015 WL 4514510, at *2 (S.D. Fla. July 24, 2015).[20]

**Massachusetts.** Plaintiffs do not dispute that unjust-enrichment claims are unavailable under Massachusetts law when an adequate legal remedy exists. Instead, their only argument is that district courts in Massachusetts erred in applying this rule when a legal remedy was "mere[ly] availab[le]," regardless of the claim's viability. *Reed v. Zipcar, Inc.*, 883 F. Supp. 2d 329, 334 (D. Mass. 2012). Plaintiffs' disagreement with these decisions is not a basis for ignoring them. The decision in *Lass v.*

---

[20] Moreover, the *Williams* decision that Plaintiffs invoke simply misapprehended Florida law. The rule set forth in *Williams* traces back to *ThunderWave, Inc. v. Carnival Corp.*, 954 F. Supp. 1562, 1566 (S.D. Fla. 1997). *See Williams*, 725 So.2d at 400 (citing *Mobil Oil Corp. v. Dade Cty.*, 982 F. Supp. 873, 880 (S.D. Fla. 1991), for proposition that the adequate-remedy rule "does not apply to claims for unjust enrichment"); *Mobil*, 982 F. Supp. at 880 (citing *ThunderWave*, 954 F. Supp. at 1566, for this proposition). But *ThunderWave* noted only that the *economic-loss* rule—not the *adequate-remedy* rule— "does not apply to claims for unjust enrichment." This misreading of a district court's decision provides no basis for believing the Florida Supreme Court would abolish the adequate-remedy rule.

*Bank of America* does not help Plaintiffs, as there the court held only that the plaintiff could plead claims for unjust enrichment and breach of an express contract, in light of questions as to whether the contract actually applied.  695 F.3d at 140–41.  As discussed above, that principle does not apply.

**Michigan.**  Courts applying Michigan law hold "that '[e]quity will not take jurisdiction where there is a full, complete, and adequate remedy at law.'"  *Pacheco v. Boar's Head Provisions Co.*, No. 1:09-cv-298, 2010 WL 1323785, at *4 (W.D. Mich. Mar. 30, 2010).  Indeed, immediately after claiming that the absence of an adequate legal remedy is not required, Plaintiffs address a Michigan Supreme Court decision that applies this requirement.  Opp. 65 (citing *Tkachik v. Mandeville*, 790 N.W.2d 260, 265 (Mich. 2010)).  Plaintiffs' only other argument is that it would be "premature" to determine whether their statutory claims will provide "complete and ample" relief.  *Id.*  But courts have held that "the opportunity for plaintiff to recover under a legal theory is sufficient to bar the equitable claim," regardless of whether the plaintiff recovers under that theory.  *Duffie v. Michigan Grp., Inc.*, No. 14-cv-14148, 2016 WL 28987, at *17 (E.D. Mich. Jan. 4, 2016).

**New Jersey.**  Plaintiffs appear to dispute that New Jersey law bars unjust-enrichment claims if an adequate legal remedy exists.  Opp. 66.  But the cases they cite do not equivocate on this requirement.  *See Adamson v. Ortho-McNeil Pharm., Inc.*, 463 F. Supp. 2d 496, 505 (D.N.J. 2006) ("Restitution for unjust enrichment is an equitable remedy, available only when there is no adequate remedy at law."); *Nat'l Amusements, Inc. v. N.J. Turnpike Auth.*, 619 A.2d 262, 267 (N.J. Super. Ct. Law Div. 1992) (same), *aff'd* 645 A.2d 1194 (N.J. Super. Ct. App. Div. 1994).  Plaintiffs' only other argument is prematurity; that argument fails for the reasons set forth above.

**New York.**  The absence of an adequate legal remedy is required for unjust-enrichment claims under New York law.  *See, e.g.,* S*amiento v. World Yacht Inc.*, 883 N.E.2d 990, 996 (N.Y. 2008) ("[U]njust enrichment … does not lie as plaintiffs have an adequate remedy at law.").  Plaintiffs

again fall back on their prematurity argument (Opp. 67), but because there is no question as to the existence of an applicable statutory remedy, the practice of pleading in the alternative does not salvage Plaintiffs' unjust-enrichment claim. *See, e.g., IIG Capital LLC v. Archipelago, L.L.C.*, 36 A.D.3d 401, 405 (N.Y. App. Div. 2007) (allowing alternative pleading "where there is a bona fide dispute as to the existence of a contract or where the contract does not cover the dispute in issue").

**North Carolina.** Plaintiffs are incorrect in claiming North Carolina law does not follow the adequate-remedy rule. *See Embree Constr. Grp., Inc. v. Rascor, Inc.*, 411 S.E.2d 916, 920 (N.C. 1992) (noting that "[t]he court's equitable intervention is obviated when an adequate remedy at law is available to the plaintiff," and applying this rule to unjust-enrichment claim). And their prematurity argument once again fails for the reasons set forth above.

**Ohio.** In attempting to sidestep Ohio law's requirement that there be no adequate remedy at law, Plaintiffs fall back on prematurity. Opp. 68. But the decision that they cite explains that pleading in the alternative is allowed "only in the face of uncertainty as to the existence of a contract or, perhaps, uncertainty as to" the contract's applicability to the dispute. *Paikai*, 2009 WL 275761, at *4 (citing *Detrick v. 84 Lumber Co.*, No. 06-cv-2732, 2007 WL 1467070, at *4 (N.D. Ohio May 10, 2007)). Where, as here, there is no dispute as to the existence of applicable statutory remedies, alternative pleading does not save Plaintiffs.

**Washington.** In defending their unjust-enrichment claim under Washington law, Plaintiffs rely exclusively on their prematurity argument. Opp. 69. Again, this argument fails.

## C. *Plaintiffs Cannot Negate The Direct-Benefit Requirement That Applies Under Michigan, New Jersey, North Carolina, and Ohio Law.*

Plaintiffs' claims also fail under the laws of Michigan, New Jersey, North Carolina, and Ohio because Plaintiffs cannot allege that they conferred a benefit directly on Defendants, rather than on a third-party retailer. Plaintiffs urge a boundless interpretation of directness, under which it is

enough that they purchased NAS cigarettes from retailers in the distribution chain.  Opp. 69–70.

They thus ask the Court to hold that the requirement of a *direct* benefit is satisfied by the conferring

of an *indirect* benefit.  Plaintiffs' cited decisions do not support this request.  With respect to

Michigan, North Carolina, and Ohio law, Plaintiffs merely offer unpublished federal-court decisions

that impose a less stringent rule than the States' own courts have applied.[21]  This is no basis for

ignoring these state courts' elucidation of the governing law.  And with respect to New Jersey law,

Plaintiffs' only support comes from a single federal decision (*Stewart v. Beam Global Spirits & Wine,

Inc.,* 877 F. Supp. 2d 192 (D.N.J.2012)) that disagrees with the rule applied by "the vast majority of

courts in this District"—and that courts have refused to follow on that basis.  *See Fishman v. Gen.

Elec. Co.,* No. 2:12-cv-585, 2013 WL 1845615, at *6 (D.N.J. Apr. 30, 2013) (dismissing unjust-

enrichment claim where plaintiffs "did not purchase their washing machines directly from GE").

This Court should not depart from the clear majority rule under New Jersey law.

### D. *Plaintiffs' New Jersey And New York Unjust-Enrichment Claims Fail For Still Other Reasons.*

Plaintiffs also cannot deny other defects in their New Jersey and New York claims.

**New Jersey.**  The New Jersey Supreme Court has held that unjust enrichment is an exclusively

equitable remedy that requires a plaintiff to "show that it expected remuneration from the defendant

at the time it performed or conferred a benefit on defendant and that the failure of remuneration

---

[21] *Compare A & M Supply Co. v. Microsoft Corp.,* No. 274164, 2008 WL 540883, at *2 (Mich. Ct. App. Feb. 28, 2008) (rejecting unjust-enrichment claim because plaintiffs could not "show that Microsoft received any direct payment or other benefit" from individuals who purchased Microsoft products from entities other than Microsoft); *Baker Constr. Co. v. City of Burlington,* 200 N.C. App. 435, at *6 (2009) (table) ("[T]his Court has limited the scope of a claim of unjust enrichment such that the benefit conferred must be conferred directly from plaintiff to defendant, not through a third party." (citing *Effler v. Pyles,* 380 S.E.2d 149, 152 (N.C. App. 1989))); *Johnson v. Microsoft Corp.,* 834 N.E.2d 791, 799 (Ohio 2005) (affirming dismissal of unjust-enrichment claim by individuals who bought Microsoft products from entity other than Microsoft, because "no economic transaction occurred between Johnson and Microsoft, and, therefore, Johnson cannot establish that Microsoft retained any benefit 'to which it is not justly entitled'" (citation omitted)), *with* decisions cited at Opp. 69–70.

enriched defendant beyond its contractual rights." *VRG Corp. v. GKN Realty Corp.*, 641 A.2d 519, 554 (N.J. 1994). Plaintiffs ask the Court to construe their claim as equitable (Opp. 70–71), but they do not even claim to have plausibly alleged an expectation of remuneration. Nor could they.

**New York.** New York law rejects unjust-enrichment claims that "simply duplicate[]" (*Koenig v. Boulder Brands, Inc.*, 995 F. Supp. 2d 274, 290 (S.D.N.Y. 2014) (quoting *Corsello v. Verizon N.Y., Inc.*, 967 N.E.2d 1177, 1185 (N.Y. 2012))) or "stem[] from the same underlying allegations" (*Reynolds v. Lifewatch, Inc.*, 136 F. Supp. 3d 503, 525 (S.D.N.Y. 2015)) as statutory claims. This is not, as Plaintiffs claim, merely a reiteration of the adequate-remedy rule. Opp. 71. Instead, this rule reflects New York's decision to make unjust enrichment available "only in unusual situations" and not as "a catchall cause of action to be used when others fail." *Corsello*, 967 N.E.2d at 1185. Here, Plaintiffs attempt to use the unjust-enrichment cause of action in precisely that catchall fashion, as a fall-back for their statutory claims. New York law forecloses this effort.

## V. Plaintiffs Cannot Show A Breach Of Any Express Warranty.

Plaintiffs similarly cannot salvage their express-warranty claims. Those claims fail under the law of every relevant State because Plaintiffs have not plausibly alleged that they *reasonably* relied on the supposed warranty—no reasonable consumer could understand a package of menthol cigarettes to be promising cigarettes or tobacco free of menthol. Additionally, Plaintiffs' claims fail under several States' laws because they have not provided the requisite pre-litigation notice or established privity.[22]

### A. *Any Warranty On NAS Menthol Cigarettes Necessarily Did Not Guarantee An Absence Of Menthol.*

Under the law of every relevant State, Plaintiffs must plausibly allege that their reading of the alleged express warranty was a reasonable one. Plaintiffs distance themselves from the obviously absurd claim that they did not recognize that NAS menthol cigarettes would contain menthol, and

---

[22] Plaintiffs do not dispute that these claims are governed by the law of the state of purchase.

insist that what they expected was menthol-free tobacco.  Opp. 72.  But given Plaintiffs' assertion regarding post-production, in-pack migration of menthol no matter where in the container the menthol is placed (e.g., CAC ¶ 68), no reasonable consumer could construe a package of menthol cigarettes as promising the absence of menthol in those cigarettes' tobacco; "additive-free" must be understood in light of the fact that the cigarettes are expressly represented to contain menthol.  *Cf. supra* at 12 n.8.  The decision in *Nelson v. MillerCoors, LLC*, No. 15-cv-7082, 2017 WL 1403343 (E.D.N.Y. Mar. 31, 2017), underscores the flaw in Plaintiffs' logic.  There the court held that, even if the use of Australian imagery in marketing Foster's beer could create a warranty that the beer was produced in Australia, that warranty was necessarily modified by the express statement on the beer's label that the beer was actually produced in the United States.  *Id.* at *8.  The same is true here. Because Plaintiffs rely on a fundamentally unreasonable reading of the alleged warranty, their claim fails under the law of each relevant State.

### B.  *Plaintiffs Cannot Eliminate Six States' Pre-Litigation Notice Requirements.*

Plaintiffs' attempts at circumventing the requirement of pre-litigation notice (required under California, Florida, Illinois, New Mexico, New York, and North Carolina law) all fail.

Plaintiffs claim that they adequately alleged pre-litigation notice through their vague assertion that "[a]ll conditions precedent to Defendants' liability have been performed" (CAC ¶ 456), and insist that it would be premature for the Court to conduct "an exhaustive review of the factual sufficiency" of this allegation.  Opp. 73–74 (quoting *In re Rust-Oleum Restore Mktg., Sales Practices & Prod. Liab. Litig.*, 155 F. Supp. 3d 772, 800 (N.D. Ill. 2016)).  But this argument fails, because Plaintiffs never actually alleged pre-litigation notice.  Indeed, Plaintiffs do not identify any authority establishing that the sweeping catch-all they quote—which makes no mention of notice—suffices. It does not.  To the contrary, the decision that they primarily rely upon notes that, while the *sufficiency*

of notice "is a question of fact not susceptible to a motion to dismiss[,] … the law still mandates a complaint provide factual allegations sufficient to establish pre-suit notice to sustain a breach of warranty claim." *Rust-Oleum*, 155 F. Supp. 3d at 799. Plaintiffs have not satisfied this requirement.

Beyond this, Plaintiffs advance a variety of state-specific reasons that their lack of pre-litigation notice is of no consequence. Their arguments are uniformly flawed.[23]

*First*, Plaintiffs try to circumvent Illinois's notice requirement by claiming Defendants had "actual knowledge" of the alleged misconduct. But the Illinois Supreme Court has held that it is not enough that "a manufacturer is aware of problems with a particular product line"—rather, it must be "apprised of the trouble with *the particular product purchased by a particular buyer*." *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 590 (Ill. 1996) (emphasis added). In other words, "[t]he notice of the breach required is not of the facts, which the seller presumably knows quite as well as, if not better than, the buyer, but of *buyer's claim* that they constitute a breach." *Id.* (citation omitted). Because Plaintiffs do not allege that Defendants had actual notice of their claim, this exception is irrelevant.

*Second*, Plaintiffs attempt to find shelter in various other exceptions to the notice requirement, arguing that Illinois and North Carolina law treat the filing of a lawsuit as valid notice, and that New York law excuses the requirement in "cases involving goods sold for human consumption." Opp. 74–75. These arguments fail for a common reason: the exceptions in question apply only in personal-injury cases.[24] As the North Carolina Supreme Court has explained, there is a straightforward reason

---

[23] Plaintiffs do not dispute that the lack of pre-suit notice defeats their claims under Florida and New Mexico law, effectively conceding that those claims must be dismissed.

[24] *See Connick*, 675 N.E.2d at 590 (under Illinois law, "[o]nly a consumer plaintiff who suffers a personal injury may satisfy the section 2–607 notice requirement by filing a complaint …."); *Kacsuta v. Lenovo (U.S.) Inc.*, No. 13-cv-316, 2013 WL 12126775, at *2 (C.D. Cal. July 16, 2013) (explaining that, under North Carolina law, the exception "allow[ing] notice with the filing of the complaint" is limited to personal-injury cases (citing *Maybank v. S. S. Kresge Co.*, 273 S.E.2d 681, 684 (N.C. 1981)));

for loosening the notice requirement in such cases:  arguably, the "most important policy behind the notice requirement is enabling the seller to make efforts to cure the breach," and "this policy has no application" in personal-injury cases, "because the damage has already occurred and is irreversible." *Maybank*, 273 S.E.2d at 684.  This is not a personal-injury case, and so these exceptions are irrelevant.

*Finally*, Plaintiffs argue that California law excuses the notice requirement in indirect-purchaser cases.  Opp. 74.  But as explained in *In re Mentor Corp. ObTape Transobturator Sling Products Liability Litigation*, this exception *does not* "stand[] for the proposition that the warranty notice requirement does not exist for 'remote buyer' breach of warranty claims."  No. 4:08-md-2004, 2015 WL 5468791, at *2 (M.D. Ga. Sept. 16, 2015) (citing *Greenman v. Yuba Power Prods., Inc.,* 377 P.2d 897 (Cal. 1963)).  Rather, *Greenman* established only "that the procedural requirements of a warranty claim cannot defeat strict products liability in tort"—a rule that does not apply where, as here, Plaintiffs "attempt[] to proceed under a *contract* theory of recovery."  *Id.*  The *Mentor Corp.* court thus concluded that the plaintiff's failure to provide pre-suit notice was fatal to his express-warranty claim.  *Id.*  So too, here.

### C.  *Plaintiffs Do Not Satisfy Exceptions To The Privity Requirement.*

Plaintiffs do not deny that they lack privity with Defendants.  Instead, they claim that the relevant States (Florida, Illinois, and New York) excuse the privity requirement for claims based on packaging or other materials provided to consumers.  Opp. 75.  Plaintiffs fail to acknowledge, however, that courts applying each State's laws have rejected express-warranty claims in precisely the circumstances that their claimed exception would apply.  For instance, the court in *Keith v. Ferring Pharmaceuticals, Inc.* (which postdates the opinion that Plaintiffs rely upon, *Bietsch v. Sergeant's Pet Care Prod., Inc.,* No. 15-cv-5432, 2016 WL 1011512 (N.D. Ill. Mar. 15, 2016)), specifically considered the

---

*In re 5-Hour ENERGY Mktg. & Sales Practices Litig.*, 2015 WL 12734796, at *9 (C.D. Cal. Jan. 22, 2015) (holding, after considering the *Fischer v. Mead Johnson Labs.*, 341 N.Y.S.2d 257 (N.Y. Sup. Ct. App. Div. 1973), decision that Plaintiffs invoke, that New York's "goods for human consumption" exception "envisions causes of action that are grounded in personal injuries to plaintiffs").

argument that privity is not required where the alleged warranty "relates to the goods and becomes part of the basis of the bargain," but *rejected* that argument, explaining that "the Supreme Court of Illinois has yet to extend express warranties to non-privity plaintiffs." No. 15-cv-10381, 2016 WL 5391224, at *7 (N.D. Ill. Sept. 27, 2016). Similarly, in *Hill v. Hoover*, the court held that Florida law in fact *does* require privity for consumer suits alleging a manufacturer's breach of an express warranty. 899 F. Supp. 2d 1259, 1266–67 (N.D. Fla. 2012). And courts applying New York law, too, have repeatedly dismissed claims premised on allegedly deceptive labels for lack of privity. *E.g.*, *Koenig*, 995 F. Supp. 2d at 290; *Ebin v. Kangadis Food Inc.*, No. 13-cv-2311, 2013 WL 6504547, at *6 (S.D.N.Y. Dec. 11, 2013).

## VI. Plaintiffs' Requests For Injunctive Relief Are Moot.

Although Plaintiffs emphasize that the FDA agreement[25] allows Santa Fe to continue using "Natural" in the NAS brand name, they implicitly concede that the agreement provides the relief they seek insofar as it requires Defendants to cease using the term "Additive-Free" and all other instances of the term "Natural." Their claim is thus moot *at least* to that extent. And although Santa Fe has not yet finalized the changes to the label, those changes are well underway: on May 9, 2017, the FTC confirmed that Santa Fe will remain in compliance with the Consent Order by including a modified disclosure stating that "Natural American Spirit cigarettes are not safer than other cigarettes," thereby triggering the Memorandum of Agreement's seven-month period in which Santa Fe must implement the required changes.[26] *See* FTC, Informal Staff Guidance Regarding Santa Fe Natural Tobacco Co.'s Consent Order (FTC Dkt. No. C-3952) (May 9, 2017); Memo. of Agreement

---

[25] As explained in Defendants' Reply in Support of their Second Motion for Judicial Notice (filed today), the FDA has now publicly verified the Memorandum of Agreement, curing Plaintiffs' only objection to the court's taking judicial notice of that document.

[26] This Guidance is attached to Defendants' Third Motion for Judicial Notice (filed today).

at ¶ 2.  This seven-month window (ending in December 2017) will close long before this case

reaches judgment, thus ensuring that Plaintiffs will receive what their injunctive claims seek.

Plaintiffs' only other response is to suggest that, notwithstanding Santa Fe's agreement with two

federal agencies, the company might "resume using th[e] [challenged] terms in the future."  Opp. 77.

This attempt at invoking the voluntary-cessation exception fails.  To maintain a request for

injunctive relief regarding conduct that Defendants have ceased, "some reason must support

Plaintiffs' insistence that the alleged violation is likely to recur."  *Comm. for First Amendment v.*

*Campbell*, 962 F.2d 1517, 1525 (10th Cir. 1992).  Plaintiffs, however, cannot even suggest that

Defendants would engage in the "gamesmanship" that the voluntary-cessation exception is designed

to prevent.  *Brown v. Buhman*, 822 F.3d 1151, 1166 (9th Cir. 2016).  This exception is inapplicable.

**VII. The Court Lacks Personal Jurisdiction Over RAI With Respect To The Claims Of The Five Plaintiffs That Were Not Parties To A Suit Originally Filed In North Carolina.**

Plaintiffs argue that it is "unnecessary" for the Court to decide whether personal jurisdiction is

lacking over RAI for purposes of the claims brought by the five Plaintiffs in actions transferred

from outside North Carolina.  Opp. 77.  But they do not deny that each transferred case retains its

distinct identity in this MDL proceeding—meaning that, if any claims survive these pretrial

proceedings, this Court will need to transfer the cases back to their courts of origin.  *In re Korean Air*

*Lines Co.*, 642 F.3d 685, 700 (9th Cir. 2011).  The jurisdictional issue therefore undoubtedly matters;

this Court cannot confer jurisdiction over RAI upon a court that lacks such jurisdiction.  Courts

presiding over MDL proceedings thus grant motions to dismiss certain plaintiffs' claims for lack of

personal jurisdiction, even if there are other plaintiffs who *have* established personal jurisdiction.  *See,*

*e.g.*, *In re Cmty. Health Sys., Inc.*, No. 15-cv-222, 2016 WL 4732630, at *2, *5 (N.D. Ala. Sept. 12, 2016)

(holding that plaintiffs in actions transferred from Tennessee had personal jurisdiction over

defendant, but dismissing claims of plaintiffs in actions transferred from "states *other than Tennessee*").

Plaintiffs fare no better on the merits of their jurisdictional argument.  They (rightly) do not suggest RAI is subject to general jurisdiction in any court outside North Carolina.  Nor have they overcome RAI's showing that it has not engaged in conduct that would subject it to specific jurisdiction outside North Carolina.  Plaintiffs rehash the CAC's conclusory "allegations of RAI's substantial involvement in activities that gave rise to Plaintiffs' claims"—for instance, allegations that RAI "considers Santa Fe an operating segment," and has "involvement and control over Santa Fe's advertising."  Opp. 78 (quoting CAC ¶¶ 35, 36).  But these allegations come nowhere near suggesting the "*quid pro quo*" needed to show that RAI, "in exchange for 'benefitting' from some purposive conduct directed at the forum state, … consent[ed] to the exercise of jurisdiction for claims related to those contacts." *Dudnikov v. Chalk & Vermillion Fine Arts, Inc.*, 514 F.3d 1063, 1078 (10th Cir. 2008).  Instead, proving these allegations would mean only that RAI is a typical holding company that has interacted with Santa Fe in ordinary ways that did not give rise to Plaintiffs' claims.  After all, Plaintiffs do not and cannot plausibly allege that RAI has *any* role in the representations at issue here—as the Gentry Declaration makes clear, RAI has no role in advertising, marketing, or packaging any products, including NAS cigarettes.  Gentry Decl. ¶¶ 9, 10.  This Court has previously held that facts like those alleged here—"evidence only that [a parent] has corporate relationships with subsidiary corporate entities"—fail to establish specific jurisdiction. *Walker v. THI of N.M. at Hobbs Ctr.*, 801 F. Supp. 2d 1128, 1155–58 (D.N.M. 2011).

Plaintiffs also cannot impute Santa Fe's contacts with the transferor States to RAI.  They do not deny that imputation is possible only where "the parent company actually controls the subsidiary's day-to-day business decisions and disregards the subsidiary's corporate form." *Willis v. Gov't Emps. Ins. Co.*, No. 13-cv-280, 2016 WL 3946782, at *5 (D.N.M. Feb. 1, 2016); *see also Jemez Agency, Inc. v. CIGNA Corp.*, 866 F. Supp. 1340, 1344 (D.N.M. 1994) (no personal jurisdiction where no showing

that parent "possesses de facto dominance over the [subsidiary] such that the [companies] can be characterized as one entity").  And Plaintiffs rightly do not suggest they could establish "actual[] control[]" or "de facto dominance."  Indeed, the Gentry Declaration confirms this would be impossible, as it explains that RAI is not involved in developing or executing the marketing of NAS cigarettes, is not involved in Santa Fe's or RJRT's day-to-day operations, and maintains separate accounts and records from Santa Fe and RJRT.  Gentry Decl. ¶¶ 7, 9, 11.  Merely labeling these sworn statements as "boilerplate" (Opp. 78) does not bring Plaintiffs over the high bar for imputation.

Plaintiffs close their brief by suggesting that there is some special jurisdictional rule for parent tobacco companies.  Opp. 79.  To the contrary, the cases Plaintiffs invoke merely concluded that the allegations before them *did* establish a plausible basis for finding parent-company involvement in the conduct at issue.  Plaintiffs cannot plausibly make such allegations here.  Indeed, courts routinely have held that there is no personal jurisdiction over parent companies within the Reynolds corporate structure, further confirming that the standards are not somehow different for tobacco companies. *E.g.*, *Taft v. Nabisco*, No. 15-cv-2685, 2015 WL 12819144, at *2 (C.D. Cal. June 4, 2015); *Dymits v. Am. Brands, Inc.*, No. 96-cv-1897, 1996 WL 751111, at *4–*6 (N.D. Cal. Dec. 31, 1996).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court dismiss the Consolidated Amended Complaint with prejudice and, if reached, dismiss for lack of personal jurisdiction the claims brought against RAI by Plaintiffs in actions transferred from courts outside North Carolina.

Dated:  May 30, 2017

Respectfully submitted,

/s/ David M. Monde
_____

Andrew G. Schultz
   aschultz@rodey.com
RODEY, DICKASON, SLOAN,
AKIN & ROBB, P.A.
201 3rd Street N.W., Suite 2200
Albuquerque, NM 87102
T: 505.765.5900
F: 505.768.7395

David M. Monde (*pro hac vice*)
   dmmonde@jonesday.com
JONES DAY
1420 Peachtree Street, N.E.
Suite 800
Atlanta, GA 30309
T: 404.521.3939
F: 404.581.8330

Peter J. Biersteker (*pro hac vice*)
   pbiersteker@jonesday.com
William D. Coglianese (*pro hac vice*)
   wcoglianese@jonesday.com
Jordan Von Bokern (*pro hac vice*)
   jvonbokern@jonesday.com
Jon G. Heintz (*pro hac vice*)
   jheintz@jonesday.com
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001
T: 202.879.3939
F: 202.626.1700

Sharyl Reisman (*pro hac vice*)
   sareisman@jonesday.com
JONES DAY
250 Vesey Street
New York, NY 10281
T: 212.326.3939
F: 212.755.7306

*Counsel for Defendants*
*Santa Fe Natural Tobacco Company, Inc.,*
*Reynolds American Inc., and*
*R.J. Reynolds Tobacco Company*

## CERTIFICATE OF SERVICE

I hereby certify that on May 30, 2017, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel or parties of record.


Dated:  May 30, 2017                          Respectfully submitted,


                                              /s/ David M. Monde
                                              _____

                                              David M. Monde (*pro hac vice*)
                                                  dmmonde@jonesday.com
                                              JONES DAY
                                              1420 Peachtree Street, N.E.
                                              Suite 800
                                              Atlanta, GA 30309
                                              T: 404.521.3939
                                              F: 404.581.8330

                                              *Counsel for Defendants*
                                              *Santa Fe Natural Tobacco Company, Inc.,*
                                              *Reynolds American Inc., and*
                                              *R.J. Reynolds Tobacco Company*