1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF NEW MEXICO

3

4    IN RE: SANTA FE NATURAL
     TOBACCO COMPANY MARKETING
5    AND SALES PRACTICES LITIGATION,

6
                           NO. 16-MD-2695 JB/LF
7

8

9

10

11
            Transcript of Motion Proceedings before
12   The Honorable James O. Browning, United States
     District Judge, Albuquerque, Bernalillo County,
13   New Mexico, commencing on June 9, 2017.

14
     For the Plaintiffs:  Ms. Melissa Wolchansky; Mr.
15   Michael Reese; Mr. Scott Schlesinger; Mr. Reed
     Bienvenu; Ms. Marisa Glassman; Mr. Nicholas Koluncich
16
     For the Plaintiffs (Via telephone):  Mr. Jeffrey
17   Haberman; Mr. Jonathan Gdanski

18
     For the Defendants:  Mr. Andrew Schultz; Mr. Peter
19   Biersteker; Mr. William Coglianese

20

21
              Jennifer Bean, FAPR, RDR, RMR, CCR
22             United States Court Reporter
               Certified Realtime Reporter
23                333 Lomas, Northwest
               Albuquerque, NM  87102
24             Phone:  (505) 348-2283
                 Fax:  (505) 843-9492
25

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              THE COURT:  All right.  The Court will call

 2   In Re: Santa Fe Natural Tobacco Company Marketing and

 3   Sales Practices and Products Liability Litigation;

 4   Lead Case No. 16-MD-2695 JB/LF.

 5              Let's start with the plaintiffs that are

 6   present.  I don't know if we want to call these

 7   individual cases or not.

 8              So why don't I just turn it over to you,

 9   Ms. Wolchansky, and let you sort of do the directions

10   here.

11              MS. WOLCHANSKY:  Sure.  Good morning, Your

12   Honor.  Melissa Wolchansky, Halunen Law, Minneapolis.

13   I'll let my co-counsel introduce themselves.  I will

14   be presenting today, as well as Mr. Reese, my

15   co-counsel.

16              THE COURT:  All right.  Ms. Wolchansky,

17   good morning to you.

18              MR. REESE:  Good morning, Your Honor.

19   Michael Reese on behalf of the plaintiffs, from Reese

20   LLP.  Good morning, Your Honor.

21              THE COURT:  All right.  Mr. Reese, good

22   morning to you.

23              MR. SCHLESINGER:  Good morning, Judge,

24   Scott Schlesinger.

25              THE COURT:  Mr. Schlesinger, good morning
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    to you.

 2              MS. GLASSMAN:  Marisa Glassman from Morgan

 3    and Morgan Complex Litigation Group.  Good morning.

 4              THE COURT:  All right.  Ms. Glassman, good

 5    morning to you.

 6              MR. BIENVENU:  Good morning, Your Honor.

 7    Reed Bienvenu, Rothstein Donatelli in Santa Fe.

 8              THE COURT:  Mr. Bienvenu, good morning to

 9    you.

10          Anyone else from the plaintiffs?  How about

11    on the phone?

12              MR. HABERMAN:  Good morning, Your Honor.

13    Jeffrey Haberman from Schlesinger Law Offices.

14              MR. GDANSKI:  And good morning, Jon

15    Gdanski, also from the Schlesinger firm.

16              THE COURT:  All right.  Mr. Haberman, Mr.

17    Gdanski, good morning to you.

18          Anyone else on the phone?

19          All right.  For the defendants?

20              MR. SCHULTZ:  Andrew Schultz from the Rodey

21    Law Firm for the defendants, Your Honor.

22              THE COURT:  Mr. Schultz, good morning to

23    you.

24              MR. BIERSTEKER:  Peter Biersteker from

25    Jones Day on behalf of the defendants.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              THE COURT:  Mr. Biersteker, good morning to
 2    you.
 3              MR. COGLIANESE:  Bill Coglianese from Jones
 4    Day on behalf of the defendants.
 5              THE COURT:  Mr. Coglianese, good morning to
 6    you.
 7              All right.  Let me go over a couple of
 8    housekeeping measures.  One is that Ms. Wild has been
 9    wanting to change the scheduling order that we
10    entered early in the case, Document 37, that y'all
11    would notify the Court in writing by letter.  If it's
12    all right with you, I think we're just going to enter
13    an amended one that just says you can do this by
14    electronic.  There is no reason to have everybody do
15    a letter and stuff.  We'll just do it by CM/ECF
16    filings.  So anybody have any objection to that?
17    You'll see an amended order, but it will be on page
18    3, paragraph 2(a), next to the last sentence.  I'll
19    make that change because I think it would just be
20    easier that if we have a status conference, people
21    can notify us that they have no agenda items by
22    CM/ECF, rather than trying to get some letter to the
23    Court.  So a little bit old school.  Is that all
24    right with the plaintiffs?
25              MR. SCHLESINGER:  Yes, Judge.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1                THE COURT:  Defendants?

 2                MR. SCHULTZ:  No objection.

 3                THE COURT:  What I understand, and where we

 4    are with the case management order number 2 is that

 5    after today you will be waiting for a ruling from me,

 6    and that the defendants will answer the consolidated

 7    amended complaint 30 days after ruling on a motion to

 8    dismiss.

 9                So we've been in a little bit of a stall

10    pattern.  And so today we'll then put the clock on me

11    to get an opinion out to you.  And then nothing else

12    will occur until I get that ruling on the motion to

13    dismiss.  I will give some inclinations today as to

14    where I'm going, but I don't think that constitutes a

15    ruling until I get the opinion out.  So if anyone has

16    any different view of where we are in this case, let

17    me know.

18                Let's see, I have a motion that I

19    understand -- I did read it, and I don't think it's

20    wasted time at all, because it helped me get into the

21    issues.  But I do understand that we're dealing not

22    with the defendant's first motion to dismiss.  We are

23    instead dealing with the second motion to dismiss.

24    So I understand the defendants are going to withdraw

25    Document No. 70, and then we'll just be acting on the
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

6

```
1    operative.  Is that correct?
2              MR. BIERSTEKER:  That's correct, Judge.
3              THE COURT:  All right.  Do I hear any
4    objection to the defendant withdrawing Document 70
5    from the plaintiffs?
6              MS. WOLCHANSKY:  No.
7              THE COURT:  All right.  So you just need to
8    file a notice.  You don't need to file a motion, just
9    file a notice.  You can indicate it's unopposed.  And
10   that will take care of that and clean it up off the
11   docket.
12             Any other --
13             THE CLERK:  No, sir.
14             THE COURT:  Before we start, these are all
15   the defendant's motions, so if the defendants want to
16   proceed in a different way, they certainly can let me
17   know.  They want to go to the judicial notice motions
18   or things like that.  But I focused primarily on the
19   motion to dismiss.  Like I said, I started with
20   Document 70, and then read Document 90.  So I'll
21   leave it to the defendants how they want to make
22   their presentations today, whether they want to start
23   with judicial notice or they want to start with the
24   motion to dismiss.
25             Let me give you some thoughts, though, on
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1    the motion to dismiss.  I will certainly hear
2    anything anybody wants to say on this.  These are
3    just my thoughts after reading the materials.  So it
4    will give you something to shoot at, at least you'll
5    know what the judge is thinking.
6            As far as the defendant's FTC consent
7    decree arguments that that is preemption, I guess I'm
8    not, right at the moment, persuaded by that.  The
9    cases that you rely on is Southern District of
10   Florida case, a Fourth Circuit case, Second Circuit
11   case.  I guess I think there has been a lot of water
12   under the bridge since those 1990 cases in the
13   preemption area.  I know that's not been a completely
14   linear trip at the Supreme Court.  But it didn't seem
15   like there was anything really binding either from
16   the Supreme Court or the Tenth Circuit in that area.
17           So I was not persuaded that if I'm writing
18   on a clean slate, I'm probably going to find an FTC
19   consent decree to be preemptive of state law.  I
20   think the trend has been a little bit against that
21   area, and in other areas.  And so I was not persuaded
22   by that.  But you're welcome to argue it today.
23           It seems to me that when people litigate
24   with the FTC or any agency -- I've had other agencies
25   before me -- they often make certain deals and
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    litigation strategies in the context of trying to get
 2    a federal agency off their back.  And so I'm not sure
 3    that -- administrations change, FTCs change, agencies
 4    change -- I'm not sure that we ought to find a
 5    consent decree to be preemptive of legislative
 6    enactments and state claims without a clear
 7    indication from Congress that that should be the
 8    effect of the FTC decree.  So those are my thoughts
 9    about that issue.
10          The First Amendment issue, I know that's
11    the second issue in the motion to dismiss, but it may
12    be one of those issues that, until I clear out a lot
13    of other underbrush, I may not be able to really
14    analyze it well, because so much of, you know, what
15    the First Amendment test relies upon in the
16    commercial area, commercial speech area, is whether
17    it's misleading or not.  And so I guess I'll tip my
18    hand a little bit by saying some of these claims do
19    not strike me as misleading.  So I'm not sure I
20    necessarily need to reach a First Amendment issue.
21    And so I might put that into a category of not
22    needing to be decided earlier, rather than it needed
23    to be decided later.  So I may come back to that.
24          I guess I tend to think that in these
25    commercial speech areas, while I'll probably spend
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    quite a few pages saying it, it really comes down to:

2    If it's misleading, the state usually has a

3    sufficient interest to prohibit misleading conduct.

4    And if it's not misleading, then states typically

5    don't have interest.  I've never found the First

6    Amendment analysis particularly enlightening in this

7    area, but maybe I will need to study it more.

8              So that brings us, then, to the three

9    misrepresentations that the plaintiffs are

10   advocating.  While I don't think the FTC consent

11   order preempts the claims, statutory claims about

12   that a reasonable consumer would not interpret the

13   terms "natural" and "additive-free" to mean that the

14   cigarettes are safer than other cigarettes, I do find

15   all the FTC's analysis of it, with the warnings and

16   with the additional warnings that the defendants have

17   added to it, to be very persuasive.  I just am having

18   a hard time seeing how that is misleading.  So that

19   claim seems to me to be weak.  Whether it's worthy of

20   dismissal at this stage, I'll have to give it some

21   thought.  But I'm just not seeing that as misleading.

22             Skipping over to the second, I come to the

23   one about the manufacturing processes.  I guess I'm

24   kind of coming out the same way.  I know the FTC

25   order doesn't have anything to do with that claim.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    But I think, if you stare at a cigarette, you know it

2    didn't grow on a tree.  It somehow got into that form

3    and shape.  I don't know, it just doesn't seem to me

4    that the term "natural" means that it's not subjected

5    to some manufacturing process.  So that one seems to

6    me to be weak, too.

7            I do think, however, there are some legs to

8    the "additive-free" and the menthol cigarettes.  It

9    seems to me that that's the one that is misleading --

10   could be misleading.  It would seem to me that

11   perhaps, particularly the younger generation that's

12   looking for natural products, additive-free, may --

13   they might consider the addition of menthol not to be

14   consistent with "additive-free."  So that one seems

15   to me to be the one that has legs.

16           Whether that particular statutory claim

17   falls within the safe harbor for conduct that is

18   permitted by federal law, I'll have to think about

19   that.  That's a little bit of a newer issue for me.

20   It didn't seem to me the FTC consent decree dealt

21   with that issue.  So trying to extrapolate that the

22   FTC permits that might be a bit harder.  So I guess

23   I'm thinking that one is weaving its way through to

24   maybe survival.

25           The sort of intense analysis that you have

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    of some of the state unfair practices act claims, you

 2    know, that's a little bit further than I was able to

 3    sort of reach.  So I don't have much in the way of

 4    comments on that.

 5            But now, going back to the First Amendment

 6    analysis, it seems to me that that one might survive

 7    a First Amendment analysis and be able to go forward.

 8    The other two either fall because they're protected,

 9    or because they are just not misleading in the first

10    place.

11            As far as the unjust enrichment claim, I

12    need to give this much more thought, but my initial

13    reaction is that it depends upon the relief that the

14    plaintiffs are seeking.  So much of these equitable

15    claims, they tend to survive motions to dismiss,

16    because if the plaintiffs are going to seek some sort

17    of restitution or some sort of amount that comes from

18    the profits of the defendants, then it seems to me

19    that you may not be able to knock it out at this

20    point.  Obviously, if they're going to go on some

21    misrepresentation claims, and say, Well, there is

22    reliance, and here's the damages, and that sort of

23    thing, then, if that's their theory, then they're

24    going to be precluded, because there is a remedy at

25    law.  But it seems maybe difficult at this stage if
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
1    the plaintiffs are putting into their complaint that

2    they're going to look at some unjust enrichment, that

3    it's difficult to knock it out.

4             The other sort of common law claims,

5    warranty, I'm afraid I'll just have to be enlightened

6    a little about that; the prelitigation notices and

7    privity, I don't have much sense.  It looks to me

8    like the injunctive relief -- I don't know, the

9    defendants are saying it's moot.  But I guess on this

10   menthol one I'm not certain.

11            Trying to read Supreme Court opinions over

12   the last two or three years on personal jurisdiction

13   is a fun exercise, but I tend to think that RAI would

14   probably not be subject to the jurisdiction here for

15   the five plaintiffs that were parties to the suit in

16   North Carolina.  It looked to me like RAI is a

17   specific -- if somebody was coming in and saying all

18   of Reynolds was exempt from jurisdiction in New

19   Mexico, that would probably be problematical.  But

20   RAI seems to be a particular corporation; it may well

21   be protected from either specific or general

22   jurisdiction in New Mexico.  So I'm inclined to think

23   that that one may be a good motion to dismiss, at

24   least some of the plaintiffs, from bringing the

25   claims here.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1                 Well, I have probably talked enough.  But
 2     at least you have some sense of what I thought after
 3     I had plowed through large amounts of the briefing
 4     and exhibits as well.  I may not have a mastery of
 5     all the exhibits, just because of the volume here,
 6     but at least it gives you something to shoot at, what
 7     the judge is thinking after reading this material.
 8                 Mr. Biersteker, if you want to argue the
 9     motion to dismiss or your other motions, you're
10     welcome to do so.  But I'll let you kind of take
11     over.
12                 MR. BIERSTEKER:  Thank you, Your Honor.
13                 Just to give you a little roadmap maybe
14     before we get into it:  The motion to dismiss, as
15     Your Honor just went through, presents maybe about
16     seven different grounds for dismissal.  And together,
17     Mr. Schultz and I will address the Court today.
18     Mr. Schultz will tackle two broad topics:  The First
19     Amendment and then a recurring issue that permeates,
20     as I think Your Honor indicated in your preliminary
21     remarks, a number of plaintiffs' legal issues,
22     including the First Amendment issues, and that is
23     whether the descriptors are inherently misleading,
24     and whether the alleged misrepresentations it's even
25     plausible to assert that a reasonable consumer would
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

14

 1   be misled.

 2           I'll address the remainder.  Unless Your

 3   Honor has a different preference, what we propose to

 4   do is to first talk about preemption, then the First

 5   Amendment, which I think segues, in light of

 6   inherently misleading, right into the -- it's not --

 7   there is no plausible allegation here that anybody

 8   has been misled, no reasonable consumer would

 9   believe.  Then I'll take up the remainder.  And I

10   propose to do it in this order.  But I'm happy to do

11   it in whatever order Your Honor wishes.  The safe

12   harbors and the other statutory defenses:  Unjust

13   enrichment, express warranty, RAI personal

14   jurisdiction, and then mootness.  Does Your Honor

15   have a different preference?

16           THE COURT:  No, those are fine.  I'm

17   wondering if you'd tolerate, after you get through

18   with preemption, if I hear from the plaintiffs, and

19   then you come back and respond, so I take these a

20   little bit in bites.

21           MR. BIERSTEKER:  That's fine.  No objection

22   to that whatsoever.

23           I guess, let's just start off with -- I

24   think Your Honor laid out the law regarding

25   preemption in Pueblo of Pojoaque -- did I do well?



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1   Thank you.  And I think they're preempted here
 2   because of the 2000 consent --
 3            THE COURT:  The only problem with Pueblo of
 4   Pojoaque is the Tenth Circuit didn't agree with my
 5   stay, so I may be bracing myself for reversal here.
 6   I don't know.  I was proud of my preemption analysis.
 7            MR. BIERSTEKER:  I thought it was spot on.
 8            But the issue, I guess, is whether there
 9   is -- as I heard Your Honor -- is whether or not
10   consent decrees from the FTC can ever have preemptive
11   effect.  And I think the answer to that -- although
12   certainly not binding on Your Honor, as you noted --
13   needs to be "yes."  I don't read Altria versus Good,
14   which is the case that plaintiffs significantly rely
15   upon for this proposition, to stand for the
16   proposition that there that is a blanket rule that
17   FTC consent decrees cannot have preemptive effect.
18            I don't know if Your Honor reads the case
19   the same way plaintiffs do.  But I think I read it
20   just the opposite way.  So let me start with that
21   issue.  The cases, both before and after the Supreme
22   Court's 2008 decision in Good versus -- Altria versus
23   Good, generally give preemptive effect to FTC consent
24   orders.  And we've got some cases in our brief.
25   There is no case, post-Altria, Your Honor -- that we
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    could find anyway -- that refused to give preemptive
 2    effect to any FTC consent decree other than the
 3    specific decree that was at issue in Altria versus
 4    Good.  Plaintiffs do not cite one, and again, we
 5    couldn't find one.
 6            And, in fact, the government in Altria, in
 7    its amicus brief, began with the premise that consent
 8    orders generally can have preemptive effect, and
 9    argued only that the specific consent order in
10    question in that case lacked preemptive effect for
11    reasons that the Supreme Court basically adopted in
12    its decision.  In adopting the government's
13    conclusions regarding this, the Supreme Court
14    presumably would have said if it disagreed with the
15    general principle that consent orders can have
16    preemptive -- can preempt state law.
17            THE COURT:  Well, that's one thing that I
18    guess I pause on, just because the Supreme Court is
19    so divided on preemption these days; that it's hard
20    to infer everything from anything that they don't
21    say.  Your thoughts on that?
22            MR. BIERSTEKER:  Well, I think what's
23    telling is what they did say in the Altria decision,
24    which is -- if the Supreme Court had intended to
25    enunciate some sort of blanket rule that consent
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    decrees cannot be afforded preemptive effect,
 2    contrary to prior precedent, then it seems to me it
 3    would not need to have done what it did do.  The
 4    Supreme Court identified a number of circumstances
 5    that suggested that the FTC cease and desist order,
 6    the 1971 cease and desist order that was at issue in
 7    Altria, was not intended to preempt claims being
 8    asserted against the Altria defendants in that case.
 9    And none of those circumstances obtain here.  I think
10    there are four.  First, was that the Altria
11    defendants were not bound by the 1971 consent decree
12    that was at issue.  Here, in contrast, Santa Fe is a
13    party to, and bound by the FTC's 2000 decision and
14    order.
15           Second, the government filed a brief saying
16    that it did not intend the 1971 cease and desist
17    order from the FTC to have preemptive effect.  Of
18    course, there is no such indication here by brief or
19    otherwise.
20           Third, in the decades after the 1971 cease
21    and desist order at issue in Altria was entered, the
22    FTC was obviously clarifying its stance on the very
23    issue that that original consent decree addressed.
24           So, for example, the FTC repeatedly brought
25    enforcement actions against manufacturers for conduct
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    that was within the four corners of, and complied
 2    with, the original 1971 consent decree.  And they
 3    found it, nonetheless, misleading.  And indeed the
 4    FTC also repeatedly questioned and reevaluated the
 5    methodology on which the 1971 cease and desist order
 6    in Altria relied.  And in fact, by the time Altria
 7    was decided by the Supreme Court, the FTC had
 8    rescinded and abandoned its test method for measuring
 9    tar and nicotine yields in cigarette smoke.  That was
10    the foundation of the 1971 consent decree's exception
11    to the general cease and desist order.
12            Here, in contrast, the course of conduct
13    over the last 17 years since the 2000 decision and
14    order were entered has been markedly different.  The
15    FTC and Santa Fe have abided by that decision and
16    order without any disputes, and without any
17    indication that the FTC questions the adequacy of the
18    disclaimer as originally formulated.
19            To the contrary, the recent guidance
20    letter, which is the subject of our third motion for
21    judicial notice, from the FTC staff reaffirms at
22    least the staff's continuing judgment that the
23    disclaimer that, even plaintiffs allow the FTC
24    blessed in the 2000 decision and order, is
25    sufficient, even while the guidance letter allows
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Santa Fe to modify the disclaimer slightly without

2    fear of further enforcement action.

3         And finally -- and I think this is

4    important, too -- there are significant differences

5    in the text of the 2000 decision and order at issue

6    here and the 1971 cease and desist order at issue in

7    Altria versus Good.  The 1971 order with respect to

8    American Brands was written in purely injunctive

9    terms.  The introduction characterized it as, quote,

10   "a consent order requiring a major cigarette

11   manufacturer to cease advertising in a specified

12   manner."  And the key provision under Section 1,

13   under the heading "Order," required the manufacturer

14   to, quote, "Forthwith cease and desist from making

15   the low tar representations unless the required test

16   results were included."

17        The 2000 decision and order here, with

18   respect to Santa Fe, does not include those or really

19   any other injunctive terms.  For example, there is no

20   cease and desist language.  And indeed, the 2000

21   decision and order did two things:  First, it states

22   that Santa Fe shall display the disclosure in

23   advertisements containing the relevant descriptors,

24   without suggesting that Santa Fe was prohibited from

25   using those words.  And second, the order goes out of

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    its way to make clear that Santa Fe is specifically
 2    permitted to keep using the challenged terms, stating
 3    "this provision shall not prohibit respondent from
 4    truthfully representing through the use of such
 5    phrases as no additives, no chemicals, additive-free,
 6    chemical-free, chemical additive-free, 100% tobacco,
 7    pure tobacco, or substantially similar terms that a
 8    tobacco product has no additives or chemicals, where
 9    such representation is accompanied by the disclosure
10    mandated by this provision," close quote.
11            The 1971 consent order at issue in Altria
12    didn't have any similar provision.  And if the
13    Supreme Court's language in the footnote in Altria
14    versus Good attempting to draw a distinction between
15    enjoining and authorizing means anything, it must
16    mean that the differences in the language in the two
17    consent orders -- the first, the one at issue in
18    Altria, and the second one at issue here today --
19    must matter.
20            It's a different proposition entirely, if
21    Your Honor is of the view -- so let me back up a
22    minute.  So it's my view, then, that Altria versus
23    Good did not enunciate a blanket rule.  There would
24    have been no need for the court to have gone through
25    this analysis -- never mind that they didn't say
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    it -- but there would have been no need for them to

 2    go through this analysis and distinguish the issues

 3    that they saw with the 1971 cease and desist order

 4    that was at issue in Altria versus Good, if a more

 5    general rule would have applied.

 6              And again, the precedent -- although not

 7    binding on Your Honor, you're correct -- does not --

 8    the precedent that we have reviewed in our briefs and

 9    that we have addressed shows that consent decrees,

10    both before and after Altria versus Good, from the

11    FTC are given preemptive effect.  And I think that

12    makes sense.  I understand that there is some

13    resistance to obstacle preemption, more so recently

14    than there was historically.  And I appreciate that.

15    But it seems --

16              THE COURT:  I mean, I guess I would

17    describe it as almost on life support.  Would you go

18    that far?

19              MR. BIERSTEKER:  I don't know that I would

20    go that far.  And I do think that if there is going

21    to be any consent decree that gets accorded

22    preemptive effect, it ought to be the 2000 decision

23    and order here that specifically addressed the

24    conduct, the very conduct that the plaintiffs here

25    seek to challenge.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              THE COURT:  Why would you say that?  Why
 2    would you say if we're going to breathe life into
 3    obstacle preemption, this would be the one to do it
 4    in?
 5              MR. BIERSTEKER:  Because the challenge is
 6    so clear and specific and direct with respect to
 7    language that the FTC specifically considered,
 8    specifically --
 9              THE COURT:  So you don't have to stretch
10    this one, it's on point?
11              MR. BIERSTEKER:  Yeah.  I mean, look, let
12    me put it this way:  If you're looking for the text
13    and how the text -- whether the text teaches there
14    should be some preemptive effect here, I think the
15    text of the 2000 decision and order, presupposing
16    that such a consent decree could have preemptive
17    effect under conflict obstacle preemption.  If you
18    accept that premise that it is possible, then I think
19    this one, if you look at the text, intellectively
20    leads to the conclusion that that is what is
21    appropriate here.
22              THE COURT:  Well, administrations come and
23    go, and FTCs come and go.  Let's say a current
24    administration wanted to enter into very friendly
25    consent decrees with corporations, and lower the
```

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                   201 Third NW, Suite 1630
Santa Fe, NM 87501                                           Albuquerque, NM 87102
(505) 989-4949                                                        (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1   standards to something that is extremely low.  And

2   they're consent decrees, so they're, by nature,

3   things that the corporation and the government are

4   agreeing -- it's the flip side; it's not when

5   government, the federal government is exercising its

6   enforcement powers that concern me, as much as when

7   it's laying down and just entering into consent

8   decrees around the country with corporations, and

9   then saying, "That's it.  That's the floor and the

10  ceiling."

11          MR. BIERSTEKER:  And I appreciate the

12  issue.  But I think it would be ill-advised to view

13  as a remedy, which I think would be far too blunt an

14  instrument, to say:  We're just not going to give

15  preemptive effect to consent decrees ever.

16          THE COURT:  Well, then what do you do?  I

17  mean, how do you pick consent decrees that you're

18  going to say preempt state law, and then you have

19  consent decrees that you say don't preempt?  That

20  seems to me to then put the federal court in a very

21  unprincipled position.  I pick which ones I like and

22  which ones I don't like.  And that doesn't seem to be

23  a good way to --

24          MR. BIERSTEKER:  No, I'm not suggesting

25  that Your Honor or any other federal court should be

SANTA FE OFFICE                                              MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                  Albuquerque, NM 87102
(505) 989-4949                                            (505) 843-9494
FAX (505) 843-9492                                   FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1    put in the position of choosing consent decrees that

2    they like or dislike on their merits or on the

3    substance.

4           But I do think, given the backdrop of the

5    preemptive effect generally given to agency

6    regulatory action, including adjudications, and then

7    including consent decrees, that it's appropriate to

8    look at them one by one, and to make a determination

9    of whether or not the agency specifically considered,

10   and specifically addressed the very conduct that is

11   sought -- that the plaintiffs seek to challenge under

12   state law.

13          THE COURT:  All right.  Anything else on

14   the preemption issue?

15          MR. BIERSTEKER:  Not unless Your Honor has

16   questions, no.

17          THE COURT:  I may in a moment.  But let me

18   see what Ms. Wolchansky says.

19          Mr. Biersteker, thank you very much.  I

20   appreciate it.

21          MR. REESE:  Your Honor, again, good

22   morning.  Michael Reese on behalf of the plaintiffs.

23   Ms. Wolchansky and I are actually taking different

24   issues.  I have been assigned the task of responding

25   with respect to the preemption argument.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              THE COURT:  All right.  Mr. Reese.
 2              MR. REESE:  Thank you, Your Honor.
 3              As Your Honor recognized in the Pueblo of
 4   Pojoaque versus New Mexico case from 2016, you have
 5   to start with what is the standard.  And we haven't
 6   talked about that yet.  But when you look at what the
 7   standard is, especially in light of the recent
 8   Supreme Court decisions in the area of preemption,
 9   it's clear that this case is not preempted.  So as
10   Your Honor stated and held in the Pueblo of Pojoaque
11   case, you have to begin your analysis with
12   "assumption that the historic police powers of the
13   States are not to be superseded by federal law unless
14   that was the clear and manifest purpose of Congress."
15   And there you were citing the Medtronics, Inc. versus
16   Lohr case from the Supreme Court.  And indeed, as
17   Your Honor recognized in the Pueblo of Pojoaque case,
18   the United States Supreme Court has recently held
19   that -- and this is a direct quotation from the
20   United States Supreme Court -- "In areas of
21   traditional state regulation, the Court assumes that
22   federal statute has not supplanted state law unless
23   Congress has made such an intention clear and
24   manifest."  In that instance, Your Honor, in the
25   Pueblo of Pojoaque case you were citing the Bates v.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1    Dow Agrosciences, LLC case, at 554 U.S. 449.
2              And then, finally, as Your Honor
3    recognized, the Supreme Court has also held that when
4    there are two plausible interpretations of the
5    statute, the Court has a duty to accept the reading
6    that disfavors preemption.  And again, that's Your
7    Honor's case of Pueblo of Pojoaque citing the Bates
8    v. Dow Agrosciences.
9              In the area of preemption there is three
10   ways that clear manifest intent of Congress can be
11   found:  That's express preemption, there is field
12   preemption, and there is conflict preemption.  We're
13   only dealing with conflict preemption.  The only
14   issue here is whether a 2000 consent order with the
15   FTC preempts the entirety of this case.  And that
16   would only fall into the last bucket, which is
17   conflict preemption.  And it simply does not exist.
18             My learned counsel faulted us for not
19   citing any cases since the Supreme Court's decision
20   in Altria v. Good.  We think a Supreme Court decision
21   is enough.  It's good enough.  It's governing
22   throughout this land.  And if you look at the
23   language of that case, it's clear.  It's on all four
24   points here, and said that the consent decree, such
25   as in this case -- and in that case they cannot bind,
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1    they cannot preempt.  And what's important is:  Let's
2    start with the text, because the text is what is
3    really important.  What are we looking for?  We're
4    looking for a clear and manifest intent of Congress
5    that these claims would be preempted.  If that
6    doesn't exist, it cannot be preempted under governing
7    United States Supreme Court precedent.
8            So how does the FTC do what it does?  It's
9    based upon a law of Congress.  And that law of
10   Congress makes crystal clear -- it actually makes
11   crystal clear that the manifest intent of Congress is
12   not that these claims be preempted.
13           You go to 15 USC Section 57, Subsection B,
14   and it states, "These remedies are provided in
15   addition to, and not in lieu of, any other remedy or
16   right of action provided by state or federal law."
17   And in enacting this section of the FTC Act, this is
18   what Congress stated:  "It is not the intention that
19   private rights of actions for redress based on the
20   acts or practices which are the subject of a
21   commission consumer redress action be barred by
22   commission action."
23           So if you actually look at the text of the
24   law that Congress passed it certainly doesn't support
25   the defendant's position that there is a clear and
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
1    manifest intent.  It actually shows the opposite.
2    Now, we don't have to show the opposite.  The burden
3    is not on us.  The burden is on the defendant to show
4    that Congress had a clear and manifest intent.  And
5    that simply absolutely does not exist here.
6           Now, what's interesting about this language
7    from the FTC Act that was cited by the First Circuit
8    in the Altria -- which was the Good v. Altria case at
9    that point in the history of the procedure of that
10   case.  And in that case, the Court found -- First
11   Circuit found that those claims were not preempted.
12   That's the same action that the Supreme Court, then,
13   in 2008, ruled as a matter of governing law that
14   these type of claims are not preempted.  A consent
15   decree, a consent order cannot preempt these type of
16   claims.  And it talks about how, if they want formal
17   rule making, they can go through formal rule making.
18   But they don't when they just enter into a
19   settlement.
20          So based on just the text and the
21   language -- the text of the FTC Act itself, based on
22   governing Supreme Court law from the Good v. Altria
23   matter -- which is all still good law today --
24   defendants certainly have not met their burden and
25   the claims are not preempted.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1              I'll just make one final point as well,
2    Your Honor, unless you have any questions, because
3    this issue is pretty simple, is that the FTC consent
4    decree doesn't even apply to labeling.  The text
5    doesn't apply to labeling, and in fact, it couldn't
6    govern labeling at the time, because of the
7    regulatory structure.  Now, many of the claims in
8    this case are premised upon the alleged misleading
9    and deceptive labeling of the products.  So a consent
10   decree that doesn't even touch upon that can't in any
11   way preempt claims based upon the labeling.
12             Unless Your Honor has any questions on
13   this, we think that the briefs speak for themselves,
14   that the governing authority speaks for itself, and
15   that it's clear that the burden, which is on the
16   defendant, has certainly not been met here.
17             THE COURT:  Well, you know, I'm a little
18   bit in a pause of wondering if my views on preemption
19   have been too hostile to federal preemption -- if
20   I've got too much Clarence Thomas in me to -- so
21   after the Tenth Circuit extended the stay in
22   Pojoaque.  What's your thoughts?  Do you think maybe
23   I am not receptive enough to federal preemption?
24             MR. REESE:  No, Your Honor.  I think we do
25   think Pojoaque is correctly decided.  But even if the
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1    Pojoaque case had never been filed in the first
2    place, Your Honor's decision is based upon quotation
3    after quotation after direct quotation of governing
4    Supreme Court law.  What has happened in the last
5    decade, or last 10 years, so going into the last --
6    2008, 2009, as well -- is the Supreme Court has
7    solidified the law on preemption and made it crystal
8    clear that these type of claims are not preempted.
9    So Pojoaque is not an outlier.  Pojoaque is just
10   relying on sound authority from the United States
11   Supreme Court.
12             THE COURT:  Well, the defendant's position
13   is that I would be the first one to say that these
14   FTC consent decrees do not have preemptive effect;
15   that you can't find a case that says that.  And I
16   know you're drawing it from the Supreme Court's case.
17   But since then no one has drawn that.  Thoughts on
18   that?
19             MR. REESE:  Just go back to my opening
20   remarks is that, if it's a Supreme Court case --
21             THE COURT:  You like the Supreme Court
22   case.
23             MR. REESE:  -- that is good enough.  It's
24   governing authority.  And we do read the Supreme
25   Court decision, the Supreme Court decision, Altria v.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   Good, does say that these type of consent decrees

2   cannot have preemptive effect.

3          THE COURT:  Is there a category or kind of

4   consent decree that you think would have preemptive

5   effect?  Mr. Biersteker seemed to think that there

6   might be categories that would not, and so his is a

7   more moderate position.  Is yours also there?  And if

8   so, which ones have preemptive effect and which ones

9   don't?

10          MR. REESE:  Many of the cases in which the

11   defendant cites do not involve FTC consent decrees.

12   And certainly, each regulatory body has a different

13   statutory authority.  So when you look at the

14   statutory authority for the FTC -- and this is

15   discussed in detail in the First Circuit's decision

16   in the Good v. Altria case, and it goes through a

17   detailed analysis of the FTC Act.  That shows that

18   because of the way the FTC is set up, and that these

19   consent decrees come down, they are expecting

20   parallel actions.  And again, I'll go back to the law

21   itself that gives the FTC the ability and the

22   authority to do this.  It states, "Remedies provided

23   in this section are in addition to, and not in lieu

24   of, any other remedy or right of action provided by

25   state or federal law."  That's, again, 15 USC Section

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

57.   And Congress stated that that's not the
intention that the FTC Act private rights of action
be subject to being barred or precluded in any way.

          So maybe consent decrees with other
regulatory agencies, the EPA, Health and Human
Services, I'm not sure what their statutory authority
is.  But with the FTC it's crystal clear based upon
the act itself that they are not to -- FTC consent
decrees are not supposed to preclude other
litigation.  In fact, the way that the FTC works and
consumers are protected is by having parallel actions
brought by private litigants or brought by AGs of the
state governments.

          THE COURT:  All right.  Anything else on
preemption, Mr. Reese?

          MR. REESE:  No, Your Honor.

          THE COURT:  Thank you, Mr. Reese.

          MR. REESE:  Thank you.

          THE COURT:  Mr. Biersteker, I'll give you
the last word on preemption.

          MR. BIERSTEKER:  Thank you, Your Honor,
just briefly.

          To the extent that plaintiffs are taking
the position that, while maybe consent decrees can
have preemptive effect, but not FTC consent decrees

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   because of the FTC Act, I think their argument is off
 2   the mark.  They're relying upon Section 57(b)(E) of
 3   the act.  And the language they quote that an action
 4   there for a violation of a federal rule or cease or
 5   desist order, that's what that section governs -- and
 6   it has that language that they remark upon -- in
 7   addition to any other remedy or right of action
 8   provided by state or federal law, that it doesn't
 9   preempt.
10           But that's a different section of the
11   statute than the section under which the consent
12   decree here was issued.  The consent decree here was
13   issued under a different section, Section 45(b).
14   That does not have a similar savings provision.  And,
15   of course, they talk about Altria v. Good.  And
16   Altria v. Good in the First Circuit addressed the
17   specific argument that plaintiffs are making here,
18   saying that they did not think it was a stretch.  But
19   no other court has adopted that rewrite of the
20   statute.  And indeed, when the U.S. Supreme Court
21   reviewed Altria v. Good, it didn't even cite section
22   57(b) for that portion of the First Circuit's
23   decision.
24           And neither plaintiffs here, nor the First
25   Circuit, make any attempt to reconcile their argument
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1   with the statutory text and the well-settled rule of
 2   statutory construction that, when Congress includes
 3   language in one section of a statute, but not
 4   another, courts will presume that Congress intended a
 5   different reading.  So I think that the FTC Act does
 6   not indicate -- in fact, arguably to the contrary --
 7   that FTC consent orders, such as the one before Your
 8   Honor here under 45(b), cannot have preemptive
 9   effect.
10            And again, the cases that we cited in our
11   briefs about giving preemptive effect to consent
12   decrees from the FTC, both before and after the
13   Altria ruling, as well as recent decisions giving
14   preemptive effect to other agencies' consent
15   decrees -- for example, the EPA -- all, again,
16   post-Altria -- argue against the blanket rule that
17   they're asserting.
18            And then, just briefly, if I may, Your
19   Honor, plaintiffs talked about the packs.  And I
20   wanted to briefly address that.  It's a scope issue.
21   It's not whether there is preemptive effect, but
22   whether or not the scope of preemption would reach
23   the packs in addition to the ads.  And they say it
24   cannot.  They make that argument, even though the FTC
25   chose not to require any disclaimer on the packs, and
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    that Santa Fe Tobacco, the defendant -- one of the

2    defendants here -- nonetheless, put the exact same

3    disclaimer on the packs voluntarily.

4            And to be sure, plaintiffs have quibbled

5    with the font size used on the packaging.  But given

6    that the font requirements are only for ads, and do

7    not apply to the packs, this is not an instance of

8    noncompliance with the consent order, which I think

9    would have a different implication.  And I think it's

10   just a nod to inherent space limitations on the pack.

11           And, in addition, at the end of the day, I

12   think there just can be no question that a consumer

13   who looked at one side of the pack and saw the

14   Surgeon General's warning, the placement and other

15   aspects of which are adequate as a matter of law

16   under the Federal Cigarette Advertising and Labeling

17   Act to inform consumers about the health risks of

18   smoking, so, too, would that consumer have looked at

19   the opposite side of the pack, see the disclaimer

20   that has the language that the FTC determined in the

21   2000 consent decree and order were adequate to

22   disclaim any implied suggestion that additive-free

23   tobacco somehow makes Natural American Spirit

24   cigarettes safer.

25           By using that same language, I would submit

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                201 Third NW, Suite 1630
Santa Fe, NM 87501                                        Albuquerque, NM 87102
(505) 989-4949                                                     (505) 843-9494
FAX (505) 843-9492                                           FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

that Santa Fe brought the packs within the ambit of
the consent decree as well.  Again, it's a scope
issue, it's not a threshold issue of whether there
can be preemption.

Anything further you would like to hear
from me, Judge?

THE COURT:  Not on preemption.  Thank you,
Mr. Biersteker.

Well, I'm going to probably start the
opinion with -- at least writing it toward a
nonpreemption.  I'll certainly read and study more,
and particularly these more recent cases.  But I'm
inclined to at least stick with -- my initial
inclination is that the consent decree here does
not -- federal preemption does not knock out the
state claims.  So that all the other six issues we
have to address here, we're probably going to have to
grapple with.  But I'll certainly try to get you
something on that as soon as possible.

All right.  Mr. Schultz, are you going to
take up the First Amendment issue next?

MR. SCHULTZ:  Let me ask the Court's
preference.  When you were going through your initial
inclinations, you got to the First Amendment, but
then you put that to the side.  So I don't know if

that Santa Fe brought the packs within the ambit of
the consent decree as well.  Again, it's a scope
issue, it's not a threshold issue of whether there
can be preemption.

Anything further you would like to hear
from me, Judge?

THE COURT:  Not on preemption.  Thank you,
Mr. Biersteker.

Well, I'm going to probably start the
opinion with -- at least writing it toward a
nonpreemption.  I'll certainly read and study more,
and particularly these more recent cases.  But I'm
inclined to at least stick with -- my initial
inclination is that the consent decree here does
not -- federal preemption does not knock out the
state claims.  So that all the other six issues we
have to address here, we're probably going to have to
grapple with.  But I'll certainly try to get you
something on that as soon as possible.

All right.  Mr. Schultz, are you going to
take up the First Amendment issue next?

MR. SCHULTZ:  Let me ask the Court's
preference.  When you were going through your initial
inclinations, you got to the First Amendment, but
then you put that to the side.  So I don't know if



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1    that's an indication that you'd rather hear about the
 2    reasonable consumer issues first, and then the First
 3    Amendment?  Whichever --
 4            THE COURT:  No, it's really up to you.  I
 5    guess I'm having a little trouble maybe -- it seems
 6    to me, if I don't have to reach these First Amendment
 7    issues -- as can you tell, I don't avoid many issues,
 8    so I may reach them anyway -- but I'm wondering if I
 9    need to address them until I go through the three
10    theories.  But if you want -- I know you and Mr.
11    Biersteker got two of these arguments that would
12    knock out everything upfront.  And I understand
13    certainly the preemption issue.  With the First
14    Amendment, though, it's hard for me to analyze it
15    without getting into the specific claims, because of
16    the inherently misleading prong on these.  But you
17    take it the way you want to go.
18            MR. SCHULTZ:  Your Honor, how about if I
19    propose this:  Let me start with the reasonable
20    consumer argument about those three claims.  And in
21    particular, given the Court's concern, let me start
22    with the menthol issue.  It's not in the order that
23    they're presented, but let me start with that issue.
24    And then, when I'm done with that, if the Court would
25    like, I can move into the First Amendment, or if you
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   want me to break and allow the plaintiffs to respond

 2   on that issue, we can go that way.

 3          THE COURT:  All right.  I probably will ask

 4   you to break, if we're going to go to this one.

 5   Because, as you can tell, it's the one that is

 6   troubling me at the moment.

 7          MR. SCHULTZ:  Your Honor, that's fine.

 8          So what we're really talking about are 14

 9   of the 19 plaintiffs' statutory claims.  All of these

10   claims are based on a reasonable consumer standard.

11   And we list what all those claims are in the brief.

12   What this requires, Your Honor, is for the plaintiffs

13   to be able to plausibly allege that the statements at

14   issue would mislead a reasonable consumer.  And if

15   they can't make that plausible allegation, then the

16   plaintiffs have failed to state a claim.

17          The plaintiffs' basic response is very

18   similar to what they say with response to their First

19   Amendment argument.  And it's a narrowly simple

20   syllogism, which is:  We have pled, and we have used

21   the words that the statements at issue are either

22   inherently misleading or are deceptive.  This is a

23   motion to dismiss.  You must accept that allegation

24   as true.  Therefore, the statements would mislead a

25   reasonable consumer.  It's a simple syllogism.  The
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1    problem is it's just wrong.  You don't have to accept
2    the fact that they have alleged this over and over
3    again.
4            The question of whether the allegations are
5    sufficient is actually a question of law.  It's not a
6    question of fact.  And it's a question that this
7    Court can decide based on the allegations put forward
8    in the complaint.
9            THE COURT:  I tend to agree with that.
10           MR. SCHULTZ:  And more specifically, Your
11   Honor, it's not a question of whether there is some
12   hypothetical consumer out there who may be misled.
13   Reasonable consumer -- I think the language from the
14   Ninth Circuit, Judge Nelson's opinion in Davis versus
15   HSC Bank Nevada, the plaintiffs have to show that the
16   ordinary consumer, acting reasonably under the
17   circumstances is likely to be deceived.  And that's
18   where the plaintiffs have failed.  So, Your Honor,
19   let me start with the menthol issue, because that was
20   the one that seemed to give the Court some pause out
21   of the three issues.
22           THE COURT:  And I guess to be more
23   specific, I don't think it's the word "natural" there
24   as much as the word "additive-free" that seems to me
25   to be the potentially misleading phrase.
```

SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                         201 Third NW, Suite 1630
Santa Fe, NM 87501                                                Albuquerque, NM 87102
(505) 989-4949                                                         (505) 843-9494
FAX (505) 843-9492                                             FAX (505) 843-9492
                                                                      1-800-669-9492

PROFESSIONAL COURT
REPORTING SERVICE                                     e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.

```
 1              MR. SCHULTZ:  Understood, Your Honor.
 2              Let me start, though, with talking about
 3    what the situation would be if the plaintiffs -- what
 4    about if the plaintiffs would have alleged that
 5    defendant's menthol cigarettes, cigarettes that said
 6    they were menthol-flavored, did not contain any
 7    menthol at all?  Well, clearly, Your Honor, they
 8    would have a claim for deception.  They would say:
 9    You told us there was menthol, and yet, when we
10    bought these cigarettes, there was no menthol.
11              But here, Your Honor, what the plaintiffs
12    are claiming is that a reasonable consumer who
13    purchased a menthol cigarette -- and as the
14    plaintiffs made clear in their complaint, there is a
15    universe of Santa Fe tobaccos they could purchase.
16    They're shown in full color in their complaint.  They
17    could pick any one of these flavors.  We have
18    consumers who specifically are picking menthol
19    cigarettes.  And yet what they're really saying is
20    that a reasonable consumer who purchased the menthol
21    cigarettes, and the fact that the pack clearly states
22    that they are menthol, and that the ingredients
23    include menthol, somehow they were deceived.
24              That's just not plausible, Your Honor.
25    They can't establish that a reasonable consumer who
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

41

```
1    chose to pick a menthol-flavored cigarette, and where
2    it was clearly disclosed that the ingredients were
3    tobacco and menthol -- that's stated right on the
4    pack -- that somehow they were under the belief that
5    these cigarettes wouldn't contain menthol, or that
6    they wouldn't be menthol-flavored.
7              And, Your Honor, let's be very, very
8    specific about exactly what it is the plaintiffs
9    alleged, as compared to what they're arguing now.
10   All of this comes down to two paragraphs in the
11   complaint, Your Honor.  First, start at paragraph 67.
12   What the plaintiffs said there is, quote, "Contrary
13   to the explicit claim on every label that Natural
14   American Spirit cigarettes contain additive-free
15   natural tobacco, defendants add additives to Natural
16   American Spirit menthol cigarettes."  They don't
17   allege that we add menthol to the tobacco -- their
18   words.  "Defendants add additives to Natural American
19   Spirit menthol cigarettes.
20             And the very next paragraph, paragraph 68:
21   "Defendants place menthol in the cigarette filter."
22   That's the allegation.
23             So, Your Honor, here, the only way that
24   plaintiffs could succeed in their claim is that they
25   would have to show that, although a cigarette that
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    claims to be a menthol cigarette must contain
2    menthol, but somehow that menthol cannot in any way,
3    shape, or form touch the tobacco.  That's not a
4    plausible allegation, Your Honor.
5              THE COURT:  Well, I'm trying to look for a
6    bit of an analogy here.  But if Coke put on its
7    product:  "There is no sugar here in our Coke," and
8    then on the back side listed out sugar as an
9    ingredient, and then, would you, in that situation,
10   they cancel each other out, say that no reasonable
11   consumer would ever think that Coke does not have
12   sugar?  That still would trouble me, from a labeling,
13   or from an advertising standpoint, that we just say,
14   well, there is enough on there, they should figure it
15   out.
16             MR. SCHULTZ:  Your Honor, the difference
17   though, is here, again, look at exactly what the
18   defendants state.  The defendants state that they are
19   using 100% additive-free tobacco.  And then on the
20   back of the carton it states the ingredients are
21   organic tobacco and menthol.  And the pack is labeled
22   "menthol-flavored."  There is no deception for a
23   consumer who chooses a menthol cigarette.  They know
24   they are getting a cigarette that is
25   menthol-flavored.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

43

```
 1              THE COURT:  Why not, on just the menthol
 2     cigarettes, don't they eliminate this additive-free,
 3     though, statement?  I mean, if they've got products
 4     in which they don't add anything to it, why don't
 5     they on the menthol cigarette just drop that?
 6              MR. SCHULTZ:  Probably, Your Honor --
 7     again, let's be very clear -- the statement is 100%
 8     additive-free tobacco.  The tobacco is not --
 9              THE COURT:  But the menthol gets into the
10     tobacco at the delivery of the product stage, right?
11     I mean, it may not be touching the tobacco when
12     they're selling it.  But for the consumer, the
13     menthol is part of the tobacco, right?
14              MR. SCHULTZ:  Actually, I'm going to
15     disagree, Your Honor.  The menthol is part of the
16     cigarette.  It is not part of the tobacco.  And there
17     is no allegation that we have in any way artificially
18     flavored the tobacco.
19              THE COURT:  I guess, just in the use, when
20     the product is used, the menthol is part of and
21     touches the tobacco.
22              MR. SCHULTZ:  Through the delivery system,
23     that is true, and that's inevitable, and the
24     plaintiffs allege that it is inevitable.  So, Your
25     Honor, it begs the question.  How then -- number one,
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    how then is a menthol-flavored cigarette going to be

2    provided when menthol is not included?  And where is

3    the deception to a reasonable consumer who knows they

4    are buying a menthol cigarette, and they turn the

5    package over, and under ingredients it clearly states

6    "organic tobacco and menthol," which is 100% correct.

7    Where is the deception?  How can a person who is a

8    reasonable consumer honestly claim that they had no

9    idea that they were going to be opening a pack and

10   smoking a menthol-flavored cigarette?

11          I mean, Your Honor, we provided the Court

12   with some cases.  For example, the Thomas versus

13   Costco Wholesale case.  That was a claim where the

14   consumer was challenging the use of the word

15   evaporated cane juice for chocolate milk.  And the

16   court said there was no deception, it was not

17   mislabeled, because a reasonable consumer could not

18   plausibly believe that there was no added sugar for

19   something that was called chocolate milk.

20          And, similarly, Your Honor, the Ang versus

21   WhiteWave Foods; that was a consumer fraud claim that

22   was dismissed.  That had to deal with the claims for

23   soy milk and almond milk.  And the consumer there

24   claimed that they were misled because they honestly

25   believed that came from a cow, because it was labeled

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    "milk."  The Court said that could not be a

2    reasonable consumer viewing that.

3              Your Honor, we feel the same is here for

4    menthol.  What is listed on the pack for the menthol

5    cigarettes, 100% additive-free tobacco and menthol.

6    That is precisely what is provided.  That is

7    precisely what is delivered.  And it is precisely

8    what the consumer expects when he or she chooses a

9    pack of menthol-flavored cigarettes.

10             Your Honor, I can turn to the other two

11   claims, or I can break here.

12             THE COURT:  Let's break here, because this

13   is one of the things I'm most troubled by.  So let's

14   focus on it a little bit.  Anything else,

15   Mr. Schultz?

16             MR. SCHULTZ:  Not on that claim, Your

17   Honor.

18             THE COURT:  Thank you, Mr. Schultz.

19             Ms. Wolchansky, are you going to tackle

20   this one?

21             MS. WOLCHANSKY:  I am.  And I have some

22   visual aids for the Court.  I'll just bring it up.

23             THE COURT:  All right.

24             I know you didn't want to enter an

25   appearance, Mr. Koluncich, but good morning to you.



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
e-mail: info@litsupport.com

1          MR. KOLUNCICH:  Good morning, Your Honor,

2     plaintiffs' team, defense counsel.  Good to see you

3     all.

4          THE COURT:  Let me ask Mr. Schultz before

5     we look at the visuals here.  The statement that you

6     have in your brief:  "Obviously consumers are not

7     misled by a product's inclusion of an ingredient that

8     serves as one of its primary distinguishing and

9     desired characteristics."  It just seems to me that

10    may sweep too broadly.  I may not be thinking on my

11    feet of examples where you have somebody saying one

12    thing, but then saying something untrue about the

13    product.  It just seems to me that shouldn't take it

14    out of the misleading characteristic.  Your thoughts

15    about that?  I mean, to write that as an opinion

16    would trouble me.

17         MR. SCHULTZ:  Well, and Your Honor, we

18    wouldn't be hurt in the least if you didn't quote our

19    brief hook, line, and sinker.

20         But it still begs the question.  The

21    allegation in the complaint is that menthol was added

22    to the cigarette.  There is no allegation that we

23    added menthol to the tobacco.  And the plaintiffs are

24    even more explicit that menthol is added to the

25    filter.  There is no question that Santa Fe is

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1    permitted to provide a menthol-flavored cigarette.
2    And given that menthol tobacco is not a natural
3    product, somehow the menthol has to be incorporated
4    into the delivery system.  Santa Fe chose to do that
5    by not altering the tobacco, but by adding it to a
6    filter.
7           As a result, again, Your Honor, the
8    ingredients listed on the back of the pack are
9    precisely correct:  "Organic tobacco and menthol."
10          So I'm not going to disagree with Your
11   Honor about, perhaps, some of the adjectives used in
12   our brief being too broad.  But the fundamental point
13   doesn't change, Your Honor.  And we would stand by
14   that as a reason why no reasonable consumer could
15   find, that when they purchase that pack, they weren't
16   getting exactly what they thought they were buying.
17          THE COURT:  All right.  Thank you,
18   Mr. Schultz.
19          Ms. Wolchansky.
20          MS. WOLCHANSKY:  Your Honor, if I might
21   just approach.
22          THE COURT:  You may.
23          MS. WOLCHANSKY:  We are talking about this
24   box.  We have an entire rainbow collection over
25   there.  This is a menthol pack.
```

SANTA FE OFFICE                                         MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                   Albuquerque, NM 87102
(505) 989-4949                                              (505) 843-9494
FAX (505) 843-9492                                    FAX (505) 843-9492
                                                          1-800-669-9492

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE                           e-mail: info@litsupport.com

```
 1              THE COURT:  All right.
 2              MS. WOLCHANSKY:  So if I might just pass
 3      this up to the Court.
 4              THE COURT:  You may.
 5              MS. WOLCHANSKY:  I will try to do this in a
 6      bit of a vacuum since we are dealing right now with
 7      the menthol issue.
 8              But it is important when we're talking
 9      about these reasonable consumer issues -- and nobody
10      here today has yet talked about the facts -- but this
11      is not a evaporated cane juice; it's not soy milk.
12      These are cigarettes.  It is tobacco.  It is an
13      addiction.  It is a drug.  And it is important to
14      give ourselves a little bit of a backdrop here before
15      we jump into the law and talk about why this is
16      inappropriate on a motion to dismiss.
17              So, again, just to revisit the burden on a
18      motion to dismiss, because it is really important,
19      especially with respect to these reasonable consumer
20      issues, we are today to take all of the allegations
21      in the complaint -- and they are plentiful -- as
22      true.  And many of the cases that the defendants cite
23      today are mere -- very simple determinations made by
24      the Court.
25              Let's look at an evaporated cane juice
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   label.  Is that misleading?  Can the court decide

 2   that?  No outside evidence; we don't have regulatory

 3   agencies, nonprofits, government bodies, courts

 4   weighing in on whether or not the actual labeling is

 5   deceptive.

 6            Here, we have all of that.  And we should

 7   not ignore the allegations in the complaint.  And all

 8   we're looking at here is whether a reasonable

 9   inference can be drawn that the defendant could be

10   liable for the misconduct alleged.  And the

11   complaint, which is full of factual allegations

12   regarding the alleged deception here, cannot be

13   ignored.

14            We also have 12 plaintiffs, all of whom

15   purchased Natural American Spirit cigarettes because

16   they believed that they were safer and healthier.  We

17   have that in the complaint.  That can't be ignored

18   either.

19            We also have many more clients and

20   plaintiffs, should this case proceed, that may be

21   entered into this case as well.

22            So, again, let's talk really quickly about

23   the history here so that we know what we're dealing

24   with.  This is a drug addiction.  It's not a choice.

25   It's not a food.  These are cigarettes.  Reynolds, a
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   pioneer in the tobacco industry, sought to sell
 2   cigarettes promoting a safer and healthier option.
 3   This has been over the course of many, many, many
 4   years, back to the '30s and '40s.
 5          First, we had filters.  Then we had low
 6   tar.  We had lights.  And now we have natural,
 7   Additive-free.  These are very, very important
 8   indicators on the front of every pack, at every
 9   purchase, that are meant to deceive consumers into
10   believing that this is a safer or healthier option.
11          And Your Honor doesn't have to believe me
12   or Mr. Schultz.  We have plenty of scientific
13   evidence:  Testing; we have the FDA.  The most recent
14   letter that was filed with the Court for judicial
15   notice with the FTC stating that this could be
16   misleading to reasonable consumers.  The FDA warning
17   letter.  I will go through all of these allegations
18   in the complaint to talk about why, in fact, these
19   natural, additive-free and organic representations,
20   taken in context of the pretty packaging that we have
21   here is, in fact, deceptive.
22          So let's talk first about the label.  I
23   handed the Court a pack for your viewing.  But the
24   complaint specifically alleges in paragraph 40 that
25   they sell these cigarettes as "natural" and "100%
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  additive-free."  It's right on the front.  "Natural"

2  is one of the largest representations on the front of

3  package.  And right on the bottom it says, "100%

4  additive-free natural tobacco."

5         We'll talk in a minute why the distinction

6  that Mr. Schultz made between the tobacco and the

7  cigarette is just a nonissue, because consumers --

8  which, when we get to discovery, which we should in

9  this case -- we will learn that the difference

10 between tobacco and cigarettes to a consumer

11 purchasing these products, they are interchangeable,

12 it does not matter.

13        So we have the "natural" representation,

14 the "100% additive-free" representation.  And all of

15 these are intertwined with the Native American on the

16 front smoking the pipe.  We have the eagle, the

17 representations all over the advertisements about the

18 earth, and U.S. grown tobacco, all feel-good visual

19 noise.  All of this is meant to distract from what

20 they claim -- and the focus in this case is on the

21 disclaimer -- or here in this case the menthol that

22 might be listed very, very small, as Your Honor can

23 see on the pack that I handed you, very, very small

24 that it says "menthol."

25        Well, we have lots of case law that is a

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    very clear that you cannot put something on the front
 2    that it's 100% additive-free, and force the consumer
 3    to turn around and say, Hum, well, it says menthol on
 4    the back.  Is that natural menthol?  Is that grown in
 5    the field?  Or is it added to the cigarette?  Is it
 6    added to the filter?  Is it added in some way to the
 7    cigarette that makes it not additive-free?
 8              Again, this entire labeling and marketing
 9    scheme is meant to reassure the consumer that it is,
10    in fact, healthier and safer.  So with respect to the
11    menthol, specifically, we might have an ingredient
12    listed on the back that says "menthol."  Mr. Schultz
13    argued that menthol is -- they're buying it because
14    it's menthol.  Well, why don't we take
15    "additive-free" off, as Court suggested?
16              In the complaint we don't simply state that
17    the cigarettes contain menthol.  In paragraph 68 the
18    complaint states, "Defendants placed menthol in the
19    cigarette filters.  Because menthol is highly
20    volatile, it migrates into the tobacco and throughout
21    the cigarette providing a menthol flavor.  As the FDA
22    has noted, menthol diffuses throughout the cigarette
23    irrespective of where it was applied.  This makes the
24    additive-free claim literally false."
25              So, again, if all cigarettes --
```

SANTA FE OFFICE                                              MAIN OFFICE
119 East Marcy, Suite 110                           201 Third NW, Suite 1630
Santa Fe, NM 87501                                    Albuquerque, NM 87102
(505) 989-4949                                                    (505) 843-9494
FAX (505) 843-9492                                      FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1              THE COURT:  What did you just read?

 2              MS. WOLCHANSKY:  Paragraph 68 of the

 3    complaint.

 4              69 addresses menthol as well.  And it

 5    states that "menthol contaminates everything in a

 6    pack."  No menthol is applied to their filter.

 7    Instead, they apply menthol to their brand --

 8              THE COURT:  It wouldn't contaminate it

 9    until someone starts smoking it, right?  I mean, you

10    don't really contaminate a pack.  You contaminate the

11    tobacco once you light it up; correct?

12              MS. WOLCHANSKY:  So the menthol is in the

13    cigarette.  And, arguably, as paragraph 69 of the

14    complaint states, "Menthol is applied to the paper

15    side of the foil, and allowed to equilibrate in the

16    pack."  So the argument or the complaint states that

17    it can contaminate the entire pack.

18              But to Your Honor's point earlier, assuming

19    that that's true, who cares if it's only in the

20    cigarette as it sits in the pack?  The point is:  How

21    is it delivered into your lungs?  When a cigarette is

22    ignited and it is lit, the menthol, the tobacco, the

23    chemicals, everything in that cigarette goes into

24    your mouth and into your lungs.  So the menthol is

25    mixed with the tobacco.  So it is disingenuous to
```

SANTA FE OFFICE                                                                MAIN OFFICE
119 East Marcy, Suite 110                                              201 Third NW, Suite 1630
Santa Fe, NM 87501                                                      Albuquerque, NM 87102
(505) 989-4949                                                                     (505) 843-9494
FAX (505) 843-9492                                                          FAX (505) 843-9492
                                                                                1-800-669-9492
         BEAN & ASSOCIATES, Inc.                          e-mail: info@litsupport.com
         PROFESSIONAL COURT
           REPORTING SERVICE

1    suggest that because the tobacco, which as it may sit

2    in its manufactured state doesn't contain menthol, it

3    contains the menthol the minute that you light that

4    cigarette.  So it is not, in fact, additive-free.

5            And to suggest, Well, we say that it has

6    menthol on the back, so that doesn't make the 100%

7    additive-free claim literally false, is just as

8    disingenuous as they claim our allegation is, which

9    is why this is inappropriate on a motion to dismiss.

10           Reasonable consumers, what is that

11   standard?  The reason why all of the case law that we

12   have cited in our brief states that this is a jury

13   question, is because there is a reason why those

14   packs say "100% additive-free."  There is a reason

15   why they say "natural."  These are very important

16   indicators.  They are reassurances for the consumer.

17   They are the reason why Natural American Spirit

18   cigarettes are 100 percent on the incline in sales,

19   when all other cigarette brands are 20 percent down.

20           THE COURT:  Educate me a little bit about

21   menthol.  What is menthol?

22           MS. WOLCHANSKY:  We have a tobacco expert

23   in the courtroom.

24           MR. SCHLESINGER:  May I address that,

25   Judge?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              THE COURT:  You may.
 2              MR. SCHLESINGER:  Scott Schlesinger for the
 3     plaintiff.
 4              I've looked over the remarks I made some
 5     time ago when I visited with Your Honor.  And I
 6     remember showing you a menthol pack.  And I remember
 7     it got your attention back then, what Mr. Monte said
 8     was:  There was an appropriate distinction to draw,
 9     the menthol is in the filter, not in the tobacco.
10              The FDA, the FTC, the Tobacco Act all
11     define a cigarette as any tobacco product.  So it's a
12     distinction without a difference.
13              And here's what menthol is.  Menthol is an
14     extraordinary important ingredient, additive,
15     chemical additive, with major physiological effects
16     that's the important part of cigarette sales.  As a
17     matter of fact, 99 percent of every single U.S.
18     cigarette on the market contains menthol to some
19     degree.  However, 1/3 of every cigarette on the
20     market in the United States contains enough menthol
21     for the consumer to be aware of it, and what's called
22     a characterizing flavor, and it's thus, identified
23     and advertised that way.
24              But if you look at the ingredients, now
25     required to be disclosed on all tobacco products,
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1   almost all cigarettes contain menthol.  Why?  Menthol
 2   was first put in cigarettes in the '30s and '40s,
 3   back when they had Kool, and things like that, as a
 4   way for people to smoke when they were sick.
 5          But it was discovered to have a synergistic
 6   effect on the addictive nature of the cigarette.  And
 7   we cite in paragraph -- as Footnote 21 on page 31 of
 8   our complaint, the physiological effects of menthol
 9   cigarettes from the FDA.  The FDA has a major report
10   out.  The Tobacco Act contains an obligation that
11   Congress put on the FDA, to let -- the FDA had, under
12   the act, determined that menthol should be removed
13   from all cigarettes within one year of the Tobacco
14   Act coming in, in 2009.
15          The determination has been -- and this is
16   unrefuted evidentarily -- I mean, there is literally
17   thousands of peer-reviewed scientific studies --
18   menthol eases inhalation.  It acts as an anesthetic.
19   It allows the first dose of menthol -- of nicotine to
20   get to the brain by making a child, who -- all
21   cigarette smoking begins in pediatrics, in
22   adolescence -- it's a pediatric disease.  Addiction
23   is considered a pediatric disease.  The menthol numbs
24   the throat, so the first dose of cigarette smoke can
25   get down a person's throat.  A kid, or a 16-year-old
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

57

1    who smokes, chokes, or gets dizzy, or throws up.

2    It's very hard.  It's harsh.  Which is why a lot of

3    this is designed up the sugars, lower the pH, make it

4    inhalable.  Menthol helps that.  It numbs the throat.

5    Gets the smoke into the lungs.  It has no taste buds,

6    and allows for rapid and one hundred percent perfect

7    transference of nicotine in to the alveolar capillary

8    beds, shooting nicotine to the brain seven seconds

9    faster than IV.

10          The FDA has determined through its Tobacco

11   Product Scientific Advisory Committee, as well as the

12   FDA itself, in monster extensive reports that menthol

13   causes youth initiation, eases and makes it quicker

14   for people to become addicted, and makes it harder to

15   get off cigarettes.  And that they are a public

16   health problem that makes cigarettes more deadly,

17   more dangerous.

18          So that's -- menthol is a critically

19   important component for -- one-third of all

20   cigarettes in the United States are menthol

21   characterized in flavor.  It's a very important

22   chemical.

23          And, for instance, when Reynolds recently

24   bought Lorillard, two years ago -- the oldest tobacco

25   company in the United States, Lorillard Tobacco, from

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    the 1700s -- they purchased it solely to get Newport

2    menthol cigarettes, the number 1 selling menthol

3    brand in the country, 50 percent of the menthol

4    market.  And they moved -- through doubling the sales

5    force, they moved Newport into second place overall

6    selling cigarette behind Marlboro, even above their

7    Camels.

8            Now, this cigarette, Natural American

9    Spirit, which Judge Kessler has adjudicated the term

10   "natural" is unlawful.  In her adjudicated findings,

11   her corrective statements, her injunctive relief, she

12   restricted the right to award money in the Department

13   of Justice case.  But her judgment has been approved

14   by the federal appellate courts, cert denied to the

15   Supreme Court.  She said that lights, natural, and

16   other similar descriptors confer health benefits, and

17   they are prohibited.

18           So one of the strange things about this

19   case before Your Honor, one of the things we're

20   asking Your Honor to do as injunctive relief is to

21   enforce her order.  The law of this land approved

22   that "natural" is not permitted.  That's the law.

23   The FDA has issued a ruling saying that the modified

24   tobacco risk product guidelines, which are found to

25   be constitutional by the Discount Lottery case, that



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    we listed for Your Honor's reading, which, if you

 2    read that case alone, tell you everything you need to

 3    know about this case.  You read that case, that case

 4    alone will cover everything you need to know about

 5    this case, Discount Lottery; where Reynolds is a

 6    named plaintiff.

 7         Modified tobacco risk product guidelines

 8    came out after the FTC, subject to the 2009 Tobacco

 9    Act.  They govern whether or not -- when you put

10    Natural American Spirit organic tobacco out there for

11    people to see, whether you are saying to the addicted

12    consumer -- these are drug addicts, these are drug

13    addicts.

14         In other words, we see on the CBS evening

15    news and in the newspaper lately that we have a

16    terrible problem in this country because heroin

17    overdose deaths, drug addiction deaths have

18    skyrocketed in the last 20 years, and they show how

19    it went from about 4 to 10,000, all the way to

20    40,000.  But nobody takes that point and keeps

21    raising that number to 550,000.  That's how many

22    people a year are killed by cigarettes.

23         So this is not babyfood.  There is no safe

24    cigarette.  This is a lethal and poisonous substance.

25    Justice Stevens, the Supreme Court of the United
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    States said that they are a deceptive distributor of
 2    a poisonous and addictive lethal product.
 3              Historically, unfortunately, tobacco has
 4    been found to be a rogue industry.  The appellate
 5    court that approved the findings of Judge Kessler
 6    said "they have a proclivity for unlawful activity."
 7              And the illusion of this pack of lies is so
 8    powerful that even for Your Honor, when you look at
 9    it -- we all are this way -- we have to disabuse
10    juries of this in week and two- and three-week long
11    trials -- the illusion of this is so powerful that we
12    look at it like it's a box of Cheerios, or a pack of
13    Bicycle cards, playing cards, or something that's
14    innocuous.  It isn't.  This is lethal, deadly poison.
15    This is drug addiction.
16              And when you say "natural," Judge Kessler
17    said you're not allowed to do it.  The FDA told them,
18    you've got to take it off.  And now they're trying to
19    make a deal.  And as Your Honor said, administrations
20    change, regulatory agencies changes, the will of
21    these regulatory bodies changes over time.
22              But here's what's interesting:  And I'll
23    approach with this.  But Philip Morris bought Nat
24    Sherman.  Nat Sherman had cigarettes called
25    "Naturals."  Nat Sherman got the same warning letter
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    at the same time as Reynolds got the Natural American

2    Spirit warning letter.

3          Well, now, if you go down the street to the

4    smoke shop, which I did last night, I found one of

5    the leftover -- may I approach -- one of the leftover

6    packs of "Naturals" that no longer can be made

7    because now this is what they changed the name to.

8    Let me give that to the Court as well.  So Phillip

9    Morris that bought Nat Sherman; went ahead and has

10   complied with the August 27, 2015 FDA warning letter,

11   taken Nat Sherman's name "Natural" off.  And you

12   won't see those cigarettes anymore very soon.  There

13   was a leftover pack.  I got my hands on it so I could

14   show the Court.  But "Select" is what they call it

15   now.  So at least "Select" doesn't talk about health.

16          So menthol is one of the things we

17   emphasize to the Court because it's so obviously

18   false to say it's not an additive, and to have

19   something in the cigarette or the tobacco, or as Your

20   Honor said, the device.  A cigarette is a nicotine

21   delivery device.  Menthol is volatile.  Anyplace you

22   put it, it migrates everywhere.  We've already done

23   extensive testing internally with the packs of

24   cigarettes, and we found menthol in the tobacco, if

25   you want to make that distinction.  But it's a

SANTA FE OFFICE                                      MAIN OFFICE
119 East Marcy, Suite 110                      201 Third NW, Suite 1630
Santa Fe, NM 87501                              Albuquerque, NM 87102
(505) 989-4949                                              (505) 843-9494
FAX (505) 843-9492                                  FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1    pretext and it's not necessary because their own

2    documents, Reynolds' own document says the cigarette

3    should not be thought of as a product of the package.

4    The product is nicotine.  And the cigarette is the

5    most perfectly engineered dispenser of the unit dose

6    of nicotine to the lungs.

7            Menthol, even in the filter, when the

8    cigarette is ignited and inhaled, it draws the smoke,

9    which mixes with the menthol, eases inhalation, gets

10   deep into the lungs, transfers the nicotine to the

11   brain, and causes addiction, which is every bit, if

12   not more powerful than an addiction to heroin and

13   cocaine.

14           That's C. Everett Koop, 1988, when he

15   declared, much to the dismay of the tobacco industry,

16   that nicotine addiction was killing 300,000 people a

17   year then.  It's killing 540,000 people a year now

18   It's not a food.

19           So it's a super powerful illusion, Judge.

20   And one of the things we try really hard to do,

21   especially in the fact part of this case, is to show

22   the harm of this product.

23           And every one of the experts -- you'll see

24   in most of the articles that we cited, for instance,

25   Judith Proshaska, who has written on Santa Fe; she's

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                           Albuquerque, NM 87102
(505) 989-4949                                                          (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1    a president of the Society for Research of Nicotine

2    and Tobacco, United States major peer-reviewed

3    publication.  She's our expert witness, the leading

4    scientist on the history of tobacco.  And you must

5    look at the history.  And the case law says that the

6    history of past misconduct of tobacco informs future

7    control of tobacco.

8            Dr. Robert Proctor, who is a

9    Harvard-trained full professor in the history of

10   science and medicine, and on staff in the medical

11   school at Stanford, and a major contributor to the

12   Surgeon General's report is our expert witness.

13           Ruth Malone, who wrote one of the major

14   articles that's cited in your complaint talking about

15   the nature in which Natural American Spirit is a 21st

16   Century version of the health reassurance fraud

17   that's existed for decades, is our expert in the

18   case.

19           So we tried to put enough into that

20   complaint so Your Honor could, if you're of a mind to

21   read that scientific literature, and see that there

22   is no counter-narrative.

23           In other words, merely denying in their

24   answer, in this motion to dismiss that no reasonable

25   consumer could be confused is untenable, because this

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    is intentional.  And the only reason they call it
 2    natural, organic, and additive-free, is to take an
 3    addict, a drug addict, who is fearful of dying, and
 4    undermine his resolve to quit -- intercept quitting.
 5    That's their words, their internal language.
 6              I've gone on too far, Judge.  I said a few
 7    things that I think are pertinent to this.  Thank you
 8    for letting me have the time.
 9              THE COURT:  Well, let me ask -- I guess I'm
10    showing my ignorance.  But menthol, what is it?  Is
11    it a plant?  Is it a chemical that science has
12    invented?  What exactly is menthol?
13              MR. SCHLESINGER:  Menthol is an organic
14    molecule that can be derived from mint.  It can be
15    derived from mint, or it can be synthesized
16    chemically in a lab with test tubes.  So it's an
17    organic chemical.  And it has structural similarity,
18    in some strange synergistic effect with nicotine and
19    with inhalation, anesthetic on the throat.  But it's
20    a drug.  Menthol is also a chemical, with drug-like
21    properties.
22              When they say "organic menthol" -- we
23    haven't gotten to the facts -- presumably, they're
24    deriving it from a leaf, probably a mint leaf.  But
25    it's still being derived and synthesized.  There is
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

65

1    no such thing in nature as a menthol crystal, so to

2    speak.  It would have to be processed from the leaf

3    of mint, spearmint, peppermint, various varieties of

4    mint, and you can drive out the organic chemical

5    compound, menthol.  It's got ring structures, double

6    bonds, carbon atoms, hydrogen atoms.

7            THE COURT:  So the menthol that cigarette

8    manufacturers use could be derived from a plant, or

9    it could be created in the laboratory?

10           MR. SCHLESINGER:  Yes.  However, if they

11   say "organic," that would suggest and indicate that

12   it's plant-derived.  But we don't know that.  We're

13   not at that point.  We don't know that.

14           THE COURT:  All right.  Thank you, Mr.

15   Schlesinger.

16           MS. WOLCHANSKY:  So just to piggyback a

17   minute after Mr. Schlesinger's comments, I think

18   there are two things at play here.  One is whether

19   menthol is an additive.  But the most important --

20   again, to step back and look at the large picture

21   here, we are talking about health reassurance claims

22   on these packs of cigarettes, "natural,

23   additive-free, organic," which tell and reassure the

24   consumer that the products are safer or healthier.

25           So the menthol piece of this, and whether

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   menthol is -- it is literally false, which we allege
 2   it is -- to call a pack of cigarettes additive-free,
 3   when, in fact, it contains an additive, that's one
 4   piece of this.  But the other piece, which is -- and
 5   we'll walk through the complaint in a moment -- these
 6   health reassurance claims on the front of the packs
 7   of cigarettes tell consumers that these are safer and
 8   healthier.  And we know that because, as I just
 9   stated, the sales are so steeply on the incline, when
10   the rest of the industry is down 20 percent.
11             And I heard Mr. Schultz say that we view
12   the words "inherently misleading" and "deceptive" so
13   many times, and we just don't have to accept that
14   because we've alleged it over and over again; that,
15   you know, this is a question of law, we haven't
16   alleged the facts.
17             This is an interesting case, because it's
18   in the world of misleading advertising, false
19   advertising.  And this is a space that I practice in
20   a lot.  And I have never litigated a case -- and I
21   have had cases certified, and we've settled cases --
22   where there is so much evidence on the misleading
23   nature, unrebutted evidence, corroborated evidence of
24   the misleading nature.
25             Where else do you have the government
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    weighing in?  Judge Kessler, the FDA, the FTC,

2    stating that a reasonable consumer could be misled

3    here.

4         That's why we have the existence of a

5    disclaimer.  Now, the disclaimer does not mean that

6    the front of the pack isn't misleading.  But a

7    disclaimer exists because the FDA, the FTC, the

8    courts have specifically targeted these products as

9    being potentially misleading to a reasonable

10   consumer.

11        So to say today, as a matter of law, that

12   we can decide, because Melissa Wolchansky gets up

13   here, and Mr. Schultz gets up, and we make colorful

14   arguments to the Court, that doesn't matter.  What we

15   have is scientific, unrebutted evidence in the

16   complaint.  So let's talk about that.

17        The consent order requires that the

18   disclaimer -- which, again, this case is a lot about

19   this disclaimer -- is there a disclaimer that means

20   that the 100% additive and the natural claims on the

21   front of the packs are somehow not misleading,

22   because we put an absolute tiny, tiny text on the

23   side of the pack -- if Your Honor would take a look

24   with me -- "No additives in our tobacco does not mean

25   a safer cigarette."  Well, that's buried.  You can

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   see the size of it in comparison to the front of the
 2   box, where natural is the first thing, Natural
 3   American Spirit is, without question, the first thing
 4   you see.  And 100% additive-free is right on the
 5   bottom of that pack.
 6            So, now, if I'm a consumer, I'm going to
 7   flip this around -- oh, will I find this tiny text on
 8   the side of the box with a massive bar code,
 9   questions -- you know, all these little insignias on
10   the side of the box -- to find what that disclaimer
11   means, a double negative:  "No additives does not
12   mean a safer cigarette."
13            Why don't we say that it is; that it's
14   addictive; that it's dangerous.  We don't.  We
15   confuse consumers with this disclaimer.  It's hidden.
16            And certainly, as Mr. Reese discussed this
17   morning, this is not preempted.  But we can be sure
18   that the FTC did not allow Reynolds to put a
19   disclaimer -- Santa Fe to put a disclaimer on this
20   product, with the intent of allowing the defendant to
21   then go ahead and mislead consumers by hiding it in a
22   place that is too small and too innocuous to see.
23            So we have the record here of all of the
24   places where, in the complaint, the facts that we are
25   to presume as true, at this stage in the litigation,
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    why this is, in fact, misleading.
 2             Here, we have the FDA warning letter.
 3    "Your product labeling for Natural American Spirit
 4    cigarettes, which uses the descriptors "Natural" and
 5    "Additive-free," represents explicitly and/or
 6    implicitly that the products or their smoke do not
 7    contain or are free from a substance and/or that the
 8    products present a lower risk of tobacco-related
 9    disease or are less harmful than one or more other
10    commercially marketed tobacco products."
11             We can stop there, Judge.  We have the FDA
12    telling Reynolds that its product is potentially
13    misleading to a reasonable consumer because it is
14    doing two things.  One, it is telling consumers that
15    it doesn't contain or is free from a substance; and
16    two, it is saying that it's safer or healthier.
17             So we have facts right there in the record
18    that could suggest -- and all we have to do at this
19    stage in the litigation is point to reasonable
20    inferences that, in fact, they could be liable for
21    the conduct.
22             Next, we have the Pearson article:  "The
23    prevalence of reduced harm perception among NAS
24    smokers also clearly demonstrates that the disclaimer
25    statements on the packs and advertisements, are not
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    an effective means to correct consumers'

2    inappropriate for harm perceptions."

3           Judge Kessler, as Mr. Schlesinger pointed

4    out, has banned the use of the word "natural."  We

5    still have it.  That is a huge question in this

6    industry.  Why is it even allowed to be on these

7    packs.  That Judge Kessler -- and again, cert denied

8    at the Supreme Court, why is "natural" even on these

9    packs?  Well, that is one of the questions we'll ask

10   Your Honor:  Can we enforce that.  And we hope that

11   you will do so.

12          Next, we have the Discount Tobacco City &

13   Lottery, where R.J. Reynolds is a plaintiff, where

14   the court talks about R. J. Reynolds' attempts to

15   de-link hypothetical consumers' preferences for

16   "organic" and "additive-free" products from general

17   health concerns" -- i.e., safer or healthier -- "is

18   unsustainable."

19          So now we've seen the FDA, we've seen

20   peer-reviewed articles, experts in the industry

21   telling us that reasonable consumers can, in fact, be

22   misled.

23          Here, the first quote on this page.  "We

24   may safely presume that naturalists and those who

25   subscribe to organic products do not engage in

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                   201 Third NW, Suite 1630
Santa Fe, NM 87501                                           Albuquerque, NM 87102
(505) 989-4949                                                     (505) 843-9494
FAX (505) 843-9492                                           FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1    unmotivated or arbitrary behavior -- common sense

2    dictates the conclusion that they prefer such

3    products precisely because they believe that natural

4    and organic products confer health advantages over

5    conventional products."

6                So the suggestion that reasonable consumers

7    are so unreasonable to think that a product that says

8    "additive-free" or "natural" means nothing is just

9    simply not supported by the record in this case.

10               You don't need -- I don't need to stand

11   here and tell us.  We have the facts in the

12   complaint.  And, in fact, in 2015, Santa Fe itself

13   confirmed that "the aim" of using the terms, quote,

14   "natural" and "additive-free" was to drive brand

15   awareness, highlight their 100% additive-free natural

16   proposition, and generate trial among adult smokers.

17   So they did this knowing that those words mean

18   something.

19               So to now suggest that they don't mean

20   anything at all, which is in and of itself

21   misleading, or to suggest they don't mean what the

22   FDA, the FTC, and the courts have found, is just not

23   right.

24               THE COURT:  Ms. Wolchansky, I hate to

25   interrupt your argument, but I'm going to have to

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   give Ms. Bean a break.  We've been going for about an

2   hour and a half.  So why don't we be in recess for

3   about 15 minutes.

4           MS. WOLCHANSKY:  No problem.  Thank you.

5           (The Court stood in recess.)

6           THE COURT:  All right.  Ms. Wolchansky if

7   you wish to continue your argument.

8           MS. WOLCHANSKY:  Yes, sir.  We were in the

9   process of walking through all of the allegations in

10  the complaint that demonstrate the misleading nature

11  of the labeling of the cigarettes.  Importantly, the

12  distinction that the menthol additive, and whether or

13  not it is literally false to call a product, quote,

14  "100% additive-free," when in fact it contains

15  menthol is one piece.

16          And the second is whether these

17  representations on the front of the package and the

18  carton:  "Natural additive-free organic," mean that

19  the product -- and reassure consumers that the

20  products are, quote, "safer and healthier," and all

21  of the evidence that we have in the record that a

22  reasonable consumer, in fact, could be misled.

23          So this is where we left off, Your Honor.

24  A 2007 study conducted by researchers at the

25  University of California confirmed that consumers

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    "frequently concluded that 'natural' cigarettes must

2    be healthier or safer than cigarettes containing

3    chemicals."  "Natural is similarly misleading and

4    implies unwarranted health claims."

5             Again, we need to look at this not in a

6    vacuum.  I know that I'm up here talking about

7    menthol and additive-free, and I'm a little bit

8    moving into natural.  But it is important to

9    recognize that these packs of cigarettes contain the

10   natural, the 100% additive-free, and in some cases

11   the organic label.  And these cannot just be looked

12   at in a vacuum.  We have these representations,

13   importantly, that we do not have on competitor packs.

14   So when you are in the store, and a consumer is

15   making a choice -- most likely, as Mr. Schlesinger

16   said -- a young adolescent is making a choice of

17   which cigarette to purchase, you have Natural

18   American Spirit, 100% additive-free cigarettes, and

19   you have the alternative that does not contain those

20   representations.

21            So to suggest, as a matter of law, that we

22   can sit here today and not look at all of that

23   evidence of what does a reasonable and a reasonably

24   addicted consumer here, a consumer who is buying and

25   repetitively purchasing these cigarettes, what does

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
e-mail: info@litsupport.com

```
1    that mean, and is it misleading?  We simply cannot do
2    that as a matter of law at this stage, with all of
3    the evidence in the complaint.
4              Next, a 2016 study, conducted by
5    researchers at the Schroeder Institute for Tobacco
6    Research and Policy Studies "revealed consumers
7    believe that cigarettes labeled or advertised as
8    'natural, organic, and additive-free' are
9    significantly more appealing, healthier, or less
10   harmful than those not so labeled."  And they
11   encourage smokers to switch cigarette brands rather
12   than quit smoking entirely.  Again, this is a
13   study -- this is scientific evidence that reasonable
14   consumers believe that these labels:  natural,
15   organic, and additive-free appear to be safer and
16   healthier.
17             And specifically, Natural American Spirit
18   smokers, in a study in paragraph 52 of the complaint,
19   the study showed that 63.9 percent of smokers of
20   Natural American Spirit -- not just general smokers
21   out there in the public -- of these very cigarettes
22   believed that their brand was less harmful than other
23   brands.
24             So how can we say here on a motion to
25   dismiss, as matter of law, that a reasonable consumer
```

SANTA FE OFFICE                                              MAIN OFFICE
119 East Marcy, Suite 110                              201 Third NW, Suite 1630
Santa Fe, NM 87501                                        Albuquerque, NM 87102
(505) 989-4949                                                     (505) 843-9494
FAX (505) 843-9492                                          FAX (505) 843-9492
                                                                 1-800-669-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

e-mail: info@litsupport.com

1    could not be misled by the representations that exist

2    on the front of the Natural American Spirit packs,

3    but not competitor packs, as a matter of law, they

4    couldn't have possibly been deceived?  The law just

5    does not allow us to do that at this stage, Your

6    Honor.

7           Ultimately, the Schroeder Institute

8    concluded that Natural American Spirit smokers are 22

9    times more likely than other smokers to believe that

10   their brand is less harmful than other cigarette

11   brands.

12          Again, we can stop with any one of these

13   scientific studies, the FDA warning letter, FTC

14   letter, the FTC letter that was just recently

15   submitted by the defendants in this case, because it

16   is all evidence that goes to the jury question of

17   whether a reasonable consumer could be misled.  And

18   there is more than enough evidence at this stage in

19   the litigation to draw a reasonable inference in that

20   sense.  Here, adult smokers may choose American

21   Spirit brand because they perceive it as a less

22   harmful cigarette based on the descriptors "organic,

23   natural, and additive-free" on the product packaging.

24   And here, the disclaimer is "not an effective means

25   to correct consumers' inappropriate harm perception."

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                  201 Third NW, Suite 1630
Santa Fe, NM 87501                                         Albuquerque, NM 87102
(505) 989-4949                                                     (505) 843-9494
FAX (505) 843-9492                                        FAX (505) 843-9492
                                                                1-800-669-9492
BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
e-mail: info@litsupport.com

1        You will not find in all of the evidence

2   that has been submitted, and asking the Court to take

3   judicial notice, and any of the briefing submitted by

4   defendants, none of this evidence has been rebutted.

5   And it can't be, because it is reasonable consumers'

6   belief regarding the representations on the front of

7   those packs.

8        So, again, I don't want to belabor the

9   point.  But this is a motion to dismiss, Your Honor.

10  And I'll go through the case law in a minute.  There

11  is more than enough evidence in the record here for

12  this case and all of these representations and health

13  reassurances to move forward.

14       The 2004 survey, paragraph 53, a survey of

15  more than 1000 smokers revealed that 60 percent

16  believe that removing additives make them less

17  dangerous to smoke, and 73 percent believed that

18  cigarettes with additives were more harmful.  How

19  does that not go to what a reasonable consumer

20  believes?

21       A study published in 2016, paragraph 54,

22  again, including the Schroeder Institute,

23  demonstrated that the pack descriptors, "made with

24  organic tobacco, 100% additive-free, U.S. grown

25  tobacco," as well as other aspects of the American

SANTA FE OFFICE                                                      MAIN OFFICE
119 East Marcy, Suite 110                                     201 Third NW, Suite 1630
Santa Fe, NM 87501                                            Albuquerque, NM 87102
(505) 989-4949                                                          (505) 843-9494
FAX (505) 843-9492                                            FAX (505) 843-9492

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
1    Spirit pack design communicated lower risk.

2              So here we're talking again, safer,

3    healthier.  All of these descriptors taken alone,

4    taken together, tell consumers, and reassure them

5    that these are a safer and healthier cigarette.

6              Their own marketing research regarding the

7    use of additive-free confirmed that consumers believe

8    additive-free cigarettes to be safer.  Reynolds

9    conducted its own survey, hoping that the results

10   would be different.  This is all in paragraph 56 of

11   the complaint.  And, in fact, it came out the other

12   way; that, no, the use of additive-free, consumers

13   think that that would be safer, healthier.

14             We have now Reynolds' own survey; we have

15   the FDA; we have the FTC; we have Judge Kessler; we

16   have peer-reviewed scientific studies; we have

17   nonprofits; we have so much evidence to suggest that

18   a reasonable consumer would be misled.

19             And this is the Judge Kessler 1600-page

20   order that I'm sure everyone here is reading at bed.

21   But I pulled just a couple of nuggets out of this:

22   Found the defendant's use of the descriptor "natural"

23   meant that they were less hazardous to health than

24   other cigarettes.

25             So, now, we have Judge Kessler telling us
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    that natural is misleading, in addition to lights and
2    other descriptors.
3              "Market research shows that consumers
4    incorrectly interpret the word 'natural' to mean that
5    the cigarettes are safer and healthier."
6              Now, the most important piece:  They aren't
7    safer or healthier.  So we have the 100%
8    additive-free claim.  They aren't.  The addition of
9    menthol; they are not safer or healthier.  This
10   little pack right here, the purple -- well, it's a
11   blue box, but it's this purple-looking box -- has the
12   highest total of PAH -- and Mr. Schlesinger told me
13   what that stands for, it's in the complaint, I will
14   not try to pronounce it -- delivering from 60 percent
15   to 170 percent higher PAH yield than the average
16   yield of all other cigarettes tested.  This is the
17   most dangerous, most PAHs of any of the packs.  They
18   have more heavy metals than the other cigarettes;
19   they have the highest mean concentrations for mercury
20   and cadmium, which is a known carcinogen, and also
21   associated with chronic obstructive pulmonary
22   disease.  They are not safer or healthier.
23             They intentionally engineered them "to be
24   at least as addictive as other cigarettes by creating
25   free base nicotine, which is volatile especially when

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    smoked."  And, as we talked about earlier with
 2    respect to menthol, they just contain additives.  It
 3    is literally false to suggest otherwise.
 4            And Mr. Schultz has asked us, Well, if it's
 5    so obvious, how can that be misleading?  And the
 6    Court should demand objectively truthful
 7    representations.  They shouldn't be permitted to lie
 8    to consumers, and say, Oh, everyone knew we were
 9    lying.  That's not fair.  They concede that menthol
10    is an additive.  But they say it's so obvious, how
11    can consumers possibly be mislead?  But we can't give
12    them a free pass on this issue.  The fact that it
13    does contain menthol, and it is an additive, is
14    something that this Court should be able to -- we
15    should be able to talk about removal, and we should
16    be able to talk about why, in fact, that is
17    misleading to consumers.
18            Again, Mr. Schlesinger just came up here
19    and talked about what menthol is.  But what do
20    consumers know about menthol?  Is it grown in the
21    field?  Is it manufactured into the tobacco after,
22    and processed?  Where does it sit in the cigarette
23    itself?  These are all questions that we will be able
24    to answer as we go through discovery.
25            I will hold on the manufacturing processes
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   specifically, but I do want to talk for a moment
 2   about the law because it is important and it is very
 3   in our favor here.  This is all detailed in the
 4   complaint.  But where we start here, when we talk
 5   about the law, this is not an issue that is
 6   appropriate for determination on a motion to dismiss.
 7           Defendants have cited very, very few cases
 8   where the court was able, at a motion to dismiss --
 9   and I would submit that the Court shouldn't in a
10   motion to dismiss ever weigh the evidence, because we
11   take all the evidence in the complaint as true, which
12   is why the absolute majority of case law on
13   reasonable consumer find that this is a jury issue,
14   not appropriate, either on demurrer in California,
15   there are a lot of cases, and we have cited cases in
16   every single jurisdiction, I believe except maybe
17   one, where it is not appropriate for the Court on a
18   motion to dismiss to weigh the evidence.
19           Now, the Gerber case, the Williams versus
20   Gerber case, which is a Ninth Circuit decision,
21   widely cited, all you have to do is Shepardize the
22   Williams versus Gerber case, to see that it is cited
23   in many different circumstances, not just in food
24   products.  And the court finds that it is a rare
25   situation in which granting a motion to dismiss on a
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

81

```
 1    reasonable consumer is appropriate.  We cited three
 2    pages in our brief of case law on that point; that it
 3    is not appropriate on a motion to dismiss to find
 4    what a reasonable consumer may or may not believe.
 5    And I can tell Your Honor -- and I've read all those
 6    cases -- none of them had nearly the evidence that we
 7    have in this case on what is misleading to a
 8    reasonable consumer.
 9            Most of those cases will never have this
10    much evidence, even if those cases go to trial.  A
11    natural case on the front of a food product or a baby
12    food, maybe the complainants in that case will
13    conduct a consumer survey.  Maybe the defendant's
14    internal documents in that case will show that they
15    intended to market that product to mislead consumers.
16    I litigated a lot of those cases.  There aren't so
17    many of those documents.
18            But here, we have so much evidence, and we
19    walked through it.  And I'll leave the Court with a
20    copy of this PowerPoint, but all of this comes from
21    the complaint.  So much evidence regarding what, in
22    fact, has and will continue to mislead a reasonable
23    consumer.
24            So the very few cases that defendants have
25    cited, where the Court was able just at the motion to
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    dismiss to say, Oh, evaporated cane juice, doesn't

2    really seem to be that misleading on the front of

3    label; that is not this evidence.  We have evidence

4    and we have cited all the cases in our brief:  The

5    Williams versus Gerber case is absolutely on point.

6            There are a couple of cases that the

7    defendants have cited where that is a disclaimer, and

8    the disclaimer is in the Trujillo case, in the

9    Freeman versus Time case.  The Court in both of those

10   cases focused on the placement of the disclaimer, and

11   the prominence of the disclaimer.  Neither of those

12   fact scenarios exist here.

13           We have, as Your Honor has seen, a very,

14   very tiny disclaimer that does not comply with the

15   consent order, is not in either location, type, font,

16   size, near to the representations on the front of the

17   pack, and, again, all of this evidence that supports

18   the proposition that a reasonable consumer might be

19   misled, even though that disclaimer exists.

20           The FDA warning letter itself states, and

21   the disclaimer has been in place, that consumers

22   could be misled by the existence of those labels on

23   the front.  And, again, they're in negotiation right

24   now with the FDA regarding the use of those words on

25   the front of the package despite the existence of the

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1   disclaimer.  So we know that consumers can still be

 2   misled.

 3          The Ackerman case is also on point.  There,

 4   we have representation on the front of the pack, and

 5   we have a, quote, disclaimer on the back, where we

 6   have an FDA mandated label that talks about how much

 7   sugar is, in fact, in the product.  And the court

 8   found the fact that the actual sugar content was

 9   accurately stated in an FDA mandated label does not

10   eliminate the possibility that reasonable consumers

11   may be misled.

12          So this notion that "menthol" might be very

13   tiny on the back of this pack, so it's not misleading

14   to say on the front to say it's additive-free, the

15   case law just simply doesn't support that.

16          The Jou versus Kimberly-Clark case, 2013

17   Westlaw 6491158, "Defendant cannot rely on

18   disclosures on the back or side panels of the

19   packaging to contend that any misrepresentations on

20   the front of the packaging is excused."

21          There are many cases in our brief, Your

22   Honor, that are cited in that regard, that you cannot

23   disclaim something on the back or side that is

24   misleading on the front.

25          The argument that they make, the defendants

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



84

1    make in their brief is that the decisions that we

2    cite to are inapposite because they deal with

3    disclosures that directly contradict

4    misrepresentations.

5          But that's exactly what we have here.  The

6    idea, the representations on the front "natural, 100%

7    additive, organic," all of the evidence that we've

8    cited that those representations and health

9    assurances are that these cigarettes are healthier

10   and safer.

11         And then on the side we have something that

12   seems to suggest, although it's confusing, that it's

13   not safer.  That's a direct contradiction.  So the

14   case law that we cited is absolutely on point.

15   Defendants also claim that it's, quote, "more

16   detailed information."  Well, we're saying on the

17   front that it's "natural and additive-free," and then

18   on the side we're telling you it doesn't actually

19   mean it's safer; that's not what that is.  It's

20   contradictory to the prominent statements on the

21   front label that, as we've seen in all of these

22   allegations in the complaint tell consumers that

23   these products are safer or healthier.

24         The bottom line is all of these

25   representations implicate the larger issue of the

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    relationship between the factual misrepresentations

2    on the front of the package, and the disclaimer of

3    that representation on the side.

4            So if you consider "natural," under their

5    reasoning, they should be able to conspicuously

6    misrepresent on the front that these cigarettes

7    contain natural, unprocessed tobacco, or

8    additive-free tobacco, just as it was harvested from

9    the field, but then neutralize that with a prominent

10   statement on either the side or the back that says,

11   "the tobacco has been highly processed after

12   harvesting."

13           We shouldn't allow them to do that here

14   today with regard to additive-free, with regard to

15   natural.  It's misleading.  And there is plenty of

16   evidence here for the Court to look at in the

17   complaint to deny this motion on the reasonable

18   consumer.

19           I have a bit more on the natural

20   processing, but I will defer to Mr. Biersteker or Mr.

21   Schultz for now, unless the Court has other

22   questions.

23           THE COURT:  No, not at the present time.

24   Thank you, Ms. Wolchansky.

25           All right.  Mr. Schultz, do you want to --

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    I'll give you the last word on the menthol.  And if
 2    you want to go into these other areas that Ms.
 3    Wolchansky -- and on your PowerPoint, I do want to
 4    see it, but file it.  So just put it on CM/ECF, just
 5    file it as a document.  I do want to see it.
 6              All right.  Mr. Schultz.
 7              MR. SCHULTZ:  Thank you, Your Honor.
 8              Your Honor, I want to just touch briefly on
 9    where I was.  We were specifically talking about the
10    menthol-free issue.  And I'll say that, Your Honor,
11    because -- I think the only last point I'd like to
12    make on this is very similar to a point that you made
13    at the very introduction, when you were talking about
14    your reaction to all three of the theories.  And on
15    the theory about the manufacturing process, the Court
16    made the observation cigarettes don't come off a
17    cigarette tree.  So to say that the word "natural"
18    somehow was misleading, that a cigarette hadn't gone
19    through some kind of manufacturing process didn't
20    strike you as misleading to the reasonable consumer,
21    the same is true on the menthol issue.  Menthol
22    cigarettes don't exist in nature.  The only way to
23    get a menthol cigarette is to have tobacco and
24    menthol.
25              THE COURT:  Well, I guess -- and that's
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   where I think that "natural" is not the biggest
 2   concern with me as far as the menthol claim.  It's
 3   the no additive portion of it.  I know we were
 4   drifting back and forth in the response, but I --
 5   that is the reason, it's the no additive words that
 6   give me the concern.
 7            MR. SCHULTZ:  Well, again, Your Honor, the
 8   only thing I would point to is, again, what the
 9   representation on the front is 100% no additive
10   tobacco.  And on the back -- you asked the question,
11   Your Honor, what is menthol, and --
12            THE COURT:  See, when I read that
13   statement -- I see the way you read it.  But it's two
14   lines.  And, of course, what the plaintiffs focus on
15   it is 100% additive-free, and then underneath it it
16   says "natural tobacco."  Is that communicating two
17   messages or one?  You're saying it's one; that it's
18   100% additive-free natural tobacco.  But I think that
19   what the plaintiffs have been saying is that it's
20   communicating two messages.  One that it's 100%
21   additive-free and then it also contains natural
22   tobacco.
23            MR. SCHULTZ:  And I guess my sixth grade
24   teacher and the way she taught me to diagram
25   sentences would disagree with that characterization,
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Your Honor.

2            THE COURT:  Well, it's not a sentence any

3    way we cut it.

4            MR. SCHULTZ:  I won't argue the grammar,

5    Your Honor.

6            But again -- I'll move on after this -- but

7    to look at both the front and the back together,

8    which the Court, in looking at what a reasonable

9    consumer would understand, the cases have instructed

10   the Court to consider all of the circumstances.  So

11   if the Court looks at the front and then looks at the

12   back, where it says "ingredients" and it says,

13   "organic tobacco" and "organic menthol."  The

14   plaintiffs are still hard pressed, and have not

15   explained how a consumer, who wishes to buy a menthol

16   cigarette believes that they will get a menthol

17   cigarette with anything other than tobacco and

18   menthol.

19           And here, the company is very clear in

20   exactly what kind of tobacco they're getting and what

21   kind of menthol they're getting.  So all of the long

22   discourse notwithstanding, Your Honor, that really is

23   the bottom line on the menthol question.  For a

24   reasonable consumer, who walks into the store and

25   chooses a menthol cigarette, knowing that a menthol

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    cigarette doesn't exist in nature, how are they going
 2    to get that?  And what, if anything, did the company
 3    tell them that was deceptive in any mean, or that
 4    would lead them to believe that they did not purchase
 5    exactly what they thought?
 6              Your Honor, because the plaintiffs spent so
 7    much time on their first theory, I'd like to address
 8    that.
 9              THE COURT:  Can I give you the thing
10    that -- I told you at the beginning I wasn't really
11    excited about this claim because of the reasons the
12    FTC gives for its consent decree.  But the one thing
13    that sort of lingers in my mind that's a little bit
14    troubling is, when you look at the disclaimer --
15    before I really focused on the product itself -- and
16    I just read the briefing -- I thought what I would be
17    seeing on the side of the package is that "natural,
18    free, and no additives in our tobacco does not mean a
19    safer cigarette."  What did I just say?  Yes, the
20    fact that the tobacco is natural and that there are
21    no additives does not mean a safer cigarette.  But
22    the disclaimer is a little different.  It focuses, in
23    my mind, on the no additives, and doesn't really
24    address the issue about the "natural."
25              So it would seem to me that, when I read
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   the FTC's concerns, and how they're addressing it, I
 2   guess I would have thought that there would have been
 3   a different disclaimer; that 100% -- or just say, I
 4   guess, "natural tobacco and 100% additive-free does
 5   not mean a safer cigarette."  Do you see my concern?
 6   I agreed with what the FTC was saying.  But then I
 7   was surprised by the disclaimer, and whether it fully
 8   addressed their concerns.  They seem to have dropped
 9   out the word "natural" on the disclaimer.
10          MR. SCHULTZ:  Well, and Your Honor, the FTC
11   chose what it chose, and we have complied with that.
12   I want to make a very specific point on that.  Your
13   Honor was looking at the package.  And since you've
14   read the FTC, you know that there was no requirement
15   in the FTC that this be put on the package; it was
16   with our advertising.
17          And if the Court looks at, starting on
18   paragraph 43 in the complaint, pages 17, 18, 19, 20,
19   21, the advertising is listed.  And there, Your
20   Honor, you see that not only is the FTC disclaimer
21   there, but also language to the effect -- not only
22   with the Surgeon General's warnings, but also the
23   disclaimer that "organic tobacco does not mean a
24   safer cigarette."  So that is in the advertisement,
25   Your Honor, and you can see that on several of the
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    ads --
 2              THE COURT:  Why did the defendants choose
 3    not to track what's in the advertising and then put
 4    it on the product?  Because I thought one of the
 5    arguments that the defendants had made in the
 6    briefing was:  We went beyond what the FTC required;
 7    we put it on the labeling.  But that's not quite
 8    true.  It shows a different disclaimer on the product
 9    than it did in the advertising, because the
10    advertising wasn't being required by the FTC.
11              MR. SCHULTZ:  Your Honor, at that point,
12    I'd be going far beyond anything that is alleged in
13    the complaint.  I think the simple matter, and a
14    better way to look at this, Your Honor is, if you
15    look at the first motion for judicial notice.  And in
16    the exhibits, where it shows the pack, there is a
17    more graphic depiction of what the pack looks like
18    laid out.  And I think, if the Court looks at it that
19    way, or even just from the pack this way, it's fairly
20    obvious to see that there isn't a whole lot of space
21    that's left on this pack for anything more to be
22    added.
23              So the language in our brief was 100
24    precent correct.  We went beyond what the FTC
25    required with regard to the disclaimer, in the sense
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   that the FTC never required the disclaimer to be

2   placed on the packaging.  So that part is still a

3   true statement, Your Honor.

4          But more to your point about the difference

5   between what the FTC has, and what appears in our

6   advertising, I think those disclaimers cover both.

7   It covers both that "no additives in our tobacco does

8   not mean a safer cigarette" and "organic tobacco does

9   not mean a safer cigarette."  And that comes directly

10  from the plaintiff's complaint at paragraph 43.

11  That's what this motion is about.  It's about the

12  adequacy of what is in the complaint.

13         And, Your Honor, one of the bottom lines on

14  this entire issue, this whole safer cigarette theory,

15  is plaintiffs went to great length to talk about the

16  detail of everything that is in their complaint.  The

17  one thing that is missing in the complaint in all

18  several hundred of their allegations, they nowhere

19  mention the use of the FTC disclaimer.  They focus

20  solely on the language on the front of the package,

21  but they don't discuss -- they don't address how that

22  fits with the FTC disclaimer that appears in the

23  advertising.

24         And in looking at what a reasonable

25  consumer would look at, the reasonable consumer is

SANTA FE OFFICE                                          MAIN OFFICE
119 East Marcy, Suite 110                        201 Third NW, Suite 1630
Santa Fe, NM 87501                               Albuquerque, NM 87102
(505) 989-4949                                        (505) 843-9494
FAX (505) 843-9492                               FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1   going to look at both of these things.  So, rather
 2   than a reasonable consumer, what the plaintiffs are
 3   postulating is an unreasonable consumer.  An
 4   unreasonable consumer who either only reads the front
 5   of a pack, and nothing else, or, even worse, reads
 6   the advertisement, sees the language "100%
 7   additive-free natural tobacco," and then does not
 8   read anything else that appears on that page; that
 9   appears in clear letters, in letters and in fonts
10   that are prescribed by the FTC, surrounded in a white
11   box.  That is not a reasonable consumer.  That is not
12   a person who has made a reasoned choice in what
13   they're going to purchase.  So only a consumer who
14   ignores these express disclaimers is the kind of
15   consumer that the plaintiffs want to parade in front
16   of you.  And that's just not simply who the
17   reasonable consumer is.
18           It's interesting, Your Honor, in their
19   response to our motion, the plaintiffs seem to almost
20   concede this point with regard to our advertising.
21   They make virtually no argument about the adequacy of
22   the disclaimers in our advertising.  And they focus,
23   instead, solely on the packaging.  There --
24           THE COURT:  That's good for you, isn't it?
25           MR. SCHULTZ:  We'll take what we can get,
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

e-mail: info@litsupport.com

1   Your Honor, absolutely.  We agree with that

2   completely.

3           But let's just focus, then, on the

4   packaging.  Now, the issue is about what is the

5   effect of that disclosure on the reasonable consumer?

6   The defense position has been that that disclosure in

7   no way contradicts the language that appears on the

8   front, "natural" or "additive-free," but it helps to

9   amplify its meaning.

10          And the plaintiffs agree.  I would ask you,

11  Your Honor, to look at their response at page 46.

12  This is what they say:  Quote, "Reasonable consumers

13  should be able to expect that the information on the

14  side of the package simply provides more detailed

15  confirmation of the representation on the front."

16  That's their language.  And that's exactly what we

17  have here, Your Honor.  We have a statement that says

18  "natural, additive-free," and then language on the

19  side.

20          THE COURT:  What they're saying is it

21  doesn't complement what's on the front.  It takes it

22  away.  It says it on the front, and takes it away on

23  the back.

24          MR. SCHULTZ:  Your Honor, that's their

25  interpretation of the word "natural."  And the

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                              201 Third NW, Suite 1630
Santa Fe, NM 87501                                      Albuquerque, NM 87102
(505) 989-4949                                               (505) 843-9494
FAX (505) 843-9492                                       FAX (505) 843-9492

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

95

```
1    problem that we have with that, and the problem that
2    other cases have had that use the word "natural," is
3    the word "natural" has no content.  And when it has
4    no content, courts have held --
5              THE COURT:  That troubles me.  I know cases
6    have said that.  But it's such a -- I mean, we've got
7    Whole Foods and Sprouts, and everything; we've got a
8    whole industry out there that pushes this.  To say it
9    has no content concerns me a little bit.
10             MR. SCHULTZ:  Well, and I can understand
11   the concern, Your Honor.
12             THE COURT:  I mean, it may be ambiguous; it
13   may be misleading; it may not be very informative.
14   But take a good English word and say it has no
15   content troubles me a little bit.
16             MR. SCHULTZ:  Well, Your Honor, I think the
17   problem that courts have had when they've talked
18   about that is, if we're going to talk about what a
19   reasonable consumer is -- and you see this same line
20   of thought in talking about what is inherently
21   misleading under the First Amendment.
22             The Court says:  If we're going to look at
23   that, there should be some standard that we can
24   measure against.  Reasonable consumer, we're talking
25   more of an objective standard.  And when we don't
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
e-mail: info@litsupport.com

1    have that objective touchstone to go against, the

2    word "natural" becomes so ubiquitous that it almost

3    loses all meaning.  So it's difficult to know what

4    any consumer, let alone a reasonable consumer, will

5    think when they read it, because it can have

6    different meanings in different contexts.

7              So the plaintiffs' point that the word

8    "natural" automatically means safer -- well, we could

9    probably have a war of dictionaries, Your Honor, as

10   to where that appears, or whether that's a construct

11   that is placed on there by the plaintiff.  But the

12   fact of the matter is that a reasonable consumer

13   reading the entirety of an ad, the entirety of a

14   package, where they see the word "natural," or they

15   see the word "additive-free," and then they are told

16   repeatedly:  "No additives in our tobacco does not

17   mean a safer cigarette.  Organic tobacco does not

18   mean a safer cigarette."  And they're given the

19   Surgeon General's warning about smoking in general.

20             Again, Your Honor, only an unreasonable

21   consumer will ignore all of that and assume that the

22   word "natural" can have one, and one meaning only,

23   and that is a meaning that equates natural with

24   safer.  We just simply don't believe, Your Honor,

25   that that is what a reasonable consumer would do.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    And, also, it's certainly not what the case law has
 2    done.
 3              Particularly, Your Honor, we'd point the
 4    Court to the Kane versus Chobani case, 2013 case from
 5    the Northern District of California.  The Court said
 6    that "where a label clearly discloses the preference
 7    of an unnatural ingredient, it is implausible that
 8    the plaintiff would believe the defendant's
 9    representation of all natural ingredients."
10              THE COURT:  What was the product in that
11    case?
12              MR. SCHULTZ:  It was yogurt, Your Honor.
13              Or Foreman versus Pfizer; that had to do
14    with how many pills happen to be an Advil bottle.
15    And the Court said:  It's just not plausible that the
16    company in any way misled about the number of pills,
17    when you can't read the whole box and not understand
18    how many pills are in the bottle.
19              So, Your Honor, the same holds true here.
20    The defendant's packaging, the advertising expressly
21    state that the cigarettes are not safer than other
22    cigarettes.  And as a result, Your Honor, no
23    reasonable consumer could be misled to think anything
24    else.
25              Your Honor, if you want, I can address
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

98

```
 1   their last claim, or --
 2            THE COURT:  Well, why don't I see if Ms.
 3   Wolchansky has anything else she wants to say on this
 4   first theory about the natural and additive, because
 5   under the theory that primacy is first, they must
 6   have thought this -- they may have thought this was
 7   their strongest argument.  So let me see if she has
 8   anything else on this.  And then we'll come back to
 9   the manufacturing or engineered product.
10            Mr. Schlesinger, do you want to say
11   anything further on this first theory, first claim?
12            MR. SCHLESINGER:  Yes.  And I'll go back
13   to -- you know, Judge, I'm like the closing argument
14   guy.  And so when it comes to the motion to dismiss
15   and stick to the pleadings and, you know, accept
16   everything as true, I look at the big picture, and I
17   go back to this concept, which is very simply that --
18   and Your Honor may have picked up on it when you said
19   what kind of product it is.  You'll notice they don't
20   cite tobacco cases, because the tobacco cases
21   uniformly support us through all jurisdictions:
22   federal, state court, lower Supreme Court case, they
23   all support our position.  They cite food and things
24   like that.
25            And I think, when I heard Mr. Schultz say
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    the reasonable consumer -- it would be unreasonable

2    to think of "natural" as meaning healthful, it

3    occurred to me that the mind, the brain of the

4    drug-addicted consumer is somewhat unreasonable,

5    because the brain has been changed by the addictive

6    nicotine.

7            THE COURT:  Well, if we go that route,

8    though, don't we just really throw out the standard?

9    We don't have a standard; we're just saying:  We've

10   got drug addicts we're targeting here, so that's your

11   reasonable consumer?  I mean, doesn't that just

12   mean -- basically mean we don't have a standard?

13           MR. SCHLESINGER:  Oh, I think we definitely

14   do.  I just think that we have to consider the

15   standard in light of the reasonable consumer standard

16   that might ought to be modified, in light of the

17   defendant's target audience, and just say that it's a

18   reasonably -- it's a reasonable, but already

19   addicted, nicotine-addicted consumer.  So we think

20   about that in terms of a cigarette that they say

21   doesn't mean safer as a disclaimer, when, in fact,

22   it's got more cancer than any other cigarette on the

23   market.

24           THE COURT:  But I guess, you know, our last

25   President smoked cigarettes.  And to sort of picture



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    him as a drug addict and unable to read a label on a

2    cigarette, I don't know, that -- it seems to me I

3    could say somebody like him is a very reasonable

4    consumer.

5         MR. SCHLESINGER:  No doubt.  It's really

6    hard.  It's a tight -- it's a very difficult illusion

7    to break.  Because we all grew up -- we all lived in

8    a culture that the tobacco industry created, and has

9    been found guilty of racketeering, conspiring,

10   corrupt organization conduct in misleading the

11   American people for decades.  So we grew up in this

12   environment where people think that everything you

13   need to know about cigarettes is known.  And there is

14   a very powerful illusion.

15        But here's what I would say about the

16   "natural," is that if it means nothing in particular,

17   then their use of the term to describe the product is

18   confusion and misleading.

19        THE COURT:  Well, I signaled that I don't

20   think it doesn't mean anything.  That troubles me

21   that people in the corporate word that use "natural"

22   must think it means something, or they wouldn't use

23   it.  And so I do think it means something.  I don't

24   think it's so empty of meaning.

25        MR. SCHLESINGER:  Agreed.



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1          THE COURT:  But I guess I'm a little -- it

2     seems to me it's a little bit of a leap to then say

3     that because you tell people you're using a natural

4     tobacco product that you're signaling to them it's a

5     safer tobacco product.

6          MR. SCHLESINGER:  Yes.

7          THE COURT:  And that leap is the one I'm

8     having trouble making.

9          MR. SCHLESINGER:  And what I'm asking Your

10    Honor to do is -- first of all, I completely

11    recognize where Your Honor is coming from, because

12    your preconceived conception of it is understandable,

13    and is a commonly held belief in the American public.

14    Your mindset on it is exactly the way 8 out of 10 of

15    our jurors will answer the same question when we ask

16    them -- when we impanel them hundreds at a time in

17    what's been 250 trials in the State of Florida, going

18    through thousands of jurors, you're very much in the

19    mainstream of thought on this.

20          And what I ask Your Honor to do is suspend

21    your disbelief, and let us get past this motion to

22    dismiss, so you can learn in the unfortunately

23    necessary intricacies and detail of the science that

24    exists, the courts that have labored for eons on

25    this, and have all concluded that, in the context of

SANTA FE OFFICE                                          MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                  Albuquerque, NM 87102
(505) 989-4949                                              (505) 843-9494
FAX (505) 843-9492                                    FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
1-800-669-9492
e-mail: info@litsupport.com

1     a nonfood product, an inhalable, addictive drug --

2     which is all a cigarette is -- there is no other --

3     as Reynolds says, "Nicotine is a sine que non of

4     smoking, without which this is nothing.  If there was

5     no nicotine in cigarettes, our industry would

6     collapse overnight."  And recognize that it takes a

7     while to understand this stuff.  There has been

8     eminent researchers have explained -- and again,

9     Judge Kessler, who is a District Court Judge in D.C,

10    has ordered "natural" to be removed.  And that's her

11    judgment.

12            In other words, you're looking at a product

13    that we say unlawfully contains the word "natural"

14    because it promotes safety.  And what my thinking is

15    that you want to avoid language that causes

16    confusion.  And that if "natural" is -- doesn't have

17    a precise or fixed meaning, at a minimum, the word,

18    to a reasonable consumer would suggest that tobacco

19    in Natural American cigarettes was not the produce of

20    human alteration, manipulation, or engineering.

21            And while Your Honor said cigarettes don't

22    grow from trees, tobacco's impression that they want

23    to convey with an all natural product is very much

24    that tobacco does grow from trees; that it's a plant.

25    And they just take it, and wrap it up.  And that

SANTA FE OFFICE                                          MAIN OFFICE
119 East Marcy, Suite 110                      201 Third NW, Suite 1630
Santa Fe, NM 87501                              Albuquerque, NM 87102
(505) 989-4949                                          (505) 843-9494
FAX (505) 843-9492                                FAX (505) 843-9492
                                                          1-800-669-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

e-mail: info@litsupport.com

1    those additives that the consuming public had come to

2    think are the reason smoking is bad for you are gone.

3    And they're natural without those additives.  When,

4    in fact, it's the combustible smoke which contains

5    7000 different chemicals and over 60 known

6    cancer-causing chemicals that happens when you ignite

7    and inhale the smoke, which is the delivery vehicle

8    for the nicotine, which causes the addiction, and the

9    mass daily consumption of cigarettes, where people

10   smoke enough to get sick.

11           Think about it:  20 cigarettes in a pack;

12   10 puffs per cigarette; 10 inhalations is 10 nicotine

13   doses to the brain per cigarette.  That's 200 puffs

14   per day from the first thing in the morning when they

15   wake up till the last thing they do before they go to

16   bed at night.  That's crazy mass daily consumption.

17   If I stood before you and said, Judge, you ought to

18   know I'm pack-a-day smoker, the average person will

19   say, hey, that's legal, that's fine, no problem, you

20   should do it, because they don't know what's really

21   in it.

22           But if I said, Hey, Judge, every morning I

23   get up before I come to court and I have a Jack

24   Daniels and Coke 30 minutes after I wake up.  And

25   just so you know it, I have 19 more before I go to



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1    bed, 10 sips on that cocktail every single day.  And
2    you know what I've done it for?  Every day of the
3    week for the last 30 years of my life.  Everyone in
4    this courtroom would know that I would be an
5    alcoholic under that definition.
6              But somehow the tobacco industry, they're
7    the great seductionists.  And they lower the
8    perception, appreciation of the threat level, as they
9    do with the language "natural," to folks who are
10   reasonable consumers who have the problem of
11   addiction which compromises choice, alters the way a
12   brain works.
13             THE COURT:  But if you told me that you did
14   what you did with whiskey and Coke every day, would I
15   think you're a very reasonable consumer?
16             MR. SCHLESINGER:  I don't know.  You'd
17   think I was an alcoholic.
18             THE COURT:  I'd probably think, you know,
19   they could put "This is poison you're about to take,
20   and it's going to kill you by noon," it wouldn't stop
21   you.
22             MR. SCHLESINGER:  It might.  But then why
23   don't they do that?  In other words, if the "natural"
24   doesn't mean anything, and if Judge Kessler said it's
25   not lawful, and the FDA said, it means it's a
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    modified risk tobacco product, and you have to prove

2    it's safer, why don't they take the word "natural"

3    off and put "addictive" on there?

4         Do you know that, to this day, there is no

5    pack of cigarettes in the United States except the

6    Liggett brand, which is less than 1 percent of the

7    market that says "Smoking is addictive."  The

8    warnings, the federal warnings are from 1984.

9         THE COURT:  Well, but that's not our case,

10   right?  We're not talking about they should have

11   "addictive" or something else on there.  We're

12   talking about specifically whether "natural" means --

13   conveys to the reasonable consumer that it's a safer

14   cigarette.

15        MR. SCHLESINGER:  And I agree with you up

16   to the point that defendants themselves tout the

17   Surgeon General's warnings as being helpful and

18   additional information, when, in fact --

19        THE COURT:  They do.

20        MR. SCHLESINGER:  -- they haven't modified

21   since 1984, 33 years ago, when the graphic warning

22   labels that are mandated by the Tobacco Act and are

23   in charge of the FDA to put forward, the FDA hasn't

24   put them forward, Tobacco Free Kids filed a lawsuit

25   along with American Academy of Pediatrics to try to

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    get these graphic warning labels out, because people

2    still don't understand just how deadly dangerous and

3    addictive cigarettes are.  And the fact is, they

4    don't -- is this providing useful information about

5    this product to say "organic Natural American

6    Spirit," a product that's really just an addictive

7    drug?

8            THE COURT:  Well, educate me a little bit.

9    Let's say we're talking about a pack of Marlboros.

10   Do they put something into the tobacco that maybe

11   Natural American Spirit does not put into their

12   tobacco?

13           MR. SCHLESINGER:  They do.

14           THE COURT:  And so I guess I think then

15   there is your distinction.

16           MR. SCHLESINGER:  There is a distinction.

17   Marlboro uses reconstituted tobacco, paper tobacco,

18   where they take the stems, the pulp, the seeds; they

19   grind it up, crush it.  And they actually have paper

20   mill unions that roll it out as paper, chop it up,

21   and it looks like cigarettes, and they put

22   reconstituted tobacco in.  They use diammonium

23   phosphate.

24           THE COURT:  So if I'm somebody that shops

25   at Whole Foods, and I also want to have a natural

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    tobacco, this is my product, right?
 2              MR. SCHLESINGER:  Well, that's --
 3              THE COURT:  I want all those stems.
 4              MR. SCHLESINGER:  Well, that's part of the
 5    distinction that Natural American Spirit trades on.
 6    But at the end of the day, it's still delivering as
 7    much, if not more nicotine.  It's still delivering,
 8    according to our complaint, the free base nicotine.
 9    And it's got more cancer in it.
10              THE COURT:  Well, tell me, though, then
11    that -- tell me then how it's defective to say no
12    additives in our product does not -- capitalizing all
13    three letters of "not" -- mean a safer cigarette.
14    Tell me what then is wrong with that disclaimer?
15              MR. SCHLESINGER:  A couple interesting
16    things about it.  The FDA decided that disclaimer was
17    inadequate, and has taken control and authority over
18    this, and rejected the FTC's consent ruling.  And
19    that's in the letter that's attached to the complaint
20    from August 27, 2015, by the FDA, saying this is a
21    modified risk tobacco product.
22              The disclaimer is worded as a double
23    negative.  It doesn't use the term lethal.  It
24    doesn't say:  This cigarette here is more lethal than
25    any other cigarette on the market.  It says "no
```

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                           Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                             FAX (505) 843-9492

BEAN
& ASSOCIATES, Inc.                                          1-800-669-9492
PROFESSIONAL COURT                                   e-mail: info@litsupport.com
REPORTING SERVICE

108

```
 1   additives in our tobacco."
 2            THE COURT:  We don't know that to be the
 3   case, do we?
 4            MR. SCHLESINGER:  Oh, yes, sir.  Appended
 5   to our complaint is the study that tested the 50 most
 6   popular brands of cigarettes sold domestically in the
 7   United States, and the amount of cancer, polyaromatic
 8   hydrocarbons, which is a major cancer causing -- lung
 9   cancer causing carcinogen in cigarettes exists in a
10   much higher state, number one, in the American Spirit
11   blue pack over every other cigarette in the country,
12   Marlboro, Camel, Newport --
13            THE COURT:  How many different cigarettes
14   of Natural American Spirit are there?
15            MR. SCHLESINGER:  Well, these are -- I'll
16   bring all these to Your Honor, because I think, if
17   we're going to have a case on products, you ought to
18   have the product.  That's why I brought them.
19            THE COURT:  But do they make 50 products?
20            MR. SCHLESINGER:  They make something like
21   a dozen different colors.
22            THE COURT:  When you said "50 products,"
23   what were you referring to?
24            MR. SCHLESINGER:  The 50 major domestic
25   brands across all brands, we have -- in other words,
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    we may have Philip Morris makes Marlboro, the number

2    one selling brand.  They come in a bunch of different

3    colors and varieties.  Philip Morris makes Marlboro.

4    That's the number one selling brand.  It's got over

5    50 percent of the market all by itself.

6              THE COURT:  So there is multiple brands in

7    the products -- in the 50 that you just mentioned?

8              MR. SCHLESINGER:  Yes, line extensions they

9    call them.

10             THE COURT:  It's not just Natural American

11   Spirit?

12             MR. SCHLESINGER:  Yes, sir.  In other

13   words, the research -- the article that we cite went

14   ahead and tested for cancer causing chemicals, PAHs.

15   They tested Marlboro, they tested Camel, they tested

16   Newport.  So they tested Reynolds and Philip Morris

17   products.

18             And as Your Honor may know, as we sit here

19   today there is really two manufacturers in the United

20   States that own all the companies, own all the brands

21   and have absorbed every other company.  So we've got

22   Philip Morris, and its flagship brand is Marlboro.

23   And we have Reynolds, R. J. Reynolds, RAI.  And their

24   flagship brand now is Newport and Camel.  And Media

25   Work, astronomical growth, Natural American Spirit,

SANTA FE OFFICE                                          MAIN OFFICE
119 East Marcy, Suite 110                           201 Third NW, Suite 1630
Santa Fe, NM 87501                                  Albuquerque, NM 87102
(505) 989-4949                                             (505) 843-9494
FAX (505) 843-9492                                    FAX (505) 843-9492
                                                        1-800-669-9492
BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE                        e-mail: info@litsupport.com

1    which has captured now over 2 percent of the tobacco

2    market, which, believe it or not, is a billion

3    dollars of tobacco sales of Natural American Spirit

4    cigarettes.

5              And that's why, to a certain extent, when I

6    say enforce Judge Kessler's order, time is of the

7    essence because, just like the Marlboro Lights had to

8    take the word "lights" off, but if you go into any

9    store in the United States, ask anybody for a pack of

10   Marlboro Lights, and it doesn't matter who is behind

11   the counter, they'll hand you a pack of Marlboro

12   Gold.  Because gold is the symbol for Lights;

13   everybody knows it.  Anywhere in this country, you

14   can go into any store anywhere and say, "I want

15   Marlboro Ultralights"; they'll give you the silver

16   pack.  So the symbolism becomes attributable to the

17   product, at some point, even without the word

18   "natural," even without the word "organic," even

19   without the term "additive-free."  The mere fact of

20   American Spirit having positioned itself as a health

21   reassurance brand of the 21st Century, will endure

22   beyond this Court's rulings.  Even if there were in

23   acceptance of our position, there is some point where

24   it won't matter.

25              As far as the reasonable consumer is



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   concerned, I think perhaps the only effective way to

2   avoid gamesmanship is to adopt a per se rule that

3   contradictory factual assertions about a product are

4   inherently misleading as a matter of law.  The aim of

5   the law should be to discourage the initial

6   misrepresentation; not encourage clever, post hoc

7   disclaimers of that misrepresentation.

8           There is a case -- I don't know if we cited

9   it -- but it's called Carter Products versus Federal

10  Trade Commission.  It's an old case, cited at 186

11  F.2d 821 in the Seventh Circuit, 1951 case.  And this

12  is just a couple years before the cancer scare of

13  cigarettes.  But this is Carter versus Federal Trade

14  Commission, 186 F.2d 821, Seventh Circuit, 1951.

15  We'll provide this case.  It talks about how "the law

16  is violated if the first contact is secured by

17  deception, even though the true facts are made known

18  to the buyer before he enters into the contract to

19  purchase."  In other words, the come-on should not be

20  deceptive or trickery.

21          And, you know, the courts should be

22  encouraging -- and this is cited in one of the cases,

23  not only the free flow of information, but the free

24  flow of clean, truthful, complete information that's

25  useful.  It is not useful or beneficial to the

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                201 Third NW, Suite 1630
Santa Fe, NM 87501                                        Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                          FAX (505) 843-9492

BEAN
& ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1  consumer, particularly an addicted consumer, to

2  make -- to reassure an addict.  Because the whole

3  idea of addiction is that reassurance, health

4  reassurance, is the psychological crutch -- that's

5  the term they use -- that keeps people from quitting

6  smoking.  Because addicts can be in denial.  Addicts

7  can look for a place where they can live within

8  themselves with guilt.  So if you say, Hey, this one

9  might not kill you; this one doesn't have those

10  additives.  It's organic; that must be healthier.

11  The addicted mind of a reasonable addicted consumer

12  is going to hue towards that safe harbor -- which

13  there is no such thing as a safe cigarette; they're

14  all uniformly lethal.  If you smoke them long enough,

15  they're going to kill two out of three people.

16          It's not like pharmaceutical products

17  litigation Your Honor may have presided over, where 1

18  percent or a fraction of 1 percent of people are

19  harmed by a product:  Mesh, or the hips, or the

20  Takata airbags, or the Volkswagen, you know,

21  emissions.

22          These cigarettes, when used as intended,

23  reliably will kill two-thirds of their customers.  So

24  that's the weird thing about cigarettes is they

25  look -- we make them look like -- the industry makes

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1    them look like a normal thing.  They reduce the
2    appreciation of level of threat.
3              So it's reasonable some consumers are going
4    to think those things are safer.  And there isn't
5    anybody in science, in the law, in the courts, in the
6    federal regulatory bodies that has said any
7    different.  The reasonable consumer is going to think
8    those cigarettes are safer.  It's unrebuttable
9    science.  And it's uniform throughout the law in the
10   United States.  Any tobacco case will tell you that.
11   That Discount Tobacco Lottery, which Reynolds is also
12   a plaintiff, is -- it's a revelatory case, because it
13   really lays out the history of things.  And it does
14   address quite a few of the arguments that defendants
15   make in support of its motion to dismiss, which is
16   why I continue to refer to it.
17              Thanks, Judge.
18              THE COURT:  Thank you, Mr. Schlesinger.
19              Did you have anything you wanted to add on
20   that, Ms. Wolchansky, before I let Mr. Schultz have
21   the last word on that claim?
22              MS. WOLCHANSKY:  Just extremely briefly,
23   Your Honor.  I think that the point is -- you know,
24   Mr. Schlesinger is making arguments up here.
25              I heard Mr. Schultz say several times, We
```

SANTA FE OFFICE                                              MAIN OFFICE
119 East Marcy, Suite 110                              201 Third NW, Suite 1630
Santa Fe, NM 87501                                       Albuquerque, NM 87102
(505) 989-4949                                                    (505) 843-9494
FAX (505) 843-9492                                        FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1    don't think that a reasonable consumer would believe

2    this to be misleading, and talking all about what,

3    you know, he thinks a reasonable consumer may or may

4    not do in this instance, or may or may not believe

5    with respect to "natural, additive-free, organic."

6    We don't have to listen to any of that, Judge.  All

7    you have to do is look at the complaint.  And the

8    complaint is full of allegations, and the case law

9    where courts, with much less evidence than what we

10   have in the complaint, have found that it is

11   absolutely inappropriate on a motion to dismiss, when

12   there is evidence of this magnitude suggesting that

13   this is misleading to a reasonable consumer, it is

14   not our place at this point in this litigation to

15   talk about what a reasonable consumer may or may not

16   find misleading.

17              THE COURT:  Well, here's my concern about

18   that sort of pleading and standard, is that it seems

19   to gut Federal Rule 12 (b)(6) of any meaning in a

20   case like this.  Because the plaintiffs could find an

21   expert, put it in its report, and say that, then, the

22   Court can't make any independent determination of,

23   say, materiality in a securities action, or here,

24   reasonable consumer.  It would seem to gut it, just

25   because we're saying that we've got a report here

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    that says a reasonable consumer would go the other

2    way.  I mean, isn't it ultimately for the Court to

3    decide whether a reasonable consumer would do that or

4    not?

5            MS. WOLCHANSKY:  It's not.  I mean, this is

6    why we have juries.  It is a fact question.

7            THE COURT:  Well, but I mean, I have to

8    determine this on -- I mean, otherwise, you're saying

9    that because you put the words "reasonable" into a

10   complaint, I can never grant a motion to dismiss a

11   negligence claim, for example, which is based upon

12   reasonableness.  So, I mean, that can't be the

13   standard.

14           MS. WOLCHANSKY:  Well, it is the standard

15   in this case -- in a case like this, where we're

16   talking about misleading advertising, and what was

17   misleading to the public -- you want to call it a

18   reasonable consumer -- but the whole point, and the

19   reason why we don't do that at this stage is because

20   there is so much evidence that is important.

21           So if the Court is going to --

22           THE COURT:  Don't courts do this all the

23   time?  That's the reason we've got a 100-page motion

24   and a 100-page response is because people know that a

25   lot of times the ball game is this hearing?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1        MS. WOLCHANSKY:  Well, not on an issue like
2   this, where the factual --
3        THE COURT:  So no judge in the country has
4   ever granted a motion to dismiss in a consumer case?
5        MS. WOLCHANSKY:  Judge, I would not
6   represent that.  But what I will tell Your Honor --
7        THE COURT:  They do it all the time, don't
8   they?
9        MS. WOLCHANSKY:  No, not in this context.
10  The majority of courts do not, in this context, rule
11  on a motion to dismiss that a reasonable consumer is
12  a matter that can be decided --
13        THE COURT:  Why should I do anything
14  different here than what I do in a securities case?
15  I mean, for example, you line up the complaints, and
16  I say:  That one is not misleading, this one is
17  misleading, let's go the trial on the misleading
18  ones.
19        MS. WOLCHANSKY:  Because especially in a
20  case like this, where we have so much evidence at
21  this stage of what is in fact -- I mean, if Your
22  Honor wants to do that, then it should come out on
23  the other side, that it could absolutely be
24  misleading to a reasonable consumer.  We have all of
25  this scientific evidence.  We have surveys.  We have



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    courts saying that it's misleading; Judge Kessler

2    says "natural" is misleading to a reasonable

3    consumer, that it suggests health benefits.  We have

4    the FDA that's warning that it's misleading.  We have

5    the FTC that's warning that it's misleading.  We have

6    consent orders that go to the advertising because

7    it's misleading.

8              So if anything, if Your Honor wants to make

9    a determination as a matter of law, it should be that

10   this could be misleading to a reasonable consumer.

11   But we're not even asking Your Honor to go that far.

12   What we're asking Your Honor to do -- this is

13   tobacco.  We have legacy databases full of

14   information and documents.  We have evidence that

15   will come in in this case that's not just about the

16   experts that we'll put forward, which of course will

17   be self-serving, as will the defendant's.  We'll find

18   experts that say what we believe is true.  So will

19   the defendants.

20             It's their own internal information and

21   documents that we are entitled to, in discovery in

22   this case, to prove not only that a reasonable

23   consumer was, in fact, misled, but they knew it.  And

24   they did this intentionally in order to deceive that

25   reasonable consumer.

SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                        201 Third NW, Suite 1630
Santa Fe, NM 87501                                                Albuquerque, NM 87102
(505) 989-4949                                                              (505) 843-9494
FAX (505) 843-9492                                                   FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1          So in all of the cases that Your Honor will

2    see in the complaint, there is not even nearly the

3    evidence on a reasonable consumer that we have here.

4    So has a court in this country granted a motion to

5    dismiss?  Of course.  The defendant cited most of

6    those cases that are -- they're going to cite the

7    best cases for them.  But those cases are dealing

8    with very, very simple -- evaporated cane juice, or

9    soy milk on the front of a label.  Not a mass

10   marketing scheme, targeted at deceiving consumers in

11   tobacco like the Lights, like low tar.  I mean, this

12   is a case where there is so much evidence that, to

13   find at this stage, and to start weighing that

14   evidence, is just simply contrary to the majority of

15   the case law in the country.

16          THE COURT:  All right.  Anything else on

17   that theory, Ms. Wolchansky?

18          MS. WOLCHANSKY:  No.  Thank you.

19          THE COURT:  Thank you.

20          Mr. Schultz, do you want to have the last

21   word on that first theory?

22          MR. SCHULTZ:  Your Honor, I don't believe

23   we have in this case more to add.

24          THE COURT:  Well, let me ask you on this

25   point.  She's telling me:  Don't weigh the evidence,

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    and that's what I'm doing up here by stating that I'm

2    having trouble with this first theory.  Is that what

3    I'm doing?  I'm weighing the evidence.  And there's

4    Judge Kessler, she's a reasonable mind; if she comes

5    out the other way, I ought to let this go forward

6    just because Judge Kessler said that "natural" didn't

7    have any meaning, and that that is enough to create

8    maybe a factual issue for the jury?

9              MR. SCHULTZ:  Your Honor, absolutely not.

10             You were correct the very first time I

11   raised this issue in what your response was.  This is

12   a 12(b)(6) motion.  A 12(b)(6) motion, the standard

13   is very clear.  And the Supreme Court in both Twombly

14   and Ashcroft made it very clear that that standard --

15   the standard that the Court was articulating on

16   plausibility applied across the board.

17             THE COURT:  Well, in fact, Twombly was a

18   patent case, wasn't it -- or it's an antitrust case?

19             MR. SCHULTZ:  It's an antitrust case, and

20   then Ashcroft applied it to all cases.  And the

21   language from the Ashcroft case is exactly the

22   standard that this Court has cited in its earlier

23   cases.  Quote, "The tenet that a court must accept as

24   true all of the allegations contained in a complaint

25   is inapplicable to legal conclusions.  Threadbare

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    recitals of the elements of a cause of action

2    supported by mere conclusory statements do not

3    suffice."

4            It is your job, Your Honor, as a gatekeeper

5    for the litigation process to make the determination.

6    As you said, you line up the language in the

7    complaint.  You read it, in terms of what is

8    plausible.  And you make a determination which cases

9    are legally sufficient and which are not.

10           And in this case, Your Honor, the question

11   of the reasonable consumer, this is a matter that is

12   properly decided on a motion to dismiss under the

13   plausibility standard.

14           Your Honor, the only issue we have not

15   talked about on the reasonable consumer question is

16   their last claim.  And I'll just touch on that very

17   briefly.

18           We agree with the comment you made at the

19   very beginning of the hearing, Your Honor:

20   Cigarettes don't appear out of thin air, no matter

21   what they contain.  The only way that a cigarette

22   appears in that package is if they undergo some sort

23   of manufacturing process.

24           So for the plaintiffs to claim because the

25   word "natural" appears, or because that it says

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    "additive-free," that that implies that somehow these

2    cigarettes magically do appear, without being touched

3    by human hands, without undergoing a manufacturing

4    process, is not reasonable, and does not pass the

5    plausibility standard for a 12(b)(6) motion.

6              The only conclusion that a reasonable

7    consumer could have, reading the language, whether

8    it's of the package or of the advertisements, is that

9    the term "natural" refers to the tobacco inside the

10   cigarettes, and not that the cigarettes themselves

11   were being sold without the use of any manufacturing

12   process.  It's simply not possible for a cigarette to

13   appear in any other way.

14             So, Your Honor, if you have any other

15   questions, I'll be glad to address it.  But,

16   otherwise, I think that concludes our presentation on

17   the reasonable consumer.

18             THE COURT:  All right.  Let me hear the

19   plaintiffs on this one, and then we'll hear further

20   arguments on the motion to dismiss.  Ms. Wolchansky.

21             MS. WOLCHANSKY:  I will keep it brief, Your

22   Honor, so we can keep this moving.  But again, I will

23   incorporate all of my arguments on why this is not

24   appropriate at this stage to talk about what a

25   reasonable consumer -- who that reasonable consumer

SANTA FE OFFICE                                          MAIN OFFICE
119 East Marcy, Suite 110                      201 Third NW, Suite 1630
Santa Fe, NM 87501                              Albuquerque, NM 87102
(505) 989-4949                                          (505) 843-9494
FAX (505) 843-9492                                  FAX (505) 843-9492

**BEAN
& ASSOCIATES**, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1    is; is it a reasonably-addicted consumer.  These are
 2    all things that we will talk about in discovery in
 3    this case, what the reasonable consumer looks like in
 4    this case.  But what "natural" means to a reasonable
 5    consumer on this pack of cigarettes, given what it
 6    looks like -- all of the, you know, the corresponding
 7    imagery on the pack.
 8              But what I will say is again, why does this
 9    say "natural"?  So if it's not a natural process; if
10    it, in fact, goes through the manufacturing process
11    that all other cigarettes go through, they are not
12    special, why are these labeled differently?  So if
13    you're a reasonable consumer, and we're talking here
14    about what would a reasonable consumer believe,
15    they're going to believe it doesn't go through a
16    manufacturing process like that.  Because if they all
17    go through the same process, why is this different?
18    Why do they call it out as "natural" and it's
19    different and it's premium, if it doesn't, in fact,
20    do anything different?  It goes through the same
21    exact manufacturing process as every other cigarette.
22              THE COURT:  But I thought Mr. Schlesinger
23    said -- even he conceded that there is a difference
24    between the way they manufacture Marlboros and the
25    way they manufacture these; that it's a different
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    product.  Isn't that the reason they put it on, and

2    they get some marketing advantage from that in

3    today's environment by putting that on there?

4             MS. WOLCHANSKY:  No.  I mean, every

5    cigarette manufacturer is going to manufacture their

6    product in some different way.  They're going to

7    include some additive.  Some chemical will have its

8    own unique manufacturing.  But it's the point, if

9    you're calling something "natural" -- and there is so

10   much case law now why natural means something to

11   consumers, that consumers in this day and age,

12   organic, natural, they're important to consumers, and

13   they cause people to buy a product.  And here we have

14   all the allegations --

15            THE COURT:  Isn't that sort of the lesson,

16   it means something to the businesses that are selling

17   the product.  It means something to the consumers.

18   And rather than just saying it doesn't mean anything,

19   don't we need to go in and say, Well, we need to

20   match the expectations of the purchasers of these

21   products with what the representations of the

22   corporations are?  And it may differ.  I mean, for a

23   marshmallow natural may mean something quite

24   different than natural oranges, for example.  But

25   don't we have to go in and deal with that?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1          MS. WOLCHANSKY:  So "natural" here means

2    safer and healthier, and it also means that it's

3    manufactured in a way that is natural.  And the truth

4    is, it's not.

5          I mean, if we're going to talk about

6    weighing the evidence at this stage --

7          THE COURT:  How would you manufacture

8    differently a cigarette than using an engineering

9    process?  I mean, you know, assuming there is a

10   tobacco plant, and you end up with a cigarette that's

11   rolled -- you're not rolling your own like the

12   cowboy -- how do you -- what consumer is going to

13   think there is not some engineering in that process?

14         MS. WOLCHANSKY:  I think the question is

15   what's the threshold of the reasonable consumer?  I

16   mean, obviously, they know it's not being rolled by

17   hand.

18         THE COURT:  They're not rolling it like the

19   cowboy.

20         MS. WOLCHANSKY:  Right.  But the question

21   is:  Okay, are they using highly engineered

22   processes, flue curing the tobacco --

23         THE COURT:  What does that mean, though?

24   Highly engineered processes?  I don't understand, why

25   is a consumer going to say:  This is a lower

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    engineering process, and I didn't expect it to be a

2    higher engineering process?  I don't understand what

3    that even conveys.

4              MS. WOLCHANSKY:  So again, I mean, I will

5    start with on the firsthand --

6              THE COURT:  If they used a lower

7    engineering process, would that be natural for you?

8              MS. WOLCHANSKY:  Well, I think that there

9    is a lot of case law -- and this is exactly why this

10   is a question for a jury.  We will get up there and

11   tell the jury why, in fact, this is not natural,

12   because in the entire engineering process for these

13   cigarettes, we will have discovery.  We will go

14   through how exactly these products are made; that

15   they are -- that there is flue curing to make it

16   inhalable; that they use water.  How do they soak it?

17   How do they put the nicotine back into the cigarette

18   so every cigarette has the exact amount of nicotine?

19   How do they do that?  And is that natural?  That is a

20   question of fact for a jury.

21             So for us to stand here in the courtroom

22   today and talk about, based on world experiences,

23   what a reasonable consumer might or might not think

24   "natural" has a meaning in the market.  There is tons

25   of case law that we've cited that it means to

SANTA FE OFFICE                                                           MAIN OFFICE
119 East Marcy, Suite 110                                        201 Third NW, Suite 1630
Santa Fe, NM 87501                                               Albuquerque, NM 87102
(505) 989-4949                                                             (505) 843-9494
FAX (505) 843-9492                                                  FAX (505) 843-9492

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1    consumers, and it has definitions; it's been
 2    studied --
 3              THE COURT:  But it sounds like you're
 4    talking about a kosher cigarette; that it has to be
 5    manufactured in a particular way for it to be natural
 6    Just like you have to do certain things to really
 7    label it kosher.  What is the natural process of
 8    making a cigarette?
 9              MS. WOLCHANSKY:  Well, I think the point
10    is:  What isn't it?  And it is not --
11              THE COURT:  No, no, no.  Answer my
12    question.  What's the natural process of making
13    cigarette?
14              MS. WOLCHANSKY:  Well, I don't think that
15    there is a single answer of what is the one
16    manufacture -- I think the point is, Your Honor, that
17    to stand here and say what a reasonable consumer -- a
18    reasonable consumer would not believe that the things
19    that are done in these cigarettes to create and make
20    these cigarettes, in manufacturing these cigarettes
21    would be natural.  And so, if we're talking about
22    tobacco that is grown, how the menthol is, in fact,
23    put into these cigarettes, the additives that are in
24    these cigarettes, the processes that are used to make
25    these cigarettes, those are not natural.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              So to turn it on its head, and require a
 2    consumer to say exactly what a natural process would
 3    be, it's certainly not what they're doing here.
 4              THE COURT:  Is this a correct statement of
 5    your theory here that using the term natural to
 6    describe the tobacco in Natural American Spirit
 7    cigarettes suggests that the cigarettes are not
 8    subject to engineering processes?  Is that a fair
 9    characterization of your theory?
10              MS. WOLCHANSKY:  Again, to suggest that
11    they are rolled in -- I won't stand here and be
12    unreasonable with the Court to suggest that they're
13    hand-rolled.
14              But again, I would turn the Court to the
15    case law on "natural."  And the FDA -- and again,
16    this isn't food, but there is plenty of authority out
17    there to talk about what highly engineered
18    products -- how those are not to be considered
19    natural.
20              THE COURT:  That's what confusing me.  I
21    don't understand what high engineering -- and I
22    assume there is then a corollary of low engineering.
23    And that because you're alleging that this is highly
24    engineered processes, but that low engineering
25    process might be natural, that's the message that's
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    not resonating with me.

2            MR. SCHLESINGER:  Let me try to clarify,

3    Judge.

4            Look at one of these packs.  Just take a

5    look at one of these packs.  Look at the front of the

6    pack.  You asked Melissa what would be natural.  On

7    the front of the pack you see the Native American

8    smoking a peace pipe.  That's an example of natural.

9    Because the natural state of tobacco or cigarettes is

10   uninhalable.  It is puffed in the mouth ceremonially

11   by Native Americans as part of religious and mystical

12   ceremonies.  It was puffed in the mouth.  The mouth

13   has got the surface area of a tennis ball.  The lungs

14   have got the surface area of a tennis court.  Tobacco

15   was never inhalable.  The pH was too high to make it

16   inhalable.

17           What unleashed the epidemic of addiction in

18   this country, and corresponding lung disease and

19   heart disease was the device of the cigarette being

20   made inhalable by flue curing, which made the sugars

21   go up very high, lower the pH, so that it could be

22   inhaled.  So a natural cigarette would be a cigar.

23   Because cigarette means little cigar.  And a cigar is

24   not inhalable.  That's why cigars are not associated

25   with lung cancer.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1        And as Dr. Proctor has testified many, many

2    times, and will in this case, the cigarette is the

3    most highly engineered and craftily designed small

4    device on the planet with billions of dollars of

5    engineering in it.

6        And as Ms. Wolchansky said to you, even the

7    term only 100% water and tobacco is not innocent,

8    because, while they show a rain cloud or a sprinkler

9    system, what they don't tell you is nicotine is water

10   soluble.  And by rinsing the tobacco with warm water

11   and spraying it, they can remove all the water

12   soluble components, including the nicotine, hold

13   back, and then reapply it with such precision

14   specificity that it meets pharmaceutical standards,

15   that every single cigarette in every single pack of

16   that blue American Spirit before you will contain

17   precisely the same drug dosage of nicotine.  No

18   matter what cigarette you take out of any one of

19   those packs anywhere in the country.  It's a

20   precision pharmaceutical device.

21       So when you say natural versus unnatural,

22   or how high engineering processes, that's part of

23   facts we'll show, Your Honor.  But that's an example

24   of natural:  Uninhalable, puffed in the mouth.

25       THE COURT:  Well, that was the reason I was

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    reading the statement that I did, because I did not

2    understand from the complaint that we were talking

3    about high engineering processes or lows.  It just

4    said simply "the term "natural" to describe the

5    tobacco in Natural American Spirit cigarettes

6    suggests that the cigarettes are not subject to

7    engineering processes."  Now, is that not a fair

8    characterization of your theory.

9             MR. SCHLESINGER:  I think, in part, it

10   absolutely is.  I don't think the average consumer,

11   particularly a person buying a pack of Natural

12   American Spirit, organic, additive-free, thinks that

13   this is going through a complicated, highly

14   sophisticated development and alteration of the

15   natural function of tobacco.

16            If you took tobacco from a field in North

17   Carolina or south Virginia -- which, by the way, is

18   where these cigarettes are manufactured -- I know

19   we're out here in Santa Fe, but they don't make Santa

20   Fe Natural American Spirit, Santa Fe cigarettes here

21   in New Mexico.  They make them in Winston-Salem,

22   Raleigh-Durham, back at the Reynolds plant with all

23   the other cigarettes they make.  But if you took a

24   tobacco leaf out of the ground, and you let it dry,

25   and then you crushed it or cut it, or do whatever,

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    and you rolled it up in some paper, like the cowboys

2    used to do, you would not be able to inhale it,

3    because the pH would be too high, and it would

4    provoke the gag reflex.  Remember, this is fire,

5    right, fire and smoke.  What does a human or any

6    living thing in the world do to respond to smoke?

7    They run away.  Smoke is a noxious fume.  It is a

8    harbinger of fire, which is dangerous.  And smoke

9    itself is noxious.  It provokes a human survival

10   reaction when inhaled of choking, coughing, and

11   avoidance.  In other words, it's not normal.  It's

12   not natural to pull smoke into your lungs.  Nobody is

13   standing around the campfire roasting marshmallows,

14   to bring up Your Honor's marshmallow discussion,

15   leans over the fire and sucks in the smoke, because

16   you would cough and get sick.  And that's because the

17   body has a survival mechanism where it rejects

18   dangers and noxious things.  Smoke inhalation in a

19   fire, smoke is deadly dangerous.  But it's been

20   engineered artificially, in ways that consumers can't

21   possibly understand, but the cigarette companies can,

22   to permit inhalation into lungs that have no taste

23   buds, but that are the perfect surface area for a

24   transfer of nicotine for addiction.

25              So what is the natural process?  And

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1     they -- and this is part of symbolism and imagery.
2     The original advertising by Santa Fe used to say the
3     Native Americans used tobacco for many years without
4     getting lung cancer, overt health messages that their
5     way of doing it wouldn't cause cancer.  And they show
6     a Native American smoking a peace pipe.  You don't
7     inhale.  That pipe was puffed in the mouth.  It was
8     not inhaled.  It was not mass daily consumption.
9              So that answers Your Honor's questions.
10    That is the natural process.  Not the blending and
11    the mixing, and the removal of nicotine, and the
12    reapplication so it's as precise as a pharmaceutical
13    company would have, and a change in the acidity of
14    the tobacco, along, in some case with menthol, to
15    permit the inhalation into the lungs.  That is what's
16    so daunting for a regular person out there trying to
17    make a decision about smoking, to even begin to
18    conceptualize what's behind that cigarette.
19             MS. WOLCHANSKY:  I think the point is --
20             THE COURT:  Thank you, Mr. Schlesinger.
21             MS. WOLCHANSKY:  It's kind of like the
22    menthol discussion.  The fact that the defendants
23    claim it's so obvious that it has to go through some
24    manufacturing process.  It's not natural.  There is
25    no question about this process being natural to allow
```

SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                  Albuquerque, NM 87102
(505) 989-4949                                                              (505) 843-9494
FAX (505) 843-9492                                                   FAX (505) 843-9492
                                                                              1-800-669-9492

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE                                      e-mail: info@litsupport.com

```
 1    them to use a phrase that they claim is so obviously
 2    not misleading, which is literally false, is why we
 3    have consumer fraud statutes.
 4              THE COURT:  All right.  Thank you, Ms.
 5    Wolchansky.
 6              Mr. Schultz, I'll give you the last word on
 7    the engineering process.
 8              MR. SCHULTZ:  I appreciate it, Your Honor.
 9    I don't believe we have anything more to add.
10              THE COURT:  Well, I gave you my
11    inclinations at the beginning.  I appreciate
12    presentations.  But I'm still inclined to let the one
13    on menthol go forward.  I'm still skeptical of the
14    other two.  I do think I have the power to dismiss at
15    the 12(b)(6) stage.  I will read everything again,
16    and I'll get you an opinion, and I'll certainly
17    consider the arguments that are made.  But I'm
18    inclined to think that this menthol one is the one
19    that troubles me.  And the other two, it seems
20    that -- should not go forward because they're not
21    misleading.
22              Mr. Schultz, is it now time to tackle the
23    First Amendment?  Or tell me roadmap-wise where you
24    want to go.
25              MR. SCHULTZ:  Well, Your Honor, we could
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    actually use some guidance from you at this point.

2    There are some other issues that are more discrete,

3    that will have an immediate impact on the case.  We

4    didn't know whether you wanted to move forward to

5    address those, things like the personal jurisdiction,

6    the question on the injunctive relief, or whether you

7    wanted us to plow through the First Amendment, even

8    though we know that that's an issue that the Court is

9    hoping not to have to reach.

10            THE COURT:  Well, do this -- do y'all -- I

11   know y'all have got flights, a lot of your counsel

12   got flights and stuff like that.  I want to be as

13   helpful as I can.  We may not get to cover

14   everything.  We may have to do another day, or may

15   just have to call this.  Do y'all want to take a

16   minute and tell me?  I mean, I assume, given my years

17   of being in your shoes and up here that sometimes

18   when the judge starts talking, it's helpful to other

19   things in a case.  So if that's helpful to you, then

20   you ought to argue the issues that you want.  So do

21   y'all want to take a minute?

22            MR. SCHULTZ:  If we could, Your Honor, that

23   would be helpful.

24            THE COURT:  Or you can just stand up and

25   start arguing.  You know, tell me what you want to

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   argue.
 2             MR. SCHULTZ:  If we could confer, Your
 3   Honor --
 4             THE COURT:  Go ahead.
 5             MS. WOLCHANSKY:  And we should probably
 6   talk.  If you-all want to talk, then why don't we
 7   talk?
 8             MR. SCHULTZ:  Sure, okay.
 9             THE COURT:  Let me suggest this:  What do
10   y'all have as far as time-wise?  Here's what I'd
11   suggest.  I'm going to have to give Ms. Bean a break
12   to take lunch.
13             I've got a sentencing at 1:30 that's not
14   going to take too long.  What if we just took our
15   lunch break now, y'all can talk however you want to,
16   and you're not under the gun.  We'll shoot for being
17   back at 1:00.  I'm going to run an errand, so I'm the
18   one that's probably going to be the one maybe a
19   little bit late.  Shoot for being back at 1:00, go
20   another half hour.  Let me break a little bit and
21   sentence this person.  And then when y'all need to
22   get out of here, and you're done, you get out of
23   here.
24             MS. WOLCHANSKY:  Your Honor, if I'm getting
25   out of here today, I would have to get out of here by
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      1:30.  I have a 3:00 flight.

2              THE COURT:  Okay.  Well, that will give us

3      another 30 minutes.  And I maybe it will be a topic.

4              I don't think I can go much further with

5      Ms. Bean.  I need to give her a break.  We've been

6      going another hour and a half.  So let's shoot for

7      1:00.  If you need to leave here at 1:30, we'll shut

8      her down.  That will give you time to talk about some

9      subjects.  Does that sound all right?

10             MS. WOLCHANSKY:  Maybe there are a couple

11     of issues we can agree to submit on the papers.

12             THE COURT:  That's fine.  Or if we need

13     another day, I'm available.  All right.  See y'all

14     about 1:00 o'clock.  Y'all bear with me, I'm going to

15     take a quick run here.

16             (The lunch recess was held.)

17             THE COURT:  All right.  Mr. Schultz, I'll

18     let you dictate where we're going this afternoon.

19             And like I said, if people need to leave,

20     you know, I knew that y'all were expecting a half

21     day, so --

22             MR. BIERSTEKER:  I think we don't really

23     have an agreement on what to do, Your Honor.

24             THE COURT:  Okay.

25             MR. BIERSTEKER:  Let me just lay out what

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    I -- the defense would propose.

2            THE COURT:  It's your motion.  So,

3    probably, you can argue with it, but probably

4    whatever the defendants are going to want, since it's

5    all their motions, I'll probably let them dictate it.

6    Go ahead.

7            MR. BIERSTEKER:  What the defense would

8    propose is to rest on the papers with respect to

9    personal jurisdiction over RAI, the mootness issue,

10   which really only extends to additive-free and

11   natural, and the safe harbors, because that's only

12   the safer cigarette theory.  It would be an

13   alternative --

14           THE COURT:  Let me ask on the injunctive

15   relief and mootness issue, it wouldn't moot out the

16   claim that I'm sort of saying I'm thinking might

17   survive here, would it?

18           MR. BIERSTEKER:  Yeah, I think it would,

19   Your Honor.

20           THE COURT:  Why would it?

21           MR. BIERSTEKER:  Because the company will

22   agree, and has agreed to stop using the descriptors

23   "additive-free" and "natural."  And I thought Your

24   Honor's problem with the menthol theory was that it

25   was the confluence of the presence of menthol, plus

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                 Albuquerque, NM 87102
(505) 989-4949                                                     (505) 843-9494
FAX (505) 843-9492                                                 FAX (505) 843-9492
                                                                   1-800-669-9492
                                                                   e-mail: info@litsupport.com


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1   the claim "additive-free."  And if "additive-free" is

2   removed, as it will be by year end, then it seems to

3   me that that claim gets mooted.

4            And that would leave, Your Honor, unjust

5   enrichment and express warranty that we would like to

6   argue as long as we are here, and perhaps something

7   very brief that Mr. Schultz would finish up on the

8   First Amendment, which would be the three central

9   Hudson factors, only as applied to menthol, would be

10  our proposal.

11           And I don't want to speak for plaintiffs.

12  But as I understand it, their proposal is that we

13  call it a day and come back another time.  And there

14  may be a request for supplemental briefing.  But I

15  don't want to tread on your toes.  So go ahead.

16           MS. WOLCHANSKY:  So, Your Honor raised a

17  couple of issues.  Obviously, this is really meaty,

18  and we had space in the brief to address all of these

19  issues.  But now that we're here before the Court,

20  and this is an important case, and it's likely that

21  issues might go up to the appellate court, no matter

22  how it works.  Your Honor raised a couple of issues

23  with regard to the standard on the motion to dismiss,

24  and the reasonable consumer, and weighing of the

25  evidence in cases like securities cases, and

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1    comparing those to this case here today.
2              So we would like to request some
3    supplemental briefing, and Your Honor's comments when
4    we talked in this morning were on the unjust
5    enrichment and express warranty, that the Court was
6    kind of looking to us on our argument.  And we would
7    like to spend a fair amount of time on the unjust
8    enrichment and express warranty, and think that there
9    is quite a bit on the injunctive relief as well.  So
10   we would like to request some supplemental briefing.
11   And if defendants had an idea in terms of a
12   response -- we talked just briefly about this in the
13   hallway -- and then a second hearing date in 45 days
14   or so to continue the rest of the argument on the
15   remaining issues.
16             THE COURT:  Okay.  Well, let me say this on
17   supplemental briefing:  I mean, I'm pretty generous
18   on it.  If people want to -- as you can tell, I let
19   people take as much time as they reasonably need to
20   argue issues.  And so I'm not inclined to cut off the
21   briefing.  So, you know, if people want to send me
22   more material, that's fine.  I'll read it, but -- at
23   least on that issue.
24             Mr. Biersteker?
25             MR. BIERSTEKER:  Well, in light of Your
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1   Honor's comment, instead of opposing altogether, let
 2   me just plead with you for a very short limitation on
 3   the pages of any supplemental briefing.  I mean,
 4   we've had, I think, 200 pages of briefing, including
 5   on the 12(b)(6) issue.  I think plaintiff's counsel
 6   indicated from this podium that there were three
 7   pages of cases they cited on the 12(b)(6) issue.  And
 8   so I don't know -- I mean, there is one 12(b)(6)
 9   standard; it's the same for all cases.  I don't know
10   that Your Honor mentioned, as hypotheticals, security
11   cases or negligence cases, or whatever else is a
12   reason for there to be additional briefing.  But if
13   Your Honor is going to entertain it, I would ask that
14   basically each side submit one brief in the range of
15   like five pages.  I really would not want to brief it
16   extensively.
17            THE COURT:  What do you suggest, Ms.
18   Wolchansky?
19            MS. WOLCHANSKY:  We would like something a
20   little more than five pages, but understand that
21   there is a deep record here.  Maybe if we could have
22   10 pages.
23            THE COURT:  Okay.  Live with that?
24            MR. BIERSTEKER:  Yes, Your Honor.
25            THE COURT:  All right.  So 10 pages
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

 
BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    supplemental material.  Mr. Biersteker said that you

2    wanted to call it quits here rather than argue

3    another 20 minutes.

4           MS. WOLCHANSKY:  That's right.  We'd like

5    to -- with the issues that remain, we don't think

6    that there is anything that we could handle in 20

7    minutes and respond to.  So we'd request another day

8    of argument to finish, kind of from this point

9    forward.

10          THE COURT:  Which issue did you want to

11   take up first, Mr. Biersteker?

12          MR. BIERSTEKER:  I would have proposed

13   unjust enrichment, although plaintiffs' counsel just

14   indicated that that is maybe one of the lengthier

15   topics, and express warranty would be the two that I

16   would put first, but --

17          THE COURT:  Well, let's do this:  Let me go

18   ahead and hear what Mr. Biersteker says on unjust

19   enrichment.  And if you don't get to respond, then

20   we'll figure out -- you know, talk to Ms. Wild, and

21   we can figure out what we're going to do from here.

22   I want to leave about five minutes to talk to you

23   about just logistics.  So let's go about 15 minutes,

24   then we'll call it quits.

25          MR. BIERSTEKER:  And, I'm sorry, Your

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

 

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1    Honor, one point of clarification.  The additional
 2    briefing is limited to the 12(b)(6) issue; is that
 3    correct?
 4              MS. WOLCHANSKY:  On the reasonable
 5    consumer, is what we had in mind, what we've
 6    discussed this morning.
 7              MR. BIERSTEKER:  The 12(b)(6) standard,
 8    okay.  All right.
 9              THE COURT:  All right.  Mr. Biersteker, why
10    don't we go about 15 minutes -- nobody has got a
11    flight before 3:00, right?
12              MS. WOLCHANSKY:  3:00.
13              THE COURT:  All right.  So I think we're in
14    good shape.  If you're one of those people that
15    actually takes the airport's warnings in getting out
16    there three days in advance, but if you're like me, I
17    leave the courthouse an hour and 15 minutes, and I'm
18    usually out there.  But you can ask your local
19    counsel about that.
20              Mr. Biersteker.
21              MR. BIERSTEKER:  Yes, thank you, Your
22    Honor.
23              As to unjust enrichment, there are 12
24    unjust enrichment claims, Your Honor, and nine of
25    them fail for at least one, and as many as three
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    additional reasons.

2           And I do have a chart, which I actually

3    found helpful when I was preparing that -- I'll file

4    this on ECF if you want, but it's only two pages.

5           THE COURT:  Go ahead and give it to me.

6    But if you don't mind filing it, that would be great.

7           MR. BIERSTEKER:  We would be happy to.  May

8    I approach?

9           THE COURT:  That way, when I cite it, I can

10   use it.

11          MR. BIERSTEKER:  It's just a way of trying

12   to keep track of -- the statutory claims are on one

13   page; the safe harbor boxes are there; the reasonable

14   consumer standard; and then other.  And if you flip

15   it over you get unjust enrichment and express

16   warranties, and it allows you to sort of sort through

17   the claims.

18          But basically, nine of the 12 claims for

19   unjust enrichment fail, because plaintiffs have an

20   adequate remedy at law.  Their unjust enrichment --

21   picking up on Your Honor's point from earlier today,

22   their unjust enrichment claims seek restitution or

23   discouragement of alleged increased financial gains

24   obtained by marketing Natural American Spirit

25   cigarettes as being natural or additive-free tobacco.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1     That's the same legal theory and the same theory that

2     they advance in support of their money damages

3     claims, where they seek the price premium that was

4     allegedly paid because NAS cigarettes were marketed

5     as containing natural or additive-free tobacco.

6              Plaintiffs initially opposed this aspect of

7     defendant's motion as premature, claiming that they

8     are procedurally allowed to plead in the alternative.

9     And I would observe as to that, that the state's

10    substantive laws limit the scope of the unjust

11    enrichment remedy.  And where an adequate remedy at

12    law exists, state substantive law provides that no

13    unjust enrichment claims exist.

14             This is not a procedural rule against

15    pleading two claims in the alternative.  Federal Rule

16    of Civil Procedure 8(b), which allows pleading in the

17    alternative cannot function to change how far state

18    unjust enrichment law reaches.  Nor is the motion to

19    dismiss premature because of any uncertainty over

20    whether plaintiffs will prevail upon any of their

21    statutory claims at law.  Rather, the test is whether

22    a legal remedy is available, not whether the

23    plaintiffs can succeed on the merits in obtaining

24    that legal remedy.

25             As one court explained applying Michigan

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    law, and I quote, "The plaintiff does not have to

2    actually recover under the legal theory for an

3    equitable claim to be barred.  Instead, the

4    opportunity for plaintiff to recover under legal

5    theory is sufficient to bar the inequitable claim."

6    That's the Duffy case, Your Honor, from the Eastern

7    District of Michigan.  That's in our brief.

8            And that makes perfect sense.  Why does it

9    make sense?  Equity is a gap-filler.  It is meant to

10   provide a remedy for inequity, where there otherwise

11   would be none at law.  If there is no gap to fill, as

12   there is here -- and that's because each of the

13   states has enacted a statute that provides legal

14   remedies for allegedly false and misleading

15   advertising, and other sales practices.  And to allow

16   plaintiffs to invoke unjust enrichment would be to

17   override the considered judgment reflected in those

18   state statutes, of the extent of the available

19   remedy, such as to exempt conduct that falls within

20   the safe harbors.  That is not to fill any gap in the

21   law.

22           Second, plaintiffs argue to the contrary

23   against our motion, based on mostly inapposite cases,

24   cases in which the legal remedy was enforcement of an

25   express contract, and there was a question about

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                 Albuquerque, NM 87102
(505) 989-4949                                                     (505) 843-9494
FAX (505) 843-9492                                                 FAX (505) 843-9492
                                                                   1-800-669-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE                            e-mail: info@litsupport.com

1    whether the contract existed at all, or was

2    applicable to the dispute.  In that circumstance, a

3    motion to dismiss would be premature, because the

4    very existence of the legal remedy is in question.

5    If there is no contract, for example, there is no

6    suit to enforce it.

7          In all events, there is no dispute here

8    that the legal statutory remedies exist.  And

9    especially where, as here, the alleged deception

10   underlying a plaintiff's legal and unjust enrichment

11   claims is exactly the same, the courts rightly grant

12   motions to dismiss.

13         Plaintiffs' next sort of general objection

14   to the motion on this front is to invoke a

15   presumption under Maine law, that statutory remedies

16   do not displace common law remedies in Maine,

17   ignoring that they neither allege a claim under Maine

18   law, nor seek to certify any class for Maine

19   purchasers of Natural American Spirit cigarettes.

20         I could turn and discuss the state-by-state

21   law, if Your Honor would find that helpful, but I

22   don't know that that is something I can actually get

23   through in the time allowed.

24         So let me just maybe, instead, touch on the

25   alternative grounds.  But if Your Honor wants me to

SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                    Albuquerque, NM 87102
(505) 989-4949                                                                 (505) 843-9494
FAX (505) 843-9492                                                    FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    address the state law, I can do that.

2              THE COURT:  Go ahead.  Do whatever you'd

3    like to do.

4              MR. BIERSTEKER:  All right.  Well, let me

5    do the state law.  And I'll start.  Let's start with

6    the merits under state law.  Let's start with

7    Colorado.  I'm just going to do the states sort of

8    alphabetically.  But there is no real disagreement

9    that in Colorado the existence of an adequate legal

10   remedy generally bars an unjust enrichment claim.

11   And that's exactly the rule that was announced in the

12   decision of the Colorado Supreme Court in the L3

13   Communications case, upon which plaintiffs rely.  L3

14   Communications also recognized an exception to that

15   general rule.  Unjust enrichment claims under the

16   exception may piggyback on a legal claim, where the

17   relief under the unjust enrichment claim is both

18   distinct from and unavailable under the legal claim.

19             But plaintiffs ultimately do not even try

20   to explain why their unjust enrichment claim for

21   restitution of ill-gotten gains caused by defendant's

22   alleged use of misleading descriptors is distinct in

23   any material way from their statutory claims to

24   recover damages equal to an unwarranted price premium

25   that the plaintiffs say they paid, that was also

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    caused by defendant's alleged use of the misleading

2    descriptors.

3              Florida:  Florida is a little complicated,

4    but ultimately no less clear.  In 1950, the Florida

5    Supreme Court held -- and I quote, "Where the only

6    relief sought by a bill of equity is one for which a

7    plain, adequate, and complete remedy at law exists, a

8    court of equity has no jurisdiction and resort

9    thereto is improper and unnecessary," close quote.

10   That's the Greenfield Village case at page 56 of our

11   opening brief.  The more recent cases applying

12   Florida law are to the same effect.  For example, in

13   American Honda Motor Company, in our opening brief,

14   at 57, and reply at 29, the Court characterized as

15   well-settled Florida's substantive law that an

16   adequate remedy at law bars an unjust enrichment

17   claim without any qualification.

18             There was, however, a momentary hiccup in

19   Florida law in the late 1990s.  And it was born of a

20   mistake, as we explained in Footnote 20, on page 29

21   of our reply.  Let me tell you what it was.

22   Specifically, in 1997, the District Court for the

23   Southern District of Florida observed that the

24   Economic Loss Rule does not apply to claims for

25   unjust enrichment.  That was the ThunderWave case.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Later that same year, 1997 -- not 1991, as citation

2    in our brief would lead you to believe -- later that

3    same year, in 1997, the Southern District of Florida,

4    in a case called Mobil Oil Corp v. Dade City, misread

5    ThunderWave as having decided that the Adequate

6    Remedy Rule, not the Economic Loss Rule does not

7    apply to claims for unjust enrichment.

8            ThunderWave did no such thing.  In fact,

9    ThunderWave reaffirmed the rule that an unjust

10   enrichment claim fails where an express contract

11   exists, and thus provides an adequate legal remedy.

12   And the Court in ThunderWave specifically considered,

13   but rejected support for a contrary conclusion.

14           Mobil, in turn, unfortunately was decided

15   by an intermediate appellate court decision in

16   Florida that next year, in 1998 -- that's the

17   Williams versus Bear Stearns case -- and perpetuated

18   the misapprehension of Florida law.  It is the

19   Williams case upon which plaintiffs rely in their

20   opposition.  And it was the Williams case, and the

21   Williams case alone, that the Eleventh Circuit cited

22   on this issue in an unpublished decision that

23   plaintiffs claim implicitly overruled American Honda.

24           Once unpacked, there is no real reason to

25   believe that the Florida Supreme Court would abandon

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    its long-standing rule that an adequate remedy at law

2    bars an unjust enrichment claim.  And the Florida

3    federal decisions that are more recent are in accord.

4              Again, the Florida cases, except for the

5    hiccup in the late 1990s apply the rule that an

6    adequate remedy at law bars claims for unjust

7    enrichment.

8              Massachusetts:  Not even plaintiffs dispute

9    that under Massachusetts law the existence of an

10   adequate legal remedy bars an unjust enrichment

11   claim.  They do claim that the district courts in

12   Massachusetts erred by applying the rule to legal

13   remedies that were, quote, "merely available

14   regardless of the claim's validity."  But nowhere do

15   plaintiffs challenge the two Massachusetts Court of

16   Appeals decisions applying the Adequate Remedy Rule

17   cited in our opening brief.

18             In Santagate versus Tower, a decision of

19   the Massachusetts Appellate Court, the court there

20   rejected an unjust enrichment claim because the

21   plaintiff, and I quote, "has made no showing that its

22   remedy at law based on the contract is inadequate."

23             In Taylor, by the district court in

24   Massachusetts, even though the plaintiff there

25   asserted no legal claim, the court granted summary

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                  201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                     (505) 843-9494
FAX (505) 843-9492                                          FAX (505) 843-9492
                                                                  1-800-669-9492

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE                          e-mail: info@litsupport.com

1    judgment on the plaintiff's unjust enrichment claim

2    because the plaintiff had an unasserted adequate

3    remedy at law.

4            Defendants could have cited still more

5    cases applying the same principle under Massachusetts

6    law.  I'd be happy to do that, if Your Honor wishes.

7    But the truth is, Massachusetts law is clear about

8    this.

9            At the end of the day, plaintiffs provide

10   Your Honor with no reasoned basis grounded in

11   Massachusetts law for disagreeing with the

12   Massachusetts Federal District Court decisions.

13   Plaintiffs themselves rely upon two federal court

14   decisions in Massachusetts:  The Lass case from the

15   First Circuit, in 2012, and Deponte -- which I'm sure

16   I'm mispronouncing, which is a district court case in

17   2014.

18           In Lass, there was a dispute, however,

19   about whether the contract applied to the dispute in

20   question.  And as explained here, there is no

21   question that a Massachusetts statute provides for

22   legal relief as a result of false and misleading

23   advertising.

24           The Deponte court specifically noted that

25   the defendant had not argued that a remedy in unjust

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    enrichment is unavailable because there was an

2    adequate legal remedy.  So they didn't even reach the

3    issue.

4             Michigan:  Two different opinions by the

5    Michigan Supreme Court establish that an adequate, a

6    complete, and ample remedy at law bars a suit in

7    equity.  Plaintiffs note the existence of a legal

8    remedy also must not be doubtful or uncertain.

9             Defendants agree, for example, that a suit

10   at law in contract, where the existence of the

11   contract is in dispute -- let me back up.  We agree

12   that in a case where there is an action at law on a

13   contract, the existence of the contract must not be

14   doubtful or uncertain, which would make the existence

15   of a legal remedy doubtful and uncertain.

16            But here, again, there is no doubt that

17   plaintiffs have an adequate legal remedy under the

18   status enacted in Michigan.  Plaintiffs ultimately

19   are reduced to arguing that there is doubt, not about

20   the existence of their statutory claims, but about

21   whether they ultimately will provide complete relief.

22   But that's not the test, as explained on page 30 of

23   our reply brief, as held in the Duffy case, which is

24   what I quoted at the beginning of this argument, a

25   decision by the District Court for the Eastern

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    District of Michigan just last year.  The

2    opportunity, and I quote, "The opportunity for

3    plaintiff to recover under a legal theory is

4    insufficient to bar the equitable claim.

5             New Jersey:  New Jersey law is clear,

6    Judge.

7             THE COURT:  I'll tell you what, before we

8    tackle New Jersey, I think we better bring it to a

9    close, Mr. Biersteker.

10            So let me ask some logistics.  Y'all tell

11   me what you want me to do.  Do you want me to stand

12   down and just wait for additional briefing?  Wait

13   till we have an argument?  Do you want me to start

14   working on the opinion, particularly on the

15   preemption issues and the claims that we have?

16            Ms. Wolchansky, what would you like for the

17   Court to do?

18            MS. WOLCHANSKY:  We would ask that the

19   Court wait for the supplemental briefing; that we set

20   an additional day to come back, and that the Court

21   take the entire matter under advisement at the

22   completion of the next hearing.

23            THE COURT:  At the completion.

24            How about you, Mr. Biersteker?  What would

25   you like the Court to do?



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
1              MR. BIERSTEKER:  I would prefer if Your
2     Honor were to start working on the opinion as to
3     those matters.  We've already fully briefed and
4     argued.
5              THE COURT:  All right.  Well, we end the
6     day in complete agreement on how we should proceed.
7     So I'll figure it out.  I was going to -- you know,
8     this is going to be a lot of work.  I don't think
9     y'all would deny that, even if you're not going to be
10    the one to draft it.  And so I'm trying to figure out
11    whether I've got clerks that are going to be around
12    long enough to see this process through, or do I need
13    to double-up clerks on this, or something like that.
14    But given that there is no agreement, you don't have
15    to worry about that.  I'll think about that
16    internally.
17             All right.  I appreciate y'all's
18    presentations.  Sorry we didn't get it all done
19    today.  Maybe we'll start on Monday next time, and
20    we'll go as long it takes to get it all done.
21             Be safe on your travels.  Have a good
22    weekend.
23             (A discussion was held off the record.)
24             MR. BIERSTEKER:  I was also going to ask
25    about timing on briefing.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              MS. WOLCHANSKY:  Depending on when we can
 2    get a date, I want to make sure we have enough time
 3    on the brief, and give the Court enough time to have
 4    reviewed everything before we come back again.  So --
 5              THE COURT:  Ten pages I think I can handle.
 6    So don't worry about me.
 7              MR. BIERSTEKER:  Do you want us to confer,
 8    Your Honor, separately, and then we'll get back to
 9    Your Honor?  Would that make sense?
10              THE COURT:  I think Ms. Wild wants a
11    decision now.
12              MS. WOLCHANSKY:  I think we'd like 30 days,
13    21 days?  I saw the eye roll.  It was so subtle, it
14    was hard to dismiss.
15              MR. BIERSTEKER:  I'm sorry.  I'm really
16    transparent.
17              THE COURT:  Well, you know, I don't -- I'm
18    not going to sit here with bated breath.  It's not
19    going to matter.  Take your 21 days.  Do you want
20    simultaneous, or do you want to respond?
21              MR. BIERSTEKER:  No, we'll respond, I don't
22    know, two weeks.
23              THE COURT:  Two weeks?  Is that all right?
24    I'm glad we end on such agreement.  We at least end
25    on eye rolls, right?  At least you're not making it
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    at the judge.
 2              Y'all be safe.
 3              Do you know how much time you'll need to
 4    finish the hearing?  Give me an estimate of how much
 5    time; when y'all call in, how much time you want to
 6    finish.
 7              MS. WOLCHANSKY:  I think a morning.  I
 8    think a half a day.  I just think we should be
 9    realistic, depending on what the First Amendment --
10              THE COURT:  If you think it's a half day, I
11    can give you July 25 at 1:30.
12              MS. WOLCHANSKY:  We don't need a whole day.
13              MR. SCHULTZ:  Your Honor, I will be in a
14    jury trial with Judge Franchini in state court that
15    starts on the 17th.  We're scheduled for 10 days, so
16    the 25th is not available for myself.
17              MS. WOLCHANSKY:  Is there anything the week
18    of the 17th?
19              MR. SCHULTZ:  I start my jury trial.
20              MS. WOLCHANSKY:  I'm sorry, on the 17th.
21    August 2?
22              THE COURT:  August 3rd at 8:30?
23              MS. WOLCHANSKY:  I have an oral argument in
24    New York on that day.
25              THE CLERK:  August 4?
```




SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              MS. WOLCHANSKY:  Is there anything on the
 2    1st or 2nd of August?
 3              THE CLERK:  The 1st would probably work
 4    okay, Judge.
 5              THE COURT:  The 1st work for everybody?
 6              MR. SCHULTZ:  Yes, sir.
 7              THE COURT:  August 1st, Mr. Biersteker?
 8              MR. BIERSTEKER:  I have to turn on my
 9    phone.  I'm sorry.  I was confident about my
10    schedule.
11              MS. WOLCHANSKY:  Andy, is your trial two
12    weeks?
13              MR. SCHULTZ:  Yes, we have a firm setting,
14    we're number one on the docket.  We pick the jury the
15    17th.
16              THE COURT:  What kind of case is it?
17              MS. WOLCHANSKY:  Michael is in Japan.
18              MR. SCHULTZ:  Your Honor, it is an abuse
19    case that Mike Hart and I are co-counseling.
20              THE COURT:  August 1st may work.  Who is
21    going to be in Japan?
22              MS. WOLCHANSKY:  Michael.
23              THE COURT:  You can call in, Mr. Reese.
24              MS. WOLCHANSKY:  From Japan?
25              MR. REESE:  I'd like to.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1              THE COURT:  So the 9th, is that what we're
2    working on?
3              MS. WOLCHANSKY:  If it's not before the
4    1st, the 9th doesn't matter.  Either John or I will
5    take the First Amendment issue, right?  Let's just do
6    the 1st.
7              MR. SCHLESINGER:  Yes, Judge, that's
8    probably the best.
9              THE COURT:  The 1st for the plaintiffs, 1st
10   for the defendants?  8:30, August 1st.  I think
11   that's a Monday.
12             THE CLERK:  Tuesday.
13             MS. WOLCHANSKY:  I'm sorry.  I have a
14   mediation on the 31st.  I don't know how I'm going to
15   get here.  I can't get here.
16             THE COURT:  Where is your mediation?
17             MS. WOLCHANSKY:  It's in Minneapolis but
18   it's all day.  I wouldn't be able to get here.
19   Unless we do the afternoon on the 1st.  I can get
20   here.
21             THE COURT:  That's fine, if it's all right
22   with the defendants.  Y'all want to do the afternoon?
23   Minneapolis, we got a lot of flights in and out.
24   We've got direct flights.
25             MS. WOLCHANSKY:  I know.  I can get here in
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   the evening on the 31st.

2          THE COURT:  How about doing this:  Find out

3   when you --

4          MS. WOLCHANSKY:  Why don't I just call you.

5   Do you want us to confer?

6          THE COURT:  Well, why don't you do this:

7   Why don't you find out when you'll be here, and we'll

8   set the hearing then, according to your flight time

9   in.

10          MS. WOLCHANSKY:  Okay.

11          MR. REESE:  I'm not exactly sure.  I'm not

12   my scheduler.  I may have something available that

13   week, sometime that week.  I'm not quite sure.

14          MS. WOLCHANSKY:  We'll figure out --

15          THE COURT:  Okay.  So we'll set it August

16   1st.  All right.  We'll set it for August 1st, and

17   we'll leave the time fluid, depending on -- we'll set

18   it for 8:30, so there will be a notice.  But we'll

19   leave here with the understanding that we may have to

20   adjust that backward depending upon flight times.

21          MS. WOLCHANSKY:  I'm sure we're jinxing my

22   mediation that it will go all day.

23          THE COURT:  If they pay you money, you

24   don't care, do you?

25          All right.  Y'all be safe.  Have a good

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                   201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                          FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1   weekend.

 2              (The Court stood in recess.)

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1                    C-E-R-T-I-F-I-C-A-T-E

2

3    UNITED STATES OF AMERICA

4    DISTRICT OF NEW MEXICO

5

6

7        I, Jennifer Bean, FAPR, RDR, CRR, RMR, CCR,

8    Official Court Reporter for the State of New Mexico,

9    do hereby certify that the foregoing pages constitute

10   a true transcript of proceedings had before the said

11   Court, held in the District of New Mexico, in the

12   matter therein stated.

13       In testimony whereof, I have hereunto set my

14   hand on June 13, 2017.

15

16

17

18   _____
                 Jennifer Bean, FAPR, RMR-RDR-CCR
19               Certified Realtime Reporter
                 United States Court Reporter
20               NM CCR #94
                 333 Lomas, Northwest
21               Albuquerque, New Mexico 87102
                 Phone:  (505) 348-2283
22               Fax:    (505) 843-9492

23

24

25
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com