# EXHIBIT C

# JONES DAY

51 LOUISIANA AVENUE, N.W. • WASHINGTON, D.C. 20001.2113
TELEPHONE: +1.202.879.3939 • FACSIMILE: +1.202.626.1700

Direct Number: (202) 879-3755
pbiersteker@JonesDay.com

JP973075

October 5, 2018

VIA E-MAIL: MWEINER@PSWLAW.COM

Ms. Melissa Weiner, Esq.
Pearson, Simon & Warshaw, LLP
800 LaSalle Avenue, Suite 2150
Minneapolis, MN 55402

Re: In re: Santa Fe Natural Tobacco Company Marketing & Sales Practices Litigation, U.S. District Court, New Mexico, Case No. 1:16-md-02695-JB-LF

Dear Melissa:

I write in response to your September 21, 2018 "meet and confer" letter concerning Defendants' document production.

Initially, your letter raises no issue specifically with respect to Defendant Santa Fe Natural Tobacco Company's ("Santa Fe's") use of technology assisted review ("TAR") on three subsets of Santa Fe documents as part of its production last year (a) that resulted in the initial under production through December 2017; and (b) that Santa Fe expeditiously cured, at considerable expense, by determining which documents "hit" by the agreed-upon ESI search terms were responsive through a traditional, human review by June of this year.

I also observe that Santa Fe's use of TAR to assist in determining what documents were responsive from the three subsets of Santa Fe documents with ESI search term "hits" and Santa Fe's subsequent cure of the resulting initial under production was the sole focus of the agreed-upon and Court-ordered 30(b)(6) deposition of Santa Fe. The 30(b)(6) deposition was not about Santa Fe's production generally, much less the document productions made by any other Defendant. Defense counsel made that clear at the outset of 30(b)(6) deposition, and Plaintiffs' counsel did not disagree. *See* August 20, 2018 30(b)(6) Deposition Transcript ("Dep. Tr.") at 7:11-21.

To be sure, the 30(b)(6) witness, Mr. Burkhalter, was asked questions in the 30(b)(6) deposition that were outside of the scope of his testimony as a representative of Santa Fe that Mr. Burkhalter answered as best he could in his individual capacity based on his limited personal knowledge.

Rather than discuss the primary focus of the 30(b)(6) deposition, however, your letter concentrates primarily, if not exclusively, on those extraneous questions. And, in many

NAI-1504884095v3

ALKHOBAR • AMSTERDAM • ATLANTA • BEIJING • BOSTON • BRUSSELS • CHICAGO • CLEVELAND • COLUMBUS • DALLAS
DUBAI • DÜSSELDORF • FRANKFURT • HONG KONG • HOUSTON • IRVINE • JEDDAH • LONDON • LOS ANGELES • MADRID
MEXICO CITY • MIAMI • MILAN • MOSCOW • MUNICH • NEW YORK • PARIS • PERTH • PITTSBURGH • RIYADH • SAN DIEGO
SAN FRANCISCO • SÃO PAULO • SHANGHAI • SILICON VALLEY • SINGAPORE • SYDNEY • TAIPEI • TOKYO • WASHINGTON

JONES DAY

Ms. Melissa Weiner, Esq.
October 5, 2018
Page 2

instances distorts the actual testimony. Defendants welcome this opportunity to respond to the issues you raise.

1.      You state (at 2) that Plaintiffs have concerns about the completeness of Defendants' document production because Defendants failed to collect and review information from a variety of sources.

You initially assert (at 2-3) that Mr. Burkhalter testified that "no workstations, mobile devices, or other repositories under various custodians' control or possession had been searched." Mr. Burkhalter, in fact, testified, in the very passage of the deposition you cite (Dep. Tr. 36:25-37:6), only that he personally was "not aware of whether individual mobile devices were searched for e-mails that were not already retained and captured as part of the systems in terms of the communication with the company or among company representative[s]."

You next claim (at 3) that (a) it is "clear" that Defendants generally "made no meaningful inquiry into the existence of relevant information on custodians' mobile devices, remote or cloud storage, or e-mail hosted by other third-party email systems" and (b) it is "unclear" whether "meaningful inquiry (if any) was made into whether discovery information was stored in any workstation, mobile phone, tablet, or laptop device."

Mr. Burkhalter testified that it was his personal belief that the systems used at R.J. Reynolds Tobacco Company ("RJRT") have, since in or about 2002, been designed to prevent users from saving materials or data to their business hard drives or other personal devices. (Dep. Tr. 40:10-41:1). I have confirmed that the personal belief of Mr. Burkhalter in this regard is correct. RJRT employees could save materials from their company work stations only to their home drives or share point sites. Further, company policy prohibited the storage of company documents on laptops or personal devices. As you concede (at 3), relevant RJRT share point sites were searched as were the home drives of RJRT employees who performed services for Santa Fe pursuant to the services agreement.

The same was also true of Santa Fe employees starting in 2009, the beginning of the class period. Namely, they too were unable to save materials or data to their business work stations' hard drives or other personal devices. They could only save materials from their work stations to their home drives or share point sites, both of which, together with e-mails, were collected, searched, reviewed, and produced.

Moreover, pertinent custodians who were employed by Santa Fe were contacted as part of the document collection process. As part of that process, those custodians were specifically asked to make available for collection and review "hard copy (paper) documents;" any "business related notebooks" that were not blank; "CDs, DVDs, flash drives, or other laterally stored

NAI-1504884095v3

**JONES DAY**

Ms. Melissa Weiner, Esq.
October 5, 2018
Page 3

electronic files, not duplicated on a SFNTC system or in email;" and, finally, especially for the period prior to 2009, for "information stored on personal electronics." *See* Exh. 1 to this letter entitled "Custodian/Hart (*sic*) Copy Sweep for SFNTC."

As a result of Santa Fe's due diligence, external sources of potentially-responsive information were identified, the potentially responsive materials were collected, searched, reviewed for responsiveness, and, if responsive, they were produced. The external sources identified included hard copy documents, archived Santa Fe materials at a Recall site in Atlanta (including archived e-mails), and electronically stored copies of what turned out to be largely older advertisements that Santa Fe retained an outside consultant to access.

In short, it is simply not the case, as you allege, that "Defendants'. . . identification, collection, and search" for responsive documents was limited to "custodians' home drives."

Last, you say (at 3) that Plaintiffs have "significant concerns" based on a purported "representation" by "Defendants" that "no searches were made for text or other instant messaging communications." Mr. Burkhalter was a corporate representative of Santa Fe only. Moreover, the question from the deposition you cite (38:2-5) plainly inquired about Mr. Burkhalter's personal knowledge: "To your knowledge. . . ." Finally, Mr. Burkhalter's response made no such "representation;" instead, he testified that he personally was not aware of any such search.

Two observations are pertinent. First, as noted, Santa Fe's collection and review efforts focused not only on information located on corporate communication and data storage systems but also lateral sources, including the personal electronics of those Santa Fe custodians who indicated that non-duplicative, business-related information was located on those lateral sources. Second, Instant Messages were captured as part of the corporate communication and data storage systems, and over 150 Instant Messages were produced by Santa Fe to Plaintiffs. They all bear the notation: "Transcript for instant messaging ( IM ) session."

2.   Your letter (n.1 at 2) claims that "Defendants have failed to respond to the discovery served upon them on July 27, 2018. Defendants never sought a meet and confer nor requested an extension."

Defendants, in fact, responded to that discovery, Plaintiffs' Third Requests for Production, on September 10, 2018, eleven days before your September 21, 2018 letter. Moreover, there was no need for any Defendant to obtain an extension. The response was timely under the Case Management Order, which provides that responses are due 45 (forty-five) days after service of a document production request. [Doc. 37 at 3.C].

NAI-1504884095v3

JONES DAY

Ms. Melissa Weiner, Esq.
October 5, 2018
Page 4

3. You next complain (at 3) that Defendants "cannot state with any confidence that email threads (parents/children and attachments) are complete" and that, as a result, "Plaintiffs have been saddled with emails and documents whose chronological position in a time spectrum is unknown."

Santa Fe produced complete, responsive e-mails. As Mr. Burkhalter testified, the e-mails were "journaled" – *i.e.,* preserved exactly as they were sent. (Dep. Tr. 29:18-30:15). If responsive and not privileged, they were produced as TIFF files that were identical to the e-mails as they were sent and "journaled" in full compliance with both Federal Rule of Civil Procedure 34(b)(2)(E) and the ESI Order in this case.[1] To be clear, Defendants "produced families, which would be the attachments that were with e-mails, as part of [their] overall production." (Dep. Tr. 26:17-19).

In that connection, I note that "threading" e-mails – *i.e.,* electronically combining "journaled" e-mails that are part of a string after the fact to produce only one version that contains all of the various replies and all attachments that were ever included as part of the thread – is optional under the ESI Order.[2] Santa Fe chose not to pursue that option, in part because it could not "thread" the e-mails that were "journaled" using the TCDI system that was in place prior to the adoption of the Recommind system in June 2016.

In all events, the notion that the "chronological position in a time sequence" of e-mails and their attachments "is unknown" makes little sense. It is known. Every e-mail has a date and time allowing them to be sorted chronologically.

4. Your letter (at 4-6) contends "Defendant R.J. Reynolds Tobacco Company ("RJRT") failed to comply with its obligation under the Federal (*sic*) to produce responsive documents."

It is indisputable that RJRT was never served with a document production request.

Accordingly, your letter contends that Defendant Reynolds American Inc. ("RAI") had an obligation to collect and review for responsiveness a broader universe of documents, beyond those that, in fact, were collected, reviewed, and, if responsive and not privileged, produced as part of the Santa Fe and RAI productions.

---

[1] September 27, 2016 Order for the Discovery of Electronically Stored Information. [Doc. 55].

[2] ESI Order at 8, Section III(C)(3), entitled "E-mail Threading" provides:

> The producing Party *may* identify e-mail threads in which all previous emails making up the thread are present in the body of the final e-mail in the thread. Any Party *electing* to use this procedure must notify all receiving Parities that it plans to use email thread suppression on a specific production. (emphases added)).

NAI-1504884095v3

**JONES DAY**

Ms. Melissa Weiner, Esq.
October 5, 2018
Page 5

      Your contention rests upon two different theories: (a) a purported "agreement" by RAI that RJRT would search and produced documents responsive to Plaintiffs' First Request for Production of Documents served on RAI; and (b) a perceived legal obligation for RAI to search and produce responsive documents from RJRT, its subsidiary, even though RJRT itself was a party to the case. We disagree with each theory.

      First, as to the claimed "agreement," RAI (and Santa Fe) responded to each of Plaintiffs' six different sets of requests for production (RFPs) that were directed to RAI or Santa Fe, that RAI and Santa Fe, respectively, would produce responsive documents located in their own files. RAI and Santa Fe, moreover, both essentially invited Plaintiffs, to the extent they wished to obtain documents from Defendant RJRT's files, to serve a request on Defendant RJRT. Specifically, RAI and Santa Fe both noted in all six of their collective responses to Plaintiffs' RFPs directed to them that RJRT was also a Defendant in the case and "presumably" Plaintiffs would serve an RFP on RJRT for documents in RJRT's files. Finally, RAI expressly objected to Plaintiffs' attempt to define RAI to include the two other Defendants, Santa Fe and RJRT.

      Against this background, your letter seizes on a fragment of a sentence that is found only in RAI's response to Plaintiffs' First RFP. Here is the full excerpt with your chosen language underscored.

> Plaintiffs defined RAI to include its subsidiaries Santa Fe and R.J. Reynolds Tobacco Company ("Reynolds.") (Requests at 1). RAI objects to that portion of the definition because it makes these Requests redundant of Plaintiffs' First Request for Production of Documents to Santa Fe. RAI's responses are based on a search of its files only. Plaintiffs have served duplicative requests on Santa Fe and presumably will serve duplicate requests on newly-added defendant, R.J. Reynolds Tobacco Company ("Reynolds."). Regardless, each defendant will provide responses based on searches of its own files. Moreover, Reynolds was first named as a defendant in the Consolidated Amended Complaint filed September 19, 2016 ("the Amended Complaint"). Thus, while Reynolds <u>needs some additional time to identify those documents that are potentially responsive to these Requests, Reynolds will produce responsive materials, whether in response to these Requests or duplicate requests directed to Reynolds</u>.

It is difficult to read the underscored language, in context, as anything other than a cautionary note that, since RJRT had been named as a Defendant only recently and after service of the First RFPs on Santa Fe and RAI, RJRT would need "additional time" to identify and produce

NAI-1504884095v3

Ms. Melissa Weiner, Esq.
October 5, 2018
Page 6

responsive documents in response to the "presumably" forthcoming RFPs that would be specifically "directed to Reynolds [RJRT]." That is consistent, moreover, with RAI's responses to Plaintiffs Second and Third RFPs that were served after RJRT was named as a Defendant in the case and that omitted entirely the final sentence above, including the underscored text, but is otherwise the same.

Plaintiffs' current position – *i.e.*, that Plaintiffs thought the underscored language somehow constituted an "agreement" upon which Plaintiffs have relied ever since -- is belied by Plaintiffs' own conduct. Plaintiffs never once sought confirmation of the perceived "agreement." Plaintiffs never once took issue with RAI's failure to similarly "agree" in its responses to the Second and Third RFPs. In late August of this year, Plaintiffs first raised an issue regarding RJRT's production in a series of e-mails. Plaintiffs made no claim in those e-mails that they perceived that there was any "agreement" upon which they had been relying for the last nearly two years. To the contrary, Plaintiffs affirmatively acknowledged that RAI had objected, claiming, instead, that the objection to producing documents from the files of RJRT was ineffective: "RAI does not have the prerogative to redefine or object its way out of" producing documents from the files of its subsidiary and co-defendant, RJRT. (August 28, 2018 e-mail from Mr. M. Schultz to Mr. D. Monde, copying, among others, you and me).

I turn now to that issue, which is your letter's second theory – *i.e.*, that, despite its objection, RAI was obligated to produce responsive documents from the files of RJRT because, as RJRT's parent, RAI had "control" over RJRT's files.

Your letter and Mr. Schultz's earlier e-mails misapprehend the basis of RAI's objection to producing documents from the files of RJRT. RAI did not object because it lacked "control" over RJRT's files within the meaning of the Rule 34 of the Federal Rules of Civil Procedure. RAI's objection, instead, was based on proportionality and burden. Namely, there was no need for RAI to assume the burden of collecting, searching, and reviewing RJRT's files because RJRT, as a Defendant in the case, could produce responsive documents more readily from its own files in response to whatever RFP Plaintiffs wished to direct to RJRT. *None* of the cases cited in your letter involved an RFP served on a parent corporation that sought production of documents from a subsidiary that was also a defendant in the same case.

It would have been easy for Plaintiffs to serve a RFP on Defendant RJRT, as Santa Fe and RAI expressly invited Plaintiffs to do in all six of their collective responses to Plaintiffs' RFPs. Plaintiffs could still do so. That path would be far less costly and less time consuming than embarking on motion practice to force RAI to produce documents on behalf of its Defendant subsidiary, which Defendants believe additionally would be ill-founded.

**JONES DAY**

Ms. Melissa Weiner, Esq.
October 5, 2018
Page 7

In that connection, I note that your letter made no demand that either RAI or RJRT produce additional documents from RJRT's files responsive to the RFPs previously served on RAI or otherwise. Defendants, moreover, believe that there is little point in pursuing this issue further for two reasons.

First, RAI and Santa Fe, notwithstanding their objections, have already produced responsive documents from (a) pertinent RJRT share point sites (to which Santa Fe employees and/or RJRT employees performing work for Santa Fe pursuant to the services agreement had access) that were in addition to the pertinent Santa Fe share point sites (to which RJRT employees who performed work for Santa Fe pursuant to the services agreement also had access); (b) the home drives of those RJRT employees who did pertinent work for Santa Fe pursuant to the services agreement; (c) electronic communications between employees of RJRT and Santa Fe, such as e-mails and instant messages; and (d) specific individual documents that were identified by employees of any Defendant in the course of the document collection effort, such as tests performed by RJRT's Research and Development Department either at the request of Santa Fe pursuant to the services agreement or tests that RJRT's Research and Development Department occasionally performed on a wide array of commercially available cigarettes, including, in some instances, Natural American Spirit cigarettes.

Second, despite your assertion (at 6) that RJRT "is very much involved" in the "labeling and marketing of Natural American Spirit" cigarettes,[3] the "involvement" was limited to individual RJRT employees who performed work requested by Santa Fe, for Santa Fe, directed or supervised by Santa Fe, and paid for by Santa Fe under the services agreement. As the immediately preceding paragraph makes clear, a substantial volume of documents from the files of RJRT related to those specific employees' work for Santa Fe have already been searched and, if responsive and not privileged, has been produced.

It is far from clear that any *proportionate* response by RJRT to the RFPs previously served on Santa Fe and RAI would extend the search beyond the RJRT files from which responsive documents have already been produced.

5.  I also wanted to take this opportunity to address RAI's supplemental production later today of a small volume of responsive e-mails and attachments.

As you know, RAI currently is a Defendant in a suit brought by a nonprofit organization, Breathe DC, in the Superior Court of the District of Columbia ("*Breathe DC*"). *Breathe DC*

---

[3] The referenced portion of your letter refers to Natural American Spirit "Tobacco," not cigarettes. Defendants note that the operative complaint is about Natural American Spirit "cigarettes." Defendants would oppose any effort by Plaintiffs to amend the operative complaint to include allegations related to Natural American Spirit tobacco products, other than cigarettes, such as roll-your-own tobacco.

NAI-1504884095v3

JONES DAY

Ms. Melissa Weiner, Esq.
October 5, 2018
Page 8

seeks only equitable, injunctive relief concerning Santa Fe's labeling and marketing of Natural American Spirit cigarettes. Defendants' long-pending motion to dismiss *Breathe DC*, including a request to dismiss RAI for lack of personal jurisdiction, has not yet been decided.

In the meantime, Plaintiff in *Breathe DC* served RAI with a RFP. During the course of its review of potentially responsive materials for the *Breathe DC* action, RAI identified 354 e-mails or e-mail attachments that were responsive to the RFP directed to RAI in this case but that had not been produced previously in this case. RAI accordingly will supplement its production today in this case to include those e-mails and their attachments.

The vast majority of these 354 documents consist of attachments to non-substantive transmittal e-mails. These attachments include some general SFNTC marketing information. However, most of this information was already disclosed through documents containing similar information included in SFNTC's prior productions in this case. Further, many of these attachments are duplicates (although not necessarily identical duplicates) of documents produced from these RAI custodians – *e.g.,* there are various versions of the same presentation concerning SFNTC, presentations of similar information about SFNTC to differing groups, SFNTC documents forwarded for information to RAI personnel (and previously produced by SFNTC) or presentations of data that are reported in multiple other sources – such as RAI's public filings or other SFNTC documents already produced. In short, there is very little "new" here.

The total volume of documents produced (1055) exceeds the volume of the documents that are responsive. Why? As RAI and Santa Fe did with their earlier productions in this case, RAI's supplemental production is of e-mails or other documents and attachments thereto. That is, if any part of either an e-mail or one of its attachments is responsive, RAI is, once again, producing document "families" that include the e-mail and all of its attachments. As a result, the supplemental production includes 701 documents (e-mails and/or attachments) that are not responsive but which were in a document "family" that included one or more responsive documents.

The 701 non-responsive documents include:

- 210 transmittal e-mails with no substantive comments (but which have responsive attachments);

- More than 160 non-responsive excels;

- Dozens of attached "logos";

**JONES DAY**

Ms. Melissa Weiner, Esq.
October 5, 2018
Page 9

- Dozens of e-mails that are not responsive, but which attach one or more responsive documents;

- Dozens of attachments that are not responsive to the RFPs, but were sent in transmittal documents including one or more responsive attachments;

- Numerous blank zip files, blank .htm files, irrelevant images, etc.

6. Finally, I turn to your requested relief.

The only relief sought by Plaintiffs in your letter is a payment of $48,964.00. The requested payment, as set forth in your letter, breaks down as follows:

a. An amount not to exceed $4,000 for "forensic analysis" to assess whether Santa Fe's manual review of the three subsets of documents originally subjected to TAR was "sound."

b. $13,350 for "Relatively analytics" to assist Plaintiffs' expeditious review of Santa Fe's production made in 2018 as a result of the manual review of the three subsets of documents originally subjected to TAR.

c. $31,614 for hosting costs for three months which Plaintiffs' contend would have been avoided but for Santa Fe's initial under-production of responsive documents in the three subsets of documents originally subjected to TAR.

Defendants agree, in principle, to make the payment you request subject to two conditions.

First, the amounts claimed must be reasonable. To that end, Defendants ask that Plaintiffs provide copies of any invoice for payment, payment, bid, or estimate upon which the claimed amounts are based.

Defendants believe it is in the best interests of all the parties to focus on the merits of the case, to put fact discovery behind us, and to proceed with expert discovery as the parties discussed today.

Defendants have been candid with Plaintiffs about Santa Fe's initial under-production of responsive documents from the three subsets of documents that originally were subjected to TAR as well as Santa Fe's subsequent and expensive manual review of those three subsets of documents to address the issue.

NAI-1504884095v3

JONES DAY

Ms. Melissa Weiner, Esq.
October 5, 2018
Page 10

     Santa Fe also agreed voluntarily to a 30(b)(6) deposition concerning its use of TAR to assist in making the initial responsiveness determinations for those three subsets of documents in 2017, Santa Fe's recognition of the issue in very late March 2018, and Santa Fe's subsequent and expensive manual review of each of those three subsets of documents to complete its production in June 2018. Santa Fe, additionally, reimbursed Plaintiffs' counsel for the costs he incurred to take that deposition.

     Defendants, of course, remain willing to work with Plaintiffs going forward to address routine requests of the sort that have arisen from time-to-time regarding a specific document, such as a question about whether a document is missing an attachment or a request that the document be produced in a format other than that prescribed by the ESI Order, such as in color or in native format.

     Defendants' second condition accordingly is that Plaintiffs agree that, apart from routine requests about individual documents produced by one of the Defendants of the kind described in the immediately preceding paragraph, we are done with document production issues, including:

- No demand by Plaintiffs for further relief or discovery relating to Santa Fe's 2017 use of TAR to help determine the responsiveness of documents in the three subsets or Santa Fe's 2018 manual review of those same three subsets of documents to cure the initial underproduction.

- No further depositions on document production issues.

- No new RFPs on any Defendant.

- No motions to compel or for sanctions based on Defendants' responses to the written discovery requests served to date.

- No request that any Defendant attempt to collect potentially responsive documents from locations beyond those the Defendants have already examined.

     Defense counsel would be happy to discuss these issues over the telephone in an effort to come to closure, as we offered to do on our call earlier today. We have been able to resolve a number of issues through personal conversations, and a conference call would likely be more productive and efficient than engaging in further exchanges of written correspondence.

NAI-1504884095v3

**JONES DAY**

Ms. Melissa Weiner, Esq.
October 5, 2018
Page 11

                              Very truly yours,

                              Peter J. Biersteker