**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

IN RE: SANTA FE NATURAL
TOBACCO COMPANY MARKETING
& SALES PRACTICES AND
PRODUCTS LIABILITY LITIGATION                Lead Case No. MD 16-2695 JB/LF

*This Document Relates To All Cases*

_____

**PLAINTIFFS' MEMORANDUM MOTION TO
QUASH SUBPOENA AND FOR A PROTECTIVE ORDER**

Pursuant to Fed. R. Civ. P. 26(c) and 45(d)(3), Plaintiffs move to quash the subpoena duces tecum (Doc. 255) served by Defendants on Truth Initiative ("TI")—a non-party—on August 27, 2019, (attached as Exhibit A to the Declaration of Matt Schultz ("Schultz Decl.")). Defendants served an earlier subpoena on TI in June (Doc. 244) (Schultz Decl., Ex. B). On July 12, 2019, TI erroneously produced non-responsive confidential research (the "July 12 Production") and subsequently asked Defendants to destroy all inadvertently produced documents from the July 12 Production. Instead, Defendants retained the data and questioned Plaintiffs' expert Dr. Jennifer Pearson at deposition about the inadvertent July 12 Production. Accompanying Defendants' most recent subpoena was a letter, (Schultz Decl., Ex. C), in which Defendants demand that TI expand upon the earlier inadvertent July 12 Production. Plaintiffs seek a protective order as to that request.

**I.  BACKGROUND FACTS.**

**A.  Background Regarding Dr. Pearson & Truth Initiative.**

Plaintiffs have retained expert Jennifer L. Pearson, MPH, Ph.D., who has performed and published research demonstrating that consumers perceive Natural

American Spirit (NAS) descriptors such as "natural" and "additive-free" as implying that NAS cigarettes pose less risk of harm than other cigarette brands. Her research also shows that the NAS disclaimer does not correct these misperceptions. Dr. Pearson considered and relied upon her published and in-press NAS-related studies in forming her opinions in this case. Two of those studies were performed while Dr. Pearson worked at TI—a public interest organization that carries out scientific and policy research around issues of tobacco and health. The underlying data for those two studies is in TI's possession.[1] Dr. Pearson also was involved in other work at TI that, in part, addressed NAS-related issues. None resulted in publication. None was considered or relied upon Dr. Pearson her in forming her opinions in this case. The underlying data for that work is in TI's possession as well.

On June 18, 2019, Defendants served a subpoena on TI requesting all underlying data only for the two TI studies Dr. Pearson considered, relied upon, and discussed in her expert report. Plaintiffs did not object to this subpoena because it was in keeping with an agreement reached between the parties as to the scope of production of reliance materials for experts who considered/relied upon their own empirical work in forming their opinions, as discussed below in more detail. Because Dr. Pearson's deposition was imminent, the parties worked together to facilitate expedited production of the requested documents.

TI agreed to a rolling production of documents and turned over data in three tranches over the course of approximately one month. The second and third productions were responsive; but the first production (the July 12 Production) did

---

[1] The two studies are Pearson et al., American Spirit Pack Descriptors and Perceptions of Harm: A Crowdsourced Comparison of Modified Packs, *Nicotine Tob. Res.* 2016:8(8):1749-56 and Pearson et al., Study of 2,560 U.S. Adults (in preparation).

*not* relate to either of the two TI studies that Dr. Pearson considered/relied upon in this case as specifically identified in the subpoena. Rather, the data related to other work in which Dr. Pearson was involved while at TI, some portions of which pertained to NAS cigarettes. Counsel for TI, Ted Feldman, sent four emails to defense counsel between July 25 and August 6 notifying them of the inadvertent July 12 Production, requesting that they destroy the inadvertently produced documents, asking that they direct any other recipients to do the same, and seeking written confirmation of such.

Defense counsel David Monde responded August 6—the evening before Dr. Pearson's deposition—stating that Defendants would "reassess [their] position after the conclusion of Dr. Pearson's deposition tomorrow." Over an objection preserving the matter for this Court's consideration, defense counsel Sharyl Reisman questioned Dr. Pearson about the work reflected in the July 12 Production and attached as an exhibit to the deposition a screenshot of the July 12 Production folder. (Schultz Decl., Ex. D (Pearson Dep. at 40-51.) The subject study followed a young adult cohort that and been ongoing (before Dr. Pearson worked at TI) "for quite some time" when Dr. Pearson suggested to the principal investigator that she add survey questions pertaining to NAS cigarettes, which was done. (*Id.* at 43:2-21.) Dr. Pearson had only a "vague memory" that some analysis of the data had begun before she left TI in 2017; she had not looked at the data since leaving TI; and she did not have access to it. (*Id.* at 44:1-11; 48:6–49:11.) Dr. Pearson is not even sure she saw all of the data when she was at TI. (*Id.* at 51:6-12.) Dr. Pearson did not consider or rely upon any of the data in forming her opinions in this case and she did not incorporate any of the data into her report (indeed, when drafting her report she had not seen any of the data since her time at TI). (*Id.* at 376:21–377:12.)

On August 27 Defendants served a second subpoena, (Doc. 255) (Schultz Decl., Ex. B), accompanied by a letter from defense counsel David Monde. (Schultz Decl., Ex. C.) The second subpoena seeks the same or similar underlying data as the first subpoena, but is not limited to the two studies Dr. Pearson considered/relied upon in forming her opinions in this case. Instead it seeks all data that Dr. Pearson "had/has access to," that relates in any way to NAS regardless of whether Dr. Pearson ever saw the data or even knew of its existence and regardless of whether anyone at TI ever "analyzed or reported on" the data. (Schultz Decl., Ex. B ¶ 1.)

Surprisingly, Mr. Monde's accompanying letter, (Schultz Decl., Ex. C ¶ 1), seeks production of additional data from the inadvertent July 12 Production, although there is no dispute that the highly confidential research data already inadvertently produced to Defendants was not responsive to the initial June subpoena. This is patently inappropriate given that the entire July 12 Production was made in error and unwittingly disclosed confidential research information.[2]

The second subpoena and the letter seeking additional July 12 Production documents outside the scope of the first subpoena are untimely, overbroad, dilatory in their effect, and in violation of Rule 26 disclosure requirements as well as the Parties' agreement on the scope of production for experts who consider or rely upon their own empirical work. Allowing this production is likely to derail the current schedule and will require the rescheduling of defense expert depositions—all so Defendants can obtain documents Dr. Pearson never considered or relied upon.

---

[2] If the Court declines to quash or limit the second subpoena, then the data sought in Mr. Monde's letter would be encompassed within and appropriately produced pursuant to the second subpoena.

### B. Timeline Regarding the Parties' Agreement on Expert Disclosures.

To understand the Parties' agreement mentioned above, more background information is required.

<u>May 14, 2019</u>. Defense counsel David Monde emailed Plaintiffs' counsel Matt Schultz to "agree now on the scope of what should be produced for experts so we don't have disagreements later, which could cause delay." (Schultz Decl., Ex. E.) The scope included "1. All **materials that each expert reviewed and relied upon** in forming his/her opinions … includ[ing] all underlying instruments, measures, data and analyses in native form generated or obtained by the expert," and "2. For those **experts who analyzed quantitative or qualitative data,** such as survey or pricing data (regardless of whether the data were generated by the expert or for this litigation) please **produce all underlying measures, data and analyses** [followed by specific details on types of data and analyses]."(*Id.*) Thus, Dr. Pearson was obligated to produce, and did produce, (1) all materials reviewed and relied upon and, (2) with respect to those studies of her own for which she analyzed quantitative or qualitative data, all underlying measures, data, and analyses. In keeping with Rule 26, Plaintiffs disclosed all responsive materials *considered* or relied upon despite the narrower wording of the Parties' agreement. Because Dr. Pearson did not possess the responsive data regarding the two studies carried out at TI, the parties worked together to obtain that data from TI by way of the June subpoena. The scope of the Parties' agreement is reflected in the first subpoena to TI, which was limited specifically to the two TI studies Dr. Pearson considered in forming her opinions.

<u>May 15, 2019</u>. Matt Schultz confirmed, "We will agree on the 1/2-points about underlying data. It really only is an issue for Dr. Pearson because she is opining on her own studies and I am trying to find out what she has access to." (*Id.*) Mr. Schultz

explained that he asked her to produce all responsive data she had and to obtain from others anything she could freely obtain that would be responsive, noting that subpoenas might be necessary for data in the possession of third parties. Mr. Schultz followed up a couple of hours later confirming Plaintiffs would serve "all facts and data *considered* by our experts in formulating their opinions," (emphasis added), excluding documents produced in litigation and widely available publications. On points 1 and 2 from Mr. Monde's original email, Mr. Schultz explained he did not know what the experts might have because he did not understand some of the technicalities of what was requested but he noted, "we have forwarded your exact language to our experts and asked that they comply to the extent possible and explain if any inability to comply." He further noted that Dr. Pearson is giving opinions "based directly on published articles that she co-authored," that she had underlying data for some, and that "[w]e certainly will produce what is in her direct possession and will explain the reasons why she is unable to produce any responsive data known to exist." Mr. Schultz again noted the potential need for subpoenas. (*Id.*)

May 22, 2019. Matt Schultz sent defense counsel a long email indicating that "there will be a couple of studies of Pearson's for which the data is housed at Truth Initiative," and that TI would require a subpoena. Mr. Schultz outlined each of Dr. Pearson's studies, i.e., the five studies of hers that she considered in forming her opinions, all of which are cited in her report. TI held the data for two of the five, as noted above, while Johns Hopkins held the data for a third. Mr. Schultz detailed the location of data for each study including what Dr. Pearson possessed and what TI and Johns Hopkins possessed. The email made clear Plaintiffs' plan to produce third-party information related only to the studies Dr. Pearson considered and relied upon in her report. Mr. Schultz also provided contact information for TI.

May 24, 2019. Matt Schultz sent a follow-up email to defense counsel pasting the May 22 email and elaborating upon it. Later that day, Mr. Schultz followed up to provide contact information for Johns Hopkins. (Schultz Decl., Ex. F & ¶ 6.) The same day Plaintiffs produced all responsive data in Dr. Pearson's possession.

May 31, 2019. Mr. Monde emailed Mr. Schultz seeking all materials relating to a presentation Dr. Pearson gave in 2017 relating to one of the five studies considered and relied upon and cited in her report along with a request for clarification of one point in her report. Because the poster presentation related directly to one of her five cited studies, Mr. Schultz agreed this was reasonable and on June 12 Plaintiffs produced everything in Dr. Pearson's possession relating to that presentation while also addressing the point of clarification that was sought. When later preparing for deposition Dr. Pearson found another poster relating to one of her cited studies and Plaintiffs voluntarily produced that as well. (Schultz Decl., ¶ 7.)

June 2, 2019. Mr. Monde emailed Matt Schultz asking if Plaintiffs objected to subpoenas directed to TI and Johns Hopkins. On June 3, Mr. Schultz responded that Plaintiffs did not necessarily agree Defendants were entitled to everything requested, but that in principle Plaintiffs had no objection to Defendants obtaining "whatever the law allows you to get." The subpoena to TI was served June 18. (Schultz Decl., ¶ 8.)

Late June/July. Plaintiffs cooperated with Defendants' efforts to obtain third-party documents, including Mr. Schultz's attendance with Mr. Monde in multiple calls and correspondence to counsel for Truth Initiative before and after their production of documents. Up to this point there had been no hint of any desire from Defendants to obtain all data relating to any work Dr. Pearson had ever done, published or unpublished, in connection with NAS cigarettes. All communication

had been premised on production being limited to Mr. Monde's proposal, which included only studies Dr. Pearson considered and relied upon and cited in her report. (Schultz Decl., ¶ 9.)

<u>July 25, 2019</u>. Counsel for TI Ted Feldman emailed Mr. Monde to advise him there was "some confusion" in responding and that "the entire July 12 production was produced inadvertently." Mr. Feldman requested that Defendants "destroy all such materials" as they did not relate to either of the studies identified in the subpoena. Defense counsel did not respond. (Schultz Decl., ¶ 10.)

<u>July/August, 2019</u>. Mr. Feldman followed up with emails to Mr. Monde on July 29 and August 2 without response from Defendants. Mr. Feldman again emailed Mr. Monde on August 6 asking that the materials be destroyed. Mr. Monde responded at 6:32 p.m. EDT, "we will reassess our position after the conclusion of Dr. Pearson's deposition tomorrow." Mr. Monde noted the data "is directly relevant to the claims at issue and we would have sought it specifically had Plaintiffs or Dr. Pearson had [sic] disclosed its existence." Given the insinuation that Plaintiffs or Dr. Pearson had somehow concealed information, Mr. Schultz replied to all: "To clarify, the parties had an agreement that the relevant materials for production would be limited to studies cited or 'reviewed and relied upon' in formulating opinions. The YA55 [inadvertently produced] data are neither, which is why we were under no obligation to 'disclose its existence' (and I personally had no idea it existed until it was produced in error), and which is why we objected to their use [at Dr. Pearson's deposition]. It is not responsive to the subpoena and we would have objected to a subpoena that sought such information both on legal grounds and on grounds that it would directly contravene the parties' agreement." (Schultz Decl., Ex. G & ¶ 11.)

Finally, Dr. Pearson's original deposition notice of July 8 requested that she produce: (1) everything referenced in her expert report; (2) everything "upon which you rely in formulating his [sic] opinions in this case;" and (3) a copy of her current CV. This was consistent with the Parties' agreement (although Plaintiffs had identified or produced all documents and data considered, not merely those relied upon). Defendants amended the notice twice and the second amended notice served shortly before Dr. Pearson's deposition included a fourth request seeking 11 categories of underlying documents and data (one of the categories included 8 subparts), not just for the studies Dr. Pearson cited or considered/relied upon, but for all studies she ever had been involved with (published or unpublished) relating to NAS regardless of whether they were considered or relied upon and regardless of whether they pertained to her opinions. Defendants even requested underlying data that she never analyzed. Mr. Schultz objected to the newly-added Category 4 of the second amended deposition notice as untimely, overbroad, and in violation of the Parties' agreement. Defendants did not bring that objection before the Court. Dr. Pearson was deposed August 6.

### III. ARGUMENT

#### A. Plaintiffs Have Standing to Quash the Subpoena and to Move for a Protective Order.

Plaintiffs have standing to quash the subpoena because it "infringes upon [their] legitimate interests." *S.E.C. v. Goldstone*, 301 F.R.D. 593, 646 (D.N.M. 2014) (quoting *Trujillo v. Bd. of Educ.*, No. CIV 03-1185 JB/LFG, 2007 WL 2296916 (D.N.M. June 26, 2007)). A party may move for a protective order in response to a subpoena to a non-party if even if the party lacks standing to quash a subpoena. *See Bounds v. Capital Area Family Violence Intervention Ctr.*, 314 F.R.D. 214, 218 (M.D. La. 2016); *G.K. Las Vegas Ltd. P'ship v. Simon Prop. Grp.*, No. 2:04-CV-01199-DAE,

2007 WL 119148 at *3 (D. Nev. Jan. 9, 2007). Plaintiffs have a legitimate interest in requiring Defendants' adherence to the Parties' agreement and in avoiding the further inevitable and substantial delay of this action by way of post-deadline collateral discovery of data Dr. Pearson did not consider in forming her opinions; all well after she has been deposed.

District courts have broad discretion over discovery. *Clower v. GEICO Ins.*, No. CIV 12-0472 JB/WDS, 2013 WL 1897832 at *6 (D.N.M. Apr. 16, 2013). Upon a showing of good cause, the Court may issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense. Fed. R. Civ. P. 26(c). Absent a protective order and/or an order quashing the subpoena, Plaintiffs will incur substantial undue expense connected with Defendants' inevitable request to re-depose Dr. Pearson and in connection with the unavoidable rescheduling of defense expert depositions. Agreements that determine the scope of relevancy increase judicial efficiency and reduce delay and that was Mr. Monde's express purpose in suggesting the Parties' agreement. It is in the interests of the Court and Plaintiffs to have the agreement enforced, as the Court has done in the past with agreements among Counsel. In any event, the orders sought by this motion are warranted regardless of the Parties' agreement.

### B. The Subpoena is Untimely and Overbroad and It Will Cause Further Undue Delay and Expense.

Plaintiffs did not object to the initial June subpoena although discovery had closed. (Doc. 242, 3/23/19 Order Extending Certain Deadlines) ("all other fact-discovery to be taken prior to a decision on class certification is closed" as of May 6). Plaintiffs' counsel believed it reasonable to cooperate in Defendants' efforts to obtain the underlying TI data for the two TI studies Dr. Pearson considered/relied upon in forming her opinions), and the subpoena adhered to the Parties' agreement.

Although Defendants were advised of the need for a subpoena in mid-May, the first subpoena did not issue until June 18 and Dr. Pearson's deposition was delayed beyond the existing deposition deadline to accommodate Defendants' needs. Defendants could have served the subpoena weeks earlier and they could have sought through their first subpoena everything they now seek. Plaintiffs would have objected to such an expansive subpoena, certainly, but the matter could have been resolved *before* Dr. Pearson's deposition. Now, more than a month after her deposition and four months after the close of discovery, Defendants still seek additional documents that undoubtedly will be followed by a request for another deposition.

Not only is the subpoena untimely, but it is overbroad. Under Rule 26, the parties must produce a written report containing (i) the expert's opinions and bases for the opinions; (ii) the facts or data considered by the witness in forming the opinions; (iii) any exhibits that will be used to summarize or support the opinions; (iv) the witness's qualifications; (v) a list of previous cases in which the expert has testified; and (vi) a statement of the compensation to be paid for the study and testimony in the case. Fed. R. Civ. P. 26(a)(2)(B)(i)-(vi).

Plaintiffs turned over all such data in Dr. Pearson's possession. Plaintiffs' counsel asked that she seek to obtain all such data not in her personal possession, which she did. Plaintiffs' counsel then cooperated with defense counsel to obtain all such data in the possession of TI (and Johns Hopkins) despite the discovery period having ended. The TI subpoena served as a proxy for Dr. Pearson's Rule 26 disclosure requirements, i.e., because she could not produce responsive data she no longer possessed, Defendants obtained it from TI under the same conditions and Rule 26 strictures that would apply had they obtained it directly from her.

The second subpoena exceeds what Rule 26 would allow. It is not limited to data Dr. Pearson considered or relied upon. Rather, it seeks *all data* in TI's possession relating in any way to NAS cigarettes so long as Dr. Pearson at any time had "access" to such data. The data sought could include, for example, a cohort study that TI has conducted for 10 years asking hundreds of demographic and tobacco use questions of participants annually. If just one of those questions pertained to NAS, and if Dr. Pearson had access to any of the study data at any time, if only for a moment, then regardless of whether she had access to the NAS-related question, regardless of whether she even knew she had access to the data, and regardless of whether it pertains in any way to her opinions, *all* data relating to the entire study would be swept up by Defendants' 4-page itemization of documents and data to produce. This is particularly concerning given that these are tobacco companies seeking highly confidential study data from a public interest group dedicated to studying and ending nicotine dependence, particularly among our youth. The second subpoena thus is virtually open-ended and will cause undue delay and expense for all involved.

### C. The Subpoena Violates the Parties' Agreement on the Scope of Expert Production.

Plaintiffs have honored and exceeded their obligations under the Parties' agreement only to be met with a subpoena seeking an end-run around it. The second subpoena will cause substantial delay, which is ironic given that avoiding delay was Mr. Monde's express reason for proposing the agreement. (See § I.B. *supra*) ("[L]et's agree now on the scope of what should be produced for experts so we don't have disagreements later, which could cause delay.")

The first delay already has occurred insofar as Defendants moved the starting gate for this entire issue by taking nearly a month to serve the first subpoena after

being notified of the need to do so. That delay was compounded by their choice to issue a second, more expansive subpoena in August after Dr. Pearson's deposition rather than doing so—and litigating their entitlement to the documents now sought—at their first opportunity.

The second delay will occur while awaiting production of additional TI data. TI took nearly a month to produce in response to the relatively limited requests in the first subpoena and TI was working on an expedited basis to accommodate the deposition deadline. Given that the second subpoena encompasses far more data than the first, there is little question that a delay of weeks if not months will ensue—all to obtain data that Dr. Pearson did not consider or rely upon and to do so well after her deposition has taken place.[3] Defendants will then need, and therefore will seek, additional time to review the TI production.[4]

The third delay will come with the inevitable request to re-depose Dr. Pearson. (*See* Ex. D., Pearson Dep. at 372:9-13) (where defense counsel purports to "keep the deposition open, given the document issues that we have"). Despite learning of this issue in July upon TI's inadvertent production, Defendants made a tactical choice

---

[3] Plaintiffs respectfully suggest that if the Court is inclined to allow Defendants access to this vast array of TI study data, it should do so only if and after the Court certifies one or more classes. The existing schedule contemplates re-opening merits discovery after certification.

[4] Based upon a 90-minute meet-and-confer held between counsel for Plaintiffs, Defendants, and TI on September 10, 2019, TI does not believe there are any additional NAS studies involving Dr. Pearson, but TI could not confirm that no data responsive to the broad subpoena exists. There also are remaining issues around whether TI owes additional documents pursuant to the first subpoena as outlined in the cover letter accompanying the second subpoena. Finally, although TI made clear that in response to the first subpoena it would produce only documents Dr. Pearson considered in her analyses for the two TI studies, Defendants now contend they misapprehended this agreed-upon condition. TI now is trying to determine whether there are materials of this nature that were not produced, which is another potential point of contention between Defendants and TI.

not to send a more expansive subpoena then. They chose to depose Dr. Pearson on the inadvertently disclosed matters rather than run the risk of having this Court tell them *before* the deposition that they were neither to question Dr. Pearson around the inadvertently-produced documents nor to obtain additional ones. Inexplicably, Defendants waited three weeks after Dr. Pearson's deposition to issue the second subpoena, further increasing the likelihood of undue delay.[5]

The fourth delay will occur because some or all defense expert depositions now scheduled to occur through September and October will have to be rescheduled. Plaintiffs cannot realistically take depositions of all defense experts—three of whom seek to rebut Dr. Pearson's opinions—when Dr. Pearson remains subject to re-deposition over documents Plaintiffs (and the defense experts) have never seen. Given that all depositions are set and travel plans have been made, this additional delay also will incur undue expense.

All of this could have been avoided had Defendants' first subpoena sought all that they now seek. If they are legally entitled to it now than they were legally entitled to it then and they should have sought it before Dr. Pearson was deposed. Defendants' tactical choice to avoid a potential adverse ruling before Dr. Pearson's deposition, just like their choice to wait more than three weeks to issue each of the

---

[5] During the September 10 meet-and-confer, defense counsel confirmed the possibility that Dr. Pearson may need to sit again for deposition, but the answer to that question depends upon what, if anything, TI may still possess that Defendants contend is responsive to the first subpoena, the second subpoena and/or the August 27 cover letter accompanying the second subpoena. Defense counsel committed in principle to potentially rescheduling depositions so as not to disrupt the current schedule; but it is not clear this is feasible, particularly if Defendants and TI come to loggerheads over what is owed, if TI produces a substantial amount of additional information, or if Defendants seek to re-depose Dr. Pearson. Plaintiffs' counsel reiterated at the meet-and-confer that it is implausible for Plaintiffs to depose experts rebutting Dr. Pearson without having all materials Defendants may use to impeach her and without her deposition having concluded.

subpoenas after learning of the need to do so, comes at a cost of hefty delay. That cost should not be externalized to the Court and the Plaintiffs.[6]

Although it does not pertain directly to Plaintiffs, Defendants conduct also has served as an annoyance and a harassment to TI not only by failing to respect TI's request to return or destroy sensitive research information produced inadvertently but by asking that TI produce even more. It is an oppressive and abusive tactic. The Court has broad discretion under Rule 26 to prevent this behavior and to ensure the case stays on track to class certification.

Notably, on September 10, 2019, outside counsel hired by TI served objections to the second subpoena including, among others, objections that the subpoena is overbroad and unduly burdensome and seeks unpublished proprietary and confidential research information. TI's objections also noted that the Defendants' business interests are adverse to TI's and has a chilling effect on their mission to educate the public about tobacco use.

**IV. Conclusion**

Plaintiffs come to the Court with clean hands. They did more than was required of them to ensure production of all available responsive materials pursuant to Rule 26 and the Parties' agreement. They should not be penalized for doing so.

Defendants will come to the Court with unclean hands. They proposed the agreement to avoid conflict and delay. It would have served that purpose but for

---

[6] Defense counsel suggested during the September 10 meet-and-confer that Plaintiffs' counsel should have sought a protective order to prevent Defendants from using the July 12 Production despite the fact that the information was not requested in the initial subpoena and TI had repeatedly put Defendants on notice that the data and documents were non-responsive and were produced in error. Plaintiffs contend Defendants had an obligation not to use the documents for any purpose without seeking Court guidance and it is not Plaintiffs' burden to prevent Defendants from exploiting an inadvertent production of documents they were not entitled to obtain.

Defendants' last-minute switch before Dr. Pearson's deposition when, for the first time, Defendants sought through the second amended deposition notice to obtain documents outside the Parties' agreement. They refused to acknowledge TI's notice of inadvertent production and its call to destroy all inadvertently produced material (and indeed have asked TI to produce more from the inadvertently produced batch of documents under the first subpoena). Defendants chose not to respond to TI until 6:32 p.m. the evening before Dr. Pearson's deposition, which would ensure they could question her with impunity on the materials. They now seek to greatly expand upon the initial production of documents and to do so well after Dr. Pearson has been deposed.

Even if no agreement existed this Court would be justified in quashing the subpoena and entering a protective order to forbid further discovery of TI given the subpoena's overbreadth, the lack of demonstrated correlation between what it encompasses and the opinions Dr. Pearson has rendered, and particularly the undue delay and expense this will cause the Parties and the Court.

WHEREFORE, Plaintiffs move this Court to enter an Order or Orders that:

(1) quash the subpoena served on Truth Initiative on August 27;

(2) forbid further discovery directed toward Truth Initiative, at least during the class certification phase of this action, including Defendants' attempt to obtain additional inadvertently produced documents by way of its August 27 letter to TI; and

(3) require all Parties to destroy all materials inadvertently produced by Truth Initiative and to certify doing so to the Court.

Date: September 10, 2019.                    Respectfully submitted,


                                          /s/ *Matthew D. Schultz*
MATTHEW D. SCHULTZ
Levin, Papantonio, Thomas,
Mitchell, Rafferty & Proctor, P.A.
316 S. Baylen St., Suite 600
Pensacola, FL 32502
Tel: 850-435-7140
Fax: 850-436-6140
mschultz@levinlaw.com

NANCY LONG
Long, Komer & Associates, P.A.
P.O. Box 5098
Santa Fe, NM 87502-5098
Tel: 505-982-8405
Fax: 505-982-8513
nancy@longpoundkomer.com

*On Behalf of the Plaintiffs' Lead Counsel and the Plaintiffs*

## CERTIFICATE OF CONFERENCE

Pursuant to D.N.M. LR-CIV. 7.1(a) and Fed. R. Civ. P. 26(c)(1), Plaintiffs requested the concurrence of Defendants to the relief sought by this Motion. Defendants oppose the relief requested in this Motion.

## CERTIFICATE OF SERVICE

I certify that a copy hereof was served via e-mail and U.S. mail on Lead Counsel for Defendants and Local Counsel for Defendants:

David M. Monde
Jones Day
1420 Peachtree St., Suite 800
Atlanta, GA 30309
dmmonde@jonesday.com

Peter J. Biersteker
Jones Day
51 Louisiana Ave, N.W.
Washington, DC 20001
pbiersteker@jonesday.com

Andrew Schultz
Rodey, Dickason, Sloan, Akin
& Robb, PA
201 Third St., N.W., Suite 2200
Albuquerque, NM 87102
aschultz@rodey.com

Date: September 10, 2019

s/ *Matthew D. Schultz*
MATTHEW D. SCHULTZ
Levin, Papantonio, et al.
316 S. Baylen St., Suite 600
Pensacola, FL 32502
Tel: 850-435-7140
Fax: 850-436-6140
mschultz@levinlaw.com
*On Behalf of the Plaintiffs*