Lead Case No. MD 16-2695 JB/LF

**PLAINTIFFS' MEMORANDUM MOTION TO
QUASH SUBPOENA AND FOR A PROTECTIVE ORDER**

# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

IN RE: SANTA FE NATURAL TOBACCO
COMPANY MARKETING & SALES
PRACTICES AND PRODUCTS LIABILITY
LITIGATION

Lead Case No. 1:16-md-02695-JB-LF

*This Document Relates To All Actions*

---

### SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS

TO:     Truth Initiative (Attn: Robert Falk)
        900 G Street, NW
        Fourth Floor
        Washington, DC 20001
        (202) 454-5555

**YOU ARE COMMANDED** to produce at the time, date, and place set forth below the
documents, electronically stored information, or objects, and to permit inspection, copying,
testing, or sampling of the materials identified in Exhibit A and attached to and made part of this
subpoena.

| Place:<br>JONES DAY (Attn: Debra Belott)<br>51 Louisiana Ave., N.W.<br>Washington, D.C. 20001 | Date and Time:<br>September 10, 2019<br>10:00 am |
| --- | --- |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the
place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena;
and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential
consequences of not doing so.

Dated: August 28, 2019

*/s/ David M. Monde*
David M. Monde
JONES DAY
1420 Peachtree Street, N.E.
Suite 800
Atlanta, GA 30309
(404) 521-3939
dmmonde@jonesday.com
*Counsel for Defendants*

AO 88  (Rev. 02/14)  Subpoena to Appear and Testify at a Hearing or Trial in a Civil Action (page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❏ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❏ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ ___0.00___ .

I declare under penalty of perjury that this information is true.

Date: _____                     _____
                                                         *Server's signature*

                                                       _____
                                                         *Printed name and title*

                                                       _____
                                                         *Server's address*

Additional information regarding attempted service, etc.:

AO 88  (Rev. 02/14) Subpoena to Appear and Testify at a Hearing or Trial in a Civil Action (page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*
  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

---

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## EXHIBIT A

### INSTRUCTIONS

1.       All documents or data produced in response to this subpoena shall be produced in the manner that they are kept in the usual course of business.  All documents or data that exist in electronic format are whenever possible to be produced in electronic form and in their native form.

2.       Pursuant to the Agreed Protective Order (ECF No. 56) in this action, you may designate as "Confidential" or "Highly Confidential" any information, document, or material that you reasonably and in good faith believe constitutes Confidential or Highly Confidential Information.  The designation "Confidential" or "Highly Confidential" shall be made by affixing on the document or material containing such information and upon each page so designated if practicable, a legend that in substance states:  **"[DESIGNATING PARTY] – CONFIDENTIAL [or HIGHLY CONFIDENTIAL] – SUBJECT TO PROTECTIVE ORDER."**  A copy of the Agreed Protective Order is attached to this subpoena.

### REQUESTS FOR PRODUCTION

1. The following documents and data for any study for which Jennifer Pearson was an investigator, collaborator, consultant, participant or recipient of data or analyses, or to which she had/has access relating to Natural American Spirit cigarettes, the descriptors (including but not limited to: natural, organic and additive-free) or images that appear on Natural American Spirit cigarette packages or advertisements, and perceptions of health or addictiveness of Natural American Spirit cigarettes, regardless of whether the study or its results were published or otherwise publicly disseminated:

   a. All underlying survey instruments and documentation;

b. Documents sufficient to show:

   i. the target population and its geographic location;

   ii. the requirements for participant eligibility and the procedures employed to screen and recruit research participants;

   iii. recruitment procedures, including records of any statements made to participants regarding the purpose of the interviews, procedures and criteria for participant selection method(s) of contacting participants;

   iv. dates of data collection;

   v. the exact wording and presentation of questions and response options, including any randomization procedure used to assign respondents into study conditions, preceding respondent instructions and any preceding questions that might reasonably be expected to influence responses (e.g., programming instructions indicating that the questions and/or response options were rotated);

   vi. the sample design (e.g., the method by which the respondents were selected, recruited, intercepted or otherwise contacted or encountered, along with any eligibility requirements and/or oversampling) and, if quotas were used, the variables defining the quotas;

   vii. the relevant stimuli, such as visual or sensory exhibits or images that were shown to respondents; and

   viii. the method(s) of coder training, supervision, and monitoring, if coders were used;

c.  All raw source data in native format (e.g., unedited, original Excel or CSV files downloaded from sources including but not limited to MTurk, via survey platforms such as Qualtrics or third-party data collection vendors), whether or not such data were analyzed or reported on, including codebooks or legends of variable names and value labels in the respective data files as they correspond to items on the survey instrument;

d.  All summaries (or tabulations, evaluations or assessment) of the disposition of study-specific sample records;

e.  All procedures undertaken to ensure data quality, including re-contacts to confirm that the interview occurred and/or to verify the respondent's identity, measures taken to prevent respondents from completing the same survey more than once, and any other quality control procedures including any additional syntax (e.g., Stata code) generated in the course of the study (e.g., data cleaning, other analyses not reported on);

f.  All procedures for testing data collection instrument programming, e.g.: analyses of the impact of data instrument programming errors – including the impact of missing data on the final survey results;

g.  To the extent that only some of the raw source data were used in the analysis data set, the criteria and computer codes that were used to censor, select, analyze or combine raw data for analysis, including codebooks or legends of variable names and value labels in the respective data files as they correspond to created variables and items on the survey instrument;

h.  All analytical data in native format, including results, output and any empirical or statistical analyses of the raw data, whether or not such output, results, or analyses were reported on, and the computer codes and data utilized to perform such analyses;

i.  All draft and final submissions/proposals to Office for Human Research Protections (OHRP), Institutional Review Board (IRB) (or equivalent) and any final determinations by those entities;

j.  Documents sufficient to identity all third-party vendors who performed any work related to the study and for each the scope of work performed; and

k.  To the extent not covered by the above requests, any information necessary to replicate results or statistical modeling, such as raw (unweighted) data, identification of software program(s) and version(s) used (such as R, SPSS, Stata or SAS), software syntax or code, results and output.

Lead Case No. MD 16-2695 JB/LF

**PLAINTIFFS' MEMORANDUM MOTION TO
QUASH SUBPOENA AND FOR A PROTECTIVE ORDER**

# EXHIBIT B

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

IN RE: SANTA FE NATURAL TOBACCO
COMPANY MARKETING & SALES
PRACTICES AND PRODUCTS LIABILITY
LITIGATION

Lead Case No. 1:16-md-02695-JB-LF

*This Document Relates To All Actions*

### SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS

TO:   Truth Initiative (Attn:  Robert Falk)
      900 G Street, NW
      Fourth Floor
      Washington, DC 20001
      (202) 454-5555

**YOU ARE COMMANDED** to produce at the time, date, and place set forth below the
documents, electronically stored information, or objects, and to permit inspection, copying,
testing, or sampling of the materials identified in Exhibit A and attached to and made part of this
subpoena.

| Place:<br>JONES DAY (Attn:  Debra Belott)<br>51 Louisiana Ave., N.W.<br>Washington, D.C.  20001 | Date and Time:<br>June 28, 2019<br>10:00 am |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the
place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena;
and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential
consequences of not doing so.

Dated:  June 18, 2019

*/s/ David M. Monde*
David M. Monde
JONES DAY
1420 Peachtree Street, N.E.
Suite 800
Atlanta, GA 30309
(404) 521-3939
dmmonde@jonesday.com
*Counsel for Defendants*

AO 88  (Rev. 02/14)  Subpoena to Appear and Testify at a Hearing or Trial in a Civil Action  (page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $     0.00     .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88  (Rev. 02/14)  Subpoena to Appear and Testify at a Hearing or Trial in a Civil Action (page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*
  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

---

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## EXHIBIT A

## INSTRUCTIONS

1.     All documents or data produced in response to this subpoena shall be produced in the manner that they are kept in the usual course of business.  All documents or data that exist in electronic format are whenever possible to be produced in electronic form and in their native form.

2.     Pursuant to the Agreed Protective Order (ECF No. 56) in this action, you may designate as "Confidential" or "Highly Confidential" any information, document, or material that you reasonably and in good faith believe constitutes Confidential or Highly Confidential Information.  The designation "Confidential" or "Highly Confidential" shall be made by affixing on the document or material containing such information and upon each page so designated if practicable, a legend that in substance states:  **"[DESIGNATING PARTY] – CONFIDENTIAL [or HIGHLY CONFIDENTIAL] – SUBJECT TO PROTECTIVE ORDER."**  A copy of the Agreed Protective Order is attached to this subpoena.

### REQUESTS FOR PRODUCTION

1.  The following documents and data relating to the study Pearson JL, Richardson A, Feirman SP, et al., American Spirit pack descriptors and perceptions of harm: a crowdsourced comparison of modified packs. *Nicotine Tob Res*. 2016;18(8):1749-1756:

    a.  All underlying survey instruments and documentation;

    b.  Documents sufficient to show:

        i.   the target population and its geographic location;

        ii.  the requirements for participant eligibility and the procedures employed to screen and recruit research participants;

      iii.  recruitment procedures, including records of any statements made to participants regarding the purpose of the interviews, procedures and criteria for participant selection method(s) of contacting participants;

      iv.  dates of data collection;

      v.  the exact wording and presentation of questions and response options, including preceding respondent instructions and any preceding questions that might reasonably be expected to influence responses;

      vi.  the sample design (e.g., the method by which the respondents were selected, recruited, intercepted or otherwise contacted or encountered, along with any eligibility requirements and/or oversampling) and, if quotas were used, the variables defining the quotas;

      vii.  the relevant stimuli, such as visual or sensory exhibits or images that were shown to respondents; and

      viii.  the method(s) of coder training, supervision, and monitoring, if coders were used;

c.  All raw source data, whether or not such data were analyzed or reported on;

d.  All summaries (or tabulations, evaluations or assessment) of the disposition of study-specific sample records;

e.  All procedures undertaken to ensure data quality, including re-contacts to confirm that the interview occurred and/or to verify the respondent's identity, measures taken to prevent respondents from completing the same survey more than once, and any other quality control procedures;

f.  All procedures for testing data collection instrument programming, e.g.: analyses of the impact of data instrument programming errors – including the impact of missing data on the final survey results;

g.  To the extent that only some of the raw source data were used in the analysis data set, the criteria and computer codes that were used to censor, select, analyze or combine raw data for analysis;

h.  Any empirical or statistical analyses of the raw data, whether or not such analyses were reported on, and the computer codes and data utilized to perform such analyses;

i.  All draft and final submissions/proposals to Office for Human Research Protections (OHRP), Institutional Review Board (IRB) (or equivalent) and any final determinations by those entities;

j.  Documents sufficient to identity all third party vendors who performed any work related to the study and for each the scope of work performed; and

k.  To the extent not covered by the above requests, any information necessary to replicate results or statistical modeling, such as raw (unweighted) data, identification of software program(s) used (such as R, SPSS, Stata or SAS), software syntax or code, results and output.

2.  The following documents and data relating to the experimental study by JL Pearson et al. of 2,560 US adults (manuscript in preparation):

a.  All underlying survey instruments and documentation;

b.  Documents sufficient to show:

    i.  the target population and its geographic location;

- 3 -

    ii.   the requirements for participant eligibility and the procedures employed to screen and recruit research participants;

    iii.   recruitment procedures, including records of any statements made to participants regarding the purpose of the interviews, procedures and criteria for participant selection method(s) of contacting participants;

    iv.   dates of data collection;

    v.   the exact wording and presentation of questions and response options, including preceding respondent instructions and any preceding questions that might reasonably be expected to influence responses;

    vi.   the sample design (e.g., the method by which the respondents were selected, recruited, intercepted or otherwise contacted or encountered, along with any eligibility requirements and/or oversampling) and, if quotas were used, the variables defining the quotas;

    vii.   the relevant stimuli, such as visual or sensory exhibits or images that were shown to respondents; and

    viii.   the method(s) of coder training, supervision, and monitoring, if coders were used;

c.   All raw source data, whether or not such data were analyzed or reported on;

d.   All summaries (or tabulations, evaluations or assessment) of the disposition of study-specific sample records;

e.   All procedures undertaken to ensure data quality, including re-contacts to confirm that the interview occurred and/or to verify the respondent's identity, measures

taken to prevent respondents from completing the same survey more than once, and any other quality control procedures;

f.  All procedures for testing data collection instrument programming, e.g.: analyses of the impact of data instrument programming errors – including the impact of missing data on the final survey results;

g.  To the extent that only some of the raw source data were used in the analysis data set, the criteria and computer codes that were used to censor, select, analyze or combine raw data for analysis;

h.  Any empirical or statistical analyses of the raw data, whether or not such analyses were reported on, and the computer codes and data utilized to perform such analyses;

i.  All draft and final submissions/proposals to Office for Human Research Protections (OHRP), Institutional Review Board (IRB) (or equivalent) and any final determinations by those entities;

j.  Documents sufficient to identity all third party vendors who performed any work related to the study and for each the scope of work performed; and

k.  To the extent not covered by the above requests, any information necessary to replicate results or statistical modeling, such as raw (unweighted) data, identification of software program(s) used (such as R, SPSS, Stata or SAS), software syntax or code, results and output.

Lead Case No. MD 16-2695 JB/LF

**PLAINTIFFS' MEMORANDUM MOTION TO
QUASH SUBPOENA AND FOR A PROTECTIVE ORDER**

# EXHIBIT C

# JONES DAY

1420 PEACHTREE STREET, N.E. • SUITE 800 • ATLANTA, GEORGIA 30309.3053

TELEPHONE: +1.404.521.3939 • FACSIMILE: +1.404.581.8330

DIRECT NUMBER:  (404) 581-8206
DMMONDE@JONESDAY.COM

JP461562                              August 27, 2019

BY HAND DELIVERY

Robert Falk, Esq.
Truth Initiative
900 G Street NW, Fourth Floor
Washington, DC 20001

Re:   *In re Santa Fe Natural Tobacco Company Marketing & Sales Practices and Products
      Liability Litigation*, United States District Court for the District of New Mexico, Lead
      Case No.: 1:16-md-02695-JB-LF

Dear Rob:

Thank you for Truth Initiative's ("TI") July 12, July 19 and August 2, 2019 productions in response to Santa Fe Natural Tobacco Company's ("Santa Fe") June 18, 2019 document subpoena. Based on our review, various responsive information and data appear to be missing, which we describe below. Moreover, you have stated that in TI's view, some the data TI produced is not responsive to the June 18, 2019 subpoena. We disagree and believe that all of the data TI produced is highly relevant. But to allay your concerns, we are simultaneously serving Truth Initiative with a second subpoena (attached).

Please provide the specific information noted below as well as any other responsive information (to either subpoena), as soon as possible.

## 1.  **Truth Initiative Production on 7/12/19:**

Truth_Initiative_104 contains data for certain demographic variables (age, gender, race, education and income) and for the following questions from Truth_Initiative_101 (the survey questionnaire): Q60, Q747, Q748, Q749, Q750, Q752, Q753, AE1C, and DOV_NAS. It appears that various data collected for this study were removed from the materials we received.

There are a number of other questions on the questionnaire that pertain to issues relevant to the opinions that Dr. Pearson provides in the subject litigation that were not included in the data production. Specifically, data is missing for the following questions: Q200. [SP], Q39. [SP], Q40. [SP], Q214. [SP], Q744 [Grid, SP], Q751a-Q751q. **Please produce this data.**

AMSTERDAM • ATLANTA • BEIJING • BOSTON • BRISBANE • BRUSSELS • CHICAGO • CLEVELAND • COLUMBUS • DALLAS • DETROIT
DUBAI • DÜSSELDORF • FRANKFURT • HONG KONG • HOUSTON • IRVINE • LONDON • LOS ANGELES • MADRID • MELBOURNE
MEXICO CITY • MIAMI • MILAN • MINNEAPOLIS • MOSCOW • MUNICH • NEW YORK • PARIS • PERTH • PITTSBURGH • SAN DIEGO
SAN FRANCISCO • SÃO PAULO • SAUDI ARABIA • SHANGHAI • SILICON VALLEY • SINGAPORE • SYDNEY • TAIPEI • TOKYO • WASHINGTON

JONES DAY

Page 2

### 2. <u>Truth Initiative Production on 7/19/19:</u>

The raw data files we received are incomplete. Some types of information are present in some of the raw data files, but not others. For example, Truth_Initiative_208 and Truth_Initiative_210 contain the fields "Survey.started_at" and "Survey.completed_at" in columns I and J, respectively. However, these fields are missing from Truth_Initiative_209. In addition, "Survey.started_at" is missing in Truth_Initiative_211, Truth_Initiative_212, Truth_Initiative_213, and Truth_Initiative_214 (Only "Survey.completed_at" is present in those files). Typically, this information is automatically collected by the survey programming. **Please provide this missing data.**.

### 3. <u>Truth Initiative Production on 8/2/19:</u>

**a.  – TI_300 – "Final NAS Survey" (questionnaire)**
TI 300 includes some survey programming (e.g., skip patterns) but does not include programming indicating the randomization protocol for the conditions (e.g., whether respondents were randomly assigned using least fill, a random number generating algorithm, or some other mechanism), nor does it indicate whether the questions and/or response options were rotated, the. **Please provide this information.**

**b.  TI_301 – "CONSORT 6.2.2027 MASTER (diagram)**
TI 110 notes respondents as "Eligible but not randomized (n=110)" but provides no further explanation regarding why these respondents were not included in the study. **Please provide any information regarding these respondents and why these respondents were excluded from the study.**

**c.  TI_303 - "Final NAS Data"**
TI 303 contains some variable labels, but not value labels. **Please provide this information or verify that the values in the data correspond to the item numbers in TI_300.**

**d.  TI_304 – Final data legacy format"**
This appears to be the raw data from MTurk/Qualtrics. The question numbering starts at 43, proceeds from 43-47, and then jumps to 85. **Please provide the data for questions numbered 85-123.**

Also, this file does not contain any variable or value labels. **Can you confirm that the variables and values in the data correspond to the item numbers in TI_300?**

**e.  TI_305 – "Heatmap regions"**

JONES DAY

Page 3

TI 305 provides labels for defined regions for questions asking respondents to click on up to 3 parts of the image that grasp their attention, but there is no corresponding diagram which identifies the portions of the label covered or the size/shape/location of the field encompassing each of the defined regions. **Please produce the respective stimuli depicting the portions of the label covered or the size/shape/location of the field encompassing each of the defined regions.**

**f. TI_306 – "final merged"**
This appears to be the data used for the analysis, as it is referenced in TI_308 (R code). This file does not contain any variable or value labels. **Please provide the variable or value labels or confirm that the variables and values in the data correspond to the item numbers in TI_300.**

**g. TI_307 – "Codebook"**
This file is missing variable names or value labels for items in the raw data. The produced file contains only data labels for variables that were transformations of questions from the raw data. **Please produce the variable names or value labels for the raw data.**

In addition, it refers to files that were not produced, including by way of example, "PPT with conditions" referenced in the image below. **Please produce the missing files.**



| Variable name | Value Label | Description of variable |
|---|---|---|
| condition_r | 1= 1A<br>2= 1B<br>3= 2A<br>4=2B<br>5= 3A<br>6= 3B<br>7= 4A<br>8= 4B<br>9= 5A<br>10= 5B<br>11= 6A<br>12= 6B<br>13= 7A<br>14=7B | Conditions detailed here:<br>a\..\Survey\Images for Qualtrics\PPT with conditions.pptx |
| condition_r2 | 1= 1 (1A & 1B)<br>2= 2<br>3= 3<br>4=4<br>5= 5<br>6= 6<br>7= 7 | Conditions detailed here:<br>a\..\Survey\Images for Qualtrics\PPT with conditions.pptx<br><br>Those with same pack modifications but different warning labels were collapsed into one group. |

**Please confirm that the stimuli correspond to the values identified in the tables below or please produce information corresponding the same.**

JONES DAY

Page 4

| TI_303 condition | TI_300 Item | Stimulus |
|---|---|---|
| 1A | Q45 | Unmodified - Normal Disclaimer |
| 1B | Q86 | Unmodified - Modified Disclaimer |
| 2A | Q89 | Natural Removed - Normal Disclaimer |
| 2B | Q92 | Natural Removed - Modified Disclaimer |
| 3A | Q95 | Additive-Free Removed - Normal Disclaimer |
| 3B | Q98 | Additive-Free Removed - Modified Disclaimer |
| 4A | Q101 | Organic Removed - Normal Disclaimer |
| 4B | Q104 | Organic Removed - Modified Disclaimer |
| 5A | Q107 | US Grown Removed - Normal Disclaimer |
| 5B | Q110 | US Grown Removed - Modified Disclaimer |
| 6A | Q113 | Imagery Removed - Normal Disclaimer |
| 6B | Q116 | Imagery Removed - Modified Disclaimer |
| 7A | Q119 | Respect for the Earth Removed - Normal Disclaimer |
| 7B | Q122 | Respect for the Earth Removed - Modified Disclaimer |

| TI_306 condition_r | TI_300 Item | Stimulus |
|---|---|---|
| 1 | Q45 | Unmodified - Normal Disclaimer |
| 2 | Q86 | Unmodified - Modified Disclaimer |
| 3 | Q89 | Natural Removed - Normal Disclaimer |
| 4 | Q92 | Natural Removed - Modified Disclaimer |
| 5 | Q95 | Additive-Free Removed - Normal Disclaimer |
| 6 | Q98 | Additive-Free Removed - Modified Disclaimer |
| 7 | Q101 | Organic Removed - Normal Disclaimer |
| 8 | Q104 | Organic Removed - Modified Disclaimer |
| 9 | Q107 | US Grown Removed - Normal Disclaimer |
| 10 | Q110 | US Grown Removed - Modified Disclaimer |
| 11 | Q113 | Imagery Removed - Normal Disclaimer |
| 12 | Q116 | Imagery Removed - Modified Disclaimer |
| 13 | Q119 | Respect for the Earth Removed - Normal Disclaimer |
| 14 | Q122 | Respect for the Earth Removed - Modified Disclaimer |

JONES DAY

Page 5

| TI_306 condition_r2 | TI_300 Items | Stimuli |
|---|---|---|
| 1 | Q45 & Q86 | Unmodified - Normal & Modified Disclaimer |
| 2 | Q89 & Q92 | Natural Removed - Normal & Modified Disclaimer |
| 3 | Q95 & Q98 | Additive-Free Removed - Normal & Modified Disclaimer |
| 4 | Q101 & Q104 | Organic Removed - Normal & Modified Disclaimer |
| 5 | Q107 & Q110 | US Grown Removed - Normal & Modified Disclaimer |
| 6 | Q113 & Q116 | Imagery Removed - Normal & Modified Disclaimer |
| 7 | Q119 & Q122 | Respect for the Earth Removed - Normal & Modified Disclaimer |

**h.   TI_308 – R Code**
**Which version of the "sjPlot" is being used?** Is this an old version of an R package (e.g., the latest version does not have the "sjp.glmm" command that appears in the code).

**i.   TI_309 – Cohn Protocol Exempt Determination Notice**
This file contained only a single page final determination from the IRB.  No drafts or final submissions/proposals are included.  **Please provide additional materials responsive to 2(i)?**

We have asked for production of the requested material by September 10, 2019, two weeks from now.  However, we are committed to providing TI a reasonable time to comply and are open to discussing a modified production date, if necessary.  We also stand ready to answer any questions you may have regarding the specific requests in our subpoena.

We have again enclosed a copy of the protective order in our case and will cooperate with you in carrying out the terms of that protective order, or if necessary, modifying the order to meet the reasonable needs of Truth Initiative. And, as we have assured you previously, we are complying with the Protective Order with respect to materials identified as Highly Confidential under its terms.

Our subpoena calls for production of the requested material in our Washington, DC office.  However, given the nature of the data, as with previous responses, please produce the material by electronic means, whether by a tangible medium or via FTP. Please advise so we may reach mutually agreeable terms for accomplishing that.

We appreciate your attention to and cooperation in these matters.

JONES DAY

Page 6

Very truly yours,

David M. Monde / ALM

David M. Monde

Enclosures

cc: Matthew Schultz, Esq.

Lead Case No. MD 16-2695 JB/LF

**PLAINTIFFS' MEMORANDUM MOTION TO
QUASH SUBPOENA AND FOR A PROTECTIVE ORDER**

# EXHIBIT D

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF NEW MEXICO

3

4      IN RE:   SANTA FE NATURAL

       TOBACCO COMPANY MARKETING &

5      SALES PRACTICES AND PRODUCTS

       LIABILITY LITIGATION

6                                   No. 1:16-MD-02695-JB-LF

       _____/

7

8

9

10                 VIDEO-RECORDED DEPOSITION OF

11                 JENNIFER PEARSON, MPH, PH.D.

12                  San Francisco, California

13                  Tuesday, August 6, 2019

14

15

16

17

18

19

20

21

22

23     REPORTED BY:

24     LESLIE ROCKWOOD ROSAS, RPR, CSR 3462

25

Page 38

1    A. I think that's reasonable.
2    Q. And what'd they find?
3    A. Okay. Let's see if I remember this. So
4  positing that my memory of this is not perfect because
5  it's been a while since I looked at it. I remember first
6  we saw a lot of people whose memorable aspects of the ad
7  were that the brand was less harmful or safer, et cetera.
8       A lot of people also remembered the descriptors,
9  and then if I remember correctly -- I don't remember. I
10  think there was a -- a relationship between looking at
11  the eco-friendly aspects of the pack and remembering the
12  eco-friendly aspects, like recalling them.
13    Q. And what secondary analysis did you do on it?
14    A. So Liz did it. Liz Klein did it.
15    Q. For you?
16    A. Well, with my input. This was -- it wasn't,
17  like, for me. She wasn't working for me. It was a
18  collaboration, so what she did -- and again, my memory of
19  this is not perfect, but if I remember correctly, she
20  used eye tracking software -- this was my first time
21  using eye tracking software, so I was interested in -- in
22  getting some experience in it. The main reason I did
23  this.
24       And so what the eye tracking software does is --
25    Q. And, actually, I don't -- I don't really want to

Page 39

1  hear about an explanation -- and I don't mean to be rude.
2  I don't want to hear about an explanation of the eye
3  tracking.
4    A. Sure.
5    Q. I just want to know what you -- what was your
6  analysis of it? What was your takeaway from the eye
7  tracking?
8    A. Ah, just that if people looked -- spent time
9  looking at the -- the eco-friendly claims, that they were
10  more likely to volunteer that in the open-ended
11  responses.
12    Q. When was this study done?
13    A. I don't remember when the data was collected.
14    Q. The past year, two, five years?
15    A. Let's say within five years.
16    Q. Anything published on this?
17    A. I think there was. Not on this specifically,
18  but on the parent data, I would say yes.
19    Q. So when you say "parent data"?
20    A. The -- the larger study. The larger study that
21  didn't have anything to do with American Spirit. They
22  just used American Spirit as a control condition, is my
23  understanding.
24    Q. And that's something that you looked at; is that
25  correct?

Page 40

1    A. Correct.
2    Q. And you did a secondary analysis of American
3  Spirit -- perceptions of American Spirit cigarettes based
4  on that analysis; is that correct?
5    A. No, that's not correct. They weren't
6  perceptions. They were what people remembered about the
7  ad.
8    Q. Okay. So you did a secondary analysis of
9  people's takeaways from the NAS ads; is that correct?
10    A. Yeah, but they were open-ended, so they were
11  kind of like their -- it wasn't particularly -- how do I
12  say this -- systematically elicited.
13    Q. Understood.
14       So you -- you did a secondary analysis of
15  open-ended questions with respect to what people's
16  takeaway was from the NAS ads; is that correct?
17    A. That's correct.
18    Q. Okay. Anything else that you haven't produced
19  in terms of analysis that you've done on American
20  Spirits?
21    A. No.
22    Q. As part of the packet of material I gave you
23  there is another stapled set of materials, the top of
24  which says, "Plaintiffs' Expert Pearson Subpoena
25  Productions TI 7/12/2019 Production."

Page 41

1       Do you see that?
2    A. I do.
3    Q. Let's mark that as Exhibit 3C.
4       (Exhibit 3C, Plaintiffs' Expert Pearson Subpoena
5       Productions TI 7.12.2019 Production (Highly
6       Confidential), marked for identification.)
7    Q. BY MS. REISMAN: And is this is a --
8  it's actually a three-page document --
9    A. Uh-huh.
10    Q. -- that represents three different productions
11  that were produced by Truth Initiative in response to
12  subpoenas that were served on them.
13       If you look at Exhibit 3C, does this look to you
14  like the set of materials that TA -- Truth Initiative
15  produced in response to those subpoenas?
16    MR. SCHULTZ: Form, foundation.
17    THE WITNESS: Yes.
18    Q. BY MS. REISMAN: And if you look at the first
19  set of materials, on page 1 of Exhibit 3C, it begins with
20  a point-by-point response and starts with Truth
21  Initiative 100 and goes through Truth Initiative 114.
22       Do you see that?
23    A. I do.
24    Q. Do you recognize those files?
25    A. Not particularly.

11 (Pages 38 - 41)

Page 42

1    Q. Do you -- did you ever do a -- did you -- did
2 you look at these files?
3    A. I did -- I glanced at them, yes.
4    Q. Okay. And what were they?
5    A. They were -- there was, like, the young adult
6 cohort survey, I believe. Some background information on
7 the survey. There were some tables. Some output.
8    Q. And was this a study that you were involved in
9 and collaborated on?
10    MR. SCHULTZ: Let me -- before you answer,
11 Dr. Pearson, just so the record's clear, we talked about
12 it off the record -- interpose an objection, because
13 Truth Initiative has taken the position that this was
14 produced in error, and Jones Day has yet to respond to
15 that contention, but that is their position.
16    Because we're under a protective order, I'm not
17 going to argue that you shouldn't ask questions, but I
18 object to any -- any questions on the substance of this,
19 because she didn't consider it for her report, didn't
20 rely on it in any way, and it's been produced in error
21 according to the producing party.
22    Q. BY MS. REISMAN: And was this a study that you
23 were -- let me start that again.
24    Exhibit 3C is a list of files that have been
25 produced by Truth Initiative. The files are labeled

Page 43

1 Truth Initiative 100 through Truth Initiative 114.
2    Is this a study that you were involved with,
3 collaborated on?
4    A. Yes, before I left Truth Initiative.
5    Q. And tell me about the study.
6    A. So I inserted some items into the young adult
7 cohort, which is a longitudinal cohort of young adults,
8 hence the name, that Truth Initiative had been running
9 for quite some time, and so I spoke with the principal
10 investigator, Andrea Villanti, and gave her some ideas
11 about maybe we could do some of the work that I had done
12 on Amazon Turk, but in the young adult cohort, and she
13 said, "Cool. It sounds like a good idea," and we
14 inserted the items.
15    Q. Okay. So this was a study for which you -- you
16 actually inserted specific questions that you wanted
17 answers to; is that correct, Dr. Pearson?
18    A. That's correct.
19    Q. And those specific questions had to do with
20 American Spirits; is that correct?
21    A. That's correct.
22    Q. And this was back in 2016 and -- no, 2017; is
23 that correct?
24    A. I think we inserted the items in 2016. I'm not
25 positive about that.

Page 44

1    Q. And did you ever see any of the preliminary
2 results from that research?
3    A. I think we started before I left Truth
4 Initiative.
5    Q. So that is, you started looking at some of the
6 analyses before you left?
7    A. Yeah, I have a vague memory of that.
8    Q. And you haven't locked at it since you left; is
9 that correct?
10    A. Not until I saw these produced documents, and
11 I'm, like, oh, I guess we did start that.
12    Q. And were there other projects that you started
13 at Truth Initiative before you left that you continue to
14 analyze data for after you left?
15    A. No.
16    Q. The Pearson In Prep article, was that started
17 before you left Truth Initiative?
18    A. Oh, yes. You're right. That -- so that was --
19 you're correct. So I had that ongoing, and I focused on
20 that, trying to get that out. As you can see, it's a
21 slow process.
22    Q. Okay. So I just want to make sure I understand
23 where we are.
24    A. Yeah.
25    Q. You started Pearson In Prep, what is the draft

Page 45

1 manuscript that we'll review later today --
2    A. Right.
3    Q. You started that Pearson In Prep Manuscript work
4 while you were at Truth Initiative; is that correct?
5    A. Correct, yes.
6    Q. And you continued that work once you left Truth
7 Initiative; is that correct?
8    A. So I worked on the manuscript, but I wasn't able
9 to get access to the data, so that slowed things down
10 significantly, so I had to work with the analyst at Truth
11 Initiative whenever she had time.
12    Q. And you were able to do that; is that correct?
13    A. Slowly.
14    Q. And you got your manuscript drafted; is that
15 correct?
16    A. Yes.
17    Q. Okay. And so the data that we are looking at on
18 Exhibit 3C at Truth Initiative that's reflected in
19 exhibits -- Truth Initiative files 100 through 114,
20 that's a project that started when you were at Truth
21 Initiative; is that correct?
22    A. That's correct.
23    Q. And, in fact, it was started with some questions
24 that you specifically answered into an ongoing survey to
25 ask questions specifically directed to American Spirits

12 (Pages 42 - 45)

1 that you wanted the answers to; is that correct?

2    A. Correct.

3    Q. But you chose not to continue to look at those

4 analyses after you left Truth Initiative; is that

5 correct?

6       MR. SCHULTZ: Object to the form.

7       THE WITNESS: So there are several reasons why I

8 haven't continued.

9    Q. BY MS. REISMAN: I'm -- you can give me the

10 reasons. I'm just asking whether I'm correct. You chose

11 not to continue to look at the analyses of the files that

12 are listed here as Truth Initiative 100 through 114 after

13 you left TI; is that correct?

14    A. I --

15       MR. SCHULTZ: Object to the form.

16       And you can give whatever answer you believe is

17 appropriate and provide context.

18       THE WITNESS: So I did not continue. I would

19 say it is not appropriate to say I did not choose to

20 continue. If I had access to the data and was able to

21 analyze the data since 2017, I would do that, but I was

22 in a situation where, first of all, it was kind of touchy

23 after I left exactly who had access to data. There were

24 a lot of people leaving Truth Initiative at the same

25 time. They were restructuring the research department.

1 People were shifting around. They were very, very busy,

2 and I felt honestly bad that I was asking Yitong, who was

3 the analyst, to do all this work on top of work that she

4 was actually getting paid for, right, so --

5    Q. BY MS. REISMAN: You did continue, though, with

6 the Pearson In Prep manuscript and that data analysis; is

7 that correct?

8    A. Very slowly, I did, but incredibly slowly.

9    Q. And you could have proceeded with this data

10 analysis slowly and -- very slowing and incredibly slowly

11 as well.

12    A. I had to make a judgment call as to which one I

13 was going to focus on, so I decided to focus on the

14 disclaimer one, because that was more connected to

15 tobacco regulatory science --

16    Q. So --

17    A. -- in my opinion, and had more, kind of, unique

18 contributions to science than the data that was in the

19 young adult cohort.

20    Q. Okay. So going back to my question, you could

21 have continued with this analysis after you left Truth

22 Initiative, albeit very slowly; is that correct?

23       MR. SCHULTZ: Form, asked and answered.

24       THE WITNESS: It -- like I said before, it's

25 possible, but it would have been -- I had to make a

1 choice. I had to say which one am I going to focus on,

2 and given the time restraints, the restraints on the

3 data, the personal and personnel situation at Truth

4 Initiative, I decided to focus on one manuscript rather

5 than inching even slower with two manuscripts.

6    Q. BY MS. REISMAN: Did you ever try to continue

7 the analysis of the data reflected here in Exhibit 3C,

8 Truth Initiative 100 through 114?

9       MR. SCHULTZ: Form, asked and answered.

10       THE WITNESS: So as I said earlier, I did not

11 have access to the data myself, and I felt that it was a

12 better use of everyone's time to focus on the product

13 that was directly applicable to the tobacco regulatory

14 science.

15    Q. BY MS. REISMAN: Did you ever try to get access

16 to the files here, Truth Initiative 100 through 114?

17    A. I did. I did.

18    Q. And when was that?

19    A. Oh, gosh. Right after I moved, 2017, and there

20 was -- they were not willing to share that with me.

21    Q. So if we -- if we talk to people at Truth

22 Initiative, they said they refused to allow you access to

23 this data?

24    A. Yes.

25       MR. SCHULTZ: Object to the form, calls for

1 speculation.

2    Q. BY MS. REISMAN: And who -- who was it that told

3 you that you could not access this data?

4    A. Beth Hair.

5    Q. Who is it?

6    A. Beth Hair.

7    Q. How do you spell the last name?

8    A. Like hair, H-A-I-R.

9    Q. And what did she tell you?

10    A. She -- they -- they were not willing to share

11 young adult cohort data outside of Truth Initiative.

12    Q. But they were willing to share your Pearson In

13 Prep Manuscript data outside Truth Initiative?

14    A. They didn't share that data. The data was

15 analyzed at Truth Initiative, and then the tables were

16 produced to me.

17    Q. Okay. So did you try to have that same process

18 work for the Truth Initiative 100 through 114 files that

19 had the analysis done at Truth Initiative?

20    A. I may have asked that. I don't remember.

21    Q. You don't remember one way or the other; is that

22 correct?

23    A. I don't, no.

24    Q. But the bottom line is you never pursued this

25 work; is that correct?

13 (Pages 46 - 49)

1   A. I -- I haven't yet, since I just got access to
2 the data through the remote desktop. Now I can.
3   Q. So that might be something that you do?
4   A. Oh, I'd say so, yes.
5   Q. Okay. And the -- the cohort that was used for
6 this is actually a probability sample; is that correct?
7   A. Yes, it is.
8   Q. So --
9   A. But it's a -- it's a longitudinal cohort, so the
10 representativeness I would -- I would have to look back
11 at the -- the sampling and the lost follow-up to get an
12 idea. I mean, it's been two years.
13   Q. Understood.
14     But the bottom line is it's a probability
15 sample; correct?
16   A. It's a probability sample, I think, that's
17 representative of young adults at the time when the
18 cohort first started.
19   Q. Okay.
20   A. So I'm not sure if the data that I inserted into
21 wave --
22   Q. Ten?
23   A. -- 10 would actually be representative of the
24 young adults in the population.
25     I would -- like I said, I'd have to look back at

1 what they've been doing with the waves and the -- and the
2 sampling.
3   Q. Okay. And you haven't done that; is that
4 correct?
5   A. No.
6   Q. But the bottom line is with respect to the
7 materials that we have here on Exhibit 3C, these files
8 are ones that you have seen previously, even though you
9 haven't worked on them since you've left TI; is that
10 correct?
11   A. I would say I've seen many of them. I'm not
12 sure that I've seen all of them.
13   Q. Well, we will later on today have you take a
14 look at the flash drive so that you can give us a better
15 idea of that.
16   A. Okay.
17   Q. But these look familiar to you and -- and are
18 likely things, given the timing, that you saw while you
19 were at Truth Initiative?
20     MR. SCHULTZ: Form, asked and answered.
21     THE WITNESS: I -- like I said, it's -- it's
22 possible. I -- I think some of these are familiar to me.
23 Others might not be.
24   Q. BY MS. REISMAN: When did you leave Truth
25 Initiative?

1   A. July 2017. No, no. Sorry. June 2017.
2   Q. And do you remember ever seeing data after
3 Truth -- strike that.
4     Do you ever remember seeing data from this
5 survey, that is, the one that is the GFK survey? Do you
6 remember seeing data on that after you left?
7   A. No.
8   Q. And the last -- the last portion of Exhibit 3
9 is -- let's mark Exhibit 3D.
10     (Exhibit 3D, Files received from Johns Hopkins
11     University (Highly Confidential), marked for
12     identification.)
13   Q. BY MS. REISMAN: 3D is a two-page -- no -- a
14 three-page document of the files received from Johns
15 Hopkins University.
16     Do you see that?
17   A. Yeah.
18     MR. SCHULTZ: Object to the form.
19   Q. BY MS. REISMAN: Do these look -- did you review
20 the files that were produced from Johns Hopkins?
21   A. I -- I looked them over.
22   Q. And do these look like the files that were
23 produced from Johns Hopkins?
24   A. I never saw these from -- I was not involved at
25 this level of the analysis at Johns Hopkins, so I saw the

1 tables and the data -- or I'm sorry -- the tables
2 presenting the data and the manuscript, but I was not
3 involved in the coding -- I think I was involved in the
4 creation of the code book.
5   Q. So were these files that you had seen -- on page
6 3 of Exhibit 3D, are these files that you had seen while
7 you were at --
8   A. I --
9   Q. -- I mean, not -- while you worked on the
10 project?
11   A. The survey. Most likely the files marked
12 "confidential." The do file -- the do file, .do, the
13 .dta file, the .sps file and the .sav file, I never saw
14 those.
15   Q. Okay. Let me go back to one thing. On
16 Exhibit 3C, the Truth Initiative files 100 through 114 on
17 page 1 of 3C --
18   A. Uh-huh.
19   Q. -- and -- and just for ease of -- of reference,
20 if I refer to this as Pearson GFK --
21   A. Okay.
22   Q. -- can we agree that that's how we're going to
23 refer to the files Truth Initiative 100 through Truth
24 Initiative 114, Pearson GFK?
25   A. Sure.

14 (Pages 50 - 53)

Page 54

1  Q. Okay. Do you remember the preliminary analyses
2 that you had seen while you were at Truth Initiative?
3  A. I don't.
4  Q. Do you remember at all what they showed?
5  A. I don't.
6  Q. Do you remember if they were consistent or
7 inconsistent with other analyses that you've done?
8  A. I don't. Knowing myself, I -- I probably would
9 remember if they were inconsistent, but I -- I don't
10 remember either way.
11  Q. Okay. Let's put 3A, B, C, D aside.
12   If the dates in the files for Pearson GFK were
13 dated prior to your departure, is it likely that you
14 would have seen them?
15  A. I -- I couldn't say.
16  Q. You don't know one way or the other?
17  A. No.
18  Q. But you remember seeing some preliminary
19 analyses before you left --
20   MR. SCHULTZ: Asked and answered.
21  Q. BY MS. REISMAN: -- is that correct?
22  A. I remember seeing -- being in a meeting and
23 having someone show us what she had been working on. I
24 did not do any of the analyses.
25  Q. But that is to say, then, you remember seeing

Page 55

1 some of the preliminary analyses done on Pearson GFK; is
2 that correct?
3  A. I remember the fact that there -- I was in a
4 meeting and there was numbers on a screen. I remember
5 that.
6  Q. Okay. And numbers on a screen would be a
7 preliminary analysis of the data; is that correct?
8  A. You'd think so, yes.
9  Q. Okay. So we've now discussed two SRNT posters
10 and underlying data that we don't have that has not been
11 produced as one file; is that correct --
12  A. Uh-huh.
13  Q. -- or several files; is that correct?
14  A. That's correct.
15  Q. And we've produced -- we've also discussed
16 materials that haven't been produced with respect to a
17 secondary data analysis and the primary data that you
18 worked on with Elizabeth Klein at Ohio State; is that
19 correct?
20  A. Yeah.
21  Q. And we've now just talked about the Pearson GFK
22 files --
23  A. So I just want to clarify. The -- the two SRNT
24 posters, one of those is the Liz Klein.
25  Q. Okay. Got it.

Page 56

1   So let's just say there are two, two studies --
2  A. Uh-huh, yeah.
3  Q. -- between the SRNT posters and the Liz Klein
4 study, there are two studies for which we do not have the
5 underlying data --
6  A. Uh-huh.
7  Q. -- and we don't have preliminary analysis, and
8 basically, we don't have anything on them; is that
9 correct?
10  A. That's correct.
11  Q. And we've now talked about Pearson GFK. We have
12 what is in the production from Truth Initiative. But
13 other than that, do you have anything on that Pearson GFK
14 study?
15  A. No. No.
16  Q. Do you have any preliminary analyses in any of
17 your files, in any emails, or anything?
18  A. No.
19  Q. But as you sit here, you would have access to
20 this material through your remote access now; is that
21 correct?
22   MR. SCHULTZ: Asked and answered.
23   THE WITNESS: I -- yes. As I said earlier, I
24 have access to it now. I did not have access to it
25 before.

Page 57

1  Q. BY MS. REISMAN: Okay. Other than those -- so
2 those are three studies that we've talked about; correct?
3  A. Could you name those three studies, then?
4  Q. Sure.
5   The -- let's just call it the Liz Klein study
6 for which you presented a poster.
7  A. Uh-huh.
8  Q. The poster you did with the Canadian labels.
9 That reflects --
10  A. Oh, that -- I'm sorry. Go ahead.
11  Q. That reflects another study; is that correct?
12  A. Uh-huh. Correct.
13  Q. And then the Pearson GFK study; is that correct?
14  A. That's correct.
15  Q. And other than those three, are there other
16 studies that -- that you've conducted on American Spirit
17 or American Spirit descriptors for which we don't yet
18 have raw data posters, preliminary analysis or anything
19 that you have or had done on such a study?
20   MR. SCHULTZ: Object to the form, foundation.
21   THE WITNESS: I have nothing that I've
22 conducted. I have two projects that I am just getting
23 off the ground. But I wouldn't even say I -- I haven't
24 started anything. I'm, like, hiring people.
25  Q. BY MS. REISMAN: What are those?

15 (Pages 54 - 57)

Page 370

1    Q.  So they're measuring -- whether or not you
2  understand the rest of the stuff they report, they are
3  reporting an effect when disclaimers are added to the
4  ads.
5    A.  They are reporting --
6    Q.  Let me -- I'm sorry.
7        They are reporting that the ads with disclaimers
8  elicited greater perceived harm than without disclaimers;
9  correct?
10   A.  Right.  And if you continue on, they say that
11 the effect size was small.  And then they say things that
12 I don't follow what they mean.
13   Q.  Whether -- whether it's judged to be small or
14 large, they are noticing and reporting an effect similar
15 to one that would be reported with a P value.  That is,
16 noting an effect that is statistically significant.
17 Small or large, it is an effect that would be the
18 equivalent of statistical significance; correct?
19   A.  I'm not sure.
20   Q.  You don't know one way or the other?
21   A.  I don't.
22   Q.  Okay.  Do you rely on this study for anything
23 else?
24   A.  I don't believe so.
25       MR. SCHULTZ:  You mean for anything other than

Page 371

1  what's in the report?
2    Q.  BY MS. REISMAN:  Other than what we've discussed
3  today about this study.
4    A.  No.
5    Q.  Are you -- do you intend to rely on the interest
6  in switching data from here from the Baig report?
7    A.  I don't believe I use it in my report in that
8  way.
9    Q.  Are you relying on the interest in switching
10 data in the Baig study?
11   A.  In my report -- no, I don't.
12   Q.  In your opinions in this case.  It's not your
13 report.  I'm not going to ask about it if you're not
14 relying on the interest in switching data that's
15 presented in the Baig study.  If you are, we're going to
16 go into it.
17       MR. SCHULTZ:  Object to the form.
18       THE WITNESS:  No.  I don't believe I include
19 that in the report, and I'm not relying on it.
20   Q.  BY MS. REISMAN:  Okay.
21   A.  No.
22   Q.  And I -- I think we talked about this, but you
23 only have the means reported in the study.  You don't
24 have the actual scores or percentage of scores that were
25 above or below the mean; is that correct?

Page 372

1    A.  Yes.
2        MS. REISMAN:  All right.  Let's go off the
3  record.
4        THE VIDEOGRAPHER:  We are off the record at
5  6:51 p.m.
6        (Discussion off the record.)
7        THE VIDEOGRAPHER:  We are back on the record at
8  7:02 p.m.
9        MS. REISMAN:  Matt, I'm going to pass the
10 witness.  We're going to keep the deposition open, given
11 document issues that we have.  There is no sense in
12 fighting about it now, but -- or even discussing it.
13 We'll talk about it off the record among counsel.
14       But I'm passing the witness and will complete
15 this portion of today's deposition.
16       MR. SCHULTZ:  Okay.  And just to clarify
17 document issues we have, you're talking about what?
18       MS. REISMAN:  Unproduced material.  Her reliance
19 materials.
20       MR. SCHULTZ:  She has no reliance material
21 that's not produced.
22       MS. REISMAN:  Well, you may consider the fact
23 that she chose not to look at certain things or chose not
24 to rely on things as a way to determine the need to
25 disclose reliance materials.  But if she has material

Page 373

1  that forms the basis of her knowledge, that's on NAS.
2  We're entitled to that.
3        And we don't need to -- we're not going to solve
4  this now.  I'm just --
5        MR. SCHULTZ:  No.  I just want to be clear about
6  what we're talking about.
7        MS. REISMAN:  That's what we're talking about.
8        MR. SCHULTZ:  And to be clear that in addition
9  to the dictates of Rule 26, which we've abided, we had an
10 express written agreement between the parties -- that
11 David Mondie (phonetic) drafted, not me -- as to what our
12 experts would produce in terms of underlying data.
13       And we produced all of that and more and
14 facilitated -- or at least didn't get in the way of you
15 all getting third-party documents.  Including
16 non-responsive documents.
17       So I don't know what it means to keep a
18 deposition open.  My concern is I've heard tobacco
19 lawyers, defense lawyers, specifically, saying that
20 because a deposition was left open that it can't be used
21 for any purpose.  So I -- I don't agree to keeping the
22 deposition open.
23       What I would agree to is if you all seek some
24 relief from the Court, and the Judge says, "Hey, yeah, I
25 think you ought to be allowed to get these documents,"

94 (Pages 370 - 373)

Page 374

1  then we'll come back and have another deposition.
2      But, no, I don't agree to keeping it open. I
3  don't even know what that means.
4      MS. REISMAN: I'm not going to -- we don't --
5  I'm not seeking your agreement. And I'm actually -- I'm
6  done with being called a tobacco lawyer today by you and
7  the witness. We're done with that. I'm not a tobacco
8  lawyer. I'm a lawyer in a deposition, and I'm defending
9  the clients, as you are defending. And you are
10 prosecuting the case.
11     So let's leave it at that and stop with the --
12 the stuff about tobacco lawyers and what they do. I
13 don't know -- I don't have experience in that. I'm just
14 talking about that. I'm just talking to you about what
15 we're doing with the deposition today.
16     I'm not -- we're not going to solve it. You can
17 agree -- we can agree to disagree on what we're doing
18 with the deposition.
19     I'm going to pass the witness to you, so you can
20 ask your questions. And if I have follow-up questions on
21 that, I will, and we can go from there.
22     MR. SCHULTZ: That's fine. And when I say
23 "tobacco lawyers," it's not some aspersion as such.
24 There are plenty of tobacco defense lawyers who I
25 consider friends.

Page 375

1      MS. REISMAN: Yeah. And I --
2      MR. SCHULTZ: The point was in the same context
3  that we're in this litigation. Hence, my concern.
4      And your statement was: We are going to keep
5  the deposition open. And I'm saying I don't know what
6  that means.
7      MS. REISMAN: Okay.
8      MR. SCHULTZ: We are -- we are not. I'm not --
9      MS. REISMAN: Fair enough.
10     MR. SCHULTZ: -- considering that.
11     MS. REISMAN: Fair enough. And I -- when I say
12 I'm not a tobacco lawyer, I'm proud to represent my
13 client. I don't have an issue with that.
14     But there have been various statements today
15 that I do think were appropriate. I didn't react to them
16 at the time, and I'm just -- so I'm making that
17 statement. I'm proud and happy to represent my client.
18 I just don't like the statements that have been thrown
19 around today.
20     So with that, why don't we just move on with the
21 deposition?
22     MR. SCHULTZ: All right. Fair enough.
23     And thanks, everybody, including defense
24 counsel, for staying late so we can all get home a little
25 bit sooner.

Page 376

1
2              EXAMINATION
3  BY MR. SCHULTZ:
4      Q. Dr. Pearson, I've got a few follow-up questions
5  for you. I'm going to jump around a bit, because these
6  are based on notes that I took over the eight hours of
7  record time that Ms. Reisman was --
8      MS. REISMAN: Less than eight hours. 7:38, to
9  be exact, Matt.
10     MR. SCHULTZ: Pretty close.
11     Q. First of all, the deposition notice
12 Category 4 -- and I'm referring specifically to
13 Exhibit 1, the Second Amended Deposition Notice -- and I
14 think this came out on the record, but I want to be very
15 clear.
16     When you look at Category 4, did you consider or
17 rely upon, in arriving at your opinions in this case, any
18 data identified in Category 4 that was not produced to
19 the defendants?
20     A. No.
21     Q. In a related vein, there was a discussion of
22 several either posters or articles, I guess, in process.
23 Specifically the -- the nomenclature we've been using
24 today, the GFK, the Canadian Label SRNT poster, the
25 Liz Klein SRNT poster. Do you recall -- do you

Page 377

1  understand what I'm referring to there?
2      A. Yes.
3      Q. On those three items, did you consider those
4  items or rely upon those items or -- in formulating the
5  opinions that you arrived at in this case?
6      MS. REISMAN: Objection to form.
7      THE WITNESS: No.
8      Q. BY MR. SCHULTZ: Did you incorporate any of the
9  data from any of those items?
10     MS. REISMAN: I objected to form.
11     Did you get that objection to form?
12     THE WITNESS: No.
13     Q. BY MR. SCHULTZ: Also, there was a reference to
14 you being a co-author on a NAS study on environmental
15 friendliness. I think it was referred to as the NCI
16 study.
17     A. Yes.
18     Q. Are you familiar with what I'm referring to when
19 I use that rephrase?
20     A. Yes.
21     Q. Did you consider or rely upon any facts or data
22 out of that NCI study in formulating the opinions you
23 have given in this case?
24     MS. REISMAN: Object to the form.
25     THE WITNESS: No.

95 (Pages 374 - 377)

Lead Case No. MD 16-2695 JB/LF

**PLAINTIFFS' MEMORANDUM MOTION TO
QUASH SUBPOENA AND FOR A PROTECTIVE ORDER**

# EXHIBIT E

## Matt Schultz

| | |
|---|---|
| **From:** | Matt Schultz |
| **Sent:** | Wednesday, May 15, 2019 4:51 PM |
| **To:** | 'Monde, David M.' |
| **Cc:** | Melissa Weiner (Mweiner@pswlaw.com); Daniel Warshaw; Biersteker, Peter J.; howell.burkhalter@wbd-us.com; mike.leonard@wbd-us.com; Schultz Andrew (Rodey, Dickason, Sloan, Akin, & Robb - Albuquerque, NM); Jeff Haberman; Greg Blankinship; Michael Reese (mreese@reesellp.com); Carlos Ramirez; Todd Garber |
| **Subject:** | RE: Serving Expert Reports |

David, we have conferred on our end. We are amenable to serving NLT Friday May 24 all facts and data considered by our experts in formulating their opinions, excluding documents produced in litigation and excluding widely available tobacco-oriented documents like SGRs, NCI monographs and industry documents available on Legacy. This will be comprised largely of articles and book excerpts, I believe.

As to your specific numbered requests, we agree the parties should have a protocol that applies to both sides. I cannot vouch for our experts' ability to provide everything you have requested because I don't know what all of it means; but we have forwarded your exact language to our experts and asked that they comply to the extent possible and explain if any inability to comply.

Jennifer Pearson will be a special case because she gives opinions based directly on published articles that she co-authored. My understanding at this point is that she has the underlying data for some, but the data is in the possession of others with respect to some. I have asked her to request the data (sending your exact language) from the third parties and I have verified that she has done so. I will follow up with her early next week to see where we are in this regard. My hope is that all is freely shared with her and we can produce it in turn (by next Friday)--indeed, at least one already has responded with data. We certainly will produce what is in her direct possession and will explain the reasons why she she is unable to produce any responsive data known to exist. But to be clear, if any third-party institution refuses to share with her for any reason, then a subpoena will be your only option---a matter I'm sure you appreciate is beyond our control.

Of course we expect reciprocity, as I'm sure you intended, because neither side is under a compulsion to produce such data at the time of disclosure.  We do not accept any suggestion of prejudice as a result of you receiving the data 7 days after disclosures, but months before any depositions are to be taken and months before your disclosures are due. If Defendants feel the law requires production at the time of disclosure then of course we are happy to receive it, as, unlike Defendants who have months to review the data, we will be under a 14-day rebuttal deadline.

Good? Thanks. Matt

**From:** Monde, David M. [mailto:dmmonde@JonesDay.com]
**Sent:** Tuesday, May 14, 2019 7:37 PM

**To:** Matt Schultz
**Cc:** Melissa Weiner (Mweiner@pswlaw.com); Daniel Warshaw; Biersteker, Peter J.; howell.burkhalter@wbd-us.com; mike.leonard@wbd-us.com; Schultz Andrew (Rodey, Dickason, Sloan, Akin, & Robb - Albuquerque, NM)
**Subject:** RE: Serving Expert Reports

> **CAUTION: This email message is EXTERNAL.**

Matt and all, I have down the following dates and places for depositions of your experts. All start times are 9:00 a.m. local. If you have a different understanding, please advise.

Pearson: July 16, and July 17 as needed; San Francisco
Cummings: July 19, and July 20 as needed; Charleston
Dewhirst: July 22, and July 23 as needed; Toronto
Proctor: July 24, and July 25 as needed; Palo Alto
Damages Expert: August 1, and August 2 as needed; Chicago

With your expert disclosures coming due this Friday, we wanted to be sure that our expectations of what will be produced match your intentions. As we were drafting a note, we got yours this morning.

On reliance material, we understand that Mike Cummings has given you a complete set of his reliance materials. Weighing in at 8GBs, you propose to produce via FTP link, which is fine. Please send that link to Howie and Mike, copied here.

As for your proposal that you give us just a list of reliance material for your other four experts and require us to review it on a line-item basis so we may then generate a request for materials we don't have, we respectfully decline. We expect (and believe we are entitled) to a self-contained complete production of reliance materials for your four other experts, just as Mike Cummings has done. In fact, Mike probably has one of the largest reliance lists of your group, so he has demonstrated that it is a manageable task for both you and your experts. We are not trying to be difficult. We have limited time to prepare for the depositions and should not have to devote time and resources to run down reliance materials that your experts have in their possession or can access readily (presumably, anyway, because they relied on these materials to prepare their reports). And while it is true that in some *Engle* cases reliance materials are set forth in a list, that is because essentially the same lists get reused by particular plaintiff firms. In my experience, more often than not, the failure to provide the reliance material itself has resulted in confusion, needless back and forth, and avoidable hearings. (I'm guessing, of course, but surmise that Mike Cummings has had the same experience, which is why some time ago he adopted the practice of handing over all of his reliance materials on a drive; the only difference here is the timing). In short, the method you propose ends up costing the defense more time than less. And, to state the obvious, we are not in Florida state court and the practice and procedure is different here. As a further effort to be reasonable, you do not need to produce copies of filed case materials and can simply give us a list of the relevant ECF numbers.

We realize your disclosures are due in three days. If you had proposed before now limiting production to reliance lists then we could have had this discussion earlier. Your note last week about producing Mike Cummings material via FTP gave no hint that your side was intending to only give us a list of reliance materials. We want to and will be reasonable. If plaintiffs are unable to produce all of their expert reliance material by Friday, we are open to a one-week extension to allow you to accomplish that (if you need more time than that, we will accommodate but it would only underscore the delay we seek to avoid in preparing for depositions). If we get all of the reliance materials by May 24, that will not interfere with the deposition schedule we have each worked hard to construct. We would simply ask for a similar one-week extension on our expert reports, from August 16 to August 23. We will plan, of course, to produce our expert reliance material on our disclosure date just as we are asking of you.

Finally, let's agree now on the scope of what should be produced so we don't have disagreements later, which could cause delay.  In our view, the following should be disclosed with your reports:

1.  All materials that each expert reviewed and relied upon in forming his/her opinions, including all case materials (e.g., pleadings, depositions, other discovery materials), documents, studies (published or unpublished, whether generated by the expert or others), reviews, surveys, summaries, reports, and analyses.  This includes all underlying instruments, measures, data and analyses in native form generated or obtained by the expert.  For case materials (pleadings, depositions, other discovery materials), a listing of such materials is adequate to the extent the case materials have not been "edited" (marked, excerpted, etc.) from their original state.

2.  For those experts who analyzed quantitative or qualitative data, such as survey or pricing data (regardless of whether or the data were generated by the expert or for this litigation), please produce all underlying measures, data and analyses, and any materials necessary to replicate step-by-step the expert's analysis, starting with the raw source data and ending with the final results, including any statistical or sensitivity analyses performed.  For example and where applicable, please produce with the expert report:  (a) Any underlying survey instrument; (b) the raw source data in native format; (c) to the extent that only some of the raw source data were used in the analysis data set, the criteria and computer codes that were used to censor, select or combine raw data for analysis and that generate the analysis data set itself, all in native format; (d) the computer codes used to generate all intermediate data sets and all intermediate and final results including the intermediate data sets or intermediate and final results themselves, all in native format, specifying the sequence in which the various computer codes were run and the data set on which they were run; and (e) any empirical or statistical analyses of the results in native format, such as tests for statistical significance, efforts to take into account the uncertainty in the data or final estimates, and any sensitivity analyses, including, for each such empirical, statistical or sensitivity analysis,  the computer codes and data utilized to perform those empirical, statistical or sensitivity analyses of the results, indicating the sequence in which those computer codes were run.

Please confirm that your expectations of the scope of the reliance material production is consistent with yours.  If not, we are happy to discuss any specific differences.

Thanks, and safe travels to New York.

David M. Monde
Partner
JONES DAY® - One Firm Worldwide℠
1420 Peachtree St., NE, Suite 800
Atlanta, GA 30327
Office: 404-581-8206
Cell: 404-514-1237

**From:** Matt Schultz <mschultz@levinlaw.com>
**Sent:** Tuesday, May 14, 2019 9:13 AM
**To:** Monde, David M. <dmmonde@JonesDay.com>
**Cc:** Melissa Weiner (Mweiner@pswlaw.com) <Mweiner@pswlaw.com>; Daniel Warshaw <dwarshaw@pswlaw.com>; Biersteker, Peter J. <pbiersteker@JonesDay.com>
**Subject:** Serving Expert Reports
**Importance:** High

David, assuming this works for you, our plan is to have Melissa serve all reports (except Cummings) via a file-sharing app like Dropbox and my office will serve Cummings via FTP link. The "reliance" lists (and documents cited in the reports) are comprised largely of produced documents and publicly available articles. I think it would make sense to handle as we do our tobacco trials and simply serve the list and have you ID anything you don't already have or have access to, which we will promptly provide. I don't mind sharing articles that you would have to pay for or spend time searching out on

your own, so feel free to include articles if you wish (and we would do the same). Cummings has a ton of materials but for him you will receive the actual materials as that's how he turned it over to us.

If this is all good, pls let me know who should receive the invites for the file-sharing/FTP download link. Thx. Matt

**Matt Schultz**
Levin, Papantonio, Thomas, Mitchell,
Rafferty & Proctor, P.A.
316 S. Baylen Street, Suite 600
Pensacola, FL 32502-5996
850.435.7140 (office)
mschultz@levinlaw.com

***This e-mail (including any attachments) may contain information that is private, confidential, or protected by attorney-client or other privilege. If you received this e-mail in error, please delete it from your system without copying it and notify sender by reply e-mail, so that our records can be corrected.***