# EXHIBIT 1

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

JUSTIN LYTLE, et al., individually and on
behalf of all others similarly situated,

           Plaintiffs,

    v.

NUTRAMAX LABORATORIES, INC., et
al.,

           Defendants.

Case No. ED CV 19-0835 FMO (SPx)

**ORDER RE: MOTION FOR CLASS
CERTIFICATION**

Having reviewed all the briefing filed with respect to plaintiffs' Motion for Class Certification (Dkt. 91, "Motion"), the court finds that oral argument is not necessary to resolve the Motion, see Fed. R. Civ. P. 78(b); Local Rule 7-15; Willis v. Pac. Mar. Ass'n, 244 F.3d 675, 684 n. 2 (9th Cir. 2001), and concludes as follows.

**BACKGROUND**[1]

Justin Lytle ("Lytle") and Christine Musthaler ("Musthaler") (collectively, "plaintiffs"), on behalf of themselves and all others similarly situated, filed the operative Second Amended Complaint ("SAC") against Nutramax Laboratories, Inc. and Nutramax Laboratories Veterinary

---

[1] Capitalization, quotation and alteration marks, and emphasis in record citations may be altered without notation.

Sciences, Inc. (collectively, "Nutramax" or "defendants") asserting claims for: (1) violations of California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, et seq., on behalf of a putative California subclass; and (2) violations of various state consumer protection laws on behalf of a putative national class. (See Dkt. 53, SAC at ¶¶ 142-169).

Defendants research, develop, manufacture, and sell supplements for both humans and household pets, including Cosequin canine joint health supplements that contain glucosamine and chondroitin ("Gl/Ch") as the main active ingredient. (See Dkt. 53, SAC at ¶¶ 2, 17). Plaintiffs allege that in marketing Cosequin, defendants "make incomplete and inaccurate claims – both in advertising and on the packaging and packages – that would mislead and have in fact misled reasonable consumers into purchasing, using, and continuing to use [Cosequin] Products." (Id. at ¶ 1). According to plaintiffs, defendants' joint health claims "are refuted by peer-reviewed, randomized, controlled clinical trials[.]" (Id.). Also, defendants' claims that Cosequin products "enhance joint flexibility and mobility and [] support or restore joint health" are unsupported "by any reliable science." (Id. at ¶ 5). If not for defendants' misrepresentations, plaintiffs allege that they and the putative class members either "would not have bought" Cosequin or were charged a "price premium" above comparable generic products. (Id. at ¶ 123).

Lytle purchased Cosequin DS Maximum Strength Plus MSM for his pet dogs from Amazon and Petsmart in California, with his last purchase in February 2019. (See Dkt. 53, SAC at ¶ 124). Musthaler purchased Cosequin DS Maximum Strength Plus MSM chewable tablets for her pet dog from a Ralph's supermarket, with her last purchase also in February 2019. (Id. at ¶ 126). Plaintiffs allege that they read the packaging and relied on defendants' representations in purchasing the Cosequin products, and that they would not have done so "had Defendants apprised Plaintiffs that there is no scientifically valid basis for the representations made regarding the products on the packaging[.]" (Id. at ¶¶ 125, 127-129). Neither plaintiff "saw improvements in their pets" after giving them Cosequin, and both plaintiffs "are still in possession of unused" Cosequin. (Id. at ¶ 128).

Plaintiffs seek an order certifying the following class pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure:[2]

> [A]ll persons residing in California who purchased during the limitations
> period the following canine Cosequin products for personal use ("the
> Products"): Product #1: Cosequin DS Maximum Strength Chewable Tablets[;]
> Product #2: Cosequin DS Maximum Strength Plus MSM Chewable Tablets[;
> and] Product #3: Cosequin DS Maximum Strength Plus MSM Soft Chews.

(See Dkt. 120, Joint Brief on Class Certification ("Joint Br.") at 2)[3]; (see also Dkt. 91, Motion at 2). Plaintiffs also seek to be appointed class representatives and to have their counsel, Milberg Coleman Bryson Phillips Grossman, PLLC and Levin Papantonio Rafferty, appointed as co-lead class counsel. (See Dkt. 120, Joint Br. at 20); (Dkt. 145, Declaration of Adam Edwards in Support of Appointment as Co-Lead Class Counsel [] ("Edwards Decl.") at ¶ 5).

## LEGAL STANDARD

Rule 23 permits a plaintiff to sue as a representative of a class if:

> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions or law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical of the
> claims or defenses of the class; and
> (4) the representative parties will fairly and adequately protect the interests
> of the class.

Fed. R. Civ. P. 23(a). Courts refer to these requirements by the following shorthand: "numerosity, commonality, typicality and adequacy of representation[.]" Mazza v. Am. Honda Motor Co., 666 F.3d 581, 588 (9th Cir. 2012). In addition to fulfilling the four prongs of Rule 23(a), the proposed

---

[2] All "Rule" references are to the Federal Rules of Civil Procedure unless otherwise indicated.

[3] This Order references the unredacted version of the Joint Brief filed under seal, (see, e.g., Dkt. 120, Joint Br.), although it does not disclose any redacted information. A publicly-accessible version of the Joint Brief containing redactions is available at Dkt. 121.

class must meet at least one of the three requirements listed in Rule 23(b).  See Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 345, 131 S.Ct. 2541, 2548 (2011).

"Before it can certify a class, a district court must be satisfied, after a rigorous analysis, that the prerequisites of both Rule 23(a) and" the applicable Rule 23(b) provision have been satisfied. Olean Wholesale Grocery Cooperative, Inc.  v.  Bumble Bee Foods L.L.C., 2022 WL 1053459, *5 (9th Cir.  2022) (en banc).  A plaintiff "must prove the facts necessary to carry the burden of establishing that the prerequisites of Rule 23 are satisfied by a preponderance of the evidence." Id.

On occasion, the Rule 23 analysis "will entail some overlap with the merits of the plaintiff's underlying claim[,]" and "sometimes it may be necessary for the court to probe behind the pleadings[.]" Dukes, 564 U.S. at 350-51, 131 S.Ct. at 2551 (internal quotation marks omitted). However, courts must remember that "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." Amgen Inc. v. Conn. Ret. Plans & Tr. Funds, 568 U.S. 455, 466, 133 S.Ct. 1184, 1194-95 (2013); see id., 133 S.Ct. at 1195 ("Merits questions may be considered to the extent – but only to the extent – that they are relevant to determining whether the Rule 23 prerequisites . . . are satisfied."); Ellis v. Costco Wholesale Corp., 657 F.3d 970, 983 n. 8 (9th Cir. 2011) (The court examines the merits of the underlying claim "only inasmuch as it must determine whether common questions exist; not to determine whether class members could actually prevail on the merits of their claims. . . . To hold otherwise would turn class certification into a mini-trial.") (citations omitted).  Finally, a court has "broad discretion to determine whether a class should be certified, and to revisit that certification throughout the legal proceedings before the court." United Steel, Paper & Forestry, Rubber Mfg. Energy, Allied Indus. & Serv. Workers Int'l Union, AFL-CIO, CLC v. ConocoPhillips Co., 593 F.3d 802, 810 (9th Cir. 2010) (internal quotation marks omitted); see also Yokoyama v.  Midland Nat'l Life Ins.  Co., 594 F.3d 1087, 1092 (9th Cir. 2010) (The decision to certify a class and "any particular underlying Rule 23 determination involving a discretionary determination" is reviewed for abuse of discretion.).

1

**DISCUSSION**

2

I.    EVIDENTIARY OBJECTIONS

3

After the close of briefing on the instant Motion, defendants filed motions under Federal

4

Rule of Evidence 702 and Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 113 S.Ct. 2786

5

(1993), challenging plaintiffs' experts Bruce Silverman ("Silverman") and Dr. Jean Pierre Dubé

6

("Dubé").  (See Dkt. 109, Motion to Exclude the Testimony of Plaintiffs' Expert Witness, Bruce

7

Silverman); (Dkt. 112, Motion to Exclude the Opinions and Testimony of Plaintiffs' Expert Witness,

8

Dr. Jean Pierre Dubé).  Despite defendants' untimely Daubert objections, the court will exercise

9

its discretion to consider their motions.[4]

10

A court "evaluating challenged expert testimony in support of class certification . . . should

11

evaluate admissibility under the standard set forth in Daubert." Sali v. Corona Reg'l Med. Ctr., 909

12

F.3d 996, 1006 (9th Cir. 2018).  "Under Daubert, the trial court must act as a 'gatekeeper' to

13

exclude junk science that does not meet Federal Rule of Evidence 702's reliability standards by

14

making a preliminary determination that the expert's testimony is reliable." Ellis, 657 F.3d at 982.

15

At the class certification stage, however, "admissibility must not be dispositive.  Instead, an inquiry

16

into the evidence's ultimate admissibility should go to the weight that evidence is given at th[is ]

17

stage." Sali, 909 F.3d at 1006.  The court's "analysis [is] tailored to whether an expert's opinion

18

was sufficiently reliable to admit for the purpose of proving or disproving Rule 23 criteria, such as

19

commonality and predominance." Tait v. BSH Home Appliances Corp., 289 F.R.D. 466, 495 (C.D.

20

Cal. 2012).  In doing so, the "requirements of relevance and reliability set forth in Daubert . . .

21

serve as useful guideposts but the court retains discretion in determining how to test reliability as

22

well as which expert's testimony is both relevant and reliable." Id. (internal  quotation marks

23

_____

24

    [4]  As explained in the Court's Order Re: Motions for Class Certification (Dkt. 70), "[a]fter the
joint brief [on class certification] is filed, each party may file a supplemental memorandum of points

25

and authorities no later than fourteen (14) days prior to the hearing date. . . .  No other separate
memorandum of points and authorities shall be filed by either party in connection with the motion

26

for class certification." (Id. at 4).  Here, defendants filed their Daubert motions, (see Dkt. 109,
Motion to Exclude the Testimony of Plaintiffs' Expert Witness, Bruce Silverman); (Dkt. 112, Motion

27

to Exclude the Opinions and Testimony of Plaintiffs' Expert Witness, Dr. Jean Pierre Dubé), two

28

days prior to the hearing date set for plaintiff's motion for class certification. (See Dkt. 91, Motion).

1 omitted). At this stage, the court considers only "if expert evidence is useful in evaluating whether
2 class certification requirements have been met." Id. (internal quotation marks omitted).

3     A.    Silverman

4     Silverman has 50 years of professional experience in the marketing and communications
5 industry, and has provided expert testimony in many cases involving allegations of false
6 advertising. (See Dkt. 93-3, Exh. 3, Expert Report of Bruce G. Silverman ("Silverman Report") at
7 ¶¶ 9, 11); see, e.g., Bailey v. Rite Aid Corp., 338 F.R.D. 390, 400-01 (N.D. Cal. 2021);
8 Krommenhock v. Post Foods, LLC, 334 F.R.D. 552, 579-80 (N.D. Cal. 2020); Hadley v. Kellogg
9 Sales Co., 324 F.Supp.3d 1084, 1115 (N.D. Cal. 2018); Hobbs v. Brother Int'l Corp., 2016 WL
10 7647674, *4-5 (C.D. Cal. 2016). Plaintiffs rely on Silverman's opinion to support their contention
11 that the challenged label claims would be material to a reasonable consumer. (See Dkt. 120, Joint
12 Br. at 28-30).

13     Defendants raise several objections to Silverman's testimony. First, defendants argue that
14 Silverman's testimony "purport[s] to get inside the head of Defendants . . . as to their intent in
15 labeling with the challenged claims[.]" (Dkt. 109-5, Joint Brief on Defendants' Motion to Exclude
16 the Opinions and Testimony of [] Bruce Silverman ("Silverman Joint Br.") at 1; (see also id. at 6-
17 8). But even if that were true, defendants' intent with respect to the challenged label statements
18 is not an element of plaintiffs' CLRA claim, see infra at § III.A.1., and plaintiffs do not purport to
19 rely on Silverman's testimony for such evidence in support of their motion for class certification.
20 (See, generally, Dkt. 120, Joint Br.).

21     Second, defendants assert that Silverman "failed to save his internet searches and
22 materials viewed online."[5] (Dkt. 109-5, Silverman Joint Br. at 1); (see also id. at 8-10).

23 _____

24     [5] Defendants similarly argue that "Silverman omitted from his report 'the facts or data
25 considered' in forming his opinions." (Dkt. 109, Silverman Joint Br. at 12) (quoting FRCP
26(a)(2)(B)(ii)). Defendants point to portions of Silverman's deposition in which the full context
26 makes clear that Silverman was explaining that his views are informed by his cumulative
experience in consumer research. (See Dkt. 109-7, Tab 1, Deposition of Bruce Silverman
27 ("Silverman Depo.") at 63-64) ("[A]s I speak to in my – in the 'Qualifications' section in my report,
. . . I've had access to literally thousands of pieces of consumer research, all of which inform my
28 knowledge and understanding of how consumers interact with products sold in retail."); (id. at 64-

1   Defendants refer to comments Silverman made during his deposition that he probably "looked at

2   the websites from Chewy or other places where these products are sold just to get a different view

3   of the packaging." (Dkt. 109-7, Tab 1, 109-7, Tab 1, Silverman Depo. at 66). The court is not

4   persuaded that this is a reason to exclude Silverman's testimony. Moreover, Silverman explains

5   that his opinions are based on the product labels and packages that defendants provided in

6   discovery. (See Dkt. 93-3, Exh. 3, Silverman Report at ¶ 57).

7       Defendants also contend that Silverman "was recently excluded in another case for the

8   same issue." (Dkt. 109-5, Silverman Joint Br. at 9). In Price, the court excluded Silverman's

9   testimony at summary judgment "[t]o the extent that [he] opines on consumers' awareness of

10  keratin as an ingredient in haircare products and consumers' resulting perception of the

11  Challenged Terms" because that opinion was "not based on his experience, nor [was] it based on

12  a reliable methodology." 2020 WL 4937464, at *4. The court noted that "Silverman does not claim

13  to have any experience from which he can opine on consumer knowledge of keratin as an

14  ingredient in hair products[,]" and that his opinion on that topic was instead based "on certain

15  Google searches[.]" Id.

16      Here, Silverman does claim to have experience from which he can opine on how a

17  reasonable consumer would understand the challenged label claims. (See, generally, Dkt. 93-3,

18  Exh. 3, Silverman Report at ¶¶ 9-32) (describing his qualifications as an advertising expert). And

19  in Price, the court ultimately relied on Silverman's testimony in concluding that plaintiffs put

20  forward sufficient evidence to survive summary judgment as to whether the challenged label

21

22  _____

23  65) ("Q. Did you rely on any consumer surveys to form the basis of your opinions? A. No. Well[,]
    . . . other than, you know, all of the survey material that I reviewed that informs . . . my opinions.

24  Q. . . . You're referring to the survey data that you reviewed in the course of . . . your advertising
    career, not specific survey data related to this case? A. That's correct."). Courts have noted that

25  Silverman's opinion is reliable because he "has interviewed thousands of consumers over the
    course of his career and has observed thousands of focus group sessions[.]" Bailey, 338 F.R.D.

26  at 401; see Price v. L'Oreal USA, Inc., 2020 WL 4937464, *3 (S.D.N.Y. 2020) (noting that
    Silverman "has reviewed thousands of proprietary quantitative studies providing insights into

27  consumers' understanding and beliefs about various brands, products and advertising; personally
    interviewed more than five thousand consumers; and attended at least 3,500 focus group

28  sessions").

claims were deceptive based on the "reasonable consumer" standard, see Price, 2020 WL 4937464, at *10, which is the same purpose for which plaintiffs rely on Silverman's testimony in this case. (See Dkt. 120, Joint Br. at 28-29). As for defendants' contention that Silverman's opinion is unreliable because it is based on his experience in the advertising industry, (see Dkt. 109-5, Silverman Joint Br. at 6) ("Mr. Silverman purports to rely on nothing more than his experience."), that argument also lacks merit. See, e.g., Bailey, 338 F.R.D. at 401 (rejecting defendant's argument that Silverman's opinions lack support "because they are based primarily on his work experience in the advertising industry"). As the court explained in Price, "expert reports regarding consumer perception need not be based on scientific surveys, [and] experts may testify based on their own experience." 2020 WL 4937464, at *5; see also id. at *3 ("Mr. Silverman's opinions that are premised on his own experience satisfy the factors set forth in Rule 702.").

Defendants also assert that Silverman violated Rule 26(a)(2)(B)(v) because his report did not list his recent testimony in Bailey, and he did not identify his role in the case until his deposition.[6] (See Dkt. 109-5, Silverman Joint Br. at 13). According to defendants, this omission was "highly prejudicial" because they had not prepared to ask Silverman about the case during his deposition.[7] (See id.). However, defendants do not assert that this omission in Silverman's report was the result of bad faith, (see, generally, Dkt. 109-5, Silverman Joint Br. at 12-13), and they did not explore the Bailey case further after Silverman mentioned it during his deposition. (See Dkt. 109-7, Tab 1, Silverman Depo. at 22). Under the circumstances here, the court declines to take the "extreme measure" of striking an expert witness where there is no evidence of "bad faith or willfulness[.]" Box v. United States, 2019 WL 6998754, *2 (D. Kan. 2019).

Finally, defendants contend that Silverman's opinions "lack any indicia of reliability" because he "did not conduct any surveys, focus groups, or formal research to form the basis of

_____

[6] In Bailey, the court, in granting class certification, relied on Silverman's opinions regarding whether a reasonable consumer was likely to be deceived by label claims. See 338 F.R.D. at 400.

[7] To the extent defendants believe they need additional time to depose Silverman about his testimony in Bailey, the court will entertain a motion to reopen discovery for this limited purpose.

his materiality opinions." (Dkt. 109-5, Silverman Joint Br. at 16). However, California courts have "expressly rejected the 'view that a plaintiff must produce a consumer survey or similar extrinsic evidence to prevail on a claim that the public is likely to be misled by a representation.'" Mullins v. Premier Nutrition Corp., 2016 WL 1535057, *5 (N.D. Cal. 2016) (quoting Colgan v. Leatherman Tool Grp., Inc., 135 Cal.App.4th 663, 681 (2006)). And courts in other false advertising cases have specifically rejected this argument with respect to Silverman's expert testimony as to how a reasonable consumer would understand challenged label claims. See, e.g., Krommenhock, 334 F.R.D. at 580 ("Post's argument that Silverman's opinions must be excluded because he did not conduct any focus group or other consumer testing is misplaced. . . . Also without merit is Post's assertion that Silverman needed to have but had no methodology to support his analysis of meaning and materiality."); Bailey, 338 F.R.D. at 401 (rejecting defendant's argument that "Silverman's opinions have no meaningful support, because they are based primarily on his work experience in the advertising industry, and because he did not conduct a survey of Rite Aid gelcaps consumers"); Hadley, 324 F.Supp.3d at 1115 ("To the extent Kellogg argues that Plaintiff's expert testimony [by Silverman] is weak or that Plaintiff lacks consumer survey evidence, . . . that argument is without merit.").

      B.    **Dubé.**

      Dubé is a professor of marketing at the University of Chicago Booth School of Business, where he has been on the faculty since 2000, and a research fellow at the National Bureau of Economic Research. (See Dkt. 102-1, Exh. 2, Expert Report of Professor Jean-Pierre H. Dubé ("Dubé Report") at ¶¶ 5-6).[8] He has extensive experience in marketing data and analytics, has taught courses on conjoint analysis and estimating consumer demand, and has published dozens of papers on topics relating to consumer demand for branded goods and business pricing decisions. (See id. at ¶¶ 7-9). He has testified as an expert in several cases relating to false advertising and the impact of packaging information on pricing and other market outcomes. (See id. at ¶ 11). Plaintiffs rely on Dubé's proposed model to establish that "damages are capable of

---

[8] A redacted version of Dubé's report is available at Dkt. 101-1.

1   measurement on a classwide basis." (Dkt. 120, Joint Br. at 36) (quoting Comcast Corp. v.
2   Behrend ("Comcast"), 569 U.S. 27, 34, 133 S.Ct. 1426, 1433 (2013)).

3       Defendants primarily object to Dubé's testimony on the grounds that he has not "performed
4   a damages analysis using actual evidence[,]" (Dkt. 124, Joint Brief on Defendants' Motion to
5   Exclude the Opinions and Testimony of Plaintiffs' Expert Witness, Dr. Jean Pierre Dubé ("Dubé
6   Joint Br.") at 5),[9] and he "lacks critical data needed to complete his analysis." (Id. at 16). As
7   explained below, see infra at § III.A.3., "[a] plaintiff is not required to actually execute a proposed
8   conjoint analysis to show that damages are capable of determination on a class-wide basis with
9   common proof" at the class certification stage. Bailey, 338 F.R.D. at 408 n. 14 (quoting Comcast,
10  569 U.S. at 34, 133 S.Ct. at 1426) (citation and emphasis omitted).

11      Defendants also assert that "[t]he vast majority of putative class members were not
12  exposed to the majority of challenged statements." (See Dkt. 124, Dubé Joint Br. at 11-12).
13  However, as noted below, all proposed class members saw at least one of the challenged label
14  claims. See infra at §§ II.B. & II.C.

15      Finally, defendants' contention that Dubé impermissibly uses a fraud-on-the-market model
16  for damages, (see Dkt. 124, Dubé Joint Br. at 12), misapprehends his proposed model. Dubé
17  proposes a choice-based conjoint analysis to measure the impact of the challenged label claims
18  and other product features on demand for Cosequin. (See Dkt. 102-1, Dubé Report at ¶¶ 14-18,
19  32-61). According to Dubé, his analysis will control for the supply-side of the market by controlling
20  "for the marketplace realities of competitors to [Cosequin] with different product features and
21  different prices." (Id. at ¶ 14). To be clear, defendants "do[] not appear to dispute 'that conjoint
22  analysis is a well-accepted economic methodology.'" Hadley, 324 F.Supp.3d at 1107 (quoting In
23  re Dial Complete Mktg. & Sales Pracs. Litig., 320 F.R.D. 326, 331 (D.N.H. 2017)) (collecting
24  cases). Indeed, "[s]imilar conjoint surveys and analyses have been accepted against Comcast
25  and Daubert challenges by numerous courts in consumer protection cases challenging false or

26
27
        [9] A redacted version of defendants' motion to exclude Dubé's testimony is available at Dkt.
28  112-5.

1  misleading labels." Krommenhock, 334 F.R.D. at 575. At best, defendants' "[c]hallenges to
2  [Dubé's] survey methodology go to the weight given the survey, not its admissibility." Wendt v.
3  Host Int'l, Inc., 125 F.3d 806, 814 (9th Cir. 1997).

4         In short, the court finds that Silverman's and Dubé's expert reports and testimony are
5  admissible to the extent the court relies on them in determining class certification.

6  II.    RULE 23(a) REQUIREMENTS.

7         A.    Numerosity.

8         A putative class may be certified only if it "is so numerous that joinder of all members is
9  impracticable[.]" Fed. R. Civ. P. 23(a)(1). Although impracticability does not hinge only on the
10 number of members in the putative class, joinder is usually impracticable if a class is "large in
11 numbers[.]" See Jordan v. Cty. of Los Angeles, 669 F.2d 1311, 1319 (9th Cir.), vacated on other
12 grounds by Cty. of Los Angeles v. Jordan, 459 U.S. 810 (1982) (class sizes of 39, 64, and 71 are
13 sufficient to satisfy the numerosity requirement). "As a general matter, courts have found that
14 numerosity is satisfied when class size exceeds 40 members[.]" Slaven v. BP Am., Inc., 190
15 F.R.D. 649, 654 (C.D. Cal. 2000); see Tait, 289 F.R.D. at 473-74 (same).

16        Here, defendants do not contest numerosity. (See Dkt. 120, Joint Br. at 11). Moreover,
17 plaintiffs assert that while "the precise number of class members is unknown[,] . . . 'general
18 knowledge and common sense indicate it is large.'" (See id.) (quoting Tait, 289 F.R.D. at 474).
19 Having reviewed the evidence submitted in connection with the instant Motion, (see, e.g., Dkt.
20 102-4, Declaration of David M. Moore) (providing Cosequin sales data),[10] the court is satisfied that
21 the proposed class is sufficiently numerous that joinder of all members is impracticable.

22        B.    Commonality.

23        Commonality is satisfied if "there are common questions of law or fact common to the
24 class." Fed. R. Civ. P. 23(a)(2). It requires plaintiffs to demonstrate that their claims "depend
25 upon a common contention . . . [whose] truth or falsity will resolve an issue that is central to the
26 validity of each one of the claims in one stroke." Dukes, 564 U.S. at 350, 131 S.Ct. at 2551; see

27 _____

28    [10]  A redacted version of Moore's declaration is available at Dkt. 101-4.

1    also <u>Wolin v. Jaguar Land Rover N. Am., LLC</u>, 617 F.3d 1168, 1172 (9th Cir. 2010) (explaining

2    that the commonality requirement demands that "class members' situations share a common issue

3    of law or fact, and are sufficiently parallel to insure a vigorous and full presentation of all claims

4    for relief") (internal quotation marks omitted). "The plaintiff must demonstrate the capacity of

5    classwide proceedings to generate common answers to common questions of law or fact that are

6    apt to drive the resolution of the litigation." <u>Mazza</u>, 666 F.3d at 588 (internal quotation marks

7    omitted). "This does not, however, mean that every question of law or fact must be common to

8    the class; all that Rule 23(a)(2) requires is a single significant question of law or fact." <u>Abdullah</u>

9    <u>v. U.S. Sec. Assocs., Inc.</u>, 731 F.3d 952, 957 (9th Cir. 2013) (emphasis and internal quotation

10    marks omitted); <u>see Mazza</u>, 666 F.3d at 589. Proof of commonality under Rule 23(a) is "less

11    rigorous" than the related preponderance standard under Rule 23(b)(3). <u>See Mazza</u>, 666 F.3d at

12    589 (characterizing commonality as a "limited burden[,]" stating that it "only requires a single

13    significant question of law or fact[,]" and concluding that it remains a distinct inquiry from the

14    predominance issues raised under Rule 23(b)(3)). "The existence of shared legal issues with

15    divergent factual predicates is sufficient, as is a common core of salient facts coupled with

16    disparate legal remedies within the class." <u>Hanlon v. Chrysler Corp.</u>, 150 F.3d 1011, 1019 (9th

17    Cir. 1998).

18        Plaintiffs contend that the following statements on the subject product labels, which they

19    refer to collectively as the "Joint Health Representations," are false and misleading because the

20    products in question "have no effect on canine joint health": (1) "Use Cosequin to help your pet

21    Climb stairs, Rise, and Jump!"; (2) "Joint Health Supplement"; (3) "Supports Mobility for a Healthy

22    Lifestyle"; (4) "Mobility, Cartilage and Joint Health Support." (Dkt. 120, Joint Br. at 1-2) (internal

23    quotation marks omitted). Under the circumstances here, there are common questions of law and

24    fact, including: (1) whether members of the public are likely to be deceived by the Joint Health

25    Representations; (2) whether defendants communicated the Joint Health Representations; (3) if

26    so, whether the Joint Health Representations were material to a reasonable consumer; and (4)

27    if the representations were material, were they truthful. These common questions not only

28    address required elements of plaintiffs' CLRA claim, <u>see Stearns v. Ticketmaster Corp.</u>, 655 F.3d

1013, 1022 (9th Cir. 2011), abrogated on other grounds in Comcast, 569 U.S. 27, 133 S.Ct. 1426, (describing CLRA claims), but they also are susceptible to common proof – for example, testimony by plaintiffs and their experts explaining whether a reasonable consumer is likely to be misled by the contested label claims, as well as the "truth or falsity" of those claims, which will resolve "issue[s] that [are] central to the [claims'] validity[.]"  See Dukes, 564 U.S. at 350, 131 S.Ct. at 2551; see, e.g., Johns v. Bayer Corp., 280 F.R.D. 551, 557 (S.D. Cal. 2012) ("[T]he predominating common issues include whether Bayer misrepresented that the Men's Vitamins 'support prostate health' and whether the misrepresentations were likely to deceive a reasonable consumer. . . . [T]hese predominant questions are binary – advertisements were either misleading or not, and Bayer's prostate health claim is either true or false.  Plaintiffs claim each of these predominating common questions is capable of class-wide resolution using class-wide evidence, and will generate common answers to the primary questions presented in this lawsuit."); Yamagata v. Reckitt Benckiser LLC, 2019 WL 3815718, *1 (N.D. Cal. 2019) ("The plaintiffs have submitted evidence that Reckitt Benckiser labeled their 'Move Free' glucosamine and chondroitin-based supplements with claims suggesting that the supplements would improve joint functioning, but that scientific studies show the ingredients in the supplements do not actually improve joint functioning. The plaintiffs have therefore shown that liability is at least susceptible to classwide proof.").

Although defendants primarily "address[] why plaintiffs fail to show commonality as part of [their] predominance analysis[,]" (Dkt. 120, Joint Br. at 14), they briefly raise two arguments with respect to the commonality requirement.  First, defendants assert that plaintiffs "fail to cite any competent evidence that their supposed common questions can be resolved on a classwide basis."  (Id.).  As discussed below with respect to the predominance requirement, see infra at § III.A.1., plaintiffs submitted expert reports and other evidence that show that the contested label claims are false and material.  (See, e.g., Dkt. 120, Joint Br. at 13, 23, 28-29).  And aside from defendants' contention that plaintiffs lack common evidence, defendants do not say why the common questions are not "capable of classwide resolution" in "that determination of [their] truth or falsity will resolve an issue that is central to the validity of . . . [plaintiffs'] claims in one stroke." Dukes, 564 U.S. at 350, 131 S.Ct. at 2551; (see, generally, Dkt. 120, Joint Br. at 14).

Second, defendants contend that plaintiffs' authorities "are distinguishable as the challenged claims in each appeared on the front label of products[,]" whereas here plaintiffs "challenge labeling claims that appear exclusively on the back" of the products. (See Dkt. 120, Joint Br. at 14 n. 12) (citing Dkt. 120-2, Exh. 6, Cosequin Label & Ad Images).[11] As an initial matter, courts have certified similar class actions based on allegedly false advertising that appears on both the front and back labels of consumer products. See, e.g., Barrera v. Pharmavite, LLC, 2016 WL 11758373, *1 (C.D. Cal. 2016) (noting that the plaintiff, "[i]n making her purchase, . . . read the front , back, and sides of the TripleFlex Triple Strength Label and, relied on every single one of Defendant's renewal and rejuvenation representations") (internal quotation marks omitted). Moreover, defendants do not specify which of the contested label claims "appear exclusively on the back" of the products. (See, generally, Dkt. 120, Joint Br.). In any event, at least one or more of the contested label claims (e.g., "Joint Health Supplement") appears on the front of each Cosequin product to which defendants refer, and the contested label claims that appear on the back are nonetheless prominent. (See Dkt. 120-2, Exh. 6, Cosequin Label & Ad Images at ECF 3792-3809). Defendants also do not explain why the presence of certain contested label claims on the back of Cosequin products would defeat or undermine the presence of common questions here, (see, generally, Dkt. 120, Joint Br. at 14), and no reason is apparent to the court.

Under the circumstances, the court is satisfied that the commonality requirement has been met here, as there are common questions relating to the likelihood of consumers being deceived by defendants' representations, the materiality of those representations, and their veracity. See, e.g., Bailey, 338 F.R.D. at 399 (commonality established where plaintiff identified common questions for CLRA claim regarding whether a "rapid release" statement on acetaminophen gelcaps "was likely to deceive a reasonable consumer" and "whether the 'rapid release' statement was material"); Martinelli v. Johnson & Johnson, 2019 WL 1429653, *6 (E.D. Cal. 2019) ("Here, every class member has the same basic claim – they purchased Benecol because of statements on the product's packaging and those statements were false. Resolution of this common claim

---

[11] A redacted version of Exhibit 6 is available at Dkt. 121-2.

1    depends on a critical common question of fact: whether Defendants' statements were in fact

2    false.") (citation omitted); <u>McCrary v. Elations Co., LLC</u>, 2014 WL 1779243, *10 (C.D. Cal. 2014)

3    ("Plaintiff has identified legal issues common to the putative class claims, namely whether the

4    claims on Elations' packaging that it contains a 'clinically-proven combination' and/or a 'clinically-

5    proven formula' are material and false.  By definition, class members were exposed to these

6    labeling claims, creating a 'common core of salient facts.'") (citation omitted).  In short, the court

7    finds that plaintiffs have satisfied "their limited burden under Rule 23(a)(2) to show that there are

8    'questions of law or fact common to the class.'"  <u>Mazza</u>, 666 F.3d at 589.

9    　　　　C.　　Typicality.[12]

10   　　　　Typicality requires a showing that "the claims or defenses of the representative parties are

11   typical of the claims or defenses of the class[.]"  Fed. R. Civ. P. 23(a)(3).  The purpose of this

12   requirement "is to assure that the interest of the named representative aligns with the interests of

13   the class."  <u>Wolin</u>, 617 F.3d at 1175 (internal quotation marks omitted).  "The requirement is

14   permissive, such that representative claims are typical if they are reasonably coextensive with

15   those of absent class members; they need not be substantially identical."  <u>Just Film, Inc. v. Buono</u>,

16   847 F.3d 1108, 1116 (9th Cir. 2017) (internal quotation marks omitted).  "The test of typicality is

17   whether other members have the same or similar injury, whether the action is based on conduct

18   which is not unique to the named plaintiffs, and whether other class members have been injured

19   by the same course of conduct."  <u>Wolin</u>, 617 F.3d at 1175 (internal quotation marks omitted).  The

20   typicality requirement is "satisfied when each class member's claim arises from the same course

21   of events, and each class member makes similar legal arguments to prove the defendant's

22   liability."  <u>Stearns</u>, 655 F.3d at 1019 (internal quotation marks omitted).

23   　　　　Here, defendants argue that plaintiffs' claims are atypical because they are subject to

24   several unique defenses, although defendants cite little authority to support their contentions.

25

26   　　　　[12]  Because the Supreme Court has noted that "[t]he commonality and typicality requirements
     of Rule 23(a) tend to merge[,]" <u>General Tel. Co. of the SW v. Falcon</u>, 457 U.S. 147, 157 n. 13, 102
27   S.Ct. 2364, 2371 n. 13 (1982), the court hereby incorporates the Rule 23(a) commonality
     discussion set forth above.  <u>See</u> <u>supra</u> at § II.B.
28

(See, generally, Dkt. 120, Joint Br. at 16-19).  First, defendants contend that plaintiffs' "expectations about Cosequin were not based on any representations on the label." (Id. at 17). According to defendants, plaintiffs used the Cosequin products to "cure their elderly dogs' myriad diseases . . . even though the Products are not and were never marketed to treat diseases." (Id.). Defendants also contend that plaintiffs "have not shown that their dogs are typical of the class[,]" because their dogs were in "poor health" and plaintiffs do not "point to the percentage of other gravely ill and elderly dogs treated with Cosequin."[13] (Id. at 18).  Defendants' contentions are unpersuasive.

Plaintiffs testified that they purchased defendants' products because they believed it would improve their dogs' joint health.  For example, Musthaler testified that she "expected it to do what it says it's going to do on the package . . . so it would give [her dog] healthy joints." (Dkt. 93-5, Exh. 5, Deposition of Christine Musthaler at 171).  When defense counsel pressed Musthaler on whether she expected that Cosequin would make her older dog "healthy again[,]" Musthaler explained that she did not and reiterated that she "expect[ed] it to help with [her dog's] joints." (Id. at 172). Lytle similarly testified that in deciding to buy Cosequin, he "went by the labeling and what it promised to do. . . .  Just relief, joint health for older dogs." (Dkt. 93-4, Exh. 4, Deposition of Justin Anthony Lytle ("Lytle Depo.") at 53). Lytle also testified that he did not expect that Cosequin would "treat or cure" his dogs' arthritis. (Id. at 119).

Defendants' argument misapprehends the nature of the alleged injury and misconduct here. Plaintiffs' claim "is about point-of-purchase loss[,]" where they "were allegedly injured when they paid money to purchase" Cosequin products that do not provide joint health benefits. See Johns, 280 F.R.D. at 557; see, e.g., Hadley, 324 F.Supp.3d at 1101 ("Kellogg's [] argument appears to stem from a mistaken assumption that the injury that Plaintiff is seeking to redress in the instant case is physical in nature. . . .  Instead, Plaintiff is seeking to recover for the economic injury caused by Kellogg representing that its foods are healthy.") (cleaned up) (emphasis in original);

---

[13] Defendants also do not point to any scientific data that suggests Cosequin provides joint health benefits for some types of dogs, but not for others. (See, generally, Dkt. 120, Joint Br. at 16-17).

1 Chacanaca v. Quaker Oats Co., 752 F.Supp.2d 1111, 1125 (N.D. Cal. 2010) ("[T]he particular

2 harm for which [plaintiffs] seek redress is not health related. Rather, their claims sound in

3 deception, unfairness and false advertising.").

4      Second, defendants contend that "plaintiffs did not use the product as directed[,]" which

5 "render[ed] them not typical of putative class members who did." (Dkt. 120, Joint Br. at 18).

6 According to defendants, plaintiffs failed to adhere to "feeding instructions requir[ing] three tablets

7 per day for their dogs for the first 4-6 weeks." (Id.). It is true that Lytle testified that he gave his

8 dogs "maybe two or three a day[,]" although he sometimes forgot and only gave them one tablet.

9 (Dkt. 93-4, Exh. 4, Lytle Depo. at 44). However, defendants cite no evidence that plaintiffs' dogs

10 or, for that matter, any dogs, would have received the benefits set forth in the contested label

11 representations had plaintiffs used the product as directed. (See, generally, Dkt. 120, Joint Br.

12 at 18). Nor did defendants provide any evidence that all or most members of the proposed class

13 strictly adhered to defendants' instructions for administering Cosequin. (See, generally, id.). In

14 any event, even if Lytle differed from other class members in how often he gave Cosequin to his

15 dogs, that would not negate the showing that, in the context of this false-advertising claim, "other

16 members have the same or similar injury" that "is based on conduct which is not unique to" Lytle.

17 Wolin, 617 F.3d at 1175 (internal quotation marks omitted). Finally, Musthaler testified that she

18 concluded Cosequin did not work as advertised "a little over a month" after she began giving it to

19 her dogs, (Dkt. 93-5, Exh. 5, Musthaler Depo. at 40), but defendants cite no evidence that she

20 "failed to follow the directions." (See, generally, Dkt. 120, Joint Br. at 18).

21      Third, defendants repeatedly argue that "plaintiffs cannot be typical of the proposed class

22 because both purchased only one of the three Cosequin products at issue, Cosequin DS

23 Maximum Strength Plus MSM Chewable Tablets, the labeling and packaging for which did not

24 contain three of the four challenged claims." (Dkt. 120, Joint Br. at 18); (see, e.g., id. at 4) ("[T]he

25 overwhelming majority of proposed Class Members never even saw three of the four contested

26 labeling claims."); (Dkt. 123, Defendants' Supplemental Memorandum in Opposition to Class

27 Certification ("Supp. Opp.") at 2-3) (same)). However, it appears that at least one of the contested

28 label claims appeared prominently on the label of every Cosequin product purchased by the

proposed class. (See, e.g., Dkt. 120, Joint Br.) (copies of label images with the statement "Joint Health Supplement"); (see also id. at 30) (asserting that plaintiffs "can only challenge the "Joint Health Supplement" claim. Thus, at least with respect to the "Joint Health Supplement" claim, the proposed class is "defined in such a way as to include only members who were exposed to advertising that is alleged to be materially misleading."[14] Mazza, 666 F.3d at 596; see, e.g., Elkies v. Johnson & Johnson Servs., Inc., 2018 WL 11223465, *8 (C.D. Cal. 2018) ("[T]he record clearly establishes that [defendant's] alleged misrepresentations regarding the clinically proven health benefits of the Products are prominently displayed on all of the Products' packaging, a fact that [defendant] has never contested."); Johns, 280 F.R.D. at 557 (finding typicality based in part on evidence that "the Men's Vitamin packages purchased by Plaintiffs and all class members prominently and repeatedly featured the identical 'supports prostate health' claim[,]" and thus "Plaintiffs and class members [] were all exposed to the same alleged misrepresentations on the packages").

As to defendants' argument that plaintiffs are atypical because they purchased only one of the subject Cosequin products, (see Dkt. 120, Joint Br. at 18), defendants do not dispute that the Joint Health Supplement statement, and perhaps other contested label claims, appeared on all three products. (See, generally, id. at 18-19). Given that plaintiffs allege that they "and all class members were exposed to the same statement" and "were all injured in the same manner," see Martin v. Monsanto Co., 2017 WL 1115167, *4 (C.D. Cal. 2017), the court is persuaded that plaintiffs' claims are sufficiently typical of the class claims. While some class members may have purchased a slightly different type of Cosequin than plaintiffs, that "does not defeat typicality because the alleged misrepresentation was the same as to each type of" Cosequin product purchased by the class. Id. (internal quotation marks omitted). In other words, "Plaintiff[s'] claims . . . have nothing to do with the unique characteristics of the various [Cosequin] products; they have to do only with what is allegedly shared by all those products." Id. (internal quotation marks

---

[14] The court may later exclude evidence concerning the contested label claims viewed by only a small percentage of the class, and the court does not rely on that evidence in deciding the instant Motion.

omitted); see, e.g., Chavez v. Blue Sky Nat. Beverage Co., 268 F.R.D. 365, 377-78 (N.D. Cal. 2010) (even though "plaintiff did not buy each product in the Blue Sky beverage line[,]" he satisfied typicality because his claims arose "out of the [same] allegedly false statement" on the beverages and "therefore [arose] from the same facts and legal theory"); Johns, 280 F.R.D. at 557 ("Plaintiffs claim typicality is met because they and the proposed class assert exactly the same claim, arising from the same course of conduct – Bayer's marketing campaign.").

Finally, defendants argue that the evidence shows Lytle "believed Cosequin worked and was worth what he paid for it." (Dkt. 120, Joint Br. at 19). Specifically, defendants assert that "Lytle continued to use Cosequin after filing [this] lawsuit[,]" citing Lytle's deposition testimony in which it appears he was asked to estimate how long he continued to use the final bottle of Cosequin he purchased. (Id.); (see Dkt. 93-4, Exh. 4, Lytle Depo. at 78) ("Q. So at minimum, wouldn't you agree the minimum number of days that you continued to give [his dog] Zoey Cosequin after you purchased this bottle, this 250-count bottle in February 2019, is 140? . . . THE WITNESS: Correct."). Defendants also assert that Lytle "continued to purchase and give Cosequin to his dogs for years" after he believed "it was not helping[,]" (Dkt. 120, Joint Br. at 19), for which they cite the following testimony: "Q. So is it fair to say, then, sometime in 2016 or 2017 is when you came to the conclusion that Cosequin wasn't – wasn't helping with your dogs, giving them relief or better mobility? A. I can't recall the exact – exactly when, but it's when I started to have my doubts." (Dkt. 93-4, Exh. 4, Lytle Depo. at 61).

Under the circumstances, the court is not persuaded that Lytle's equivocal statement that he continued buying Cosequin after he "started to have . . . doubts" about its effectiveness renders him atypical. Moreover, defendants rely on cases in which the plaintiff continued purchasing a product even after the plaintiff knew the challenged claim was false, (see Dkt. 120, Joint Br. at 19), which is not what Lytle said. For example, in Turcios v. Carma Lab'ys, Inc., 296 F.R.D. 638 (C.D. Cal. 2014), the plaintiff alleged that the defendant sold "lip balm in packaging that contains a false bottom, deceptive covering, and/or nonfunctional slack fill[,]" and "that he would not have paid the price he paid for it had he known that the entire [] jar was not filled." Id. at 642. The Turcios court concluded that the plaintiff's testimony revealed that he did not rely "on the external volume of the

jar when he purchased the lip balm[.]" Id. at 643. The court explained that the "Plaintiff testified that he had no expectation about how much product he was getting when he first purchased the lip balm . . . , he knew he was getting .25 ounces before he purchased the product, he was satisfied with the product and did not have any concerns or complaints after he finished his first and second .25 ounce jars, he continued to purchase the Carmex .25 ounce jars without reading the information on or inspecting the jar, he had no expectation of how much product he was getting, he did not put any thought into what price was reasonable, and he would still use Carmex today if he needed it." Id. Unlike the slack-fill component in Turcios, where the consumer received a small quantity of the subject product, plaintiffs here allege that Cosequin was ineffective for its advertised use as a joint health supplement – i.e., plaintiffs' dogs received no joint health benefit from the subject products. Moreover, Lytle's testimony that he continued buying Cosequin even though he "started to have . . . doubts" provides defendants with comparably weaker evidence with which to challenge Lytle's reliance on the contested label claims.

In short, the court finds that this factor is satisfied because plaintiffs' claims are based on the same facts, that they "relied upon defendants' representations in purchasing Cosequin and expected the Products to be effective as claimed on the packaging[,]" and the same legal and remedial theories as the claims of the rest of the class members. (Dkt. 53, SAC at ¶ 128); see, e.g., Hilsley v. Ocean Spray Cranberries, Inc., 2018 WL 6300479, *6 (S.D. Cal. 2018) ("Plaintiff has demonstrated that her claims are typical as the Complaint alleges that she and all class members purchased the Products, were deceived by the false and deceptive labeling and lost money as a result."); Lilly v. Jamba Juice Co., 308 F.R.D. 231, 240 (N.D. Cal. 2014) ("Named Plaintiffs . . . clearly have a similar alleged injury as the rest of the proposed class, since they purchased products that are the same as, or very similar to, the products challenged by the rest of the proposed class. Their claims are not based on any conduct that is unique to them."). As plaintiffs state, their claims are co-extensive with those of the class because they allege they "were deceived by defendants' mislabeling about the efficacy of Cosequin" and "were harmed in that they paid for a product marketed to improve mobility that was, in reality, no more effective than placebo." (Dkt. 120, Joint Br. at 15).

1        D.    Adequacy.

2        Rule 23(a)(4) permits certification of a class action if "the representative parties will fairly

3   and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  A two-prong test is

4   used to determine adequacy of representation:  "(1) do the named plaintiffs and their counsel have

5   any conflicts of interest with other class members and (2) will the named plaintiffs and their

6   counsel prosecute the action vigorously on behalf of the class?"  Ellis, 657 F.3d at 985 (internal

7   quotation marks omitted).   "Adequate representation depends on, among other factors, an

8   absence of antagonism between representatives and absentees, and a sharing of interest

9   between representatives and absentees."  Id.  The adequacy of counsel is also considered under

10  Rule 23(g).

11       Here, defendants only challenge Lytle's adequacy to serve as a class representative based

12  on his "criminal history[.]" (Dkt. 120, Joint Br. at 20).  However, defendants rely on inapposite

13  cases, (see id. at 21), in which the plaintiff was involved in criminal activity during the class

14  certification process or had convictions for serious offenses that could be used for impeachment.

15  See, e.g., Dunford v. Am. DataBank, LLC, 64 F.Supp.3d 1378, 1396-97 (N.D. Cal. 2014) ("The

16  undersigned judge will not leave the rights of absent class members . . . in the hands of someone

17  who was arrested the day before the class certification hearing, convicted of vandalism while class

18  certification was pending, and recently 'entered the wrong apartment . . . while intoxicated' leading

19  to a guilty plea of aggravated trespass, not to mention all the other convictions."); Porath v.

20  Logitech, Inc., 2019 WL 6134936, *5 (N.D. Cal. 2019) (concluding that a proposed class

21  representative "who has seven criminal convictions, is a convicted felon three times over, has a

22  history of substance abuse, and of not reporting to his probation officer . . . is unacceptable" in part

23  because his felony convictions would be admissible as impeachment evidence under Federal Rule

24  of Evidence 609).  Based on the evidence submitted by defendants, which includes records for

25  speeding tickets from 1995 and 1996, (see Dkt. 93-26, Exh. 26, Lytle Criminal Records at ECF

26  1185, 1189), it does not appear that Lytle has been convicted of a felony or a crime involving a

27  dishonest act or false statement.   (See, generally, id.); (Dkt. 93-27, Exh. 27, Lytle Criminal

28  Records); (Dkt. 93-4, Exh. 4, Lytle Depo. at 131-133)

In short, the court finds that neither plaintiffs' counsel nor plaintiffs have any conflicts of interest with class members, and that counsel and plaintiffs have established that they will prosecute the action vigorously on behalf of the class. (See Dkt. 94, Declaration of Matt Schultz at ¶¶ 3-4);(see, generally, Dkt. 145, Edwards Decl.); (Dkt. 145-1, Exh. A, Milberg Coleman Bryson Phillips Grossman Firm Resume); (Dkt. 145-2, Exh. B, Levin Papantonio Rafferty Firm Resume).

III.    RULE 23(b)(3) REQUIREMENTS.

Certification under Rule 23(b)(3) is proper "whenever the actual interests of the parties can be served best by settling their differences in a single action." Hanlon, 150 F.3d at 1022 (internal quotation marks omitted). Fed. R. Civ. P. 23(b)(3) requires two different inquiries, specifically a determination as to whether: (1) "questions of law or fact common to class members predominate over any questions affecting only individual members[;]" and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

A.    Predominance.

"Though there is substantial overlap between [the Rule 23(a)(2) commonality test and the Rule 23(b)(3) predominance test], the 23(b)(3) test is far more demanding[.]"[15] Wolin, 617 F.3d at 1172 (internal quotation marks omitted). "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 623, 117 S.Ct. 2231, 2249 (1997). "This calls upon courts to give careful scrutiny to the relations between common and individual questions in a case." Tyson Foods, Inc. v. Bouaphakeo, 577 U.S. 442, 453, 136 S.Ct. 1036, 1045 (2016). "The predominance inquiry asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues. When one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses

---

[15]    Given the substantial overlap between Rule 23(a) and Rule 23(b)(3), and to minimize repetitiveness, the court hereby incorporates the Rule 23(a) discussion set forth above. See supra at § II.B.

1   peculiar to some individual class members." Id. (citations and internal quotation marks omitted);

2   see Wang v. Chinese Daily News, Inc., 737 F.3d 538, 545 (9th Cir. 2013) ("The predominance

3   analysis under Rule 23(b)(3) focuses on the relationship between the common and individual

4   issues in the case and tests whether the proposed classes are sufficiently cohesive to warrant

5   adjudication by representation.") (internal quotation marks omitted); In re Wells Fargo Home

6   Mortg. Overtime Pay Litig., 571 F.3d 953, 957 (9th Cir. 2009) ("The focus is on the relationship

7   between the common and individual issues.") (internal quotation marks omitted).  The class

8   members' claims do not need to be identical.  See Local Joint Exec. Bd. of Culinary/Bartender

9   Trust Fund v. Las Vegas Sands, Inc., 244 F.3d 1152, 1163 (9th Cir. 2001) (allowing "some

10   variation" between class members); Abdullah, 731 F.3d at 963 (explaining that "there may be

11   some variation among individual plaintiffs' claims") (internal quotation marks omitted).  The focus

12   is on whether the "variation [in the class member's claims] is enough to defeat predominance

13   under Rule 23(b)(3)."  Local Joint Exec. Bd. of Culinary/Bartender Trust Fund, 244 F.3d at 1163;

14   see Blackie v. Barrack, 524 F.2d 891, 902 (9th Cir. 1975) ("[C]ourts have taken the common sense

15   approach that the class is united by a common interest in determining whether defendant's course

16   of conduct is in its broad outlines actionable, which is not defeated by slight differences in class

17   members' positions[.]").

18         Where, as here, a plaintiff's claims arise under state law, the court "looks to state law to

19   determine whether the plaintiffs' claims – and [defendant's] affirmative defenses – can yield a

20   common answer that is 'apt to drive the resolution of the litigation.'"  Abdullah, 731 F.3d at 957

21   (quoting Dukes, 564 U.S. at 350, 131 S.Ct. at 2551); Erica P. John Fund, Inc. v. Halliburton Co.,

22   563 U.S. 804, 809, 131 S.Ct. 2179, 2184 (2011) ("Considering whether questions of law or fact

23   common to class members predominate begins . . . with the elements of the underlying cause of

24   action.") (internal quotation marks omitted).

25

26

27

28

### 1. The CLRA.

"The CLRA 'shall be liberally construed and applied to promote its underlying purposes, which are to protect consumers against unfair and deceptive business practices and to provide efficient and economical procedures to secure such protection.'" Nguyen v. Nissan N. Am., Inc., 932 F.3d 811, 817-18 (9th Cir. 2019) (quoting Cal. Civ. Code § 1760). To establish a CLRA claim, the plaintiff must show that: (1) the defendant's conduct was deceptive; and (2) the deception caused plaintiff harm. See Stearns, 655 F.3d at 1022; In re Vioxx Class Cases, 180 Cal.App.4th 116, 129 (2009) (same). In the class context, a CLRA claim "requires each class member to have an actual injury caused by the unlawful practice." Stearns, 655 F.3d at 1022; Edwards v. Ford Motor Co., 603 F.Appx. 538, 541 (9th Cir. 2015).

California courts often find predominance satisfied in CLRA cases because "causation, on a classwide basis, may be established by materiality[,]" meaning that "[i]f the trial court finds that material misrepresentations have been made to the entire class, an inference of reliance arises as to the class." Stearns, 655 F.3d at 1022 (cleaned up); see Tait, 289 F.R.D. at 480 (same); In re Vioxx Class Cases, 180 Cal.App.4th at 129 (same). A misrepresentation is material if "a reasonable [person] would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question[.]" Stearns, 655 F.3d at 1022 (internal quotation marks omitted); see Williams v. Gerber Prod. Co., 552 F.3d 934, 938 (9th Cir. 2008) (CLRA claims are "governed by the reasonable consumer test[,]" under which plaintiffs "must show that members of the public are likely to be deceived") (internal quotation marks omitted). "If the misrepresentation . . . is not material as to all class members, the issue of reliance would vary from consumer to consumer and the class should not be certified." Stearns, 655 F.3d at 1022-23 (internal quotation marks omitted); see In re Vioxx Class Cases, 180 Cal.App.4th at 129 (same). However, "a plaintiff is not required to show that the challenged statement is the 'sole or even the decisive cause' influencing the class members' decisions to buy the challenged products." Bailey, 338 F.R.D. at 403 (quoting Kwikset Corp. v. Superior Ct., 51 Cal.4th 310, 327 (2011)).

Here, both prongs of plaintiffs' CLRA claim present predominant questions. First, plaintiffs intend to prove defendants' deceptive conduct through expert testimony addressing the evidence

base for the contested label claims. (See Dkt. 120, Joint Br. at 22-24). Dr. Steven Budsberg opines that "[t]here is no valid and reliable medical or scientific evidence demonstrating the effectiveness of Cosequin with respect to" the challenged label claims, (Dkt. 120-1, Exh. 1, Expert Report of Steven C. Budsberg [] at 19),[16] or that "demonstrat[es] the effectiveness of Cosequin in supporting, maintaining, or improving canine joint health (including improvements in inactivity, joint flexibility, or mobility)" more broadly. (Id. at 15); (see Dkt. 120, Joint Br. at 23-24). Dr. Richard Evans ("Evans") similarly opines that there is "no evidence that [Gl/Ch] has a greater prophylactic effect than placebo control on maintaining joint health in healthy pet dogs[,]" (Dkt. 93-12, Exh. 12, Report of Richard Evans, Ph.D. at 5), and that studies purporting to show that Gl/Ch has "a beneficial effect . . . for pet dogs" lack credibility due to various methodological shortcomings. (Id. at 7); (see Joint Br. 23-24) (noting that Evans "opined on the design and validity of the key scientific key studies" relating to the joint health claims). Based on the foregoing, it may be shown that defendants' label claims are deceptive, i.e., this inquiry predominates over any individualized issues that arise in connection with the labels themselves. See, e.g., Barrera, 2016 WL 11758373, at *1 (declining to decertify class where plaintiff had alleged that defendant's "TripleFlex line of products . . . consistently conveyed the message that the products will improve joint health[,]" and "that credible scientific evidence demonstrates that these active ingredients do not confer any joint health benefits").

Second, because causation may be established by materiality, see, e.g., Tait, 289 F.R.D. at 479, plaintiffs point to common evidence that could resolve the question of whether a reasonable consumer is likely to be deceived by the subject label claims. Plaintiffs intend to show materiality through evidence that class members were uniformly exposed to the contested label claims on the subject Cosequin products, (see Dkt. 120, Joint Br. at 12-13, 27), the opinions of their advertising expert, (see id. at 28-29), defendants' market research regarding Cosequin, (see id. at 28) (under seal), and the testimony of one of defendants' expert. (See id. at 29). Plaintiffs' conjoint analysis, discussed further in the damages section, could also support materiality. See,

---

[16]  A redacted version of Budsberg's report is available at Dkt. 121-1.

1   e.g., Bailey, 338 F.R.D. at 403 (noting that plaintiff's conjoint analysis supporting damages would

2   "serve as an indicia of materiality").

3      As to whether class members were exposed to the contested label claims, it appears that

4   the class members were exposed to the statement "Joint Health Supplement" on all relevant

5   Cosequin products and that this statement was visible before purchase.[17]  The court can therefore

6   "infer class-wide exposure to the allegedly misleading conduct at issue."  Bailey, 338 F.R.D. at

7   400; see Ehret v. Uber Techs., Inc., 148 F.Supp.3d 884, 895 (N.D. Cal. 2015) ("[I]n numerous

8   cases involving claims of false-advertising, class-wide exposure has been inferred because the

9   alleged misrepresentation is on the packaging of the item being sold.  In such a case, given the

10  inherently high likelihood that in the process of buying the product, the consumer would have seen

11  the misleading statement on the product and thus been exposed to it, exposure on a classwide

12  basis may be deemed sufficient.").

13     Expert testimony can also establish materiality.  See, e.g., Krommenhock, 334 F.R.D. at

14  563 (noting that plaintiffs rely on the opinions of the same advertising expert used in the case to

15  show that common issues predominate); see also Olean Wholesale Grocery Cooperative, Inc.,

16  2022 WL 1053459, at *11 n. 16 ("[T]he persuasiveness of [an expert's] analysis is not at issue at

17  this phase of the proceeding.").  Silverman, plaintiffs' advertising expert, opines that the subject

18  label claims, including "Joint Health Supplement," "convey the message [to consumers] that

19  defendants' products will work, i.e., help alleviate joint health issues[,]" (Dkt. 93-3, Exh. 3,

20  Silverman Report at ¶ 54), that the claims would be material to a reasonable consumer, (id. at ¶¶

21

22     [17]  As noted above, see supra at §§ II.B. & II.C., defendants assert that three of the four

23  contested label claims appeared on only a small percentage of products, as measured by sales,
    which they also cite in support of their argument that "individual issues predominate and prevent

24  commonality due to diverse labels." (See, e.g., Dkt. 120, Joint Br. at 30).  Defendants also assert
    that there were dozens of "different label versions during the proposed class period."  (Id.).

25  However, it appears that the contested label claim, "Joint Health Supplement," appeared

26  prominently on each of the products purchased by the proposed class, and a review of the labels
    indicates that the statement was featured consistently across different label designs.  (See, e.g.,

27  Dkt. 120-2, Exh. 6, Cosequin Label & Ad Images); see also Kwikset Corp., 51 Cal.4th at 327 ("[A]
    plaintiff is not required to allege that the challenged misrepresentations were the sole or even the

28  decisive cause of the injury-producing conduct.") (cleaned up).

54, 59), and that "[i]f Plaintiffs are correct in their assertion that the contested label claims are not backed up by scientific evidence, or worse, contradicted by reliable scientific evidence, then . . . consumers would not want to pay" higher prices for Cosequin products, "or for that matter, buy them at all." (Id. at ¶ 71); (see Dkt. 120, Joint Br. at 28-29); see, e.g., Bailey, 338 F.R.D. at 400 (finding common evidence that a reasonable consumer was likely to be deceived based in part on Silverman's testimony regarding materiality). Plaintiffs also point to testimony by defendants' expert, Dr. Carol Scott ("Scott"), indicating that "the most important purchase driver for purchasing joint supplements is the desire to improve a dog's mobility and flexibility." (Id. at 29) (quoting Dkt. 93-15, Exh. 15, Deposition of Carol Scott, Ph.D. at 101) (emphasis omitted); see, e.g., Mullins, 2016 WL 1535057, at *5 (noting that defendants "own marketing research and surveys tend to show that numerous consumers cite joint pain, stiffness, and function as the reasons behind their purchase" of a product with contested label claims concerning joint health).

Defendants assert that "even if the challenged statements were facially uniform," the court must deny class certification if "consumers' understanding of those representations would not be.'" (Dkt. 120, Joint Br. at 22) (alterations omitted) (quoting Jones v. ConAgra Foods, Inc., 2014 WL 2702726, *14 (N.D. Cal. 2014)).[18] However, defendants "point[] to no controlling authority showing that a plaintiff must establish at the class certification stage that consumers have a uniform interpretation of the term that gives rise to the alleged deception[,]" and "[c]ourts . . . routinely hold to the contrary."[19] Bailey, 338 F.R.D. at 402 n. 12; see, e.g., Fitzhenry-Russell v. Dr. Pepper

---

[18] Defendants' reliance on Jones is unpersuasive, as the court in that case was specifically referring to the absence of a "fixed meaning for the word 'natural[,]'" 2014 WL 2702726, at *14, which is a more capacious label claim than the joint health representations here. See Kumar v. Salov N. Am. Corp., 2016 WL 3844334, *9 (N.D. Cal. 2016) (distinguishing Jones because "the label phrase at issue there, 'natural,' . . . is inherently ambiguous."); Mullins, 2016 WL 1535057, at *5 (distinguishing Jones and concluding that "[w]hether an ordinary consumer reasonably believes Premier advertises Joint Juice as a way to improve joint health is amenable to common proof: reviewing the advertisements, labels, and then asking the jury how they understand the message").

[19] Defendants also argue that "[t]he only record evidence . . . shows most consumers do not interpret the labels as promising to treat joint disease." (Dkt. 120, Joint Br. at 25). In making that argument, however, defendants narrowly characterize plaintiffs' theory regarding why the contested label claims are misleading. Plaintiffs contend that the contested label claims are

Snapple Grp., Inc., 326 F.R.D. 592, 613 (N.D. Cal. 2018) (noting that the "alleged misrepresentations were made . . . to the entire class" and that "the standard requires only that the Court find there is a probability that reasonable consumers could be misled, not that they all believed 'Made From Real Ginger' means the same thing"); Elkies, 2018 WL 11223465, at *4 ("[A]s to the CLRA claim, the law appears to be that class members do not have to have a uniform understanding of the meaning behind the challenged representation.") (emphasis in original).

Defendants repeatedly argue that plaintiffs cannot establish predominance without offering consumer survey data. (See, e.g., Dkt. 120, Joint Br. at 26) ("Plaintiffs dispute [defendants'] survey findings, but offer no other survey evidence."); (id. at 33) ("Plaintiffs did not conduct a materiality survey, or provide any other reliable evidence, to determine whether consumers relied on particular challenged label statements when making purchase decisions."). As noted earlier, California courts have "expressly rejected the 'view that a plaintiff must produce a consumer survey or similar extrinsic evidence to prevail on a claim that the public is likely to be misled by a representation.'" Mullins, 2016 WL 1535057, at *5 (quoting Colgan, 135 Cal.App.4th at 681); see, e.g., Krommenhock, 334 F.R.D. at 565 (same); Bailey, 338 F.R.D. at 401 ("[A]n expert who offers testimony on the question of whether a reasonable consumer is likely to be deceived by an allegedly misleading statement, or whether a reasonable consumer would find such a statement to be material, is not required to conduct a consumer survey if his or her testimony is otherwise reliable."); Hadley, 324 F.Supp.3d at 1115 ("To the extent Kellogg argues that Plaintiff's expert testimony is weak or that Plaintiff lacks consumer survey evidence, . . . that argument is without merit."). In other words, "the lack of extrinsic evidence of reliance does not automatically prevent class certification." Mullins, 2016 WL 1535057, at *5; see, e.g., Johns, 280 F.R.D. at 558 (noting, in response to defendant's argument in mislabeling case that "people buy multivitamins for various reasons," that "California's consumer protection laws evaluate materiality under a reasonable person standard, not on an individualized basis").

---

deceptive because Cosequin has no effect on joint health, (see, e.g., id. at 22), not that the labels falsely "promis[e] to treat joint disease." (See id. at 25).

In any event, "even if [defendants are] correct in [their] assertion that Plaintiff[s] ha[ve] failed to provide sufficient evidence of deception and materiality, that failure has no bearing on whether common questions will predominate over individual questions in the instant case." Hadley, 324 F.Supp.3d at 1115. As noted above, questions as to whether the contested label claims "were misleading and material must be evaluated according to an objective 'reasonable consumer' standard." Id. "This objective test renders claims under the [] CLRA ideal for class certification because they will not require the court to investigate class members' individual interaction with the product." Tait, 289 F.R.D. at 480 (internal quotation marks omitted). "As a result, there is no risk whatever that a failure of proof on the common questions of deception and materiality will result in individual questions predominating. Instead, the failure of proof on the elements of deception and materiality would end the case for one and for all; no claim would remain in which individual issues could potentially predominate."[20] Hadley, 324 F.Supp.3d at 1115-16 (cleaned up); see Amgen, 568 U.S. at 460, 133 S.Ct. at 1191 ("[A] failure of proof on the issue of materiality would

---

[20] For this reason, the court is unpersuaded that defendants' expert reports by Scott, (see Dkt. 122, Exh. 17, Dr. Carol A. Scott, PhD. Expert Report), and Dr. Olivier Toubia ("Toubia"), (see Dkt. 122-1, January 19, 2021, Expert Report of Olivier Toubia, Ph.D. ("January 2021, Toubia Report")); (Dkt. 122-2, Exh. 18, February 26, 2021, Expert Report of Olivier Toubia, Ph.D.), show that there are "individual issues that predominate and prevent commonality." (Dkt. 120, Joint Br. at 33). In addition, a review of defendants' expert reports reveals flaws that undercut their persuasiveness. For example, Toubia designed a survey to answer "whether the challenged claims on Cosequin's product packaging materially influence consumers' intent to purchase the product." (Dkt. 122-1, Exh. 18, January 2021, Toubia Report at 3-4). To answer this question, he showed survey respondents different images of Cosequin product packaging, with half of the respondents shown images that were "modified to only remove the challenged claims." (Id. at 5). However, the modified images still included the "Joint Health Supplement" statement prominently displayed on the front of the label, (see id. at 6), which is the contested label claim that appeared on all of the products purchased by the proposed class. (See, e.g., Dkt. 120, Joint Br. at 2); (see also Dkt. 53, SAC at ¶ 37) (identifying "Joint Health Supplement" as a challenged representation). Toubia instead removed the phrase "Joint Health Support" that appeared in smaller font on the labels, (see Dkt. 122-1, January 2021, Toubia Report at 6), and which plaintiffs do not specifically challenge in seeking class certification. (See Dkt. 120, Joint Br. at 2). In short, defendants' expert reports are "outweighed by the common evidence" presented by plaintiffs, "which supports the proposition that the question of whether a reasonable consumer was likely to be deceived by [defendants'] alleged misleading conduct can be resolved with common proof." See Bailey, 338 F.R.D. at 402-03 (emphasis omitted).

1  end the case, given that materiality is an essential element of the class members' securities-fraud

2  claims.").

3  In short, the court finds that plaintiffs have met their burden of showing that common

4  questions of fact and law predominate over individual questions with respect to their CLRA claim.

5  **2.    Damages**.

6  Under Comcast, "plaintiffs must be able to show that their damages stemmed from the

7  defendant's actions that created the legal liability." Pulaski & Middleman, LLC v. Google, Inc., 802

8  F.3d 979, 987-88 (9th Cir. 2015) (internal quotation marks omitted); see Just Film, Inc., 847 F.3d

9  at 1120 (same). "To satisfy this requirement, plaintiffs must show that 'damages are capable of

10  measurement on a classwide basis,' in the sense that the whole class suffered damages traceable

11  to the same injurious course of conduct underlying the plaintiffs' legal theory." Just Film, Inc., 847

12  F.3d at 1120 (quoting Comcast, 569 U.S. at 34, 133 S.Ct. at 1433). Although plaintiffs must

13  present the likely method for determining class damages, "it is not necessary to show that [this]

14  method will work with certainty at this time." Chavez, 268 F.R.D. at 379. Further, "the presence

15  of individualized damages cannot, by itself, defeat class certification under Rule 23(b)(3)." Leyva

16  v. Medline Indus. Inc., 716 F.3d 510, 514 (9th Cir. 2013). In other words, "the fact that the amount

17  of damage may not be susceptible of exact proof or may be uncertain, contingent or difficult of

18  ascertainment does not bar recovery." Pulaski, 802 F.3d at 989 (internal quotation marks

19  omitted); see also Comcast, 569 U.S. at 35, 133 S.Ct. at 1433 (noting that damages "[c]alculations

20  need not be exact" at the class-certification stage); Olean Wholesale Grocery Cooperative, Inc.,

21  2022 WL 1053459, at *9 ("[A] district court is not precluded from certifying a class even if plaintiffs

22  may have to prove individualized damages at trial, a conclusion implicitly based on the

23  determination that such individualized issues do not predominate over common ones.").

24  As an initial matter, it should be noted that "class wide damages calculations under the

25  CLRA are particularly forgiving[,]" because "California law requires only that some reasonable

26  basis of computation of damages be used, and the damages may be computed even if the result

27  reached is an approximation." Nguyen, 932 F.3d at 818 (cleaned up). Here, plaintiffs contend that

28  the subject label claims "were misleading or deceptive to a reasonable consumer[,]" and that

"class members paid a price premium for the [Cosequin] Products as a result of the deceptive terms included on the label" of Cosequin products. (Dkt. 120, Joint Br. at 37); see, e.g., McMorrow v. Mondelez Int'l, Inc., 2021 WL 859137, *6 (S.D. Cal. 2021) ("Plaintiffs' action is a classic mislabeling case, and their allegation is that the defendant's mislabeling of the Products caused Plaintiffs and the putative class members to pay more than they would have if the Products were properly labeled."). As a method for measuring class-wide damages, plaintiffs point to Dubé's proposed "choice-based conjoint analysis[,]" which "will determine the value consumers place on the challenged terms when purchasing these products," and "in turn permit[] him to calculate the price premium attributable to the challenged terms and the resulting classwide damages." (Dkt. 120, Joint Br. at 37). According to plaintiffs, "Dubé's proposed model will account for both demand and supply-side factors, and the calculation will not require individualized inquiry." (Id.); (see Dkt. 102-1, Exh. 2, Dubé Report at ¶ 14).

Conjoint surveys, like the one proposed by plaintiffs' expert, are a well-established method for measuring class-wide damages in CLRA mislabeling cases. See, e.g., Bailey, 338 F.R.D. at 409 ("In mislabeling cases where the injury suffered by consumers was in the form of an overpayment resulting from the alleged misrepresentation at issue, . . . courts routinely hold that choice-based conjoint models that are designed to measure the amount of overpayment satisfy Comcast's requirements."); Hadley, 324 F.Supp.3d at 1104, 1110 (noting that "[i]t is well-established that the 'price premium attributable to' an alleged misrepresentation on product labeling or packaging is a valid measure of damages in a mislabeling case under the [] CLRA," and that "conjoint analysis is widely-accepted as a reliable economic tool for isolating price premia") (quoting Brazil v. Dole Packaged Foods, LLC, 660 F.Appx. 531, 534 (9th Cir. 2016); Briseno v. ConAgra Foods, Inc., 674 F.Appx. 654, 657 (9th Cir. 2017) (recognizing that a "conjoint analysis to segregate the portion of th[e] premium attributable to" a contested label claim was a "well-established damages model[]"); Krommenhock, 334 F.R.D. at 575 ("[C]onjoint surveys and analyses have been accepted against Comcast and Daubert challenges by numerous courts in consumer protection cases challenging false or misleading labels."); McMorrow, 2021 WL 859137, at *14 (finding that the plaintiff's proposed conjoint survey, which would "isolate and measure the

price premium attached only to the term 'nutritious,'" satisfied <u>Comcast</u>). Courts have also found that conjoint analyses specifically designed by Dubé, and similar to what he proposes here, satisfy <u>Comcast</u>. <u>See</u>, <u>e.g.</u>, <u>Price v. L'Oreal USA, Inc.</u>, 2018 WL 3869896, *3 (S.D.N.Y. 2018) ("Plaintiffs' proposed model for computing class-wide damages, Dr. Dubé's Conjoint Analysis, is reliable and consistent with their price premium theory of damages."); <u>Goldemberg v. Johnson & Johnson Consumer Companies, Inc.</u>, 317 F.R.D. 374, 394 (S.D.N.Y. 2016) (finding that Dubé's proposed price premium damages model easily satisfied <u>Comcast</u>'s requirements).

Defendants contend that Dubé's damages model is "defective" because "[t]he evidence . . . shows the number of uninjured Class Members likely constitutes a significant majority of the class."  (Dkt. 120, Joint Br. at 38-39); (<u>see id.</u> at 40) ("The class cannot be certified because it includes a non-<u>de minimis</u> number of uninjured class members."); (Dkt. 123, Supp. Opp. at 2). Specifically, defendants contend that their expert's survey data and analysis of online Cosequin product reviews show that "the majority of Cosequin purchasers are satisfied with their purchase." (Dkt. 120, Joint Br. at 39); (<u>see id.</u> at 42) ("[T]he overwhelming majority of potential Class Members do not think that they have been injured because they are satisfied with their purchase.").  Defendants similarly contend that "a high proportion of uninjured potential Class Members lack standing."  (<u>Id.</u>).  Defendants' contentions are unpersuasive.

As an initial matter, the Ninth Circuit recently rejected the "argument that Rule 23 does not permit the certification of a class that potentially includes more than a de minimis number of uninjured class members." <u>Olean Wholesale Grocery Cooperative, Inc.</u>, 2022 WL 1053459, at *9. Further, defendants cite no authority supporting the proposition that plaintiffs' proposed model is incapable of measuring damages on a class-wide basis.  (<u>See</u>, <u>generally</u>, Dkt. 120, Joint Br. at 38-42).  More to the point, defendants' arguments misapprehend the alleged injury in this case, which is that class members were deceived into buying Cosequin based on misleading label claims, including the "Joint Health Supplement" that appeared on all Cosequin products purchased by the

putative class.[21] See, e.g., Mullins, 2016 WL 1535057, at *7 ("[Defendant's] advertising messages are the focus of the claims, not customer satisfaction, and therefore consumer satisfaction is irrelevant. . . . There is [] no need to examine whether consumers were satisfied with the product to find an injury."); Ries v. Arizona Beverages USA LLC, 287 F.R.D. 523, 536 (N.D. Cal. 2012) (finding that because "[a]ll of the proposed class members would have purchased the product bearing the alleged misrepresentations[,]" they had a "concrete injury under [California consumer protection laws] sufficient to establish Article III standing") (internal quotation marks omitted).

In short, the court is satisfied that plaintiffs have sufficiently shown that their proposed damages model is consistent with their theory of liability under Comcast. See, e.g., Bailey, 338 F.R.D. at 409 (Plaintiffs' proposed choice-based conjoint survey "seeks to measure the premium that consumers paid, on average, as a result of the allegedly misleading conduct at issue and is therefore directly tied to the theory of liability in the case.").

B.    Superiority.

"[T]he purpose of the superiority requirement is to assure that the class action is the most efficient and effective means of resolving the controversy." Wolin, 617 F.3d at 1175 (internal quotation marks omitted). To determine superiority, the court must look at

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

---

[21] To the extent defendants contend that plaintiffs' damages model cannot satisfy Comcast "because they have not run their damages models[,]" (Dkt. 120, Joint Br. at 39), defendants' argument is unfounded. "A plaintiff is not required to actually execute a proposed conjoint analysis to show that damages are capable of determination on a class-wide basis with common proof. . . . A plaintiff need only show that 'damages are capable of measurement' on a class-wide basis." Bailey, 338 F.R.D. at 408 n. 14 (quoting Comcast, 569 U.S. at 34, 133 S.Ct. at 1426) (citation and emphasis omitted); see Chavez, 268 F.R.D. at 379 (Plaintiffs "must present a likely method for determining class damages," but "it is not necessary to show that his method will work with certainty at this time.") (internal quotation marks omitted).

(C) the desirability or undesirability of concentrating the litigation of the claims

in the particular forum; and

(D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

Courts considering similar cases routinely find that the class action device is superior to other forms of adjudication.[22] See, e.g., Fitzhenry-Russell, 326 F.R.D. at 616 ("[A] class action is superior because in the absence of a class action, no individual plaintiff would file suit because the amounts at issue for each class member would likely be a few dollars."). If the court did not certify the proposed class, each plaintiff would have to litigate defendants' liability separately even though it could be established by common evidence using the objective reasonable consumer standard. However, because each class member's claim involves a relatively small sum of money, there is no doubt that litigation costs would render individual prosecution of such claims prohibitive. See, e.g., Carnegie v. Household Int'l, Inc., 376 F.3d 656, 661 (7th Cir. 2004) (noting that "[t]he realistic alternative to a class action is not 17 million individual suits, but zero individual suits" because of litigation costs) (emphasis in original); Valentino v. Carter-Wallace, Inc., 97 F.3d 1227, 1234-35 (9th Cir. 1996) ("A class action is the superior method for managing litigation if no realistic alternative exists."); see also Amchem Prods., Inc., 521 U.S. at 617, 117 S.Ct. at 2246 ("While the text of Rule 23(b)(3) does not exclude from certification cases in which individual damages run high, the Advisory Committee had dominantly in mind vindication of the rights of groups of people who individually would be without effective strength to bring their opponents into court at all.") (internal quotation marks omitted).

Finally, defendants did not identify any manageability issues that preclude establishing superiority.[23] (See, generally, Dkt. 120, Joint Br. at 45-47); (Dkt. 123, Supp. Opp. at 8-10); cf. 2

---

[22] Defendants have not identified or proposed a superior adjudication method. (See, generally, Dkt. 120, Joint Br.); (Dkt. 123, Supp. Opp.).

[23] Although defendants maintain that they are "not arguing lack of ascertainability[,]" they argue that plaintiffs cannot establish superiority because there is no evidence as to "the names of any putative class members (aside from Plaintiffs themselves)[,]" "how many of each of the challenged products each putative class member purchased (aside from Plaintiffs)[,]" and other information

1   Newberg on Class Actions § 4:73 (5th ed.) ("Two primary issues recur in courts' consideration of

2   the manageability of a proposed class action lawsuit – concern that a case will devolve into myriad

3   individual cases because of the salience of individual issues (i.e., that predominance is lacking)

4   and concern that a multi-state class will provoke complicated conflict of law questions rendering

5   management of a single trial impossible.").  The court previously addressed defendants'

6   contentions that there are "individualized questions [that] bear on the required elements of

7   plaintiffs' claims[,]" (see Dkt. 123, Supp. Opp. at 9), including whether "putative class members

8   interpreted the challenged statements in the same way as Plaintiffs." (Id.); see supra at § III.A.

9   Similarly, the court previously addressed defendants' assertion that "the majority of the class [was]

10   never [] exposed to the majority of the challenged claims," explaining that at least one of the

11   challenged claims did appear on all of the subject products. See supra at §§ II.B. & II.C. In short,

12   the court finds that "a class action is superior to other available methods for fairly and efficiently

13   adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

14                                 **CONCLUSION**

15       Based on the foregoing, IT IS ORDERED THAT:

16       1.  Plaintiffs' Motion for Class Certification **(Document No. 91)** is **granted** as set forth

17   above.  The court certifies the following class pursuant to Rule 23(b)(3) with respect to plaintiffs'

18   claim under the CLRA:

19              All persons residing in California who purchased during the limitations period

20              the following canine Cosequin products for personal use: Cosequin DS

21              Maximum Strength Chewable Tablets; Cosequin DS Maximum Strength Plus

22              MSM Chewable Tablets; and Cosequin DS Maximum Strength Plus MSM

23              Soft Chews.

24

25   that suggests plaintiffs are required to identify absent class members. (Dkt. 123, Supp. Opp. at

26   8-9). The Ninth Circuit has declined to require that plaintiffs "demonstrate that there is an
administratively feasible way to determine who is in the class." Briseno v. ConAgra Foods, Inc.,

27   844 F.3d 1121, 1124 (9th Cir. 2017); see Ries v. Arizona Beverages USA LLC, 287 F.R.D. 523,
535 (N.D. Cal. 2012) ("There is no requirement that the identity of class members be known at the

28   time of certification.") (cleaned up).

2. Excluded from the class are defendants, as well as its officers, employees, agents or affiliates, and any judge who presides over this action, as well as all of defendants' past and present employees, officers and directors.

3. The court hereby appoints Justin Lytle and Christine Musthaler as the representatives of the certified class.

4. The court hereby appoints Milberg Coleman Bryson Phillips Grossman, PLLC and Levin Papantonio Rafferty as class counsel.

5. Defendants' Motion to Exclude the Testimony of [] Bruce Silverman (**Document No. 109**) and Motion to Exclude the Opinions and Testimony of [] Dr. Jean Pierre Dubé (**Document No. 112**) are **denied**.

Dated this 6th day of May, 2022.

/s/
Fernando M. Olguin
United States District Judge